NOT YET SCHEDULED FOR ORAL ARGUMENT

**No. 23-5232**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Doc Society and International Documentary Association,

*Plaintiffs–Appellants,*

v.

Antony J. Blinken, in his official capacity as Secretary of State, and Alejandro N. Mayorkas, in his official capacity as Secretary of Homeland Security,

*Defendants–Appellees.*

---

On appeal from the United States District Court for the District of Columbia — No. 1:19-cv-03632 (Kelly, T.)

---

**JOINT APPENDIX — VOLUME I OF II (JA001–219)**

Carrie DeCell
Jameel Jaffer
Katie Fallow
Anna Diakun
Knight First Amendment
  Institute at Columbia
  University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
carrie.decell@knightcolumbia.org

Joshua Polster
Evan Gilbert
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
joshua.polster@stblaw.com

*Counsel for Plaintiffs–Appellants*
*(Additional counsel on next page)*

Faiza Patel
Emile Ayoub
Brennan Center for Justice
    at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
patelf@brennan.law.nyu.edu

Rachel Levinson-Waldman
    Brennan Center for Justice
    at NYU School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
Washington, D.C. 20036
(202) 249-7190
levinsonr@brennan.law.nyu.edu

*Counsel for Plaintiffs–Appellants*

# Table of Contents

**VOLUME 1**

Docket Entries ................................................................................JA001

Complaint (ECF No. 1), filed December 5, 2019 ...........................................JA010

Exhibit 1 to Defendants' Motion to Dismiss (ECF No. 31-2),
     filed April 15, 2020 ..............................................................JA045

Exhibit 2 to Defendants' Motion to Dismiss (ECF No. 31-3),
     filed April 15, 2020 ..............................................................JA057

Exhibit 3 to Defendants' Motion to Dismiss (ECF No. 31-4),
     filed April 15, 2020 ..............................................................JA061

Exhibit 4 to Defendants' Motion to Dismiss (ECF No. 31-5),
     filed April 15, 2020 ..............................................................JA065

Exhibit 5 to Defendants' Motion to Dismiss (ECF No. 31-6),
     filed April 15, 2020 ..............................................................JA067

Exhibit 6 to Defendants' Motion to Dismiss (ECF No. 31-7),
     filed April 15, 2020 ..............................................................JA070

Exhibit 7 to Defendants' Motion to Dismiss (ECF No. 31-8),
     filed April 15, 2020 ..............................................................JA072

Exhibit 8 to Defendants' Motion to Dismiss (ECF No. 31-9),
     filed April 15, 2020 ..............................................................JA096

Exhibit 9 to Defendants' Motion to Dismiss (ECF No. 31-10),
     filed April 15, 2020 ..............................................................JA121

Exhibit 10 to Defendants' Motion to Dismiss (ECF No. 31-11),
     filed April 15, 2020 ..............................................................JA124

Exhibit 11 to Defendants' Motion to Dismiss (ECF No. 31-12),
     filed April 15, 2020 ..............................................................JA127

**VOLUME II**

Exhibit 12 to Defendants' Motion to Dismiss (ECF No. 31-13),
    filed April 15, 2020 ...................................................................JA220

Exhibit 13 to Defendants' Motion to Dismiss (ECF No. 31-14),
    filed April 15, 2020 ...................................................................JA294

Exhibit 14 to Defendants' Motion to Dismiss (ECF No. 31-15),
    filed April 15, 2020 ...................................................................JA311

Order (ECF No. 66), filed August 11, 2023 ......................................JA332

Memorandum Opinion (ECF No. 67), filed August 11, 2023 ..........................JA333

Notice of Appeal (ECF No. 69), filed October 10, 2023 ................................JA373

APPEAL,CLOSED,STAYED,TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:19-cv-03632-TJK

DOC SOCIETY et al v. POMPEO et al
Assigned to: Judge Timothy J. Kelly
Case in other court: USCA, 23-05232
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 12/05/2019
Date Terminated: 08/11/2023
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of Agency
Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 12/05/2019 | 1 | COMPLAINT against MICHAEL R. POMPEO, CHAD F. WOLF ( Filing fee $ 400 receipt number ADCDC-6619108) filed by Doc Society, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons)(DeCell, Caroline) (Entered: 12/05/2019) |
| 12/05/2019 | 2 | NOTICE of Appearance by Jameel Jaffer on behalf of Doc Society, INTERNATIONAL DOCUMENTARY ASSOCIATION (Jaffer, Jameel) (Entered: 12/05/2019) |
| 12/06/2019 | | Case Assigned to Judge Timothy J. Kelly. (zrdj) (Entered: 12/06/2019) |
| 12/06/2019 | 3 | SUMMONS (2) Issued Electronically as to MICHAEL R. POMPEO, CHAD F. WOLF. (Attachments: # 1 Notice and Consent)(zrdj) (Entered: 12/06/2019) |
| 12/06/2019 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (DeCell, Caroline) (Main Document 4 replaced on 12/9/2019) (ztth). (Entered: 12/06/2019) |
| 12/06/2019 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Leena Charlton, Filing fee $ 100, receipt number ADCDC-6626338. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(DeCell, Caroline) (Entered: 12/06/2019) |
| 12/06/2019 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Anna Diakun, Filing fee $ 100, receipt number ADCDC-6626368. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(DeCell, Caroline) (Entered: 12/06/2019) |
| 12/06/2019 | 7 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Katie Fallow, Filing fee $ 100, receipt number ADCDC-6626393. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(DeCell, Caroline) (Entered: 12/06/2019) |
| 12/06/2019 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Rachel Levinson-Waldman, Filing fee $ 100, receipt number ADCDC-6626403. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(DeCell, Caroline) (Entered: 12/06/2019) |

| 12/06/2019 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Harsha Panduranga, Filing fee $ 100, receipt number ADCDC-6626410. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(DeCell, Caroline) (Entered: 12/06/2019) |
|---|---|---|
| 12/06/2019 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Faiza Patel, Filing fee $ 100, receipt number ADCDC-6626445. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(DeCell, Caroline) (Entered: 12/06/2019) |
| 12/09/2019 | | MINUTE ORDER granting 5 Motion for Leave to Appear *Pro Hac Vice*. Attorney Leena Charlton is hereby admitted *pro hac vice* to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions.** Signed by Judge Timothy J. Kelly on 12/9/2019. (lctjk3) (Entered: 12/09/2019) |
| 12/09/2019 | | MINUTE ORDER granting 6 Motion for Leave to Appear *Pro Hac Vice*. Attorney Anna Diakun is hereby admitted *pro hac vice* to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Timothy J. Kelly on 12/9/2019. (lctjk3) (Entered: 12/09/2019) |
| 12/09/2019 | | MINUTE ORDER granting 7 Motion for Leave to Appear *Pro Hac Vice*. Attorney Katie Fallow is hereby admitted *pro hac vice* to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Timothy J. Kelly on 12/9/2019. (lctjk3) (Entered: 12/09/2019) |
| 12/09/2019 | | MINUTE ORDER granting 8 Motion for Leave to Appear *Pro Hac Vice*. Attorney Rachel Levinson-Waldman is hereby admitted *pro hac vice* to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Timothy J. Kelly on 12/9/2019. (lctjk3) (Entered: 12/09/2019) |
| 12/09/2019 | | MINUTE ORDER granting 9 Motion for Leave to Appear *Pro Hac Vice*. Attorney Harsha Panduranga is hereby admitted *pro hac vice* to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Timothy J. Kelly on 12/9/2019. (lctjk3) (Entered: 12/09/2019) |
| 12/09/2019 | | MINUTE ORDER granting 10 Motion for Leave to Appear *Pro Hac Vice*. Attorney Fazia Patel is hereby admitted *pro hac vice* to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Timothy J. Kelly on 12/9/2019. (lctjk3) (Entered: 12/09/2019) |
| 12/17/2019 | 11 | NOTICE of Appearance by Harsha Panduranga on behalf of All Plaintiffs (Panduranga, Harsha) (Main Document 11 replaced on 12/19/2019) (ztth). (Entered: 12/17/2019) |
| 12/17/2019 | 12 | NOTICE of Appearance by Faiza Patel on behalf of All Plaintiffs (Patel, Faiza) (Main Document 12 replaced on 12/19/2019) (ztth). (Entered: 12/17/2019) |
| 12/17/2019 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MICHAEL R. POMPEO served on 12/11/2019 (DeCell, Caroline) (Entered: 12/17/2019) |
| 12/17/2019 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHAD F. WOLF served on 12/10/2019 (DeCell, Caroline) (Entered: 12/17/2019) |

| 12/18/2019 | 15 | NOTICE of Appearance by Leena M. Charlton on behalf of All Plaintiffs (Charlton, Leena) (Main Document 15 replaced on 12/19/2019) (ztth). (Entered: 12/18/2019) |
| --- | --- | --- |
| 12/18/2019 | 16 | NOTICE of Appearance by Anna Diakun on behalf of All Plaintiffs (Diakun, Anna) (Main Document 16 replaced on 12/19/2019) (ztth). (Entered: 12/18/2019) |
| 12/18/2019 | 17 | NOTICE of Appearance by Katherine Amy Fallow on behalf of All Plaintiffs (Fallow, Katherine) (Main Document 17 replaced on 12/19/2019) (ztth). (Entered: 12/18/2019) |
| 12/19/2019 | 18 | NOTICE of Appearance by Rachel Levinson-Waldman on behalf of All Plaintiffs (Levinson-Waldman, Rachel) (Main Document 18 replaced on 12/19/2019) (ztth). (Entered: 12/19/2019) |
| 12/19/2019 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 12/11/2019. (DeCell, Caroline) (Entered: 12/19/2019) |
| 12/19/2019 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 12/11/2019. Answer due for ALL FEDERAL DEFENDANTS by 2/9/2020. (DeCell, Caroline) (Entered: 12/19/2019) |
| 01/13/2020 | 21 | NOTICE of Appearance by Sarah Lynn Eichenberger on behalf of All Plaintiffs (Eichenberger, Sarah) (Entered: 01/13/2020) |
| 01/13/2020 | 22 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Paul C. Curnin, Filing fee $ 100, receipt number ADCDC-6728802. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Eichenberger, Sarah) (Entered: 01/13/2020) |
| 01/14/2020 | | MINUTE ORDER granting 22 Motion for Leave to Appear *Pro Hac Vice*. Attorney Paul C. Curnin is hereby admitted *pro hac vice* to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Timothy J. Kelly on 1/14/2020. (lctjk3) (Entered: 01/14/2020) |
| 01/16/2020 | 23 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MICHAEL R. POMPEO served on 1/10/2020 (DeCell, Caroline) (Entered: 01/16/2020) |
| 01/16/2020 | 24 | NOTICE of Appearance by Paul C. Curnin on behalf of DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Curnin, Paul) (Entered: 01/16/2020) |
| 01/17/2020 | 25 | NOTICE of Appearance by Nicholas P. Cartier on behalf of MICHAEL R. POMPEO, CHAD F. WOLF (Cartier, Nicholas) (Entered: 01/17/2020) |
| 01/29/2020 | 26 | Joint MOTION for Briefing Schedule by MICHAEL R. POMPEO, CHAD F. WOLF (Attachments: # 1 Text of Proposed Order)(Cartier, Nicholas) (Entered: 01/29/2020) |
| 01/31/2020 | | MINUTE ORDER granting 26 Joint Motion for Briefing Schedule. It is hereby ORDERED that Defendants shall file their response to Plaintiffs' complaint, which they have indicated will be a motion to dismiss, by March 2, 2020; Plaintiffs shall file their opposition to Defendants' Motion to Dismiss by April 2, 2020; and Defendants shall file their reply in support of their Motion to Dismiss by April 17, 2020. It is further ORDERED that any party seeking to submit an amicus brief shall move to do so, attaching its proposed brief as an exhibit to the motion, by April 3, 2020. Signed by Judge Timothy J. Kelly on 1/31/2020. (lctjk3) (Entered: 01/31/2020) |

| | | |
|---|---|---|
| 02/21/2020 | 27 | Consent MOTION for Briefing Schedule by MICHAEL R. POMPEO, CHAD F. WOLF (Attachments: # 1 Text of Proposed Order)(Cartier, Nicholas); Modified relief on 2/21/2020 (ztth). (Entered: 02/21/2020) |
| 02/21/2020 | | MINUTE ORDER granting Defendants' 27 Consent Motion to Amend Briefing Schedule. It is hereby ORDERED that Defendants shall file their response to Plaintiffs' complaint, which they have indicated will be a motion to dismiss, by March 16, 2020; Plaintiffs shall file their opposition to Defendants' Motion to Dismiss by April 16, 2020; and Defendants shall file their reply in support of their Motion to Dismiss by May 1, 2020. It is further ORDERED that amicus briefs shall be filed by April 17, 2020. Signed by Judge Timothy J. Kelly on 2/21/2020. (lctjk3) (Entered: 02/21/2020) |
| 03/11/2020 | 28 | Consent MOTION to Amend Briefing Schedule by MICHAEL R. POMPEO, CHAD F. WOLF (Attachments: # 1 Text of Proposed Order)(Cartier, Nicholas); Modified relief and text on 3/11/2020 (ztth). (Entered: 03/11/2020) |
| 03/12/2020 | | MINUTE ORDER granting Defendants' 28 Consent Motion to Amend Briefing Schedule. It is hereby ORDERED that Defendants shall file their response to Plaintiffs' complaint, which they have indicated will be a motion to dismiss, by April 1, 2020; Plaintiffs shall file their opposition to Defendants' Motion to Dismiss by May 13, 2020; and Defendants shall file their reply in support of their Motion to Dismiss by May 27, 2020. It is further ORDERED that amicus briefs shall be filed by May 14, 2020. Signed by Judge Timothy J. Kelly on 3/12/2020. (lctjk3) (Entered: 03/12/2020) |
| 03/13/2020 | | Set/Reset Deadlines: Answer due by 4/1/2020. (zkh) (Entered: 03/13/2020) |
| 03/24/2020 | 29 | NOTICE OF SUBSTITUTION OF COUNSEL by Nathan Michael Swinton on behalf of MICHAEL R. POMPEO, CHAD F. WOLF Substituting for attorney Nicholas P. Cartier (Swinton, Nathan) (Entered: 03/24/2020) |
| 03/24/2020 | 30 | Consent MOTION to Amend the Briefing Schedule by MICHAEL R. POMPEO, CHAD F. WOLF (Attachments: # 1 Text of Proposed Order)(Swinton, Nathan); Modified text and relief on 3/25/2020 (ztth). (Entered: 03/24/2020) |
| 03/24/2020 | | MINUTE ORDER granting Defendants' 30 Consent Motion to Amend Briefing Schedule. It is hereby ORDERED that Defendants shall file their response to Plaintiffs' complaint, which they have indicated will be a motion to dismiss, by April 15, 2020; Plaintiffs shall file their opposition to Defendants' Motion to Dismiss by May 27, 2020; and Defendants shall file their reply in support of their Motion to Dismiss by June 10, 2020. It is further ORDERED that amicus briefs shall be filed by May 28, 2020. Signed by Judge Timothy J. Kelly on 3/24/2020. (lctjk3) (Entered: 03/24/2020) |
| 04/15/2020 | 31 | MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim* by MICHAEL R. POMPEO, CHAD F. WOLF (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Text of Proposed Order)(Swinton, Nathan) (Entered: 04/15/2020) |
| 05/27/2020 | 32 | Memorandum in opposition to re 31 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim* filed by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Curnin, Paul) (Entered: 05/27/2020) |
| 05/28/2020 | 33 | NOTICE of Appearance by Patrick Joseph Carome on behalf of TWITTER, INC., REDDIT, INC., INTERNET ASSOCIATION (Carome, Patrick) (Entered: 05/28/2020) |
| 05/28/2020 | 34 | NOTICE of Appearance by Ari Holtzblatt on behalf of INTERNET ASSOCIATION, REDDIT, INC., TWITTER, INC. (Holtzblatt, Ari) (Entered: 05/28/2020) |

| | | |
|---|---|---|
| 05/28/2020 | 35 | Unopposed MOTION for Leave to File *Amici Curiae Brief in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss,*, by INTERNET ASSOCIATION, REDDIT, INC., TWITTER, INC. (Attachments: # 1 Exhibit A - (Proposed) Amici Curiae Brief, # 2 Text of Proposed Order)(Carome, Patrick) (Entered: 05/28/2020) |
| 05/28/2020 | 36 | NOTICE of Appearance by Matthew W. Callahan on behalf of MUSLIM ADVOCATES, T'ruah, AMERICAN FRIENDS SERVICE COMMITTEE, Reconstructionist Rabbinical Association (Callahan, Matthew) (Main Document 36 replaced on 5/29/2020) (ztth). (Entered: 05/28/2020) |
| 05/28/2020 | 37 | Unopposed MOTION for Leave to File *Amicus Brief of Faith-Based Organizations* by MUSLIM ADVOCATES (Attachments: # 1 Proposed Amicus Brief of Faith-Based Organizations, # 2 Text of Proposed Order)(Callahan, Matthew) (Entered: 05/28/2020) |
| 05/28/2020 | 38 | NOTICE of Appearance by Mitchell L. Stoltz on behalf of ELECTRONIC FRONTIER FOUNDATION (Stoltz, Mitchell) (Entered: 05/28/2020) |
| 05/28/2020 | 39 | MOTION for Leave to File *Amicus Brief* by ELECTRONIC FRONTIER FOUNDATION (Attachments: # 1 Amicus Brief, # 2 Certificate Rule LCvR 26.1, # 3 Proposed Order) (Stoltz, Mitchell) (Entered: 05/28/2020) |
| 05/29/2020 | | MINUTE ORDER granting the 35 Unopposed Motion for Leave to File Amici Curiae Brief. It is hereby ORDERED that the amicus curiae brief (ECF No. 35-1) shall be deemed filed as of May 28, 2020. Signed by Judge Timothy J. Kelly on 5/29/2020. (lctjk3) (Entered: 05/29/2020) |
| 05/29/2020 | | MINUTE ORDER granting the 37 Unopposed Motion for Leave to File Amicus Brief. It is hereby ORDERED that the amicus curiae brief (ECF No. 37-1) shall be deemed filed as of May 28, 2020. Signed by Judge Timothy J. Kelly on 5/29/2020. (lctjk3) (Entered: 05/29/2020) |
| 05/29/2020 | | MINUTE ORDER granting the 39 Consent Motion for Leave to File Amicus Brief. It is hereby ORDERED that the amicus curiae brief (ECF No. 39-1) shall be deemed filed as of May 28, 2020. Signed by Judge Timothy J. Kelly on 5/29/2020. (lctjk3) (Entered: 05/29/2020) |
| 05/29/2020 | 40 | AMICUS BRIEF by INTERNET ASSOCIATION, REDDIT, INC., TWITTER, INC. (ztth) (Entered: 05/29/2020) |
| 05/29/2020 | 41 | AMICUS BRIEF by MUSLIM ADVOCATES. (ztth) (Entered: 05/29/2020) |
| 05/29/2020 | 42 | AMICUS BRIEF by ELECTRONIC FRONTIER FOUNDATION. (ztth) (Entered: 05/29/2020) |
| 05/29/2020 | 43 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ELECTRONIC FRONTIER FOUNDATION. (ztth) (Entered: 05/29/2020) |
| 06/10/2020 | 44 | REPLY to opposition to motion re 31 MOTION to Dismiss for Lack of Jurisdiction *and for Failure to State a Claim* filed by MICHAEL R. POMPEO, CHAD F. WOLF. (Swinton, Nathan) (Entered: 06/10/2020) |
| 06/23/2020 | 45 | NOTICE OF SUPPLEMENTAL AUTHORITY by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Exhibit A)(Curnin, Paul) (Entered: 06/23/2020) |
| 06/26/2020 | 46 | STIPULATION *and [Proposed] Order* by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Curnin, Paul) (Entered: 06/26/2020) |
| 06/30/2020 | | MINUTE ORDER: Upon consideration of the parties' 46 stipulation, it is hereby ORDERED that Defendants are excused from complying with Local Rule 7(n)(1) at this |

| | | |
|---|---|---|
| | | time. It is further ORDERED that should the Court deny Defendants' motion to dismiss, Defendants shall comply with the mandates of Local Rule 7(n)(1) within thirty days of the Court's decision. Signed by Judge Timothy J. Kelly on 6/30/2020. (lctjk3) (Entered: 06/30/2020) |
| 07/13/2020 | 47 | RESPONSE re 45 NOTICE OF SUPPLEMENTAL AUTHORITY filed by MICHAEL R. POMPEO, CHAD F. WOLF. (Swinton, Nathan) (Entered: 07/13/2020) |
| 07/17/2020 | 48 | NOTICE OF SUBSTITUTION OF COUNSEL by Joseph John DeMott on behalf of All Defendants Substituting for attorney Nathan M. Swinton (DeMott, Joseph) (Entered: 07/17/2020) |
| 09/03/2020 | 49 | NOTICE OF WITHDRAWAL OF APPEARANCE as to DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. Attorney Leena M. Charlton terminated. (Charlton, Leena) (Entered: 09/03/2020) |
| 03/23/2021 | | MINUTE ORDER: Plaintiffs' 1 Complaint links the initiation of the registration requirement to Executive Order 13,780, which has recently been revoked. *See Proclamation on Ending Discriminatory Bans on Entry to the United States*, January 20, 2021. The Proclamation instructs the "Secretary of State and the Secretary of Homeland Security, in consultation with the Director of National Intelligence" to "provide to the President a report" containing "a review of the current use of social media identifiers in the screening and vetting process, including an assessment of whether this use has meaningfully improved screening and vetting, and recommendations in light of this assessment." *Id*. §§ 3, 3(d). The report is due within 120 days of the Proclamation, which is May 20, 2021. It is hereby ORDERED that this case is STAYED until further order of the Court. It is further ORDERED that the government shall file a status report by May 28, 2021, indicating whether it anticipates taking any action that moots the case. Signed by Judge Timothy J. Kelly on 03/23/2021. (lctkj3) (Entered: 03/23/2021) |
| 03/23/2021 | | Set/Reset Deadlines: Status Report due by 5/28/2021. (zkh) (Entered: 03/23/2021) |
| 03/23/2021 | | Case Stayed. (zkh) (Entered: 03/26/2021) |
| 04/23/2021 | 50 | NOTICE OF SUPPLEMENTAL AUTHORITY by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Exhibit A - Supporting Statement for Paperwork Reduction Act, # 2 Exhibit B - Notice of Office of Management and Budget Action)(Curnin, Paul) (Entered: 04/23/2021) |
| 05/28/2021 | 51 | STATUS REPORT by MICHAEL R. POMPEO, CHAD F. WOLF. (DeMott, Joseph) (Entered: 05/28/2021) |
| 07/01/2021 | 52 | Joint MOTION to Stay *Case for Additional 45 Days* by ANTONY BLINKEN, ALEJANDRO N. MAYORKAS. (DeMott, Joseph) (Entered: 07/01/2021) |
| 07/02/2021 | | MINUTE ORDER: Upon consideration of the parties' 52 Joint Motion to Stay Case for Additional 45 Days, it is hereby ORDERED that the 52 Motion is GRANTED. The stay in this case shall remain in place until August 16, 2021. It is further ORDERED that the parties shall file a joint status report by August 16, 2021. Signed by Judge Timothy J. Kelly on 07/02/2021. (lctjk3) (Entered: 07/02/2021) |
| 08/16/2021 | 53 | Joint STATUS REPORT by ANTONY BLINKEN, ALEJANDRO MAYORKAS. (DeMott, Joseph) (Entered: 08/16/2021) |
| 08/18/2021 | | MINUTE ORDER: Upon consideration of the parties' 53 Joint Status Report, it is hereby ORDERED that the stay in this case remain in place until October 18, 2021. It is further ORDERED that the parties shall file a joint status report by October 18, 2021. Signed by Judge Timothy J. Kelly on 08/18/2021. (lctjk3) (Entered: 08/18/2021) |

| 10/18/2021 | 54 | Joint STATUS REPORT by ANTONY BLINKEN, ALEJANDRO J. MAYORKAS. (DeMott, Joseph) (Entered: 10/18/2021) |
| 10/19/2021 | 55 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan Welber Falcn, Filing fee $ 100, receipt number ADCDC-8808267. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(DeCell, Caroline) (Entered: 10/19/2021) |
| 10/20/2021 | | MINUTE ORDER: It is hereby ORDERED that, within 30 days of any decision to implement a policy change that would moot or otherwise affect this case, Defendants shall file a status report so informing the Court. Signed by Judge Timothy J. Kelly on 10/20/2021. (lctjk3) (Entered: 10/20/2021) |
| 10/20/2021 | | MINUTE ORDER granting Plaintiffs' 55 Motion for Leave to Appear Pro Hac Vice. Attorney Evan Welber Falcon is hereby admitted pro hac vice to appear in this matter on behalf of Plaintiffs Doc Society and International Documentary Association. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions** Signed by Judge Timothy J. Kelly on 10/20/2021. (lctjk3) (Entered: 10/20/2021) |
| 10/22/2021 | 56 | NOTICE of Appearance by Evan Daniel Welber Falcon on behalf of All Plaintiffs (Welber Falcon, Evan) (Entered: 10/22/2021) |
| 10/22/2021 | 57 | NOTICE OF SUPPLEMENTAL AUTHORITY by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION (Attachments: # 1 Exhibit A - Supreme Court Decision)(Curnin, Paul) (Entered: 10/22/2021) |
| 02/11/2022 | 58 | NOTICE *REGARDING POLICY REVIEW AND RESPONSE* by ANTONY BLINKEN, ALEJANDRO J. MAYORKAS re 57 NOTICE OF SUPPLEMENTAL AUTHORITY (DeMott, Joseph) (Entered: 02/11/2022) |
| 02/11/2022 | 59 | RESPONSE re 57 NOTICE OF SUPPLEMENTAL AUTHORITY filed by ANTONY BLINKEN, ALEJANDRO J. MAYORKAS. (See Docket Entry 58 to view document. (ztth) (Entered: 02/11/2022) |
| 08/02/2022 | 60 | NOTICE OF WITHDRAWAL OF APPEARANCE as to DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. Attorney Harsha Panduranga terminated. (Panduranga, Harsha) (Entered: 08/02/2022) |
| 02/08/2023 | 61 | NOTICE OF SUBSTITUTION OF COUNSEL by Hannah Solomon-Strauss on behalf of All Defendants Substituting for attorney Joseph J. DeMott (Solomon-Strauss, Hannah) (Entered: 02/08/2023) |
| 07/06/2023 | 62 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Joshua Polster, Filing fee $ 100, receipt number ADCDC-10184595. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Declaration) (Baxley, Adrienne) (Entered: 07/06/2023) |
| 07/06/2023 | 63 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Emile Ayoub, Filing fee $ 100, receipt number ADCDC-10184876. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Declaration) (Baxley, Adrienne) (Entered: 07/06/2023) |
| 07/06/2023 | 64 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan Gilbert, Filing fee $ 100, receipt number ADCDC-10185310. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Declaration) (Baxley, Adrienne) (Entered: 07/06/2023) |

| | | |
|---|---|---|
| 07/06/2023 | 65 | Joint MOTION to Lift Stay by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(DeCell, Caroline) (Entered: 07/06/2023) |
| 07/06/2023 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 65 Joint MOTION to Lift Stay by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(DeCell, Caroline).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 7/13/2023. (zmrl) Modified on 7/14/2023 (zed). (Entered: 07/07/2023) |
| 07/07/2023 | | MINUTE ORDER granting Attorney Joshua Polster's 62 Motion for Admission *Pro Hac Vice*. It is hereby ORDERED that Attorney Joshua Polster is admitted *pro hac vice* to appear in this matter on behalf of Plaintiffs Doc Society and International Documentary Association. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Timothy J. Kelly on 7/7/2023. (lctjk3) (Entered: 07/07/2023) |
| 07/07/2023 | | MINUTE ORDER granting Attorney Emile Ayoub's 63 Motion for Admission *Pro Hac Vice*. It is hereby ORDERED that Attorney Emile Ayoub is admitted *pro hac vice* to appear in this matter on behalf of Plaintiffs Doc Society and International Documentary Association. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Timothy J. Kelly on 7/7/2023. (lctjk3) (Entered: 07/07/2023) |
| 07/07/2023 | | MINUTE ORDER granting Attorney Evan Gilbert's 64 Motion for Admission *Pro Hac Vice*. It is hereby ORDERED that Attorney Evan Gilbert is admitted *pro hac vice* to appear in this matter on behalf of Plaintiffs Doc Society and International Documentary Association. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Timothy J. Kelly on 7/7/2023. (lctjk3) (Entered: 07/07/2023) |
| 07/07/2023 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 64 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Evan Gilbert, Filing fee $ 100, receipt number ADCDC-10185310. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Declaration)(Baxley, Adrienne), 62 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Joshua Polster, Filing fee $ 100, receipt number ADCDC-10184595. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Declaration) (Baxley, Adrienne), 63 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Emile Ayoub, Filing fee $ 100, receipt number ADCDC-10184876. Fee Status: Fee Paid. by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (Attachments: # 1 Declaration)(Baxley, Adrienne).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. |

| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 7/14/2023. (zmrl) Modified on 7/14/2023 (zed). (Entered: 07/07/2023) |
|---|---|---|
| 08/11/2023 | 66 | ORDER granting in part and denying in part Defendants' 31 Motion to Dismiss and dismissing Plaintiffs' 1 Complaint with prejudice. See Order for details. This is a final, appealable Order. The Clerk of Court is directed to close the case. Signed by Judge Timothy J. Kelly on 8/11/2023. (lctjk3) (Entered: 08/11/2023) |
| 08/11/2023 | 67 | MEMORANDUM OPINION in support of 66 Order granting in part and denying in part Defendants' 31 Motion to Dismiss and dismissing Plaintiffs' 1 Complaint with prejudice. Signed by Judge Timothy J. Kelly on 8/11/2023. (lctjk3) (Entered: 08/11/2023) |
| 09/01/2023 | 68 | NOTICE OF WITHDRAWAL OF APPEARANCE as to DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. Attorney Evan Daniel Welber Falcon terminated. (Welber Falcon, Evan) (Entered: 09/01/2023) |
| 10/10/2023 | 69 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 67 Memorandum & Opinion, 66 Order on Motion to Dismiss/Lack of Jurisdiction, by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. Filing fee $ 505, receipt number ADCDC-10409735. Fee Status: Fee Paid. Parties have been notified. (DeCell, Caroline) (Entered: 10/10/2023) |
| 10/11/2023 | 70 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 69 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 10/11/2023) |
| 10/17/2023 | | USCA Case Number 23-5232 for 69 Notice of Appeal to DC Circuit Court, filed by DOC SOCIETY, INTERNATIONAL DOCUMENTARY ASSOCIATION. (znmw) (Entered: 10/18/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/19/2024 10:39:41 | | |
| **PACER Login:** | helenzhong | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-03632-TJK |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOC SOCIETY
20 Jay Street, Suite 1008
Brooklyn, NY 11201,

INTERNATIONAL DOCUMENTARY
ASSOCIATION
3470 Wilshire Boulevard, Suite 980
Los Angeles, CA 90010,

               Plaintiffs,

      v.

MICHAEL R. POMPEO, in his official
capacity as Secretary of State
2201 C Street, NW
Washington, D.C. 20520,

CHAD F. WOLF, in his official capacity as
Acting Secretary of Homeland Security
245 Murray Lane, SW, Mail Stop 0485
Washington, D.C. 20528-0485,

             Defendants.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Case No. ___**19-3632**___

## COMPLAINT

1.      This lawsuit challenges U.S. Department of State ("State Department") rules

requiring nearly all individuals who apply for U.S. visas from abroad to register their social media

identifiers with the U.S. government. These rules require an estimated 14.7 million visa applicants

each year to disclose on their application forms all social media identifiers, including

pseudonymous ones, they have used on any of twenty social media platforms during the preceding

five years (the "Registration Requirement"). The Registration Requirement applies even to those

with substantial connections to the United States, including to those already residing in the United

States who apply for new visas from abroad. The information collected through the Registration Requirement is retained in records systems of the State Department and U.S. Department of Homeland Security ("DHS"), shared within the U.S. government, and also disseminated, in some circumstances, to other governments. The Registration Requirement is the cornerstone of a far-reaching digital surveillance regime that enables the U.S. government to monitor visa applicants' constitutionally protected speech and associations not just at the time they apply for visas, but even after they enter the United States.

2.      The Registration Requirement violates the expressive and associational rights of visa applicants by compelling them to facilitate the government's access to what is effectively a live database of their personal, creative, and political activities online. As the Supreme Court has observed, social media platforms are now among the "most important places . . . for the exchange of views." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Billions of people from around the world use social media to share information and opinions across borders, petition government officials, and advocate for social, religious, and political change. With access to visa applicants' social media identifiers, the government can develop a detailed picture of their political and religious views; map their professional, political, and other networks; and closely track their speech and associations in real time.

3.      The Registration Requirement, along with related retention and dissemination policies, chills protected speech. Because of the requirement and related policies, some visa applicants who would otherwise use social media to speak to others, and to share their views about personal or political topics, refrain from doing so or publicly share less than they otherwise would. The implications of the Registration Requirement are especially significant for those who use pseudonymous identifiers. Many people use pseudonyms on social media so that they can speak

anonymously about sensitive or controversial issues, and so that they can shield themselves or their families or associates from possible reprisals by state or private actors. The Registration Requirement effectively conditions their eligibility for U.S. visas on their readiness to surrender their online anonymity.

4.    Plaintiffs Doc Society and the International Documentary Association ("IDA") bring this challenge because the Registration Requirement and related retention and dissemination policies violate their rights as well as the rights of their members and partners inside and outside the United States. Doc Society and IDA are U.S.-based documentary film organizations that regularly collaborate with non-U.S. filmmakers and other partners, including by inviting them to screen and discuss their work in the United States. For example, Doc Society hosts "Good Pitch" events throughout the year to facilitate filmmaking partnerships and launch social justice impact campaigns while raising funds to support these efforts. Similarly, IDA's "Getting Real" conference brings hundreds of filmmakers from around the world together in Los Angeles to share their skills and their stories with each other.

5.    Many of Plaintiffs' members and partners use social media to show their work; draw attention to human rights abuses; connect with other filmmakers, artists, and advocates; and engage with the same social and political issues that they address in their films. The Registration Requirement has a significant chilling effect on their use of social media, especially for political speech. Plaintiffs' members and partners who anticipate applying for U.S. visas must consider the risk that a U.S. official will misinterpret their speech on social media, impute others' speech to them, or subject them to additional scrutiny or delayed processing because of the views they or their contacts have expressed. Those who use pseudonymous identifiers must take into account that they will have to relinquish their online anonymity to U.S. officials when they submit their

visa applications, and they must also consider the risk that U.S. officials will disclose their social media identifiers to foreign governments, reveal the identifiers inadvertently, or fail to protect the identifiers from third parties who might access them unlawfully. In recent months, authoritarian and other rights-abusing regimes, including some U.S. allies, have used information gleaned from social media to identify, locate, and detain human rights advocates, journalists, and political dissidents—and even, in some instances, to have them killed.

6.     Because of the Registration Requirement, some of Plaintiffs' members and partners now use social media more cautiously, use it less, or no longer use it at all for speech that could be construed as controversial or political. In addition, some of Plaintiffs' members and partners who had considered applying for visas to visit or work in the United States have decided against doing so to avoid having to surrender their social media identifiers to the U.S. government and submit to indefinite surveillance of their speech and associations. The Registration Requirement impairs their professional activities, including their ability to collaborate with Plaintiffs. Plaintiffs' members and partners cannot challenge the Registration Requirement themselves, however, because doing so would require them to give up the very anonymity or obscurity that they seek to protect.

7.     The Registration Requirement, along with related retention and dissemination policies, also directly infringes Plaintiffs' expressive and associational rights, as well as those of their members, partners, and audiences here in the United States. The requirement burdens Plaintiffs' ability to discover and spotlight the work of non-U.S. members and partners and to learn about issues confronting their filmmaking communities. It also deprives Plaintiffs' U.S. members and partners of the opportunity to hear the speech that non-U.S. members and partners otherwise would have shared on social media. Additionally, because some will no longer apply for visas to

come to the United States, the requirement limits which non-U.S. members and partners the Plaintiff organizations can include in their flagship events, thereby compromising their ability to promote those events and their organizations, and depriving their U.S. members, partners, and audiences of the opportunity to engage with those foreign filmmakers and other partners in person in the United States.

8.      While the implications of the Registration Requirement for individual rights are profound, the requirement is not necessary to serve the government's legitimate interests in adjudicating visa applications, enforcing the immigration laws, or protecting national security. In adopting the Registration Requirement, the State Department cited no evidence that it is likely to be an effective, let alone necessary, means of serving those interests. Indeed, the State Department disregarded contrary evidence in the administrative record, including public comments explaining the difficulties of interpreting social media information across different languages, customs, and cultural norms, and public comments highlighting DHS's documented failures in establishing the usefulness of screening social media information in connection with visa eligibility determinations.

9.      As described further below, the Registration Requirement violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), because it exceeds the Secretary of State's authority under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, because it is contrary to constitutional right, and because it is arbitrary and capricious. The Registration Requirement, as well as related retention and dissemination policies, also violates the First Amendment to the U.S. Constitution. Plaintiffs respectfully request that the Court declare the Registration Requirement and related retention and dissemination policies to be unlawful, and enjoin the government from enforcing or relying on them. While Plaintiffs acknowledge that there

may be circumstances in which the government could lawfully investigate specific visa applicants' use of social media on the basis of individualized concerns of fraud or other wrongdoing, a mandate that requires nearly all visa applicants to register their social media identifiers, including pseudonymous ones, and that enables continuing surveillance of their speech and associations, even after they enter the country, cannot be reconciled with Defendants' statutory authority or the Constitution.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiffs' constitutional and federal statutory claims pursuant to 28 U.S.C. § 1331. The Court also has jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. § 702.

11.     This Court has authority to issue declaratory and injunctive relief pursuant to 5 U.S.C. § 706, 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers. The Court has authority to award costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (e)(1).

## PARTIES

### *Plaintiffs*

13.     Plaintiff Doc Society is a non-profit organization committed to supporting documentary filmmakers and connecting them with global audiences. Doc Society is based in New York, New York, and London, England.

14.     Plaintiff International Documentary Association ("IDA") is a non-profit, membership-based association of documentary filmmakers. IDA is based in Los Angeles, California.

## *Defendants*

15.      Defendant Michael R. Pompeo is the Secretary of State. The State Department is an agency of the federal government of the United States located in Washington, D.C. Defendant Pompeo has authority over all State Department policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

16.      Defendant Chad F. Wolf is the Acting Secretary of Homeland Security. DHS is an agency of the federal government of the United States located in Washington, D.C. Defendant Wolf has authority over all DHS policies and practices, including those challenged here. Plaintiffs sue him in his official capacity.

## FACTUAL BACKGROUND

### *U.S. Visa Applications*

17.      The INA requires applicants for immigrant and nonimmigrant visas to submit certain information in order to establish their identities and their eligibility for the visas they seek. The INA provides that an applicant for an *immigrant* visa must submit:

> his full and true name, and any other name which he has used or by which he has been known; age and sex; the date and place of his birth; and such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

8 U.S.C. § 1202(a). The INA provides that an applicant for a *nonimmigrant* visa must submit:

> his full and true name, the date and place of birth, his nationality, the purpose and length of his intended stay in the United States; his marital status; and such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

*Id.* § 1202(c).

18.      State Department regulations elaborate on the INA's visa application requirements,

specifying the forms that visa applicants must submit and authorizing consular officers to require applicants to answer questions or provide additional information as necessary to determine their visa eligibility.

19.     With respect to *immigrant* visas, State Department regulations require applicants to submit Form DS-260, the Electronic Application for Immigrant Visa and Alien Registration. 22 C.F.R. § 42.63(a)(1). Form DS-260 poses a series of specific questions that directly relate to the applicant's identity and eligibility for a visa, including questions regarding the applicant's family, health, travel, work history, and criminal history, as well as questions related to national security.

20.     The State Department's regulations provide that immigrant visa applicants may be required to provide additional information if necessary to verify their identities or to determine their visa eligibility. Specifically, the regulations provide that consular officers "may require the submission of additional information or question the [applicant] on any relevant matter whenever the officer believes that the information provided in . . . Form DS-260 is inadequate to determine the [applicant's] eligibility to receive an immigrant visa." *Id.* § 42.63(c).

21.     With respect to *nonimmigrant* visas, State Department regulations require applicants to submit Form DS-160, the Online Application for Nonimmigrant Visa. *Id.* § 41.103(a)(1). Like Form DS-260, Form DS-160 poses a series of questions directly relating to the applicant's identity and eligibility for a visa, including questions regarding the applicant's family, health, travel, work history, and criminal history, as well as questions related to national security.

22.     The State Department's regulations provide that nonimmigrant visa applicants may be required to provide additional information if necessary to verify their identities or to determine their visa eligibility. Most applicants are required to appear for a personal interview, at which they

must "provide a biometric, which will serve to authenticate identity and additionally verify the accuracy and truthfulness of the statements in the application at the time of interview." *Id.* § 41.103(b)(2). The regulations further provide that a consular officer "may require the submission of additional necessary information or question an [applicant] on any relevant matter whenever the consular officer believes that the information provided in the application is inadequate to permit a determination of the [applicant's] eligibility to receive a nonimmigrant visa." *Id.*

23.     Regardless of nationality and with only narrow exceptions, all individuals applying from abroad for immigrant visas must complete Form DS-260, and all individuals applying from abroad for nonimmigrant visas must complete Form DS-160. For a variety of reasons, it is common for non-citizens who live in the United States to apply for new visas, or to renew their existing visas, from abroad. To the extent they do this, they, too, are required to submit Form DS-260 or Form DS-160, as applicable.

*The Registration Requirement*

24.     In recent years, federal agencies have experimented with the use of social media surveillance for visa-related purposes. In December 2015, for example, DHS established a task force to test the effectiveness of social media screening in assessing the eligibility of certain visa applicants and nonimmigrant visa holders through pilot programs conducted by U.S. Citizen and Immigration Services ("USCIS"), Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP"). In February 2017, however, the DHS Inspector General reported that these pilot programs had failed to establish that social media screening was an effective tool for screening visa applicants or identifying national security threats and thus were an inadequate basis on which to build broader initiatives.

25.     Notwithstanding the lack of evidence demonstrating the effectiveness of social

9

media screening for visa-related purposes, the State Department subsequently introduced the Registration Requirement as part of a broader effort to implement President Trump's so-called "extreme vetting" program. On March 6, 2017, President Trump issued an executive order and signed a memorandum directing the Secretary of State and other Cabinet officials to implement procedures for the "enhanced" vetting of applications for visas and other immigration benefits. *See* Executive Order 13,780, 82 Fed. Reg. 13,209, 13,215 (Mar. 9, 2017) (signed Mar. 6, 2017); Memorandum for the Secretary of State, the Attorney General, and the Secretary of Homeland Security, 82 Fed. Reg. 16,279, 16,279 (Apr. 3, 2017) (signed Mar. 6, 2017). Citing President Trump's March 6, 2017 executive order and memorandum, the State Department proposed the Registration Requirement in two notices issued on March 30, 2018. 60-Day Notice of Proposed Information Collection: Application for Immigrant Visa and Alien Registration, 83 Fed. Reg. 13,806 (Mar. 30, 2018); 60-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa, 83 Fed. Reg. 13,807 (Mar. 30, 2018).

26. The March 2018 notices received over ten thousand public comments, the vast majority of which opposed the Registration Requirement. Over six thousand comments raised concerns that the new requirement would undermine the freedoms of speech, expression, and association, invade individuals' privacy, or deter travel to the United States. Additionally, hundreds of comments highlighted evidence showing that social media communications are difficult, if not impossible, to interpret accurately—especially in the context of foreign languages and cultures. Relying on the government's own reports, many comments observed that social media screening is an ineffective and unreliable means of verifying individuals' identities, confirming their eligibility for visas, and assessing any threat they might pose to national security. Only eighty-seven comments expressed support for the Registration Requirement.

27.     The State Department nonetheless updated Form DS-260 and Form DS-160 to include the Registration Requirement on May 31, 2019. In its final supporting statements, the State Department wrote that the Registration Requirement would enable consular officers, in coordination with State Department officials and other federal agencies, to confirm applicants' identities and determine their visa eligibility under U.S. law. Despite a conclusory statement that visa applicants' social media information "is necessary to make these determinations," however, the State Department cited no evidence indicating that social media screening of the kind made possible by the Registration Requirement is a reliable means of identifying visa applicants or determining their visa eligibility. Nor did the State Department explain the necessity of imposing the Registration Requirement on millions of visa applicants each year whose identification and eligibility determinations pose no difficulties for consular officers. Nor did the State Department explain why the retention of visa applicants' social media information *beyond* their visa eligibility determinations is necessary for those purposes.

28.     Since the Registration Requirement took effect, nearly all individuals applying for U.S. visas from abroad have been compelled to disclose on Form DS-260 or Form DS-160, as applicable, all social media identifiers they have used on the following social media platforms in the five years preceding their applications: Facebook, Flickr, Google+, Instagram, LinkedIn, Myspace, Pinterest, Reddit, Tumblr, Twitter, Vine, and YouTube; the Chinese sites Douban, QQ, Sina Weibo, Tencent Weibo, and Youku; the Russian social network VK; the Belgian site Twoo; and the Latvian site Ask.fm. Applicants are also asked to provide identifiers they have used on other, non-listed platforms if they "wish" to do so.

29. The Registration Requirement appears on Form DS-260 as follows:



30. The Registration Requirement appears on Form DS-160 as follows:



31. The Registration Requirement is mandatory and makes no exception for applicants who use pseudonymous social media identifiers. The State Department has made clear that visa applicants who have used any of the social media platforms listed on Form DS-260 or Form DS-

160 in the preceding five years are required to provide the associated social media identifiers on the application form, and that failure to provide complete and truthful responses to visa application questions may result in denial of a visa.

32.     The Registration Requirement applies nearly universally, with only a few narrow exceptions for, *e.g.*, diplomatic and official travelers. It applies even in contexts in which consular officers do not need any additional information, including social media information, to confirm applicants' identities or determine their visa eligibility. The State Department has estimated that the Registration Requirement applies to more than 14 million applicants each year.

33.     The Registration Requirement makes no exception for applicants who have established significant voluntary connections to the United States. The requirement applies to those who reside in the United States but renew their visas or apply for new ones from abroad; those who have pursued undergraduate or graduate degrees in the United States; those who have worked for years in the United States and who hope to continue their careers in the United States; and those with extensive familial connections to the United States.

### *Retention and Dissemination of Visa Applicants' Social Media Information*

34.     State Department and DHS policies contemplate that information collected through the Registration Requirement will be retained indefinitely, disseminated widely within the U.S. government, and, in some circumstances, disclosed to foreign governments. For example:

35.     The State Department stores information collected through the Registration Requirement in its Consular Consolidated Database ("CCD"), which contains the agency's visa records system. In addition to the State Department, agencies that can access the visa records system for a wide range of purposes include DHS, the U.S. Department of Justice, the U.S. Department of Defense, and the U.S. Department of Commerce. The State Department also makes

information from the visa records system available in certain circumstances to Congress; to state, local, and tribal government officials; and to foreign governments.

36.     DHS maintains copies of the State Department's nonimmigrant and immigrant visa data stored in the CCD in its own Automated Targeting System ("ATS"), a system of records that "allows users to search data across many different databases and systems to provide a consolidated view of data about a person or entity." U.S. Dep't of Homeland Security, DHS/CBP/PIA-006(e), Privacy Impact Assessment Update for the Automated Targeting System 1 (Jan. 13, 2017). DHS sometimes discloses information in ATS to other agencies, as well as to foreign governments. At least seventy-eight foreign governments may obtain information from ATS pursuant to Customs Mutual Assistance Agreements.

37.     On information and belief, DHS retains social media information collected through the Registration Requirement in the Alien File, Index, and National File Tracking System of Records. This system of records houses individuals' "official immigration record[s]," called "A-Files," for 100 years after their dates of birth, at which point the records are archived. DHS uses the data stored in A-Files to facilitate the administration of immigration benefits and determination of employment eligibility, among other purposes. In September 2017, DHS issued a System of Records Notice in the Federal Register indicating that A-Files include "social media handles, aliases, associated identifiable information, and search results." U.S. Dep't of Homeland Security System of Records Notice, 82 Fed. Reg. 43,556, 43,557 (Sept. 18, 2017). DHS policy permits the dissemination of A-File information not only to other DHS components with a "need to know" the information, but also to "appropriate Federal, State, local, tribal, territorial, foreign, or international government agencies," and to current and prospective employers, among other third parties. *Id.* at 43,558, 43,562.

38.     On information and belief, Defendants and their components rely on information collected through the Registration Requirement to monitor visa applicants' social media activities even after they enter the United States. For example, ICE recently launched a program to monitor the social media activities of visa holders and applicants for immigration benefits. In May 2018, ICE announced that it would seek to hire about 180 people to monitor the social media activity of 10,000 people per year.

## PLAINTIFFS

39.     Plaintiffs are U.S.-based documentary film organizations that carry out their missions by producing conferences, screenings, filmmaking labs, and film projects in close collaboration with filmmakers and other partners from around the world. Plaintiffs bring this suit on behalf of (i) themselves; (ii) their non-U.S. members and partners who have applied for U.S. visas since the Registration Requirement went into effect; who intend to apply for U.S. visas in the near future; or who will no longer apply for U.S. visas because of the Registration Requirement; and (iii) their U.S. members, partners, and audiences who wish to engage with their non-U.S. members and partners online or in person.

### *Plaintiffs and their Members and Partners*

40.     Founded in 2005, Doc Society seeks to enable the creation of documentary films that drive social change and to connect those films to global audiences. Doc Society accomplishes its mission by partnering with filmmakers, activists, foundations, philanthropists, and policymakers around the world. Doc Society provides its partners with funding for film projects, educational and promotional resources, and cross-sector networking opportunities at forums hosted all over the world. For example, Doc Society hosts "Good Pitch" events throughout the year to connect filmmakers with potential funders and supporters in order to forge coalitions and

campaigns that will drive change. To date, Good Pitch events have featured over 130 film projects from sixty different countries. Over 5,137 organizations have participated in these events, leading to more than 1,700 partnerships and 119 social justice impact campaigns. All told, Good Pitch events have raised $30 million over the past ten years. Doc Society also recognizes documentary films that have had significant and measurable social impact with its "Doc Impact Hi5" awards program. Through the Doc Impact Hi5 awards, Doc Society seeks to engage new fans with the selected films; to attract new partners for the films' social impact campaigns; and to share best practices for social impact campaigns with Doc Society's community.

41.     Founded in 1982, IDA is a non-profit organization whose mission is to support a global community of documentary filmmakers in order to foster a more informed, compassionate, and connected world. Its community of filmmakers includes over 2,700 dues-paying members across fifty-three countries. In service of its mission, IDA funds films and filmmakers and hosts dozens of screenings, conferences, workshops, and other events throughout the United States each year. In the past year alone, IDA organized over thirty events in Los Angeles, New York City, and Austin. These events included workshops on grant writing, new technologies, and legal issues; a conversation series with renowned documentary filmmakers; awards events; and film screenings. Every two years, IDA partners with the Academy of Motion Picture Arts and Sciences to host the "Getting Real" conference, where peers throughout the documentary field share skills and information and build networks to help accelerate their careers and amplify their stories. Each year, IDA holds the IDA Documentary Awards ceremony in Los Angeles to recognize outstanding documentary films. Building international bridges across the documentary community through in-person interactions at these events and online interactions beyond these events is central to IDA's mission.

42. Many of Plaintiffs' non-U.S. members and partners had plans to come to the United States, or have plans to come to the United States in the near future, to take advantage of professional or educational opportunities, including collaborating with Plaintiffs or participating in Plaintiffs' events. These members and partners are nationals of, among other countries, Australia, Canada, Chile, Denmark, England, Finland, India, Kenya, Palestine, Mexico, Spain, and Turkey. A number of these members and partners intend or intended to apply for O-1 visas as artists of extraordinary ability or for I visas as representatives of the foreign media. Some of them have recently applied or are currently applying for U.S. visas.

43. Many of Plaintiffs' non-U.S. members and partners have substantial connections to the United States. Some already live in the United States but must renew their visas to continue their lives and their work here. Some have family members in the United States. Some have spent several years pursuing arts, journalism, or other degrees at U.S. universities. Others have significant work experience in the United States, shooting films on social or human rights issues or participating in artist residency programs. As a result of their work, many have built personal and professional networks within the United States.

44. Plaintiffs' U.S. members and partners benefit from their close collaborations with non-U.S. members and partners. Often, the success of these collaborations turns on the ability of Plaintiffs' U.S. members and partners to meet with Plaintiffs' non-U.S. members and partners in person. IDA's U.S. members often work with members from other countries. For example, IDA is currently funding a film set in Zimbabwe by a Danish directing team working with a U.S. producer. And the 2019 IDA Documentary Awards will honor Syrian filmmaker Waad al-Kateab with the Courage Under Fire Award for her film documenting the siege of Aleppo, which was a United States, United Kingdom, and Syrian co-production for the Public Broadcasting Service and UK

Channel 4. Based on Doc Society's experience working to generate support for documentary film projects, it understands that such support depends on documentary filmmakers' ability to build rapport with potential funders or activists who share the filmmakers' objectives, for which there is no acceptable substitute to uninhibited, face-to-face discussion.

45.     Plaintiffs' U.S. members and partners, as well as their U.S. audiences, participate in Plaintiffs' events and attend Plaintiffs' screenings so that they can hear from and engage with non-U.S. members and partners in person. Plaintiffs and their U.S. members, partners, and audiences thus depend on the willingness and ability of non-U.S. members and partners to travel to the United States and attend these programs.

### *Use of Social Media by Plaintiffs and Their Members and Partners*

46.     Social media is an indispensable research, education, and communication tool for Plaintiffs. Plaintiffs rely on social media to discover new projects and partners, promote their events, share resources with filmmakers, and announce available funding for new film projects.

47.     Doc Society uses social media to learn about the work of filmmakers, advocates, activists, and other partners in order to inform its decisions about whom to invite to its events and about what kind of programming to offer. Doc Society also uses Twitter, Instagram, and Facebook to provide live coverage of its events and disseminate information to its broader community. It regularly conducts searches on these platforms to identify potential supporters for its films or programs. It also uses these platforms to amplify the messages of others, including filmmakers Doc Society has previously supported and individuals and organizations whose aims Doc Society shares.

48.     Similarly, IDA uses Twitter, Facebook, LinkedIn, YouTube, and Instagram to communicate with its members around the world. On these platforms, IDA researches issues

impacting filmmakers, issues calls for action to protect filmmakers in jeopardy, provides information about resources available to filmmakers, promotes its grantees' films, and facilitates interactions between its members.

49.     Plaintiffs' U.S. members and partners, as well as their U.S. audiences, likewise rely on social media to learn about new projects from filmmakers working around the world and to engage with Plaintiffs' non-U.S. members and partners about their work. Plaintiffs and their U.S. members, partners, and audiences thus depend on the willingness of non-U.S. members and partners to share information and interact with others on social media.

50.     In turn, Plaintiffs' non-U.S. members and partners engage on social media in a near-constant, cross-platform exchange of views and information. They use social media to share and promote their work; meet and network with other artists, activists, journalists, film subjects, funders, and policymakers; engage in debate on political and social issues, especially issues related to their work; and raise awareness about those issues. One IDA member, for example, uses social media to make people aware of important issues addressed in her work—focused on social issues with particular impact on women and children—as well as to connect with other people in the documentary film industry. Another IDA member who engages with political activists and filmmakers in the Middle East and North Africa has used social media in connection with political demonstrations. Doc Society's partners often use social media to build coalitions and campaigns for social impact issues, including issues related to human rights. One Doc Society partner who earned her undergraduate degree in the United States uses social media to remain engaged with U.S. domestic issues, such as mass incarceration and the Black Lives Matter movement, as well as to communicate with professional contacts and to promote her work.

51.     Some of Plaintiffs' members and partners use pseudonymous identifiers to protect

their identities, their associations, or their speech on social media. One Doc Society partner, for example, has used pseudonymous social media accounts to conduct sensitive research for a film about Nazis online, including joining discussion groups and contacting members of known Nazis' families. An IDA member from Syria uses pseudonymous accounts as a safety measure against political persecution. At least three other IDA members use pseudonymous accounts to share their views on political and social issues: one uses pseudonymous accounts to express solidarity with political protests in his home country; another uses pseudonymous social media identifiers to anonymously discuss concerns about the Trump administration, as well as to discuss various other political issues such as gun laws, abortion rights, and the selection of Supreme Court justices; and another engages on YouTube and other public forums anonymously to minimize the risk of stalking or other threatening behavior.

### *Burdens on the Speech and Association of Plaintiffs' Non-U.S. Members and Partners*

52.    The Registration Requirement, together with related retention and dissemination policies, directly burdens the speech and association of Plaintiffs' non-U.S. members and partners by compelling them to disclose their social media identifiers, thereby subjecting their online expressive activities to government surveillance of indefinite scope and duration.

53.    The Registration Requirement also deprives Plaintiffs' non-U.S. members and partners who use pseudonymous social media identifiers of their online anonymity and associational privacy. These filmmakers have no choice but to identify themselves to the U.S. government in connection with their speech and associations on social media if they apply for U.S. visas from abroad. In public comments opposing the Registration Requirement, Twitter emphasized that one of the platform's "hallmarks is that users may engage in anonymous speech to express opinions that may be challenging or unpopular, or to otherwise comment on issues without fear of reprisal." Twitter, Inc., Comment Letter on Proposed Information Collection:

Application for Nonimmigrant Visa (May 28, 2018), https://perma.cc/9NGU-8YAV. If visa applicants "are forced to disclose Twitter handles associated with otherwise anonymous accounts," Twitter's comments stated, "the value of Twitter's platform for such users evaporates," which "chills global conversation and negatively impacts the utility and value of Twitters [sic] platform for all users." *Id.*

54. The Registration Requirement results in significant self-censorship. Because the Registration Requirement is mandatory and nearly universally applicable, Plaintiffs' non-U.S. members and partners know that their speech and associations will be subject to review in connection with their visa applications and potentially to ongoing monitoring by the U.S. government. In addition, some of Plaintiffs' non-U.S. members and partners also fear that their political speech and associations on social media may subject them to additional scrutiny or delays in the processing of their visa applications. As a result, many of Plaintiffs' non-U.S. members and partners now refrain from expressing themselves and engaging with others on social media as freely as they once did.

55. Many of Plaintiffs' non-U.S. members and partners have deleted past posts, altered or limited their speech, or entirely dropped out of certain groups on social media. Because of the Registration Requirement, one IDA member currently residing in the U.S. Midwest reviewed three years of social media activity and deleted posts criticizing the current U.S. administration in order to avoid any delays on future visa applications. One Doc Society partner now avoids posting original political content on social media, instead limiting her social media activity to sharing non-original content, out of concern that her speech on social media could result in visa-processing delays that would prevent her from attending workshops or events in the United States and compromise her ability to continue partnering with U.S. funders and collaborators. Others among

Plaintiffs' non-U.S. members and partners have stopped posting or commenting on political or social issues entirely. Concerned that their political views will be used against them during the visa process, they self-censor to avoid being associated with controversial ideas or sensitive topics. A Doc Society partner who has shot two films and attended multiple film festivals in the United States applied for an I visa one week after the Registration Requirement took effect in the hope of continuing his work in the United States. Because of the Registration Requirement, he has all but stopped expressing his views and interacting with others on social media, though he previously used social media to promote his projects and to share his political views.

56.     Some of Plaintiffs' members and partners are no longer applying for U.S. visas—and are forgoing personal, educational, and professional opportunities—because they do not want to disclose their social media identifiers to Defendants and fear the consequences of doing so. Because of the Registration Requirement, one IDA member has decided not to accept future work in the United States despite significant past work experience as a journalist here. Likewise, a Turkish IDA member who is currently working on a documentary project with U.S. partners abroad has decided against applying for a U.S. visa, though visiting the United States would allow him to deepen his collaboration with his U.S. partners.

57.     The Registration Requirement's chilling effects stem in part from the risk that U.S. officials will misinterpret visa applicants' social media activity. In light of this risk, a Doc Society partner who recently applied for a J-1 visa under the new Registration Requirement reviewed two years' worth of Twitter posts, deleting posts that were critical of U.S. policy and might be misconstrued by U.S. officials. Other filmmakers have also stopped posting or commenting on any content about American politics or President Trump's administration for the same reason. This risk of misinterpretation is significant. An individual's expressive activity on social media may

include posts tailored for particular audiences, and may fail to accurately portray their age, physical attributes, profession, beliefs, or other characteristics. Social media posts can be prohibitively difficult to interpret without a nuanced understanding of the context in which they were made. Interpreting these posts is particularly challenging when the content comes from different countries, appears in different languages, and has meanings informed by layers of regional, cultural, and societal norms. And the fact that so much activity on social media consists of non-verbal actions—sharing others' posts, joining groups, using icons or buttons to "like" or express other attitudes towards others' posts, etc.—makes the interpretive task yet more challenging. When an individual reacts with an "angry" emoji to a Facebook post critical of a public official, for example, it may be unclear whether the individual is expressing anger at the public official or at the criticism of the public official. Reliance on automated review tools further exacerbates the risk of misinterpretation. Even the best natural language processing tools, which are used to determine the meaning of text, misinterpret speech 20 to 30 percent of the time. According to recent reports, USCIS instructs officers to screen refugees' social media posts using commonly available translation tools such as Google Translate, which Google itself cautions is not intended to replace human translators, given its inability to interpret slang or idiomatic language and its inability to convey nuance, among other shortcomings. The U.S. government and other governments have sometimes misinterpreted social media activity with significant negative consequences. *See, e.g.*, J. David Goodman, *Travelers Say They Were Denied Entry to U.S. for Twitter Jokes*, N.Y. Times (Jan. 30, 2012), https://perma.cc/4T79-VBTZ.

58. The Registration Requirement's chilling effects also stem in part from the risk that U.S. officials will impute to visa applicants the speech of others linked to them on social media. One IDA member is less willing to participate in screenings and "Question & Answer" sessions

because his comments may be mischaracterized by others, shared on social media, and then read by the government. Other members and partners are more cautious in associating with others online. An individual's social media accounts may display photos, comments, "likes," or other content from hundreds or thousands of other individuals, and any of this content may be misattributed to the account holder. An individual's social media accounts may also link that individual to hundreds or thousands of other people, and any of these connections may be misconstrued. For example, although all connections on a particular platform may be designated as "friends," those connections may include acquaintances, co-workers, members of the same online groups, people whom the account holder has never met in person or even engaged with online, or people whom the account holder follows specifically because of ideological disagreements. Government actors have imputed speech and inferred real-world relationships based on social media connections, at times depriving individuals of life-altering opportunities and even their freedom on those bases. *See, e.g.*, Shera S. Avi-Yonah & Delano R. Franklin, *Incoming Harvard Freshman Deported After Visa Revoked*, The Crimson, Aug. 27, 2019, https://perma.cc/UY97-TU35; Ben Popper, *How the NYPD Is Using Social Media To Put Harlem Teens Behind Bars*, The Verge (Dec. 10, 2014), https://perma.cc/5JDR-7WV7.

59.     The Registration Requirement's chilling effects stem in part from the risk that consular officers will exercise their considerable discretion to subject visa applicants to additional scrutiny or delay application processing, even if consular officers do not ultimately deny them visas. According to recent reports, the U.S. government tracked the social media activities of journalists, advocates, and activists who called attention to issues surrounding the treatment of migrants at the U.S.-Mexico border. A number of those individuals then faced additional questioning by U.S. officials when crossing the border, and some even had their passports flagged

or their visas revoked, significantly limiting their ability to travel.

60. The Registration Requirement's chilling effects also stem in part from the risk that the U.S. government will disseminate social media information to repressive foreign governments with a history of retaliating against online critics. Plaintiffs' non-U.S. members and partners include filmmakers who use pseudonymous social media identifiers to enable them to speak freely about political matters without fear of reprisal or retribution. One IDA member from Syria, for example, used pseudonymous social media identifiers to guard against persecution by the Syrian regime. These fears of retaliation are well founded. For example, in August 2019, a Myanmar court reportedly sentenced Burmese filmmaker Min Htin Ko Ko Gyi, founder and director of the Myanmar Human Rights Human Dignity Film Festival, to a year's hard labor as punishment for Facebook posts critical of the country's armed forces. The Turkish government's "virtual patrol squad" has now imprisoned more than 7,000 individuals based on their social media posts, including Kurdish journalist Rawin Sterks, who was charged with conducting propaganda for a terrorist organization based on a Facebook post about his documentary on the Kurdish Peshmerga (the military forces of Iraqi Kurdistan). Saudi Arabia, Vietnam, and Russia have likewise targeted online critics for retaliation, sometimes going to great lengths to identify dissidents who use pseudonymous account handles.

61. Finally, the Registration Requirement's chilling effects stem in part from the demonstrated vulnerability of U.S. databases to hacking and other security breaches. An internal State Department cybersecurity investigation in 2016 showed that the CCD lacked the security necessary to protect visa applicants' information, which now includes information obtained through the Registration Requirement. DHS and some of its components have also experienced significant breaches in the past few years. Earlier in 2019, for example, CBP acknowledged that

unidentified actors had hacked into a database containing traveler photographs and license plate images stored on a subcontractor's network.

62.      The chilling effect of the Registration Requirement is more severe because of the requirement's dragnet nature. Because it applies to nearly all visa applicants, the Registration Requirement enables the government to compile a database of millions of people's speech and associations, which it can cross-reference to glean more information about any given visa applicant. The more information the government collects about other individuals, the more connections the government is able to draw about any given individual's familial, social, professional, and political life.

63.      The government's indefinite retention of information collected through the Registration Requirement further exacerbates the requirement's chilling effect because it facilitates surveillance into the future. Relying in part on information collected through the Registration Requirement, the State Department engages in ongoing screening of visa applicants, even after they have submitted their applications, to determine their continued eligibility to travel to the United States. Moreover, visa applicants may be the targets of ongoing surveillance even after they enter the United States. For instance, as noted above, ICE has made clear its intent to conduct continuous monitoring of 10,000 visa applicants' and visa holders' social media and other online activities each year. The knowledge that the government will retain the information collected through the Registration Requirement indefinitely chills visa applicants' expressive and associational activities before they enter the United States, and it is likely to chill their expressive and associational activities after they enter the United States as well.

64.      Although the Registration Requirement severely burdens the speech and associational rights of Plaintiffs' non-U.S. members and partners, those non-U.S. members and

partners cannot realistically challenge the requirement themselves. Challenging the requirement would require them to draw the government's attention to their expressive and associational activities—that is, to surrender the very anonymity or obscurity they seek to protect.

### *Harms to Plaintiffs and Their U.S. Members, Partners, and Audiences*

65.    When Plaintiffs' non-U.S. members and partners censor their online speech or decline opportunities to participate in U.S.-based programs, Plaintiffs, their U.S. members and partners, and U.S. audiences are deprived of the opportunity to view these filmmakers' and collaborators' work and to hear from them on important platforms for expression.

66.    *First*, by chilling the expressive and associational activities of Plaintiffs' non-U.S. members and partners on social media, the Registration Requirement burdens Plaintiffs' ability to learn about the work of their members and partners around the world, to foster cross-border discussion within their global communities, and to promote their events.

67.    The Registration Requirement impedes Doc Society's efforts to identify films to honor at its awards ceremonies, to research issues to explore in new programs, and to disseminate resources throughout its broader community. Doc Society sponsors the Doc Impact Hi5 awards, which honor films for the effectiveness of their impact campaigns. Doc Society measures the impact of these films in part through the quality and quantity of social media engagement they generate. Doc Society also relies on social media to identify new issues to address in its programs. Through Twitter, Doc Society identified key members of the global community concerned with climate change, including scientists, indigenous and faith leaders, lawyers, and campaign organizers, whom it then connected with documentary filmmakers at a new "Climate Story Lab" program it co-hosted in New York City in the summer of 2019. Additionally, Doc Society uses social media to disseminate its "Safe + Secure" resources. These resources, which Doc Society's

non-U.S. partners have previously shared with their own online networks, provide tools for both filmmakers and funders to help mitigate risks associated with their work, including digital, legal, and journalistic risks, and risks related to their safety and health. Because the Registration Requirement deters Doc Society's non-U.S. partners from sharing information and interacting with others on social media, it makes it more difficult for Doc Society to rely on social media for these research and outreach purposes.

68. The Registration Requirement likewise impedes IDA's efforts to circulate information about resources available to its members, to learn about issues confronting its members around the world, and to promote its events. IDA uses Twitter and Facebook to share budgeting techniques for documentary filmmakers, flag resources for legal representation, and provide details about grants funded by IDA and other organizations. IDA uses LinkedIn to post job opportunities on its organizational page and to connect its members and staff through its group page. IDA's YouTube page features not only clips from interviews and screenings, but also educational videos for filmmakers, such as video series titled "Using Graphics to Tell Your Story" and "Get the Most out of Your Film's Release." Overall, IDA's social media pages serve as hubs where its members and followers can network and learn from each other. IDA itself follows numerous documentary filmmakers on Twitter and Instagram, as well as relevant industry hashtags on Instagram such as #documentaryfilmmaker, #documentaryfilm, and #documentaryfilmmaking. IDA pays close attention to what filmmakers are saying on Twitter and Facebook to inform its educational and advocacy efforts on their behalf. For example, through social media IDA has discovered a number of cases of filmmaker censorship, which IDA has then investigated in order to assist the censored filmmakers and to alert its membership to the threats they may face in different countries. IDA addresses these and similar issues in sessions during the Getting Real

conference, in its magazine, and through its own social media accounts. Because the Registration Requirement deters IDA's non-U.S. members from sharing information and interacting with others on social media, it makes it more difficult for IDA to rely on social media for these educational, advocacy, and programming purposes.

69.     For the same reasons, the Registration Requirement deprives Plaintiffs' U.S. members and partners of opportunities to hear from and engage with their non-U.S. members and partners online. Individuals within Plaintiffs' communities view their online interactions with non-U.S. members and partners as a significant benefit of their affiliation with Plaintiffs' organizations. Because the Registration Requirement deters Plaintiffs' non-U.S. members and partners from sharing information and interacting with others on social media, however, Plaintiffs' U.S. members and partners no longer enjoy that benefit to the same extent they previously did.

70.     *Second*, by deterring Plaintiffs' non-U.S. members and partners from applying for visas to attend Plaintiffs' flagship and other events in the United States, the Registration Requirement burdens Plaintiffs' ability to attract participants and, ultimately, audiences to these events.

71.     The Registration Requirement jeopardizes the success of Doc Society's U.S.-based events, which depends on the in-person participation of non-U.S. partners. Doc Society expends time and resources recruiting non-U.S. filmmakers and other partners to participate in Good Pitch events in the United States, sending invitations six to nine months in advance to enable the participants to make any necessary travel arrangements. Since 2016, Doc Society has hosted three large-scale Good Pitch events in the United States—two in New York City (on November 15, 2016, and October 22, 2019), and one in Miami (on June 20, 2017)—in addition to four smaller Good Pitch events (called Good Pitch Locals) held in the United States. A third of the films

showcased at the large-scale U.S. events were from non-U.S. film teams or addressed non-U.S. subjects. In 2016, six non-U.S. nationals were invited to the Good Pitch New York event, all of whom attended. In 2017, 278 non-U.S. nationals were invited to the Good Pitch Miami event, of whom 73 attended. In 2019, 15 non-U.S. nationals were invited to the Good Pitch New York event, of whom 13 attended. Because the Registration Requirement deters Doc Society's non-U.S. partners from traveling to the United States to participate in Doc Society's U.S.-based Good Pitch events, it diminishes the impact of these events, making them less attractive to potential audience members and making Doc Society less attractive to potential funders.

72.    The Registration Requirement likewise jeopardizes the success of IDA's events, which depends on the in-person participation of non-U.S. members. IDA's Getting Real conference, hosted in Los Angeles, offers filmmakers the opportunity to meet face-to-face with other filmmakers from around the world. It also features case studies of non-U.S. film projects and sessions highlighting advocacy efforts on behalf of filmmakers facing censorship in different countries. In part because of the global networking opportunities and internationally focused programming, Getting Real typically attracts over 1,000 attendees, approximately ten to fifteen percent of whom are based outside of the United States. In 2018, Getting Real brought documentary artists, activists, and journalists from twenty different countries together. IDA will hold the next Getting Real conference in September 2020, and it is currently working with a funder to support the attendance of filmmakers from Yemen, Palestine, and Afghanistan. IDA also assists non-U.S. filmmakers with travel to the United States to attend the IDA Documentary Awards, which recognize outstanding documentary films and programs from around the world. The 35th annual IDA Documentary Awards will be held in Los Angeles on December 7, 2019, and will honor films in fifteen categories from 785 submissions, forty percent of which are international

31

productions or co-productions. In particular, the 2019 awards will honor Syrian filmmaker Waad
al-Kateab with the Courage Under Fire Award for her films documenting the siege of Aleppo. Six
out of ten nominees in the Best Feature category, and four out of five nominees in the Best Director
category, are also from outside the United States. IDA's film screenings, too, feature the work of
non-U.S. filmmakers. During its 2019 "Screening Series," hosted in Los Angeles and New York
City, IDA screened sixty-one documentary shorts and features, over a quarter of which are non-
U.S. productions, and all of which were accompanied by in-person conversations with the
filmmakers. IDA's February 2019 "DocuDay," hosted in Los Angeles, featured ten films,
including two non-U.S. productions, with all of the filmmakers in attendance. IDA will host the
next DocuDay in Los Angeles in February 2020 but now anticipates greater challenges in attracting
non-U.S. participants. Because the Registration Requirement deters IDA's non-U.S. members
from traveling to the United States to participate in IDA's U.S.-based events, it diminishes the
impact of these events, making them less attractive to other members and broader audiences.

     73.    For the same reasons, the Registration Requirement deprives Plaintiffs' U.S.
members, partners, and audiences of opportunities to hear from and engage with non-U.S.
members and partners at Plaintiffs' U.S.-based events. Many U.S. members, partners, and audience
members attend these events to view films from around the world and to hear from and respond to
the creators and subjects themselves. Because the Registration Requirement deters Plaintiffs' non-
U.S. members and partners from traveling to the United States to participate in their U.S.-based
events, U.S. members, partners, and audiences no longer have as many opportunities to engage
with those individuals in person.

     74.    Finally, the Registration Requirement chills the expressive and associational
activity of Plaintiffs' U.S. members and partners themselves. In reviewing the social media activity

of Plaintiffs' non-U.S. members, consular officers will inevitably review and consider the posts, "likes," shares, and tags of their contacts on social media. The Registration Requirement thus implicates the speech of many more individuals than the millions of visa applicants directly subject to it, including some of Plaintiffs' U.S. members and partners, resulting in even broader chilling effects across Plaintiffs' organizations.

*  *  *

75. As a result of all of the facts described above, the Registration Requirement forces Doc Society and IDA to divert time, staff resources, and funding to find and engage with members and partners who are now reluctant to speak publicly on social media or travel to the United States; to support and promote the work of their members and partners; and to recruit new members, partners, and projects. Regardless of the additional time and resources that Plaintiffs expend, however, they anticipate that their online engagement with non-U.S. members and partners will decrease, as will participation in their U.S.-based programs and partnership opportunities across their organizations.

76. In these ways, the Registration Requirement burdens Plaintiffs' efforts to carry out their mandates. The requirement disrupts Plaintiffs' relationships with their members and partners, which Plaintiffs have spent years working to develop and strengthen. The requirement thus weakens Doc Society's ability to support the creation of documentary films and to connect those films to global audiences. It likewise weakens IDA's ability to support a global community of documentary filmmakers.

**COUNT I**

**APA Claims**

77. The Registration Requirement exceeds Defendant Pompeo's statutory jurisdiction and authority, and/or limitations set forth in the INA, 8 U.S.C. §§ 1202(a), (c), violates the First

33

Amendment, and is arbitrary and capricious. It must therefore be set aside under the APA. *See* 5 U.S.C. §§ 706(2)(A)–(C).

## COUNT II

### First Amendment Claims

78. The Registration Requirement, and related retention and dissemination policies, violate the First Amendment because they deny the rights to anonymous speech and private expressive association; because they deter expressive and associational activity and are not sufficiently tailored to any legitimate government interest; and because they are overbroad.

### REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Declare that the Registration Requirement violates the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)–(C).

B. Declare that the Registration Requirement and related retention and dissemination policies violate the First Amendment to the Constitution.

C. Enjoin Defendants from enforcing the Registration Requirement and related retention and dissemination policies.

D. Order Defendants to expunge all information collected through the Registration Requirement.

E. Award Plaintiffs reasonable attorneys' fees and costs incurred in this action.

F. Grant such other and further relief as the Court deems just and proper.

Dated: December 5, 2019

Sincerely,

*/s/ Faiza Patel*

Faiza Patel*
Harsha Panduranga*
Brennan Center for Justice
   at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
patelf@brennan.law.nyu.edu
(646) 292-8310

*/s/ Carrie DeCell*

Carrie DeCell (D.C. Bar No. 1015491)
Jameel Jaffer (D.C. Bar No. MI0067)
Katie Fallow*
Anna Diakun*
Leena Charlton*
Knight First Amendment Institute at
   Columbia University
475 Riverside Drive, Suite 302–304
New York, NY 10115
carrie.decell@knightcolumbia.org
(646) 745-8500

*/s/ Rachel Levinson-Waldman*

Rachel Levinson-Waldman*
Brennan Center for Justice
   at NYU School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
Washington, D.C. 20036
levinsonr@brennan.law.nyu.edu
(202) 249-7190

*/s/ Paul Curnin*

Paul Curnin*
Sarah Eichenberger (D.C. Bar No. D00430)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
pcurnin@stblaw.com
(212) 455-2000

*Counsel for Plaintiffs*

*\*pro hac vice* application forthcoming

# EXHIBIT 1:

# Executive Order 13,780

Federal Register

Vol. 82, No. 45

Thursday, March 9, 2017

Title 3—

The President

# Presidential Documents

**Executive Order 13780 of March 6, 2017**

## Protecting the Nation From Foreign Terrorist Entry Into the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, and section 301 of title 3, United States Code, and to protect the Nation from terrorist activities by foreign nationals admitted to the United States, it is hereby ordered as follows:

**Section 1.** *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals. The screening and vetting protocols and procedures associated with the visa-issuance process and the United States Refugee Admissions Program (USRAP) play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States. It is therefore the policy of the United States to improve the screening and vetting protocols and procedures associated with the visa-issuance process and the USRAP.

(b) On January 27, 2017, to implement this policy, I issued Executive Order 13769 (Protecting the Nation from Foreign Terrorist Entry into the United States).

(i) Among other actions, Executive Order 13769 suspended for 90 days the entry of certain aliens from seven countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. These are countries that had already been identified as presenting heightened concerns about terrorism and travel to the United States. Specifically, the suspension applied to countries referred to in, or designated under, section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), in which Congress restricted use of the Visa Waiver Program for nationals of, and aliens recently present in, (A) Iraq or Syria, (B) any country designated by the Secretary of State as a state sponsor of terrorism (currently Iran, Syria, and Sudan), and (C) any other country designated as a country of concern by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence. In 2016, the Secretary of Homeland Security designated Libya, Somalia, and Yemen as additional countries of concern for travel purposes, based on consideration of three statutory factors related to terrorism and national security: "(I) whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States; (II) whether a foreign terrorist organization has a significant presence in the country or area; and (III) whether the country or area is a safe haven for terrorists." 8 U.S.C. 1187(a)(12)(D)(ii). Additionally, Members of Congress have expressed concerns about screening and vetting procedures following recent terrorist attacks in this country and in Europe.

(ii) In ordering the temporary suspension of entry described in subsection (b)(i) of this section, I exercised my authority under Article II of the Constitution and under section 212(f) of the INA, which provides in relevant part: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

8 U.S.C. 1182(f). Under these authorities, I determined that, for a brief period of 90 days, while existing screening and vetting procedures were under review, the entry into the United States of certain aliens from the seven identified countries—each afflicted by terrorism in a manner that compromised the ability of the United States to rely on normal decision-making procedures about travel to the United States—would be detrimental to the interests of the United States. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to grant case-by-case waivers when they determined that it was in the national interest to do so.

(iii) Executive Order 13769 also suspended the USRAP for 120 days. Terrorist groups have sought to infiltrate several nations through refugee programs. Accordingly, I temporarily suspended the USRAP pending a review of our procedures for screening and vetting refugees. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to jointly grant case-by-case waivers when they determined that it was in the national interest to do so.

(iv) Executive Order 13769 did not provide a basis for discriminating for or against members of any particular religion. While that order allowed for prioritization of refugee claims from members of persecuted religious minority groups, that priority applied to refugees from every nation, including those in which Islam is a minority religion, and it applied to minority sects within a religion. That order was not motivated by animus toward any religion, but was instead intended to protect the ability of religious minorities—whoever they are and wherever they reside—to avail themselves of the USRAP in light of their particular challenges and circumstances.

(c) The implementation of Executive Order 13769 has been delayed by litigation. Most significantly, enforcement of critical provisions of that order has been temporarily halted by court orders that apply nationwide and extend even to foreign nationals with no prior or substantial connection to the United States. On February 9, 2017, the United States Court of Appeals for the Ninth Circuit declined to stay or narrow one such order pending the outcome of further judicial proceedings, while noting that the "political branches are far better equipped to make appropriate distinctions" about who should be covered by a suspension of entry or of refugee admissions.

(d) Nationals from the countries previously identified under section 217(a)(12) of the INA warrant additional scrutiny in connection with our immigration policies because the conditions in these countries present heightened threats. Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States. Finally, once foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of these countries typically delay issuing, or refuse to issue, travel documents.

(e) The following are brief descriptions, taken in part from the Department of State's *Country Reports on Terrorism 2015* (June 2016), of some of the conditions in six of the previously designated countries that demonstrate why their nationals continue to present heightened risks to the security of the United States:

(i) *Iran.* Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq. Iran has also been linked to support

for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts.

(ii) *Libya.* Libya is an active combat zone, with hostilities between the internationally recognized government and its rivals. In many parts of the country, security and law enforcement functions are provided by armed militias rather than state institutions. Violent extremist groups, including the Islamic State of Iraq and Syria (ISIS), have exploited these conditions to expand their presence in the country. The Libyan government provides some cooperation with the United States' counterterrorism efforts, but it is unable to secure thousands of miles of its land and maritime borders, enabling the illicit flow of weapons, migrants, and foreign terrorist fighters. The United States Embassy in Libya suspended its operations in 2014.

(iii) *Somalia.* Portions of Somalia have been terrorist safe havens. Al-Shabaab, an al-Qa'ida-affiliated terrorist group, has operated in the country for years and continues to plan and mount operations within Somalia and in neighboring countries. Somalia has porous borders, and most countries do not recognize Somali identity documents. The Somali government cooperates with the United States in some counterterrorism operations but does not have the capacity to sustain military pressure on or to investigate suspected terrorists.

(iv) *Sudan.* Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas. Historically, Sudan provided safe havens for al-Qa'ida and other terrorist groups to meet and train. Although Sudan's support to al-Qa'ida has ceased and it provides some cooperation with the United States' counterterrorism efforts, elements of core al-Qa'ida and ISIS-linked terrorist groups remain active in the country.

(v) *Syria.* Syria has been designated as a state sponsor of terrorism since 1979. The Syrian government is engaged in an ongoing military conflict against ISIS and others for control of portions of the country. At the same time, Syria continues to support other terrorist groups. It has allowed or encouraged extremists to pass through its territory to enter Iraq. ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States. The United States Embassy in Syria suspended its operations in 2012. Syria does not cooperate with the United States' counterterrorism efforts.

(vi) *Yemen.* Yemen is the site of an ongoing conflict between the incumbent government and the Houthi-led opposition. Both ISIS and a second group, al-Qa'ida in the Arabian Peninsula (AQAP), have exploited this conflict to expand their presence in Yemen and to carry out hundreds of attacks. Weapons and other materials smuggled across Yemen's porous borders are used to finance AQAP and other terrorist activities. In 2015, the United States Embassy in Yemen suspended its operations, and embassy staff were relocated out of the country. Yemen has been supportive of, but has not been able to cooperate fully with, the United States in counterterrorism efforts.

(f) In light of the conditions in these six countries, until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high. Accordingly, while that assessment is ongoing, I am imposing a temporary pause on the entry of nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen, subject to categorical exceptions and case-by-case waivers, as described in section 3 of this order.

(g) Iraq presents a special case. Portions of Iraq remain active combat zones. Since 2014, ISIS has had dominant influence over significant territory in northern and central Iraq. Although that influence has been significantly

reduced due to the efforts and sacrifices of the Iraqi government and armed forces, working along with a United States-led coalition, the ongoing conflict has impacted the Iraqi government's capacity to secure its borders and to identify fraudulent travel documents. Nevertheless, the close cooperative relationship between the United States and the democratically elected Iraqi government, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combat ISIS justify different treatment for Iraq. In particular, those Iraqi government forces that have fought to regain more than half of the territory previously dominated by ISIS have shown steadfast determination and earned enduring respect as they battle an armed group that is the common enemy of Iraq and the United States. In addition, since Executive Order 13769 was issued, the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal. Decisions about issuance of visas or granting admission to Iraqi nationals should be subjected to additional scrutiny to determine if applicants have connections with ISIS or other terrorist organizations, or otherwise pose a risk to either national security or public safety.

(h) Recent history shows that some of those who have entered the United States through our immigration system have proved to be threats to our national security. Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States. They have included not just persons who came here legally on visas but also individuals who first entered the country as refugees. For example, in January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses. And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon. The Attorney General has reported to me that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation.

(i) Given the foregoing, the entry into the United States of foreign nationals who may commit, aid, or support acts of terrorism remains a matter of grave concern. In light of the Ninth Circuit's observation that the political branches are better suited to determine the appropriate scope of any suspensions than are the courts, and in order to avoid spending additional time pursuing litigation, I am revoking Executive Order 13769 and replacing it with this order, which expressly excludes from the suspensions categories of aliens that have prompted judicial concerns and which clarifies or refines the approach to certain other issues or categories of affected aliens.

**Sec. 2.** *Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period.* (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat. The Secretary of Homeland Security may conclude that certain information is needed from particular countries even if it is not needed from every country.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the worldwide review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed from each country for adjudications and a list of countries that do not provide adequate information, within 20 days of the effective date of this order. The Secretary of Homeland Security

shall provide a copy of the report to the Secretary of State, the Attorney General, and the Director of National Intelligence.

(c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

(d) Upon submission of the report described in subsection (b) of this section regarding the information needed from each country for adjudications, the Secretary of State shall request that all foreign governments that do not supply such information regarding their nationals begin providing it within 50 days of notification.

(e) After the period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means. The Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States.

(f) At any point after the submission of the list described in subsection (e) of this section, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, may submit to the President the names of any additional countries recommended for similar treatment, as well as the names of any countries that they recommend should be removed from the scope of a proclamation described in subsection (e) of this section.

(g) The Secretary of State and the Secretary of Homeland Security shall submit to the President a joint report on the progress in implementing this order within 60 days of the effective date of this order, a second report within 90 days of the effective date of this order, a third report within 120 days of the effective date of this order, and a fourth report within 150 days of the effective date of this order.

**Sec. 3.** *Scope and Implementation of Suspension.*

(a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the effective date of this order;

(ii) did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and

(iii) do not have a valid visa on the effective date of this order.

(b) *Exceptions.* The suspension of entry pursuant to section 2 of this order shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any foreign national who is admitted to or paroled into the United States on or after the effective date of this order;

(iii) any foreign national who has a document other than a visa, valid on the effective date of this order or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission, such as an advance parole document;

(iv) any dual national of a country designated under section 2 of this order when the individual is traveling on a passport issued by a non-designated country;

(v) any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; or

(vi) any foreign national who has been granted asylum; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

(c) *Waivers.* Notwithstanding the suspension of entry pursuant to section 2 of this order, a consular officer, or, as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP), or the Commissioner's delegee, may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended if the foreign national has demonstrated to the officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest. Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa issuance process will be effective both for the issuance of a visa and any subsequent entry on that visa, but will leave all other requirements for admission or entry unchanged. Case-by-case waivers could be appropriate in circumstances such as the following:

(i) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the effective date of this order, seeks to reenter the United States to resume that activity, and the denial of reentry during the suspension period would impair that activity;

(ii) the foreign national has previously established significant contacts with the United States but is outside the United States on the effective date of this order for work, study, or other lawful activity;

(iii) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry during the suspension period would impair those obligations;

(iv) the foreign national seeks to enter the United States to visit or reside with a close family member (*e.g.,* a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry during the suspension period would cause undue hardship;

(v) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

(vi) the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee) and the employee can document that he or she has provided faithful and valuable service to the United States Government;

(vii) the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 *et seq.,* traveling for purposes of conducting meetings or business with the United States Government, or traveling

to conduct business on behalf of an international organization not designated under the IOIA;

(viii) the foreign national is a landed Canadian immigrant who applies for a visa at a location within Canada; or

(ix) the foreign national is traveling as a United States Government-sponsored exchange visitor.

**Sec. 4**. *Additional Inquiries Related to Nationals of Iraq.* An application by any Iraqi national for a visa, admission, or other immigration benefit should be subjected to thorough review, including, as appropriate, consultation with a designee of the Secretary of Defense and use of the additional information that has been obtained in the context of the close U.S.-Iraqi security partnership, since Executive Order 13769 was issued, concerning individuals suspected of ties to ISIS or other terrorist organizations and individuals coming from territories controlled or formerly controlled by ISIS. Such review shall include consideration of whether the applicant has connections with ISIS or other terrorist organizations or with territory that is or has been under the dominant influence of ISIS, as well as any other information bearing on whether the applicant may be a threat to commit acts of terrorism or otherwise threaten the national security or public safety of the United States.

**Sec. 5**. *Implementing Uniform Screening and Vetting Standards for All Immigration Programs.* (a) The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall implement a program, as part of the process for adjudications, to identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry. This program shall include the development of a uniform baseline for screening and vetting standards and procedures, such as in-person interviews; a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that applicants are who they claim to be; a mechanism to assess whether applicants may commit, aid, or support any kind of violent, criminal, or terrorist acts after entering the United States; and any other appropriate means for ensuring the proper collection of all information necessary for a rigorous evaluation of all grounds of inadmissibility or grounds for the denial of other immigration benefits.

(b) The Secretary of Homeland Security, in conjunction with the Secretary of State, the Attorney General, and the Director of National Intelligence, shall submit to the President an initial report on the progress of the program described in subsection (a) of this section within 60 days of the effective date of this order, a second report within 100 days of the effective date of this order, and a third report within 200 days of the effective date of this order.

**Sec. 6**. *Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.* (a) The Secretary of State shall suspend travel of refugees into the United States under the USRAP, and the Secretary of Homeland Security shall suspend decisions on applications for refugee status, for 120 days after the effective date of this order, subject to waivers pursuant to subsection (c) of this section. During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, shall review the USRAP application and adjudication processes to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures. The suspension described in this subsection shall not apply to refugee applicants who, before the effective date of this order, have been formally scheduled for transit by the Department of State. The Secretary of State shall resume travel of refugees into the

United States under the USRAP 120 days after the effective date of this order, and the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that the additional procedures implemented pursuant to this subsection are adequate to ensure the security and welfare of the United States.

(b) Pursuant to section 212(f) of the INA, I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any entries in excess of that number until such time as I determine that additional entries would be in the national interest.

(c) Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretary of State and the Secretary of Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the entry of such individuals as refugees is in the national interest and does not pose a threat to the security or welfare of the United States, including in circumstances such as the following: the individual's entry would enable the United States to conform its conduct to a preexisting international agreement or arrangement, or the denial of entry would cause undue hardship.

(d) It is the policy of the executive branch that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees. To that end, the Secretary of State shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

**Sec. 7**. *Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.* The Secretary of State and the Secretary of Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority permitted by section 212(d)(3)(B) of the INA, 8 U.S.C. 1182(d)(3)(B), relating to the terrorism grounds of inadmissibility, as well as any related implementing directives or guidance.

**Sec. 8**. *Expedited Completion of the Biometric Entry-Exit Tracking System.* (a) The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for in-scope travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b) The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive set forth in subsection (a) of this section. The initial report shall be submitted within 100 days of the effective date of this order, a second report shall be submitted within 200 days of the effective date of this order, and a third report shall be submitted within 365 days of the effective date of this order. The Secretary of Homeland Security shall submit further reports every 180 days thereafter until the system is fully deployed and operational.

**Sec. 9**. *Visa Interview Security.* (a) The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, 8 U.S.C. 1202, which requires that all individuals seeking a nonimmigrant visa undergo an in-person interview, subject to specific statutory exceptions. This suspension shall not apply to any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; traveling for purposes related to an international organization designated under the IOIA; or traveling for purposes of conducting meetings or business with the United States Government.

(b) To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that nonimmigrant visa-interview wait times are not unduly affected.

**Sec. 10**. *Visa Validity Reciprocity*. The Secretary of State shall review all nonimmigrant visa reciprocity agreements and arrangements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as required by sections 221(c) and 281 of the INA, 8 U.S.C. 1201(c) and 1351, and other treatment. If another country does not treat United States nationals seeking nonimmigrant visas in a truly reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of United States nationals by that foreign country, to the extent practicable.

**Sec. 11**. *Transparency and Data Collection*. (a) To be more transparent with the American people and to implement more effectively policies and practices that serve the national interest, the Secretary of Homeland Security, in consultation with the Attorney General, shall, consistent with applicable law and national security, collect and make publicly available the following information:

(i) information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation with or provision of material support to a terrorism-related organization, or any other national-security-related reasons;

(ii) information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and who have engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States;

(iii) information regarding the number and types of acts of gender-based violence against women, including so-called "honor killings," in the United States by foreign nationals; and

(iv) any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

(b) The Secretary of Homeland Security shall release the initial report under subsection (a) of this section within 180 days of the effective date of this order and shall include information for the period from September 11, 2001, until the date of the initial report. Subsequent reports shall be issued every 180 days thereafter and reflect the period since the previous report.

**Sec. 12**. *Enforcement*. (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of the actions directed in this order.

(b) In implementing this order, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including, as appropriate, those providing an opportunity for individuals to claim a fear of persecution or torture, such as the credible fear determination for aliens covered by section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A).

(c) No immigrant or nonimmigrant visa issued before the effective date of this order shall be revoked pursuant to this order.

(d) Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 shall be entitled to a travel document confirming that the individual is permitted to travel to the United States and seek entry. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

(e) This order shall not apply to an individual who has been granted asylum, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this order shall be construed to limit the ability of an individual to seek asylum, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 13**. *Revocation.* Executive Order 13769 of January 27, 2017, is revoked as of the effective date of this order.

**Sec. 14**. *Effective Date.* This order is effective at 12:01 a.m., eastern daylight time on March 16, 2017.

**Sec. 15**. *Severability.* (a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby.

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements.

**Sec. 16**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 6, 2017.*

[FR Doc. 2017–04837
Filed 3–8–17; 11:15 am]
Billing code 3295–F7–P

# EXHIBIT 2:

# March 6, 2017 Presidential Memorandum

Federal Register

Vol. 82, No. 62

Monday, April 3, 2017

# Presidential Documents

Title 3—

The President

**Memorandum of March 6, 2017**

**Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits, Ensuring Enforcement of All Laws for Entry Into the United States, and Increasing Transparency Among Departments and Agencies of the Federal Government and for the American People**

**Memorandum for the Secretary of State[,] the Attorney General[, and] the Secretary of Homeland Security**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, and section 301 of title 3, United States Code, I hereby direct the following:

**Section 1.** *Policy.* It is the policy of the United States to keep its citizens safe from terrorist attacks, including those committed by foreign nationals. To avert the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts, it is critical that the executive branch enhance the screening and vetting protocols and procedures for granting visas, admission to the United States, or other benefits under the INA. For that reason, in the executive order entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States," and issued today, I directed the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, to conduct a review to "identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat."

While that comprehensive review is ongoing, however, this Nation cannot delay the immediate implementation of additional heightened screening and vetting protocols and procedures for issuing visas to ensure that we strengthen the safety and security of our country.

Moreover, because it is my constitutional duty to "take Care that the Laws be faithfully executed," the executive branch is committed to ensuring that all laws related to entry into the United States are enforced rigorously and consistently.

**Sec. 2.** *Enhanced Vetting Protocols and Procedures for Visas and Other Immigration Benefits.* The Secretary of State and the Secretary of Homeland Security, in consultation with the Attorney General, shall, as permitted by law, implement protocols and procedures as soon as practicable that in their judgment will enhance the screening and vetting of applications for visas and all other immigration benefits, so as to increase the safety and security of the American people. These additional protocols and procedures should focus on:

(a) preventing the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts; and

(b) ensuring the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits.

**Sec. 3**. *Enforcement of All Laws for Entry into the United States.* I direct the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of all other relevant executive departments and agencies (as identified by the Secretary of Homeland Security) to rigorously enforce all existing grounds of inadmissibility and to ensure subsequent compliance with related laws after admission. The heads of all relevant executive departments and agencies shall issue new rules, regulations, or guidance (collectively, rules), as appropriate, to enforce laws relating to such grounds of inadmissibility and subsequent compliance. To the extent that the Secretary of Homeland Security issues such new rules, the heads of all other relevant executive departments and agencies shall, as necessary and appropriate, issue new rules that conform to them. Such new rules shall supersede any previous rules to the extent of any conflict.

**Sec. 4**. *Transparency and Data Collection.* (a) To ensure that the American people have more regular access to information, and to ensure that the executive branch shares information among its departments and agencies, the Secretary of State and Secretary of Homeland Security shall, consistent with applicable law and national security, issue regular reports regarding visas and adjustments of immigration status, written in non-technical language for broad public use and understanding. In addition to any other information released by the Secretary of State, the Attorney General, or the Secretary of Homeland Security:

(i) Beginning on April 28, 2017, and by the last day of every month thereafter, the Secretary of State shall publish the following information about actions taken during the preceding calendar month:

(A) the number of visas that have been issued from each consular office within each country during the reporting period, disaggregated by detailed visa category and country of issuance; and

(B) any other information the Secretary of State considers appropriate, including information that the Attorney General or Secretary of Homeland Security may request be published.

(ii) The Secretary of Homeland Security shall issue reports detailing the number of adjustments of immigration status that have been made during the reporting period, disaggregated by type of adjustment, type and detailed class of admission, and country of nationality. The first report shall be issued within 90 days of the date of this memorandum, and subsequent reports shall be issued every 90 days thereafter. The first report shall address data from the date of this memorandum until the report is issued, and each subsequent report shall address new data since the last report was issued.

(b) To further ensure transparency for the American people regarding the efficiency and effectiveness of our immigration programs in serving the national interest, the Secretary of State, in consultation with the Secretary of Health and Human Services, the Secretary of Homeland Security, and the Director of the Office of Management and Budget, shall, within 180 days of the date of this memorandum, submit to me a report detailing the estimated long-term costs of the United States Refugee Admissions Program at the Federal, State, and local levels, along with recommendations about how to curtail those costs.

(c) The Secretary of State, in consultation with the Director of the Office of Management and Budget, shall, within 180 days of the date of this memorandum, produce a report estimating how many refugees are being supported in countries of first asylum (near their home countries) for the same long-term cost as supporting refugees in the United States, taking into account the full lifetime cost of Federal, State, and local benefits, and the comparable cost of providing similar benefits elsewhere.

**Sec. 5**. *General Provisions.* (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) All actions taken pursuant to this memorandum shall be consistent with requirements and authorities to protect intelligence and law enforcement sources and methods, personally identifiable information, and the confidentiality of visa records. Nothing in this memorandum shall be interpreted to supersede measures established under authority of law to protect the security and integrity of specific activities and associations that are in direct support of intelligence and law enforcement operations.

(d) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(e) The Secretary of State is hereby authorized and directed to publish this memorandum in the *Federal Register*.

THE WHITE HOUSE,
*Washington, March 6, 2017*

[FR Doc. 2017–06702
Filed 3–31–17; 11:15 am]
Billing code 4710–10–P

# EXHIBIT 3:

# 60-Day Notice for Proposed Information Collection for Immigrant Visa and Alien Registration

with the requirements of 39 CFR 3007.40.

The Commission invites comments on whether the Postal Service's request(s) in the captioned docket(s) are consistent with the policies of title 39. For request(s) that the Postal Service states concern market dominant product(s), applicable statutory and regulatory requirements include 39 U.S.C. 3622, 39 U.S.C. 3642, 39 CFR part 3010, and 39 CFR part 3020, subpart B. For request(s) that the Postal Service states concern competitive product(s), applicable statutory and regulatory requirements include 39 U.S.C. 3632, 39 U.S.C. 3633, 39 U.S.C. 3642, 39 CFR part 3015, and 39 CFR part 3020, subpart B. Comment deadline(s) for each request appear in section II.

## II. Docketed Proceeding(s)

1. *Docket No(s).:* CP2018–65; *Filing Title:* USPS Notice of Amendment to Parcel Select Contract 25, Filed Under Seal; *Filing Acceptance Date:* March 22, 2018; *Filing Authority:* 39 CFR 3015.50; *Public Representative:* Matthew R. Ashford; *Comments Due:* April 3, 2018.

2. *Docket No(s).:* CP2018–191; *Filing Title:* Notice of United States Postal Service of Filing a Functionally Equivalent Global Expedited Package Services 8 Negotiated Service Agreement and Application for Non-Public Treatment of Materials Filed Under Seal; *Filing Acceptance Date:* March 26, 2018; *Filing Authority:* 39 CFR 3015.50; *Public Representative:* Matthew R. Ashford; *Comments Due:* April 3, 2018.

This Notice will be published in the **Federal Register**.

**Stacy Ruble,**
*Secretary.*

[FR Doc. 2018–06481 Filed 3–29–18; 8:45 am]

**BILLING CODE 7710–FW–P**

---

## DEPARTMENT OF STATE

[Public Notice 10261]

### 60-Day Notice of Proposed Information Collection: Application for Immigrant Visa and Alien Registration

**ACTION:** Notice of request for public comment.

**SUMMARY:** The Department of State is seeking Office of Management and Budget (OMB) approval for the information collection described below. In accordance with the Paperwork Reduction Act of 1995, we are requesting comments on this collection from all interested individuals and organizations. The purpose of this notice is to allow 60 days for public comment preceding submission of the collection to OMB.

**DATES:** The Department will accept comments from the public up to *May 29, 2018.*

**ADDRESSES:** You may submit comments by any of the following methods:

• *Web:* Persons with access to the internet may comment on this notice by going to *www.Regulations.gov.* You can search for the document by entering "Docket Number: DOS–2018–0003" in the Search field. Then click the "Comment Now" button and complete the comment form.

• *Email: PRA_BurdenComments@ state.gov.*

You must include the DS form number (if applicable), information collection title, and the OMB control number in any correspondence.

**SUPPLEMENTARY INFORMATION:**

• *Title of Information Collection:* Electronic Application for Immigrant Visa and Alien Registration.

• *OMB Control Number:* 1405–0185.

• *Type of Request:* Revision of a Currently Approved Collection.

• *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO/L/R).

• *Form Number:* DS–260.

• *Respondents:* Immigrant Visa Applicants.

• *Estimated Number of Respondents:* 710,000.

• *Estimated Number of Responses:* 710,000.

• *Average Time per Response:* 155 minutes.

• *Total Estimated Burden Time:* 1,834,167 Annual Hours.

• *Frequency:* Once per application.

• *Obligation To Respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

• Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review.

**Abstract of Proposed Collection**

The Electronic Application for Immigrant Visa and Alien Registration (DS–260) is used to collect biographical information from individuals seeking an immigrant visa. The consular officer uses the information collected to elicit information necessary to determine an applicant's eligibility for a visa.

**Methodology**

The DS–260 will be submitted electronically over an encrypted connection to the Department via the internet. The applicant will be instructed to print a confirmation page containing a bar coded record locator, which will be scanned at the time of processing.

**Additional Information**

The Department is revising the collection to add several additional questions for immigrant visa applicants. One question lists multiple social media platforms and requires the applicant to provide any identifiers used by applicants for those platforms during the five years preceding the date of application. The platforms listed may be updated by the Department by adding or removing platforms. Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval. In addition, the applicant will be given the option to provide information about any social media identifiers associated with any platforms other than those that are listed that the applicant has used in the last five years. The Department will collect this information for identity resolution and vetting purposes based on statutory visa eligibility standards. Other questions seek five years of previously used telephone numbers, email addresses, and international travel; all prior immigration violations; and whether specified family members have been involved in terrorist activities. The "Sign and Submit" statement will provide applicants information related to correcting records within Federal Bureau of Investigation databases and additional information regarding the immigrant visa medical examination. Applicants from countries where female genital mutilation/cutting (FGM/C) is prevalent will be provided a link in the DS–260 to an electronic pamphlet that covers the illegality of the practice in the United States. Further, applicants will be required to check a box verifying

that the link was provided to them. Finally, the revised visa application forms will include additional information regarding the visa medical examination that some applicants may be required to undergo. Additional details of the changes are available in supporting documents.

**Carl C. Risch,**
*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2018–06490 Filed 3–29–18; 8:45 am]

**BILLING CODE 4710-06-P**

---

## DEPARTMENT OF STATE

[Public Notice 10260]

### 60-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa

**ACTION:** Notice of request for public comment.

**SUMMARY:** The Department of State is seeking Office of Management and Budget (OMB) approval for the information collection described below. In accordance with the Paperwork Reduction Act of 1995, we are requesting comments on this collection from all interested individuals and organizations. The purpose of this notice is to allow 60 days for public comment preceding submission of the collection to OMB.

**DATES:** The Department will accept comments from the public up to *May 29, 2018.*

**ADDRESSES:** You may submit comments by any of the following methods:
- *Web:* Persons with access to the internet may comment on this notice by going to *www.Regulations.gov.* You can search for the document by entering "Docket Number: DOS–2018–0002" in the Search field. Then click the "Comment Now" button and complete the comment form.
- *Email: PRA_BurdenComments@state.gov.*

You must include the DS form number (if applicable), information collection title, and the OMB control number in any correspondence.

**SUPPLEMENTARY INFORMATION:**
- *Title of Information Collection:* Application for Nonimmigrant Visa.
- *OMB Control Number:* 1405–0182.
- *Type of Request:* Revision of a Currently Approved Collection.
- *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO).
- *Form Number:* DS–160 and DS–156.
- *Respondents:* All Nonimmigrant Visa Applicants.
- *Estimated Number of Respondents:* 14,000,000.

- *Estimated Number of Responses:* 14,000,000.
- *Average Time per Response:* 90 Minutes.
- *Total Estimated Burden Time:* 21,000,000 Annual Hours.
- *Frequency:* Once per respondent's application.
- *Obligation to Respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments to permit the Department to:
- Evaluate whether the proposed information collection is necessary for the proper functions of the Department.
- Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used.
- Enhance the quality, utility, and clarity of the information to be collected.
- Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review.

### Abstract of Proposed Collection

The Online Application for Nonimmigrant Visa (DS–160) is used to collect biographical information from individuals seeking a nonimmigrant visa. The consular officer uses the information collected to determine the applicant's eligibility for a visa. Form DS–156 is required by regulation of all nonimmigrant visa applicants who do not use the Online Application for Nonimmigrant Visa (Form DS–160). Posts will use the DS–156 in limited circumstances when the DS–160 is unavailable, as outlined below, to elicit information necessary to determine an applicant's visa eligibility.

### Methodology

The DS–160 will be submitted electronically over an encrypted connection to the Department via the internet. The applicant will be instructed to print a confirmation page containing a bar coded record locator, which will be scanned at the time of processing. The Nonimmigrant Visa Application (DS–156) paper version will be used only in the following limited circumstances when applicants cannot access the DS–160:
- An applicant has an urgent medical or humanitarian travel need and the

consular officer has received explicit permission from the Visa Office to accept form DS–156;
- The applicant is a student exchange visitor who must leave immediately in order to arrive on time for his/her course and the consular officer has explicit permission from the Visa Office to accept form DS–156;
- The applicant is a diplomatic or official traveler with urgent government business and form DS–160 has been unavailable for more than four hours; or
- Form DS–160 has been unavailable for more than three days and the officer receives explicit permission from the Visa Office.

In order to obtain a copy of form DS–156, an applicant must contact the Embassy or consulate at which he or she is applying, and request a copy.

### Additional Information

This collection is being revised to include both nonimmigrant visa application methods: the online version (form DS–160) which is used by the vast majority of applications, and the paper version (form DS–156) which is used in limited circumstances. Currently, the online application and paper application are approved under two separate collections. With this renewal, the Department seeks to combine these into a single collection. Upon approval, the Department will seek to discontinue OMB Control Number 1405–0018, the existing collection for form DS–156.

The Department also is revising the collection to add several additional questions for nonimmigrant visa applicants. One question lists multiple social media platforms and requires the applicant to provide any identifiers used by applicants for those platforms during the five years preceding the date of application. The platforms listed may be updated by the Department by adding or removing platforms. Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval. In addition, the applicant will be given the option to provide information about any social media identifiers associated with any platforms other than those that are listed that the applicant has used in the last five years. The Department will collect this information from visa applicants for identity resolution and vetting purposes based on statutory visa eligibility standards; however, the Department intends not to routinely ask the question of applicants for specific visa classifications, such as most diplomatic and official visa applicants. Other questions seek five years of previously

# EXHIBIT 4:

# 60-Day Notice for Proposed Information Collection for Nonimmigrant Visa Application

that the link was provided to them. Finally, the revised visa application forms will include additional information regarding the visa medical examination that some applicants may be required to undergo. Additional details of the changes are available in supporting documents.

**Carl C. Risch,**

*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2018–06490 Filed 3–29–18; 8:45 am]

**BILLING CODE 4710–06–P**

---

## DEPARTMENT OF STATE

[Public Notice 10260]

**60-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa**

**ACTION:** Notice of request for public comment.

**SUMMARY:** The Department of State is seeking Office of Management and Budget (OMB) approval for the information collection described below. In accordance with the Paperwork Reduction Act of 1995, we are requesting comments on this collection from all interested individuals and organizations. The purpose of this notice is to allow 60 days for public comment preceding submission of the collection to OMB.

**DATES:** The Department will accept comments from the public up to *May 29, 2018.*

**ADDRESSES:** You may submit comments by any of the following methods:

• *Web:* Persons with access to the internet may comment on this notice by going to *www.Regulations.gov.* You can search for the document by entering "Docket Number: DOS–2018–0002" in the Search field. Then click the "Comment Now" button and complete the comment form.

• *Email: PRA_BurdenComments@ state.gov.*

You must include the DS form number (if applicable), information collection title, and the OMB control number in any correspondence.

**SUPPLEMENTARY INFORMATION:**

• *Title of Information Collection:* Application for Nonimmigrant Visa.

• *OMB Control Number:* 1405–0182.

• *Type of Request:* Revision of a Currently Approved Collection.

• *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO).

• *Form Number:* DS–160 and DS–156.

• *Respondents:* All Nonimmigrant Visa Applicants.

• *Estimated Number of Respondents:* 14,000,000.

• *Estimated Number of Responses:* 14,000,000.

• *Average Time per Response:* 90 Minutes.

• *Total Estimated Burden Time:* 21,000,000 Annual Hours.

• *Frequency:* Once per respondent's application.

• *Obligation to Respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

• Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review.

**Abstract of Proposed Collection**

The Online Application for Nonimmigrant Visa (DS–160) is used to collect biographical information from individuals seeking a nonimmigrant visa. The consular officer uses the information collected to determine the applicant's eligibility for a visa. Form DS–156 is required by regulation of all nonimmigrant visa applicants who do not use the Online Application for Nonimmigrant Visa (Form DS–160). Posts will use the DS–156 in limited circumstances when the DS–160 is unavailable, as outlined below, to elicit information necessary to determine an applicant's visa eligibility.

**Methodology**

The DS–160 will be submitted electronically over an encrypted connection to the Department via the internet. The applicant will be instructed to print a confirmation page containing a bar coded record locator, which will be scanned at the time of processing. The Nonimmigrant Visa Application (DS–156) paper version will be used only in the following limited circumstances when applicants cannot access the DS–160:

• An applicant has an urgent medical or humanitarian travel need and the

consular officer has received explicit permission from the Visa Office to accept form DS–156;

• The applicant is a student exchange visitor who must leave immediately in order to arrive on time for his/her course and the consular officer has explicit permission from the Visa Office to accept form DS–156;

• The applicant is a diplomatic or official traveler with urgent government business and form DS–160 has been unavailable for more than four hours; or

• Form DS–160 has been unavailable for more than three days and the officer receives explicit permission from the Visa Office.

In order to obtain a copy of form DS–156, an applicant must contact the Embassy or consulate at which he or she is applying, and request a copy.

**Additional Information**

This collection is being revised to include both nonimmigrant visa application methods: the online version (form DS–160) which is used by the vast majority of applications, and the paper version (form DS–156) which is used in limited circumstances. Currently, the online application and paper application are approved under two separate collections. With this renewal, the Department seeks to combine these into a single collection. Upon approval, the Department will seek to discontinue OMB Control Number 1405–0018, the existing collection for form DS–156.

The Department also is revising the collection to add several additional questions for nonimmigrant visa applicants. One question lists multiple social media platforms and requires the applicant to provide any identifiers used by applicants for those platforms during the five years preceding the date of application. The platforms listed may be updated by the Department by adding or removing platforms. Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval. In addition, the applicant will be given the option to provide information about any social media identifiers associated with any platforms other than those that are listed that the applicant has used in the last five years. The Department will collect this information from visa applicants for identity resolution and vetting purposes based on statutory visa eligibility standards; however, the Department intends not to routinely ask the question of applicants for specific visa classifications, such as most diplomatic and official visa applicants. Other questions seek five years of previously

used telephone numbers, email addresses, and international travel; whether the applicant has been deported or removed from any country; and whether specified family members have been involved in terrorist activities. Additionally, some E-nonimmigrant visa applicants will be asked whether the principal treaty trader was issued a visa. The ''Sign and Submit'' statement will provide applicants additional information related to correcting records within Federal Bureau of Investigation databases. Finally, the revised visa application forms will include additional information regarding the visa medical examination that some applicants may be required to undergo. Additional details of the changes are available in supporting documents.

Carl C. Risch,

*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2018–06496 Filed 3–29–18; 8:45 am]

**BILLING CODE 4710–06–P**

---

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

### Notice of Intent To Rule on Change in Use of Aeronautical Property at Laurinburg-Maxton Airport, Maxton, NC

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice

**SUMMARY:** The Federal Aviation Administration (FAA) is requesting public comment on a request by the Laurinburg-Maxton Airport Commission, on behalf of the airport Sponsor (the City of Laurinburg and the Town of Maxton), to change a portion of airport property from aeronautical to non-aeronautical use at the Laurinburg-Maxton Airport. The request consists of release of approximately 1.72 acres to Mr. William J. Martin for use in conjunction with his existing business, Martin Transport. Martin Transport currently borders the property.

**DATES:** Comments must be received on or before April 30, 2018.

**ADDRESSES:** Comments on this notice may be mailed or delivered in triplicate to the FAA at the following address: Memphis Airports District Office, Attn: Ja'Monta Smith, Program Manager, 2600 Thousand Oaks Boulevard, Suite 2250, Memphis, TN 38118.

In addition, one copy of any comments submitted to the FAA must be mailed or delivered to Ms. Joanne Gentry, Executive Director for Laurinburg-Maxton Airport Commission at the following address: 16701 Airport Road, Maxton, NC 28364.

**FOR FURTHER INFORMATION CONTACT:** Ja'Monta Smith, Program Manager, Federal Aviation Administration, Memphis Airports District Office, 2600 Thousand Oaks Boulevard, Suite 2250, Memphis, TN 38118–2482.

The application may be reviewed in person at this same location, by appointment.

**SUPPLEMENTARY INFORMATION:** The FAA proposes to rule and invites public comment on the request to release property for non-aeronautical purposes at Laurinburg-Maxton Airport, Maxton, NC under the provisions of 49 U.S.C. 47107(h)(2). The FAA determined that the request to release property at Laurinburg-Maxton Airport (MEB) submitted by the Laurinburg-Maxton Airport Commission on behalf of the City of Laurinburg and the Town of Maxton meets the procedural requirements of the FAA and the release of the property does not and will not impact future aviation needs at the airport. The FAA may approve the request, in whole or in part, no sooner than thirty days after the publication of this notice. This action is taken under the provisions of 49 U.S.C. 47151.

The following is a brief overview of the request:

The Laurinburg-Maxton Airport Commission on behalf of the City of Laurinburg and the Town of Maxton is proposing the release of approximately 1.72 acres to Mr. William J. Martin for use in conjunction with his existing business, Martin Transport. Martin Transport currently borders the property. This property is located at the intersection of Airport Road and Skyway Church Road in Scotland County, NC. The property is separated from the majority of airport property by other parcels of land owned by others.

Any person may inspect, by appointment, the request in person at the FAA office listed above under **FOR FURTHER INFORMATION CONTACT.**

Issued in Memphis, TN, on March 23, 2018.

Phillip Braden,

*Manager, Memphis Airports District Office, Southern Region.*

[FR Doc. 2018–06406 Filed 3–29–18; 8:45 am]

**BILLING CODE P**

---

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

### Agency Information Collection Activities: Requests for Comments; Clearance of Renewed Approval of Information Collection: Renewal of AVIATOR Customer Satisfaction Survey

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice and request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, FAA invites public comments about our intention to request the Office of Management and Budget (OMB) approval to renew an information collection. The collection involves on-line, electronic applicant (customer) answers to standard survey questions. The questions are presented as multiple-choice selections and free-form text areas where applicants can choose their desired answer and, if they wish, add additional comments. The information to be collected will be used to and is necessary to gage the level of user satisfaction with the AVIATOR (Automated Vacancy Information Access Tool for Online Referral) system. Additionally, the surveys are used to obtain benchmarking and feedback to ensure quality.

**DATES:** Written comments should be submitted by August 2018.

**ADDRESSES:** Send comments to the FAA at the following address: Barbara Hall, Federal Aviation Administration, ASP–110, 10101 Hillwood Parkway, Fort Worth, TX 76177.

*Public Comments Invited:* You are asked to comment on any aspect of this information collection, including:

(a) Whether the proposed collection of information is necessary for FAA's performance

(b) The accuracy of the estimated burden

(c) Ways for FAA to enhance the quality, utility and clarity of the information collection and

(d) Ways that the burden could be minimized without reducing the quality of the collected information.

The agency will summarize and/or include your comments in the request for OMB's clearance of this information collection.

**FOR FURTHER INFORMATION CONTACT:** Barbara Hall by email at: *Barbara.L.Hall@faa.gov;* phone: 940–594–5913.

**SUPPLEMENTARY INFORMATION:**

# EXHIBIT 5:

# 30-Day Notice for Proposed Information Collection for Nonimmigrant Visa Application

| | Percent |
|---|---|
| *For Physical Damage:* | |
| Non-Profit Organizations with Credit Available Elsewhere ... | 2.500 |
| Non-Profit Organizations without Credit Available Elsewhere ................................... | 2.500 |
| *For Economic Injury:* | |
| Non-Profit Organizations without Credit Available Elsewhere ................................... | 2.500 |

The number assigned to this disaster for physical damage is 156576 and for economic injury is 156580.

(Catalog of Federal Domestic Assistance Number 59008)

**James Rivera,**
*Associate Administrator for Disaster Assistance.*

[FR Doc. 2018–18536 Filed 8–27–18; 8:45 am]

**BILLING CODE 8025–01–P**

---

# DEPARTMENT OF STATE

[Public Notice: 10503]

**30-Day Notice of Proposed Information Collection: Application for Nonimmigrant Visa**

**ACTION:** Notice of request for public comment and submission to OMB of proposed collection of information.

**SUMMARY:** The Department of State has submitted the information collection described below to the Office of Management and Budget (OMB) for approval. In accordance with the Paperwork Reduction Act of 1995 we are requesting comments on this collection from all interested individuals and organizations. The purpose of this Notice is to allow 30 days for public comment.

**DATES:** Submit comments directly to the Office of Management and Budget (OMB) up to September 27, 2018.

**ADDRESSES:** Direct comments to the Department of State Desk Officer in the Office of Information and Regulatory Affairs at the Office of Management and Budget (OMB). You may submit comments by the following methods:

• *Email:* oira_submission@omb.eop.gov. You must include the DS form number, information collection title, and the OMB control number in the subject line of your message.

• *Fax:* 202–395–5806. Attention: Desk Officer for Department of State.

**SUPPLEMENTARY INFORMATION:**

• *Title of Information Collection:* Application for Nonimmigrant Visa.

• *OMB Control Number:* 1405–0182.

• *Type of Request:* Revision of a Currently Approved Collection.

• *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO).

• *Form Number:* DS–160 and DS–156.

• *Respondents:* All Nonimmigrant Visa Applicants.

• *Estimated Number of Respondents:* 14,000,000.

• *Estimated Number of Responses:* 14,000,000.

• *Average Time per Response:* 90 Minutes.

• *Total Estimated Burden Time:* 21,000,000 Annual Hours.

• *Frequency:* Once per respondent's application.

• *Obligation to Respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

• Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review.

**Abstract of Proposed Collection**

The Online Application for Nonimmigrant Visa (DS–160) is used to collect biographical information from individuals seeking a nonimmigrant visa. The consular officer uses the information collected to determine the applicant's eligibility for a visa. Form DS–156 is required by regulation of all nonimmigrant visa applicants who do not use the Online Application for Nonimmigrant Visa (Form DS–160). Posts will use the DS–156 in limited circumstances when the DS–160 is unavailable, as outlined below, to elicit information necessary to determine an applicant's visa eligibility.

**Methodology**

The DS–160 will be submitted electronically over industry standard encryption technology to maintain a secure connection to the Department via the internet. The applicant will be instructed to print a confirmation page containing a bar coded record locator,

which will be scanned at the time of processing. The Nonimmigrant Visa Application (DS–156) paper version will be used only in the following limited circumstances when applicants cannot access the DS–160:

• An applicant has an urgent medical or humanitarian travel need and the consular officer has received explicit permission from the Visa Office to accept form DS–156;

• The applicant is a student exchange visitor who must leave immediately in order to arrive on time for his/her course and the consular officer has explicit permission from the Visa Office to accept form DS–156;

• The applicant is a diplomatic or official traveler with urgent government business and form DS–160 has been unavailable for more than four hours; or

• Form DS–160 has been unavailable for more than three days and the officer receives explicit permission from the Visa Office.

In order to obtain a copy of form DS–156, an applicant must contact the Embassy or consulate at which he or she is applying, and request a copy.

**Additional Information**

This collection is being revised to include both nonimmigrant visa application methods: The online version (form DS–160) which is used by the vast majority of applications, and the paper version (form DS–156) which is used in limited circumstances. Currently, the online application and paper application are approved under two separate collections. With this renewal, the Department seeks to combine these into a single collection. Upon approval, the Department will seek to discontinue OMB Control Number 1405–0018, the existing collection for form DS–156.

The Department also is revising the collection to add several additional questions for most nonimmigrant visa applicants. One question lists multiple social media platforms and requires the applicant to provide any identifiers used by applicants for those platforms during the five years preceding the date of application. The platforms listed may be updated by the Department by adding or removing platforms. Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval. In addition, the applicant will be given the option to provide information about any social media identifiers associated with any platforms other than those that are listed that the applicant has used in the last five years. The Department will collect this information from visa applicants for

**43952**      Federal Register / Vol. 83, No. 167 / Tuesday, August 28, 2018 / Notices

identity resolution and vetting purposes based on statutory visa eligibility standards; however, the Department does not intend to routinely require applicants for specific visa classifications, such as most diplomatic and official visa applicants, to respond to this question. Other questions seek five years of previously used telephone numbers, email addresses, and international travel; whether the applicant has been deported or removed from any country; and whether specified family members have been involved in terrorist activities. Additionally, some E nonimmigrant visa applicants will be asked whether the principal treaty trader was issued a visa. The "Sign and Submit" statement will provide applicants additional information related to correcting records within Federal Bureau of Investigation databases. Finally, the revised visa application forms will include additional information regarding the visa medical examination that some applicants may be required to undergo. Additional details of the changes are available in supporting documents.

Carl C. Risch,

*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2018–18594 Filed 8–27–18; 8:45 am]

**BILLING CODE 4710–06–P**

---

## DEPARTMENT OF STATE

[Public Notice: 10505]

### 30-Day Notice of Proposed Information Collection: Electronic Application for Immigrant Visa and Alien Registration

**ACTION:** Notice of request for public comment and submission to OMB of proposed collection of information.

**SUMMARY:** The Department of State has submitted the information collection described below to the Office of Management and Budget (OMB) for approval. In accordance with the Paperwork Reduction Act of 1995 we are requesting comments on this collection from all interested individuals and organizations. The purpose of this Notice is to allow 30 days for public comment.

**DATES:** Submit comments directly to the Office of Management and Budget (OMB) up to September 27, 2018.

**ADDRESSES:** Direct comments to the Department of State Desk Officer in the Office of Information and Regulatory Affairs at the Office of Management and Budget (OMB). You may submit comments by the following methods:

• *Email: oira_submission@ omb.eop.gov.* You must include the DS form number, information collection title, and the OMB control number in the subject line of your message.

• *Fax:* 202–395–5806. Attention: Desk Officer for Department of State.

**SUPPLEMENTARY INFORMATION:**

• *Title of Information Collection:* Electronic Application for Immigrant Visa and Alien Registration.

• *OMB Control Number:* 1405–0185.

• *Type of Request:* Revision of a Currently Approved Collection.

• *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO/L/R).

• *Form Number:* DS–260.

• *Respondents:* Immigrant Visa Applicants.

• *Estimated Number of Respondents:* 710,000.

• *Estimated Number of Responses:* 710,000.

• *Average Time per Response:* 155 minutes.

• *Total Estimated Burden Time:* 1,834,167 Annual Hours.

• *Frequency:* Once per application.

• *Obligation to Respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

• Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review.

### Abstract of Proposed Collection

The Electronic Application for Immigrant Visa and Alien Registration (DS–260) is used to collect biographical information from individuals seeking an immigrant visa. The consular officer uses the information collected to elicit information necessary to determine an applicant's eligibility for a visa.

### Methodology

The DS–260 will be submitted electronically over industry standard encryption technology to maintain a secure connection to the Department via the internet. The applicant will be instructed to print a confirmation page containing a bar coded record locator, which will be scanned at the time of processing.

### Additional Information

The Department is revising the collection to add several additional questions for immigrant visa applicants. One question lists multiple social media platforms and requires the applicant to provide any identifiers used by applicants for those platforms during the five years preceding the date of application. The platforms listed may be updated by the Department by adding or removing platforms. Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval. In addition, the applicant will be given the option to provide information about any social media identifiers associated with any platforms other than those that are listed that the applicant has used in the last five years. The Department will collect this information for identity resolution and vetting purposes based on statutory visa eligibility standards. Other questions seek five years of previously used telephone numbers, email addresses, and international travel; whether the applicant has been deported or removed from any country; and whether specified family members have been involved in terrorist activities. The "Sign and Submit" statement will provide applicants information related to correcting records within Federal Bureau of Investigation databases and additional information regarding the immigrant visa medical examination. Applicants from countries where female genital mutilation/cutting (FGM/C) is prevalent will be provided a link in the DS–260 to an electronic pamphlet that covers the illegality of the practice in the United States. Further, applicants will be required to check a box verifying that the link was provided to them. Finally, the revised visa application forms will include additional information regarding the visa medical examination that some applicants may be required to undergo. Additional details of the changes are available in supporting documents.

Carl C. Risch,

*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2018–18595 Filed 8–27–18; 8:45 am]

**BILLING CODE 4710–06–P**

# EXHIBIT 6:

# 30-Day Notice for Proposed Information Collection for Immigrant Visa and Alien Registration

identity resolution and vetting purposes based on statutory visa eligibility standards; however, the Department does not intend to routinely require applicants for specific visa classifications, such as most diplomatic and official visa applicants, to respond to this question. Other questions seek five years of previously used telephone numbers, email addresses, and international travel; whether the applicant has been deported or removed from any country; and whether specified family members have been involved in terrorist activities. Additionally, some E nonimmigrant visa applicants will be asked whether the principal treaty trader was issued a visa. The "Sign and Submit" statement will provide applicants additional information related to correcting records within Federal Bureau of Investigation databases. Finally, the revised visa application forms will include additional information regarding the visa medical examination that some applicants may be required to undergo. Additional details of the changes are available in supporting documents.

Carl C. Risch,

*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2018–18594 Filed 8–27–18; 8:45 am]

**BILLING CODE 4710–06–P**

---

# DEPARTMENT OF STATE

[Public Notice: 10505]

### 30-Day Notice of Proposed Information Collection: Electronic Application for Immigrant Visa and Alien Registration

**ACTION:** Notice of request for public comment and submission to OMB of proposed collection of information.

**SUMMARY:** The Department of State has submitted the information collection described below to the Office of Management and Budget (OMB) for approval. In accordance with the Paperwork Reduction Act of 1995 we are requesting comments on this collection from all interested individuals and organizations. The purpose of this Notice is to allow 30 days for public comment.

**DATES:** Submit comments directly to the Office of Management and Budget (OMB) up to September 27, 2018.

**ADDRESSES:** Direct comments to the Department of State Desk Officer in the Office of Information and Regulatory Affairs at the Office of Management and Budget (OMB). You may submit comments by the following methods:

• *Email: oira_submission@omb.eop.gov.* You must include the DS form number, information collection title, and the OMB control number in the subject line of your message.

• *Fax:* 202–395–5806. Attention: Desk Officer for Department of State.

**SUPPLEMENTARY INFORMATION:**

• *Title of Information Collection:* Electronic Application for Immigrant Visa and Alien Registration.

• *OMB Control Number:* 1405–0185.

• *Type of Request:* Revision of a Currently Approved Collection.

• *Originating Office:* Bureau of Consular Affairs, Visa Office (CA/VO/L/R).

• *Form Number:* DS–260.

• *Respondents:* Immigrant Visa Applicants.

• *Estimated Number of Respondents:* 710,000.

• *Estimated Number of Responses:* 710,000.

• *Average Time per Response:* 155 minutes.

• *Total Estimated Burden Time:* 1,834,167 Annual Hours.

• *Frequency:* Once per application.

• *Obligation to Respond:* Required to Obtain or Retain a Benefit.

We are soliciting public comments to permit the Department to:

• Evaluate whether the proposed information collection is necessary for the proper functions of the Department.

• Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used.

• Enhance the quality, utility, and clarity of the information to be collected.

• Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Please note that comments submitted in response to this Notice are public record. Before including any detailed personal information, you should be aware that your comments as submitted, including your personal information, will be available for public review.

### Abstract of Proposed Collection

The Electronic Application for Immigrant Visa and Alien Registration (DS–260) is used to collect biographical information from individuals seeking an immigrant visa. The consular officer uses the information collected to elicit information necessary to determine an applicant's eligibility for a visa.

### Methodology

The DS–260 will be submitted electronically over industry standard encryption technology to maintain a secure connection to the Department via the internet. The applicant will be instructed to print a confirmation page containing a bar coded record locator, which will be scanned at the time of processing.

### Additional Information

The Department is revising the collection to add several additional questions for immigrant visa applicants. One question lists multiple social media platforms and requires the applicant to provide any identifiers used by applicants for those platforms during the five years preceding the date of application. The platforms listed may be updated by the Department by adding or removing platforms. Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval. In addition, the applicant will be given the option to provide information about any social media identifiers associated with any platforms other than those that are listed that the applicant has used in the last five years. The Department will collect this information for identity resolution and vetting purposes based on statutory visa eligibility standards. Other questions seek five years of previously used telephone numbers, email addresses, and international travel; whether the applicant has been deported or removed from any country; and whether specified family members have been involved in terrorist activities. The "Sign and Submit" statement will provide applicants information related to correcting records within Federal Bureau of Investigation databases and additional information regarding the immigrant visa medical examination. Applicants from countries where female genital mutilation/cutting (FGM/C) is prevalent will be provided a link in the DS–260 to an electronic pamphlet that covers the illegality of the practice in the United States. Further, applicants will be required to check a box verifying that the link was provided to them. Finally, the revised visa application forms will include additional information regarding the visa medical examination that some applicants may be required to undergo. Additional details of the changes are available in supporting documents.

Carl C. Risch,

*Assistant Secretary, Bureau of Consular Affairs, Department of State.*

[FR Doc. 2018–18595 Filed 8–27–18; 8:45 am]

**BILLING CODE 4710–06–P**

USCA Case #23-5232      Document #2038310      Filed: 01/31/2024      Page 76 of 223

# EXHIBIT 7:

# Immigrant Visa Supporting Statement

# SUPPORTING STATEMENT FOR
# PAPERWORK REDUCTION ACT SUBMISSION

## Electronic Application for Immigrant Visa and Alien Registration
## OMB Number 1405-0185
## DS-260

## A.    JUSTIFICATION

### 1.    *Why is this collection necessary and what are the legal statutes that allow this?*

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, sets out application and eligibility requirements for aliens seeking to obtain immigrant visas. INA section 221(a), 8 U.S.C. § 1201(a) provides that a consular officer may issue an immigrant visa to an individual who has made a proper application, subject to applicable conditions and limitations in the INA and related regulations. INA section 222(a), 8 U.S.C. § 1202(a), specifically requires that an applicant provide the following information in an application for an immigrant visa: full and true name; any other names he/she has used or by which he/she has been known; age; sex; date of birth; place of birth; and such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

Visa ineligibility grounds are detailed in INA section 212(a), 8 U.S.C. § 1182(a), INA section 208(d) (6), 8 U.S.C. § 1158(d) (6), and other statutes. Among the grounds of ineligibility are those related to the health of the applicant, the applicant's past and present criminal activities, security concerns, potential for the applicant to become a public charge, and previous violations of the INA by the applicant. In the visa application form, applicants are asked a series of questions relevant to a determination of visa eligibility.

Department of State regulations pertaining to immigrant visas are published in 22 C.F.R. Part 42. The regulations on filing an application for an immigrant visa are in 22 CFR 42.63.

Executive Order 13780 (*Protecting the Nation From Foreign Terrorist Entry Into the United States*) directs the Department of State and other agencies to implement a program, as part of the process of adjudicating applications for visas and other immigration benefits, to improve screening and vetting. Section 5 of the E.O. directed relevant agencies to develop a uniform baseline for screening and vetting procedures.

In addition, in a Memorandum for the Secretary of State, the Attorney General, and the Secretary of Homeland Security, issued March 6, 2017 ("Presidential Memorandum"), the President stated that "[t]o avert the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal or terrorist acts, it is critical that the executive branch enhance the screening and vetting protocols and procedures for granting visas, admission to the United States, or other benefits under the INA." To that end, the recipient cabinet officials were directed, as permitted by law, to:

> implement protocols and procedures as soon as practicable that in their judgment will enhance the screening and vetting of applications for visas

and all other immigration benefits, so as to increase the safety and security of the American people. These additional protocols and procedures should focus on:

(a) preventing the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts; and

(b) ensuring the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits.

*2. What business purpose is the information gathered going to be used for?*

The information is gathered to enable consular officers to confirm the applicant's identity and determine visa eligibility under applicable U.S. law. Department of State consular officers will use the information collected in the visa adjudication process, coordinating with other Department officials and with partner U.S. government agencies as appropriate, for these purposes. This information is necessary to make these determinations.

*3. Is this collection able to be completed electronically (e.g. through a website or application)?*

Applicants are able to electronically fill out and submit the DS-260 online via the Consular Electronic Application Center at http://www.travel.state.gov. The Department employs industry standard encryption technology to maintain a secure connection during the online application process. Once the application is complete and the applicant has verified the answers provided, the applicant will electronically sign and submit the application. The applicant may print a copy of the application for record keeping purposes, but no paper copy of the application is separately submitted to the Department. The applicant will present to the consular officer a paper application confirmation page which will contain a record locator in the form of a barcode. The Department notes that while an applicant could save a copy of the barcode on a smart phone, Department scanners may not always be able to scan off smart phones. Further, all IV applicants are required to bring a copy of all components of their application for the consular officer's adjudication, and presumably, the barcode with the record locator will be included in this. The consular officer will scan the barcode to retrieve the electronic record of the application from the database. The electronic form will provide consular officers information needed to determine the eligibility of the applicant for a visa and will significantly reduce the need to solicit information during the applicant's interview. The electronic submission of the application to the Department will allow the information to be reviewed prior to an interview. The consular officer obtains the applicant's sworn affirmation and biometric signature at the time of the interview.

*4. Does this collection duplicate any other collection of information?*

To our knowledge, this collection is not duplicative of another existing collection. To the extent the DS-5535 (OMB Control Number 1405-0226) duplicates some questions posed in this collection, applicants completing the DS-5535 will be advised not to provide information already

Case 1:19-cv-03632-TJK   Document 31-8   Filed 04/15/20   Page 4 of 24
USCA Case #23-5232      Document #2038310      Filed: 01/31/2024      Page 79 of 223

3

reported in this collection. If this revision is approved, the Department will seek amendments to the DS-5535 to further avoid duplication.

## 5. Describe any impacts on small business.

This information collection does not involve small businesses or other small entities.

## 6. What are consequences if this collection is not done?

This information collection is essential for confirming the applicant's identity and determining whether an applicant is eligible for an immigrant visa. An applicant completes the form once per visa application. It is not possible to collect the information less frequently, as consular officers need up-to-date information to determine whether an applicant is eligible to receive a visa. *7. Are there any special collection circumstances?*

No special circumstances exist.

## 8. Document publication (or intent to publish) a request for public comments in the Federal Register

The Department of State (Visa Office, Bureau of Consular Affairs) published a 60-day notice in the Federal Register on March 30, 2018 (83 FR 13806) and a 30-day notice in the Federal Register on August 28, 2018 (83 FR 43952), soliciting public comment on this collection. The Department received a total of 10,086 combined comments on this publication and on the simultaneous publication of the Application for Nonimmigrant Visa (OMB Control No 1405-182) via email and posts to regulations.gov during the 60-day comment period. OMB received a total of five comments during the 30-day comment period. Many commenters submitted a single comment addressing both collections, while some commenters submitted identical or similar comments on each collection. The Department received 569 comments that were exact duplicates by the same commenter on the same collection that were excluded from the tallies below. Given the overlapping comments on the two proposals, the Department totals below include the total on both collections.

349 comments were non-responsive, and 2,218 additional comments simply opposed the proposal without detailed explanation. Numerous comments were substantively similar and commenters raised many overlapping issues. In those situations, the Department presents below a uniform response. Below are descriptions of the comments received during the 60-day comment period, followed by Department responses:

a) Time estimate "contains the implicit assumption that applicants would have no trouble complying with the new proposed social media questions in this information collection." American Hotel & Lodging Association, *et al* and 15 other commenters. Some commenters believed that the estimated burden was based solely on the additional questions.

**Response**:

The Department's estimated burden on affected visa applicants represents the anticipated average response time to complete the entire application. The Department recognizes that some applicants may take longer to complete the application, while other applicants may be able to compile the information more rapidly. The estimated burden for the

United States government and for respondents represents the total burden, not simply the increase based on the additional questions being proposed.

b) Many commenters expressed concerns related to the request for social media identifiers and how they will be examined during a visa adjudication. These inquiries and comments included:

- "Neither the Federal Register notice proposing these new questions, nor the supporting statement associated with this information collection, provide a list of social media platforms for which usernames and handles would be sought in this revised information collection." American Hotel and Lodging Association, *et al*. 197 other commenters expressed a concern that there was no definition of "social media."

- An anonymous commenter stated that there would be confusion with the optional social media question: "a lot of social media [sic] nowadays do not have their [sic] authorization system and rely [sic] on authentication services provided by Twitter, Facebook, Google, etc. It will be not clear which ID/login to provide if I registered on some platform and my account linked to 2 authentication options, for example, Google and Facebook. I suggest to cancel this initiative or limit it only to first field, where applicants will need to add usernames only for social media choose[n] by Department of State."

- "[T]he proposed 'option to provide information about any social media identifiers associated with any platforms other than those that are listed' is also unclear how incomplete responses or leaving it blank will affect an individual's application (for example, whether it will result in additional screening procedures or alternative forms of scrutiny)." – UN Special Rapporteur.

- Some commenters expressed concern about the number of accounts an individual could maintain, including accounts for which applicants may not be solely in control. For example, a number of organizations cosigned a comment stating that "because performing artists are public figures, their social media is often voluminous, and the content is largely beyond the control of the artists themselves." Raised by Tamizdat, et al.

- "Are we going to refuse to give a visa to people who don't use social media?" Raised by Anthony Caggiano. 304 additional commenters also questioned whether individuals who lack social media presence will be denied visas as a result.

- Many commenters requested clarification on how social media information would be reviewed and assessed. For example, anonymous commenters asked "Will records of all personal and professional interactions be searched?" 318 other commenters also requested clarification of how social media will be reviewed or verified. 22 commenters queried whether private pages would be reviewed.

- "Even the most basic machine-based translation tools do not operate with sufficient accuracy to generate reliable translations, much less inferences

based on those translations. Most commercially available natural language processing tools are only effective for English-language text, and will likely misinterpret non-English text." Raised by Muslim Advocates, and 89 other commenters expressed substantively similar concerns about the efficacy of social media review.

- "[T]here is no evidence that either robotic or human 'pre-cogs', or any algorithmic profiling ruleset, have any actual utility for predicting which individuals will engage in extremely rare acts of terrorism – regardless of the biographic data they are fed." Raised by the Identity Project, et al. 70 other commenters raised substantively similar concerns, specifically citing DHS efforts at social media screening efforts, including a DHS OIG report on the efficacy of vetting initiatives.

**Response:** With the questions on the application relating to social media identifiers and platforms, the Department is requesting that applicants provide their identifiers for specific platforms listed on the application. The Department may update the list of platforms with the approval of OMB, if the intended use is consistent with that described in this collection. By using a list of specific platforms, it will be clear to applicants what is expected in response. Applicants are not expected to include accounts designed for use by multiple users within a business or other organization. Providing social media identifiers for non-listed platforms is purely optional. Applicants will be instructed that this does not include private messaging on person-to-person messaging services, such as WhatsApp. Failure to answer the optional question will have no negative impact upon the visa adjudication. Visa applicants credibly representing that they have not used social media will not be adversely affected by not providing a social media handle.

The additional information requested, including social media platforms and identifiers, will be used to resolve questions about the applicant's identity or to determine visa eligibility.

The information will be assessed in the context of existing U.S. government information holdings, responsible U.S. agencies' knowledge of the identity of applicants, and an understanding of existing and evolving threats to national security, to enable more rigorous evaluation of applicants. Within consular and fraud prevention sections of the Department's overseas posts, public-facing social media information may be reviewed to assess potential visa fraud that would lead to a conclusion that the applicant is not eligible for a visa. For example, information on social media pages or posts may be used to validate legitimate relationships or employment required for visa eligibility, to identify indicia of fraud, or to identify misrepresentations that disguise potential threats.

The Department is aware of the February 2017 DHS Office of Inspector General Report on DHS' pilot programs for social media screening referenced by some commenters. Social media screening capabilities and effectiveness continue to evolve. The Department is constantly working to find mechanisms to improve our screening processes. Social media identifiers will provide U.S. consular officers an effective additional means for vetting visa applicants for identity resolution or specific visa ineligibility grounds.

c) The Department received numerous comments expressing concern about the privacy implications of the proposed collection, largely related to the collection of social media identifiers, and the possibility that it may chill free expression. These inquiries and comments included:

- The collection is an invasion of privacy. "[I]f the login and password are required as identifiers there would be significant privacy concerns." Raised by the Federation of Employers and Workers of America (FEWA). 3,181 commenters raised general privacy concerns or noted that the collection appeared invasive.

- "[T]he seizure of an extraordinary and forensic level of detail on five years of one's travel patterns, associations, social media handles, email addresses used, and telephone numbers used, should require reasonable suspicion of involvement of the individual in a crime, rather than being a non-negotiable condition for the granting of a visa." Raised by the Identity Project, et al. 197 other commenters raised general Fourth Amendment concerns with the proposal.

- "The notice provides no clarity regarding how the Department intends to comply with existing privacy laws, such as the Privacy Act or Judicial Redress Act, which provide certain protections for U.S. citizens, green card holders, and some non-U.S. citizens." Raised by the American Civil Liberties Union (ACLU) and 40 other commenters raised substantively similar concerns.

- 1,388 commenters were particularly concerned about potential chilling impacts on speech. For example:

  o "The collection of social media platform identifiers from nonimmigrant visa applicants, including Twitter handles, could have a chilling effect on free speech and the willingness of people who use Twitter to engage in free expression and conversation on the platform. Indeed, one of Twitter's hallmarks is that users may engage in anonymous speech to express opinions that may be challenging or unpopular, or otherwise comment on issues without fear of reprisal. However, if users applying for a nonimmigrant visa are forced to disclose Twitter handles associated with otherwise anonymous accounts, the value of Twitter's platform for such users evaporates. This may, in turn, chill global conversation and negatively impact the utility and value of Twitter's platform for **all** users." Raised by Twitter (emphasis in original).

  o "We are deeply concerned that the proposed rules will have a chilling effect on speech, and universities will be especially impacted. Universities are places where students and faculty engage in ongoing debate, questions, criticism and collaboration." Raised by the University of Minnesota-Twin Cities

Case 1:19-cv-03632-TJK   Document 31-8   Filed 04/15/20   Page 8 of 24
USCA Case #23-5232      Document #2038310      Filed: 01/31/2024      Page 83 of 223

7

- o "The most effective way for all working people to improve their conditions and treatment on the job is through collective action, most of which happens on-line in our modern world. Requiring already vulnerable workers to surrender their social media information could have a direct chilling effect on workers organizing, particularly at a time when immigration enforcement is actively targeting organizers." Raised by the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO).

- Some commenters raised concerns related to First Amendment rights to freedom of speech and association. For example, the Brennan Center and cosigning organizations state that "[p]roposed revisions will undermine First Amendment rights of speech, expression, and association" The ACLU expressed similar concerns: "[c]ollection of this information raises several First Amendment concerns. First, it will chill freedom of association by allowing the government to chart and amass connections between individuals living in the United States, including U.S. citizens, and applicants." 6,366 commenters raised substantively similar First Amendment concerns.

- "Even for travelers who might not have First Amendment rights before they arrive in the United States, a system that may penalize people for speech they engage in online and deprive their audience of the ability to hear it, is profoundly incompatible with core American constitutional values." Raised by the Brennan Center, et al. 1,248 commenters raised similar sentiments that the proposal was contrary to the values or founding principles of the United States.

- Some commenters expressed concern with the data of United States citizens being involved in the collection. For example, Twitter stated that "[g]iven the way our users interact across borders, and the lack of clarity surrounding the proposal, Twitter is concerned that information pertaining to United States citizens could be inadvertently collected and United States citizens' constitutional rights could be jeopardized." The ACLU stated that "[i]f the Department or another agency identifies individuals living in the United States through the use of social media identifiers provided on a visa application, it should promptly purge any record of that person's identifiable information. It should also make clear that that information will not be used in any immigration adjudication of that third party nor stored or retained by other agencies or components." 331 commenters raised substantively similar concerns.

- "Based upon this notice, applicants also have no idea how the information they provide might be used by other agencies or components-such as the Federal Bureau of Investigation (FBI), Immigration and Customs Enforcement (ICE), or even local law enforcement – once the applicants enter the United States." Raised by the ACLU. The University of Minnesota Twin Cities also stated "[i]t is unknown how the government will use this

Case 1:19-cv-03632-TJK   Document 31-8   Filed 04/15/20   Page 9 of 24
USCA Case #23-5232      Document #2038310      Filed: 01/31/2024      Page 84 of 223

8

information and how long it will be stored." 128 other commenters raised substantively similar concerns.

- "[B]oth OMB [sic] and the Department have dealt with data breaches in recent years, highlighting the challenge of protecting information in the current climate of digital warfare." Raised by Muslim Advocates. 39 other commenters raised substantively similar concerns about the safeguards protecting the collected information.

a. One commenter attached as a comment a copy of a comment that NAFSA submitted in response to the 2017 Department proposal to collect social media identifiers on the Supplemental Questions for Visa Applicants, DS-5535, stating "disclosing personal information shared on social media and travel history would place an added burden on vulnerable individuals, such as those who have fled terrorism and human rights abuses; those who have travelled to areas of concern for the purpose of gathering evidence, reporting what they have witnessed, and/or providing assistance to the local population; and those who are subject to persecution or negative consequences from their government or communities based on their faith, gender, sexual orientation, or other factors." 53 additional commenters raised similar concerns about vulnerable populations being at risk.

**Response:**

The Department respects First Amendment rights of speech, expression, and association; the value of the exchange of ideas; and privacy rights.

The Department is not requesting, and does not intend to request, passwords for social media accounts. The Department will add instructions stating "Please do not provide passwords." Consular staff are directed not to engage or interact with individual visa applicants on or through social media when conducting assessments of visa eligibility; not to request user passwords in furtherance of this collection; not to violate or attempt to subvert individual privacy settings or controls the applicants may have implemented on social media platforms; and not to use social media or assess an individual's social media presence beyond established Department guidance. The Department is aware that, unlike some other forms of personal information required from visa applicants, social media identifiers may afford the user anonymity. Posts will assess their respective operating environments and collect the social media identifier information from applicants in a manner that best safeguards its transmission from applicant to post. Only that content which a social media account holder shares publicly will be viewed by the Department. Department employees who set up an account on a social media website for the purpose of visa eligibility assessments must abide by the contractual rules of that service or platform provider. With regard to concerns that United States citizen communications may become involved in the collection, the Department limits its collection to information relevant to a visa adjudication. Consular staff are will be directed in connection with this collection to take particular care to avoid collection of third-party information unless relevant and necessary when conducting any review of social media information. Other U.S. government agencies authorized to access visa records are subject to other legal restrictions. Further, the Department of State intends to undergo

internal review processes to ensure that the collection, retention, and review of this content is done in accordance with all privacy related statutory, regulatory, and department policy requirements and guidelines.

To the extent that some commenters expressed concern with reports of requests for passwords by customs officials or perceived violations of the Fourth Amendment, the Department reiterates that it is not requesting passwords and will only review information that users have allowed to be viewable to the public.

The Department is mindful that personal information provided in visa applications may be of a sensitive nature. All information collected as a part of this collection is confidential under INA section 222(f), 8 U.S.C. § 1202(f) and will be protected accordingly. By law, such information may be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States, except that, in the discretion of the Secretary of State, it may be made available to a court or provided to a foreign government if the relevant requirements stated in INA section 222(f), 8 U.S.C. § 1202(f), are satisfied.

The Department takes its responsibilities to protect the confidentiality of visa records and compliance with various privacy laws seriously. With regard to the Judicial Redress Act of 2015, Public Law 114-226, the Department's Bureau of Consular Affairs is not a designated federal agency or component under that law. *See* 83 Fed. Reg. 28062. The Department's System of Record Notice (SORN) on Visa Records (STATE-39) describes the safeguards that protect certain visa records that are governed by the Privacy Act. These safeguards include thorough background investigations of Department staff, controlled access to Department systems, and annual training on the protection of sensitive but unclassified information. While the Department's Visa Records SORN applies only to certain visa records, the safeguards described therein also help to ensure the protection of all visa records maintained in Department systems.

d) Many comments focused on what information from social media might impact visa decisions, including political statements or loose connections on social media platforms. These inquiries and comments included:

- "The only thing that this measure would do is to restrict entry to our country to people whose thoughts that the State Department agrees with." Raised by Melina Minch. 572 other commenters similarly asked whether statements in opposition to the administration would result in visa denials or asked for specifics regarding what information contained in social media postings or pages may result in a denial.

- Several commenters queried what impact associations, friendships, or likes on social media would have upon a visa application. For instance, "[o]ne Pulitzer Prize-nominated journalist who reports on extremist groups connects with sources through Twitter, Instagram, Tumbler, and Telegram. An agent looking at her social media presence out of context might misunderstand the nature of such online relationships." Raised by Muslim Advocates and 45 commenters raised substantively similar concerns.

- "Given the context-specific nature of social media it could lead to misconstrued communications being treated as nefarious and result in rejected visa applications with personal and economic impact." Raised by Privacy International and 615 other commenters raised substantively similar concerns

- "For example, notes taken by a consular officer about a visa applicant's social media profile – that might be imperfectly translated, include conclusions without disclosure of the source on which they are based, or are not accompanied by contextualizing information from the visa interview – might later be introduced against them in a removal proceeding without an opportunity for verification or cross-examination, with serious consequences for the person affected." Raised by the Brennan Center.

- Several commenters requested information on what type of oversight or ability to correct information contained in Department systems visa applicants may have.  "If this program is to be implemented at all, meaningful oversight mechanisms should be built into it, including periodic audits and reviews as well as a formal dispute resolution mechanism for affected persons." Raised by Muslim Advocates.  "Both notices state that 'the "Sign and Submit" statement will provide applicants additional information related to correcting records with the Federal Bureau of Investigation databases,' but what about correcting records contained in other government security databases?" Raised by NAFSA: Association of International Educators, et al. 42 additional commenters raised similar concerns.

**Response:** The Department respects First Amendment rights of speech, expression, and association; the value of the exchange of ideas; and privacy rights.  Visa denials must be based on specific statutory visa ineligibilities.  In accordance with existing authorities, visas may not be denied on the basis of race, religion, ethnicity, national origin, political views, gender, or sexual orientation.  Consular officers determine visa eligibility based on standards set out in the INA and other applicable U.S. law.  Most of these standards are in INA section 212(a), 8 U.S.C. § 1182(a), which describes activities that trigger visa ineligibility.  To determine an applicant's visa eligibility under the INA, consular officers evaluate all available information, including the responses and perceived credibility of the visa applicant during any visa interview.  The adjudicating officer makes a determination based on the totality of the circumstances, in light of the legal standards.  Some social media activity may be evidence of activity, ties, or intent that are grounds for visa denial under the INA, and although the political motivation behind a visa applicant's posting would generally be irrelevant to the visa adjudication, political motivation behind illegal acts does not mitigate ineligibility.  For example, the INA makes inadmissible an individual convicted of a crime that is a crime involving moral turpitude under INA section 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I), and is not a purely political offense, whether or not the applicant had some political motivation for the crime.

The collection of social media identifier information is an additional tool for identity resolution and to screen visa applicants for visa ineligibility.  The Department acknowledges that the context and circumstances of the applicant, culture, country conditions, the nature of the account, and other postings will inform the interpretation of

any social media post and recognizes the challenge presented by the various contexts in which individuals post to social media.

Under INA section 212(b), 8 U.S.C. § 1182(b), an alien denied a visa based on inadmissibility under INA section 212(a), 8 U.S.C. § 1182(a), generally is entitled to notice of the determination including "the specific provision or provisions of law under which the alien is inadmissible," with the exception of denials under INA section § 1182(a)(2) or (3), for which such notice is not required.   If an immigrant visa applicant believes such a decision to be incorrect, the applicant can provide additional evidence to the consular section where he or she applied for the visa, within one year of the refusal, to demonstrate that he or she overcomes the ground of ineligibility.   Where an applicant believes that the immigration laws were applied incorrectly, the applicant or representative may pose legal questions regarding pending or recently completed visa cases by email to the Department at LegalNet@State.gov.

e)  The Department received various comments related to the burden and chilling effect on applicants, the burden on the government, and the possibility of backlogs resulting from increased information collection.  Some comments also questioned the utility of the information collected and how it improved the vetting procedures.   These inquiries and comments included:

- 1,891 comments were concerned that the proposal would chill or deter travel to the United States, particularly certain classes of visa applicants.   The commenters were particularly concerned with the economic consequences of reduced travel to the United States.  For example:

    o  "Adding unnecessary layers of inspection delays travelers' entry into the country, which imposes a cost on the United States economy. Tourists will have less time (or will) to travel to and spend money in the United States.  American business relying on members of the workforce who must retain visas will lose productivity, talent, and diversity." - Muslim Advocates.

    o  "Combined with worldwide coverage of reports of poor treatment at U.S. ports of entry, increasing numbers of international students, researchers, and scientists are making the decision to stay away or go elsewhere.  Such decisions will result in the loss of valuable intellectual content and collaboration that our nation needs, both academically and economically." - NAFSA

    o  "This decline in tourism must not be taken lightly as it has cost the U.S. billions; in 2017 international spending directly supported 15.6 million American jobs and generated a total of $2.4 trillion in economic output." – Rep. Bennie Thompson

    o  "[C]oncerned that these changes will further discourage scientists, engineers, physician-scientists, and students from other countries from pursuing research and education in the United States.   These collaborations and exchanges are crucial to U.S. science, technology,

and innovation, and to U.S. international leadership." – National Academies of the Sciences, Engineering, Medicine.

- 252 commenters expressed concerns that the proposal was xenophobic, discriminatory, or otherwise designed to deter immigration. For example, an anonymous commenter stated, "[t]his proposal is a thinly veiled excuse to grind to a halt basic immigration procedures with the political goal of preventing lawful immigration."

- "Implementation of these additional requirements will likely result in an even larger backlog which impacts appointed faculty who need to be in the United States to begin teaching, students who have been admitted to degree programs, and researchers pursuing scientific collaboration." Raised by Indiana University. Jill Leukhardt also stated that "[t]he collection of additional data is likely to stretch the resources of our consular officers, likely resulting in slower processing times." 369 other commenters raised substantively similar concerns about the amount of information collected and anticipated backlogs.

- "The new requirement to list social media identifiers, telephone numbers, email addresses, and international travel demands provided a considerable amount of information. Inadvertent omissions will provide the basis for pretextual denials." Raised by the National Immigration Law Center and 291 other commenters raised substantively similar concerns.

- "We are concerned that the high burden placed on consular officers as a result of this proposed information collection would leave little scope for these and other actions that would both heighten security and facilitate travel. To be clear, we strongly endorse increases in the number of both consular officers to process visa applications and U.S. Customs and Border Protection officers at ports of entry, as well as improving the physical and technical infrastructure each group requires for its critical security tasks." Raised by the American Hotel & Lodging Association. 1,006 other commenters raised similar concerns about the burden on consular officers and the resources that would be spent related to this collection, stating it was a waste of valuable government resources.

- 485 comments stated that additional information being collected does not appear useful to the vetting process. For example:

  o "The Department of State has been processing applications for visas for admission to the U.S. for almost two hundred years without collecting this information. There is no indication in the notice of any circumstances in which not collecting any specific item on this list which would not already be available to the Department of State, much less all of the items on the list, would in any way prevent the Department from properly adjudicating a visa application." Raised by Identity Project

- o The ACLU commented that the need for the information is not fully explained and it was "not made clear how matches obtained from intelligence holdings will be interpreted or will impact immigration determinations." The ACLU continued that the "use of identifiers to match against intelligence holdings is likely to lead to inconsistent, arbitrary, or discriminatory determinations." Finally, the ACLU stated that "the Department offers no indication how an applicant's international travel over the last five years has weight on their adjudication, particular given that this information has not been necessary in the past."

- "It is doubtful that an individual who promotes terrorism online will disclose information about the social media profile he is using to do so, or will retain postings that might get flagged as problematic." Raised by the Brennan Center, et al, and 271 other commenters expressed substantively similar concerns that individuals with troublesome social media would not disclose it.

- 329 commenters felt the proposal was counterproductive by reducing the United States standing and reputation in the world. For example, "[s]teps intended to protect national security may have the unintended consequence of inadvertently depriving our nation of extending our democratic values through contact of Americans with visitors from other countries – as tourists, in classrooms, labs, lecture halls, and the workplace. Without these contacts, America is more susceptible to the distortions of extremist organizations and movements." - Jill Leukhardt

**Response:** National security is our top priority when adjudicating visa applications. Every applicant for a U.S. visa undergoes extensive security screening. Maintaining robust screening standards for visa applicants is a dynamic practice that must adapt to emerging threats. The Department is constantly working to find mechanisms to improve our screening processes to protect our borders.

With the visa application process, the Department seeks to balance its primary goal of securing the U.S. border with its goal of facilitating legitimate travel. The Department does not aim to unnecessarily burden visa applicants, but to obtain all information necessary to appropriately screen all prospective travelers. The additional information, including social media identifiers, will provide an effective additional means for screening visa applicants for specific visa ineligibility grounds or for verifying the applicant's identity. The Department does not anticipate that it will significantly impact processing times for the vast majority of visa applicants.

While the Department appreciates that some individuals may not be entirely truthful in responding to the additional questions, that is true for existing questions and does not render the collection unnecessary. The Department similarly acknowledges that some applicants may transition their social media accounts from public-facing to protected, non-public settings.

In specific regard to student and exchange visitors, the Department recognizes the many potential benefits of foreign visitors in these categories, including significant contributions to the U.S. economy. With that in mind, the Department's goal is that

every eligible student visa applicant is able to begin his or her program of study on time. When consistent with other demands, our embassies and consulates give priority to appointments for student and exchange visitor visa applicants. Student visas now can be issued 120 days before studies begin and applicants are encouraged to apply as soon as possible.

The Department recognizes the economic and cultural value of eligible visa applicants and intended visitors. Consistent with the Department's mission, this proposal seeks to balance its goals of securing the U.S. border while facilitating legitimate travel that significantly contributes to economic and cultural exchange. The Department aims to manage the visa process strictly, but fairly, in order to best protect the United States. Travel to the United States continues to be welcomed and encouraged.

f)  The Department received comments related to situations when a visa applicant may be unable to provide certain information, and the impact of the failure to report such information. 178 commenters raised concerns on these topics. Comments related to these concerns included:

  - "Many people, including international students, are active on social media and have numerous accounts that frequently change over the years. The notice does not address the consequences should an applicant inadvertently omit an active account or forget a dormant one." Raised by NAFSA.

  - "[E]ven sophisticated social media users do not know their identifiers due to the manner in which these identifiers are assigned and used." Raised by FEWA. Some commenters echoed similar concerns about defunct accounts with five year lookback period.

  - "Visa applicants can easily overlook or forget that they own certain accounts. As an example, when a person creates a Gmail account, Google automatically creates a YouTube account for that user; this person may not realize that he has a YouTube account that he would need to report." Raised by the Center for Democracy and Technology (CDT).

  - "For example, if a visa applicant simply does not include social media information on the application, how does the Department plan to determine whether that is because the applicant does not use social media or because the applicant is not being fully truthful in the application? At a minimum, we request the Department to enunciate an unclassified policy for how it plans to verify applicants' truthfulness and the standards it will use to judge non-response." Raised by the American Hotel & Lodging Association, et al.

**Response:** The Department acknowledges that human memory is imperfect. The Department is also aware that historical information, including address history, birthdates, and familial relationships, will take a variety of forms in different nations around the world, and may in some cases be difficult to obtain. Applicants are instructed to provide the information to the best of their knowledge. The Department adjudicates visa applications around the world, and the Department and its consular officers are cognizant that not every individual has a social media presence, just as not every individual has children or a spouse. Answers on a visa application are not automatically

suspect because an individual does not have information to provide. Consular officers may note any corrections an applicant makes during the consular interview.

An applicant who willfully misrepresents a material fact in a visa application may face immigration or criminal consequences. In any visa application, the determination of whether an applicant's statement constitutes a willful misrepresentation of material fact for purpose of visa ineligibility is determined by a consular officer on a case-by-case basis. A willful misrepresentation is distinct from an accidental or inadvertent mistake and requires intent by a visa applicant. Materiality is determined in the context of individual cases, and whether the misrepresentation would have impacted the proper resolution of the alien's application for a visa. An inadvertent error should not impact an applicant's ability to receive a visa or immigration benefits.

g) Some commenters were concerned that the proposal was part of a larger endeavor involving monitoring of applicants or discriminatory motives. For example:

- "The Department of State's (DOS') proposed access to social media use is part of a larger Trump Administration scheme of continuous, open-ended monitoring of non-citizens and naturalized citizens. This monitoring will occur without probable cause or reasonable suspicion of wrongdoing and without transparency, oversight, or accountability." – NILC (emphasis in original)

- Commenters were concerned about how the proposal interacts with DHS proposals related to continuous vetting. "Approval of DOS's proposed information collection seems premature when it is clear there is no agreement among the relevant agencies on the information to be collected and how or how often it is to be reviewed." Raised by NAFSA.

- Opposed to "extreme vetting initiative" – "It would have been targeted at 'evaluating an applicant's probability of becoming a positively contributing member of society as well as their ability to contribute to national interests,' and predicting whether those entering the U.S. intended to commit a crime or terrorist attack once they arrived here." – Brennan Center, et al.

**Response:** The collection seeks only information necessary to determine visa eligibility. Visa denials must be based on standards set out in the INA section 212(a), 8 U.S.C. § 1182(a) and other applicable U.S. law. Visas may not be denied on the basis of race, religion, ethnicity, national origin, political views, gender, or sexual orientation. To determine an applicant's visa eligibility, consular officers evaluate all available information, including the responses and perceived credibility of the visa applicant during any visa interview. The adjudicating officer makes a determination based on the totality of the circumstances, in light of the legal standards.

h) "Clan/tribe identity cannot be used as a basis to grant a visa to the United States and is not dispositive of statutory eligibility for a nonimmigrant or immigrant visa. This is discriminatory on its face and indirectly violates the anti-discrimination clause under the Immigration and Nationality Act." Raised by the American-Arab Anti-Discrimination Committee. The Identity Project, et al also raised concerns with the definition of clan or tribe.

**Response**: The collection seeks information necessary to confirm an applicant's identity and determine visa eligibility. There are many fields on the visa application, such as sex, employment history, and marital status that assist consular officers in resolving identity and are not grounds for visa denial. The question related to whether an applicant is a member of a clan or tribe is an identity-related question and has been requested from some visa applicants since at least 2011.

i) In arguing that the collection has discriminatory intent, the Brennan Center raised that "the statement supporting the revision of this collection with respect to immigrant visas includes a provision to include in the application form "a link…to an electronic pamphlet that covers the illegality of [female genital mutilation], a practice that is not especially Islamic but is framed as such by anti-Muslim voices who have considerable influence in this administration."

**Response**: The United States is committed to ending female genital mutilation or cutting (FGM/C). Section 644 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Public Law 104-208 (8 U.S.C. 1374), requires the Department of Homeland Security (DHS), with the cooperation from the Department of State, to notify visa recipients of the severe harm to physical and psychological health caused by Female Genital Mutilation (FGM/C). Consistent with these obligations, written notice is given to visa applicants in countries where FGM/C is a common practice. The proposal to provide the informational pamphlet electronically, rather than in the existing paper based form, will increase efficiency and streamline the process for such notification. The informational pamphlet is already provided to nonimmigrant visa applicants electronically.

j) "Next, while a question on why an individual may have been deported from another country may potentially be appropriate for security purposes, it should not be asked as a simple yes or no question. Applicants must have an opportunity to explain their answer, especially as the reason an applicant may have been deported from another country may not be relevant to US authorities, such as a situation where an individual was deported for something that is not a crime in the US, for example by a regime that sought to punish a traveler for a comment they made that would normally be protected by the First Amendment in the US." Raised by Harrison Gill.

**Response**: Applicants who indicate a prior deportation from any country will be prompted to provide additional details within the application.

k) Some commenters expressed concern that the request was not targeted to specific applicants. For example: "This only targets those from visa-required nations, and is for all visa types. This leaves open many potential other avenues for entry where one does not have to submit documentation. I do not believe the policy should be broadened to include additional nations. I believe if ANY policy of this sort is to be enacted (which I feel uncomfortable with, see points below) that it should be done based on visa type alone - perhaps someone getting a green card, regardless of country of origin is subjected to this, but someone coming on a two week business trip is not." Raised by Elizabeth Sherman.

**Response**: The Department is constantly working to find mechanisms to improve our screening processes, while not unduly burdening legitimate travel and immigration to the United States.  This collection is intended to strike that balance.

l) The request for 5 years of telephone numbers used in the last five years "could potentially encompass any telephone number that a visa applicant has ever used to place or receive a phone call within the past five years, including all hotel rooms, hostels, bed and breakfasts, inns, motels, work phone numbers, and potentially even conference call bridge lines." Raised by AILA who suggested the Department "reframe the question as specifically and narrowly as possible."  Similar concerns were raised on requests for email addresses.  The American Hotel & Lodging Association also raised these concerns.

**Response**: The Department believes the term "use" in this context is clear and means a regularly used telephone number owned or operated by the applicant, such as home, work, or mobile number.  The Department will insert a help box or public guidance through travel.state.gov to advise applicants that such transitory phone numbers or email addresses are not expected to be provided.

m) AILA relayed concerns relating to updated sign and submit language related to the Australian Department of Home Affairs: "In the event the language is correct and medical examinations of visa applicants will be collected and temporarily stored in the eMedical system hosted, operated and maintained by the Australian Department of Home Affairs, this raises concerns about the privacy and security of medical examination records when they are outside the control of the U.S. government."

**Response**:

The eMedical system serves as a conduit for panel physicians to submit medical exam information to the Department.  The eMedical system is hosted, operated, and maintained by the Australian Department of Home Affairs (DHA) (formerly the Department of Immigration and Border Protection), which is being held to the same high standards of confidentiality that the Department would require if a private company would have hosted the service.

Approved panel physicians will be granted access to the eMedical system by the Department.  The medical examination information is input by these approved panel physicians and then transferred to the Department for the purposes of enabling consular officers to determine applicants' eligibility for a visa.  Access to visa applicant information in eMedical is password controlled and DHA and those operating under its auspices may only access the information to provide technical support to the U.S. government or its panel physicians on an as-needed basis.  The eMedical system is approved as an information collection under OMB Control Number 1405-0230, and further details related to this collection are available at reginfo.gov.

n) "The Department of State has reiterated in its most recent report to the United States Human Rights Committee that, 'As reported in the Initial Report, in the United States, the right to travel – both domestically and internationally – is constitutionally protected.'  This statement was made in the context of review of U.S. implementation

of the ICCPR, and in that context was clearly intended to indicate that, in the opinion of the Department of State, protection of the right to travel in the U.S. extends to all individuals regardless of citizenship." Raised by the Identity Project, et al.

**Response**: A citizen of a foreign country who seeks to enter the United States must comply with the immigration laws of the United States. This often means that an individual must first apply and be found eligible for a United States visa. A visa does not guarantee entry to the United States. The Department aims to manage the visa process through a rigorous enforcement of applicable laws, to best protect the United States in accordance with those laws. Travel to the United States continues to be welcomed and encouraged for legitimate travelers. Aliens outside the United States generally do not have a constitutional right to travel to the United States.

o) "[I]nstituting this question may compel other national governments to require American travelers to disclose their social media history as a precondition to travel abroad." Raised by the AFL-CIO and 345 other commenters raised similar concerns related to the reciprocal treatment of United States citizens.

**Response:** In developing the proposal, the Department was mindful that other countries may impose reciprocal requirements on U.S. travelers bound for their countries. The Department seeks to balance its multiple missions: protecting U.S. citizens, securing the U.S. border, and facilitating legitimate travel to and from the United States. This additional information, including social media identifiers, will provide U.S. consular officers an effective additional means for vetting visa applicants for specific visa ineligibility grounds.

p) There were 87 commenters who expressed support for the changes.

**Response**: The Department is constantly working to find mechanisms to improve our screening processes to protect U.S. borders and citizens, without unduly burdening legitimate travel and immigration to the United States. This collection is intended to strike that balance. *9. Are payments or gifts given to the respondents?*

No payment or gift is provided to respondents.*10. Describe assurances of privacy/confidentiality*

The Department employs industry standard encryption technology to maintain a secure connection during the online application process. In accordance with INA section 222(f), 8 U.S.C. § 1202(f), information obtained from applicants in the immigrant visa application process is considered confidential and is to be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States, except that, in the discretion of the Secretary of State, it may be made available to a court or provided to a foreign government if the relevant requirements stated in INA section 222(f), 8 U.S.C. § 1202(f) are satisfied. The same safeguards and confidentiality provisions that protect information in a visa application that is received by the United States will remain in effect for social media platforms and identifier information. The collection of social media platforms and identifiers will not be used to deny visas based on applicants' race, religion, ethnicity, national origin, political views, gender, or sexual orientation. Consular officers will not request user passwords and will not attempt to subvert any privacy controls the

applicants may have implemented on these platforms.  As noted in paragraph 10 above, such information once collected is confidential under INA section 222(f), 8 U.S.C. § 1202(f).

*11. Are any questions of a sensitive nature asked?*

The questions in the collection are designed to elicit the information necessary to determine whether an applicant is eligible for an immigrant visa under the INA, 8 U.S.C. § 1101 *et seq.* Consular officers may not issue a visa to aliens who are ineligible under applicable provisions of INA section 212, 8 U.S.C. § 1182, or any other provision of law, unless where authorized under the INA or the Department of Homeland Security grants a waiver.  In order to adjudicate visa eligibility, the application form specifically asks for biographical information on a variety of issues, including information concerning the alien's health, criminal offenses, narcotics addiction, political affiliation with subversive organizations and participation in genocide or terrorist activities.  In addition, questions concerning the applicant's marital status, employment, social media use, and financial support are necessary to identify the applicant and to assist in determining eligibility for an immigrant visa.  As noted in paragraph 10 above, such information is confidential under INA section 222(f), 8 U.S.C. § 1202(f).

> The Department recognizes the sensitivity of social media information for some visa applicants.  Consular officers are already directed not to engage or interact with individual visa applicants on or through social media when conducting assessments of visa eligibility; not to violate or attempt to violate individual privacy settings and platform terms of service; and to adhere to Department guidance limiting use of social media and assessments of an individual's social media presence. Consular officers will be mindful that, unlike some other forms of personal information required from visa applicants, social media identifiers may afford the user anonymity.  The Department employs industry standard encryption technology to maintain a secure connection during the online application process.  Consular staff will be directed in connection with this collection to take particular care to avoid collection of third-party information.

*12. Describe the hour time burden and the hour cost burden on the respondent needed to complete this collection*

The Department estimates that 710,000 applicants annually will complete this collection.  The Department estimates that each applicant will spend 155 minutes, or 35 minutes longer than the current 120 minute estimate, to complete this collection.  Therefore, the Department of State estimates that the annual hour burden to visa applicants posed by the collection is 1,834,167 hours (710,000 applicants x 155 minutes). The weighted wage hour cost burden for this collection is $62,501,074.7 based on the calculation of $24.34[1] (average hourly wage) x 1.4 (weighted wage multiplier) x 1,834,167.

*13. Describe the monetary burden to respondents (out of pocket costs) needed to complete this collection.*

---

[1] Source: Data from the U.S. Bureau of Labor Statistics' May 2017 National Occupational Employment and Wage Estimates for all occupations (http://www.bls.gov/oes). Retrieved August 13, 2018.

The applicant must submit a digital photo, which may result in a cost. Based on a survey of various overseas embassies, the Department estimates that the average cost to an alien obtaining a digital photograph will be five dollars. We therefore estimate that the total cost burden for the collection is $3,550,000 ($5 x 710,000 applicants).

*14. Describe the cost incurred by the Federal Government to complete this collection.*

The annual cost burden to the federal government for the DS-260 in fiscal year 2018 is $156,695,500. The Department acknowledges that this estimate may be low as the cost model does not incorporate the new additions to the form. However, while the cost to the Federal Government will increase because of the new information collected, the Department assumes this increase amount will be *de minimis*. This estimate is based on the Consular Affairs fiscal year 2016 update to the Cost of Service Model, which calculates the cost to the U.S. government of providing consular services including visas. This estimate includes all immigrant visa types that use the DS-260. The application fees, which vary based on the immigrant visa category, generally are computed to recover the costs associated with immigrant visas.

*15. Explain any changes/adjustments to this collection since the previous submission*

This collection is being revised to include additional questions for visa applicants. As a result of these additions, the Department is increasing its burden estimate by 35 minutes to accommodate the additional time a visa applicant will spend completing the collection. The additional information could reasonably lead to information about whether the applicant is eligible for a visa, including resolving the identity of an applicant. The Department will make the following changes:

    a. A new required question labeled "Social Media" will instruct:

Select from the list below each social media platform you have used within the last five years. In the space next to the platform's name, enter the username or handle you have used on that platform. If you have used more than one platform or more than one username or handle on a single platform, click the "Add Another" button to list each one separately. If you have not used any of the listed social media platforms in the last five years, select "None."

The form will include a data field labeled "Social Media Identifier" for the applicant to type in his or her social media "handle" or identifier. The applicant may select "Add Another" if the applicant has more than one provider/platform or social media identifier to disclose. Applicants will be advised they do not need to list accounts designated for multiple users within a business or other organization. Applicants will be provided help boxes or public guidance through travel.state.gov to assist in common questions, such as how to find the "social media identifier" of an account. Applicants will be advised to list each identifier used, including multiple identifiers on a single platform. No visa application is guaranteed approval, and all can be denied for a variety of reasons, but an applicant who does not have a social media presence will not be denied on that basis.

The platforms listed may be updated by the Department by adding or removing platforms. Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval. The Department will not collect applicant passwords for these social media platforms. The Department is only collecting public-facing identifiers from designated platforms, and will not go beyond publicly available information.

The Department will collect this information for identity resolution and vetting purposes based on statutory visa eligibility standards.

b. Applicants will be asked about prior immigration violations. Specifically, applicants will be asked "Have you ever been removed or deported from any country?" An affirmative response will prompt the applicant to provide further details.

c. Applicants will be asked: "Are you the spouse, son, or daughter of an individual who has engaged in terrorist activity, including by providing financial assistance or other support to terrorists or terrorist organizations, in the last five years?" An affirmative response will prompt the applicant to provide further details.

d. All applicants will be requested to provide details related to travel history. Specifically, applicants will be asked whether they have travelled to any country outside of their country of residence during the last five years. An affirmative response will prompt the applicant to provide further details.

e. Applicants are currently asked for their current, secondary, and work telephone numbers. Applicants will be asked "Have you used any other telephone numbers during the last five years?" An affirmative response will permit applicants to add additional numbers used.

f. Applicants are currently asked for their current email address. Applicants will be asked "Have you used any other email addresses for personal purposes during the last five years?" An affirmative response will permit applicants to add additional addresses used.

g. The "Sign and Submit" section of the DS-260 will add an additional notification for applicants related to the Federal Bureau of Investigation's fingerprinting system. Specifically, applicants will be informed that "If fingerprints are collected as part of your application process, they may be used for the purpose of comparing them to other fingerprints in the FBI's Next Generation Identification (NGI) fingerprint system or its successor systems (including civil, criminal, and latent fingerprint repositories). Procedures for obtaining a change, correction, or update of an FBI identification record are set forth in Title 28, CFR 16.34. The photograph that you provide with your application may be used for employment verification or other U.S. law enforcement purposes."

h. The Confidentiality Statement will be updated to remove the headings. The text will remain unchanged.

i. In light of changes to the medical examination process for some applicants, the Department will provide information about the new system to applicants. The

Department intends to add the following language to the "Sign and Submit" page to inform applicants about the requirements:

Immigrant visa applicants are required to undergo a medical examination with an authorized physician to assess visa eligibility consistent with INA Sections 212(a) and 221(d). I understand that failure to provide required information may cause delay or denial of my visa application. If required to undergo a medical examination, I understand that my medical examination information may be collected and temporarily stored in the eMedical system hosted, operated, and maintained by the Australian Department of Home Affairs. If my medical examination is collected in eMedical, I understand and consent to its collection and temporarily being stored in such system, and being transferred to the U.S. Government for the purposes of enabling the U.S. Department of State to determine my medical eligibility and for the U.S. Centers for Disease Control and Prevention to undertake public health functions under the Public Health Service Act Section 325 and INA Section 212(a).

j. Applicants from countries where female genital mutilation/cutting (FGM/C) is prevalent will be provided a link in the DS-260 to an electronic pamphlet that covers the illegality of the practice in the United States. Further, applicants will be required to check a box verifying that the link was provided to them. Currently, the Department posts a copy of this information sheet in visa wait rooms for applicants to read. This change will increase the accessibility of the information sheet for all applicants from FGM prevalent countries.

k. The electronic signature language will be updated to remove outdated language related to exclusion and deportation. The second paragraph of the E-Signature language will be amended to read as follows: "I understand that any willfully false or misleading statement or willful concealment of a material fact made by me herein may result in refusal of the visa, denial of admission to the United States, and, may subject me to criminal prosecution and/or removal from the United States."

16. *Specify if the data gathered by this collection will be published.*

The data gathered will not be published; however, a quantitative summary of all Department of State visa activities is published in the annual <u>Report of the Visa Office</u>. The Report of the Visa Office is an annual report providing statistical information on immigrant and non-immigrant visa issuances by consular offices, as well as information on the use of visa numbers in numerically limited categories. The Visa Office currently has annual reports available from 2000 to 2017. The link to the site is: https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics.html.

*17. If applicable, explain the reason(s) for seeking approval to not display the OMB expiration date. Otherwise, write "The Department will display the OMB expiration date."*

The Department of State will display the expiration date for OMB approval on the information collection.

*18. Explain any exceptions to the OMB certification statement below. If there are no exceptions, write "The Department is not seeking exceptions to the certification statement".*

The Department of State is not requesting any exceptions to the certification statement requirements.

**B.   COLLECTION OF INFORMATION EMPLOYING STATISTICAL METHODS**

This collection does not employ statistical methods.

USCA Case #23-5232   Document #2038310   Filed: 01/31/2024   Page 100 of 223

# EXHIBIT 8:

# Nonimmigrant Visa Supporting Statement

# SUPPORTING STATEMENT FOR
# PAPERWORK REDUCTION ACT SUBMISSION

Application for Nonimmigrant Visa
OMB Number 1405-0182
DS-160 and DS-156

## A.   JUSTIFICATION

*1.   Why is this collection necessary and what are the legal statutes that allow this?*

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, sets out application and eligibility requirements for aliens seeking to obtain nonimmigrant visas. INA section 221(a), 8 U.S.C. § 1201(a) provides that a consular officer may issue a nonimmigrant visa to an individual who has made a proper application, subject to applicable conditions and limitations in the INA and related regulations. INA section 222(c), 8 U.S.C. § 1202(c), specifically requires that:

> Every alien applying for a nonimmigrant visa and for alien registration shall make application therefore in such form and manner as shall be by regulations prescribed. In the application the alien shall state his full and true name and such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulation prescribed.

Visa ineligibility grounds are detailed in INA section 212(a), 8 U.S.C. § 1182(a), INA section 214(b), 8 U.S.C. §1184(b), INA section 208(d)(6), 8 U.S.C. § 1158(d)(6), and other statutes. Among the grounds of ineligibility are those related to the health of the applicant, the applicant's past and present criminal activities, security concerns, potential for the applicant to become a public charge, and previous violations of the INA by the applicant; however, not all grounds of ineligibility apply to all visa classifications. In the visa application form, applicants are asked a series of questions relevant to a determination of visa eligibility.

Department of State regulations pertaining to nonimmigrant visas under the INA are published at 22 CFR Part 41. The regulations on filing an application for a nonimmigrant visa are in 22 CFR 41.103.

Executive Order 13780 (*Protecting the Nation From Foreign Terrorist Entry Into the United States*) directs the Department of State and other agencies to implement a program, as part of the process of adjudicating applications for visas and other immigration benefits, to improve screening and vetting. Section 5 of the E.O. directed relevant agencies to develop a uniform baseline for screening and vetting procedures.

In addition, in a Memorandum for the Secretary of State, the Attorney General, and the Secretary of Homeland Security, issued March 6, 2017 ("Presidential Memorandum"), the President stated that "[t]o avert the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal or terrorist acts, it is critical that the executive branch enhance the screening and vetting protocols and procedures for granting visas,

admission to the United States, or other benefits under the INA." To that end, the recipient cabinet officials were directed, as permitted by law, to:

> implement protocols and procedures as soon as practicable that in their judgment will enhance the screening and  vetting of applications for visas and all other immigration benefits, so as to increase the safety and security of the American people.  These additional protocols and procedures should focus on:
>
> (a)  preventing the entry into the United States of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts; and
>
> (b)  ensuring the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits.

2. *What business purpose is the information gathered going to be used for?*

The information is gathered to enable consular officers to confirm the applicant's identity and determine visa eligibility under applicable U.S. law.  Department of State consular officers will use the information collected in the visa adjudication process, coordinating with other Department officials and with partner U.S. government agencies, as appropriate, for these purposes. Their information is necessary to make these determinations.

3. *Is this collection able to be completed electronically (e.g. through a website or application)?*

Applicants are able to electronically fill out and submit the DS-160 online via the Consular Electronic Application Center at http://www.travel.state.gov.  The Department employs industry standard encryption technology to maintain a secure connection during the online application process.  Once the application is complete and the applicant has verified the answers provided, the applicant will electronically sign and submit the application.  The applicant may print a copy of the application for record keeping purposes, but no paper copy of the DS-160 application is separately submitted to the Department.  The applicant will present to the consular officer a paper application confirmation page which will contain a record locator in the form of a barcode.  The Department notes that while an applicant could save a copy of the barcode on a smart phone, Department scanners may not always be able to scan off smart phones.  Further, all IV applicants are required to bring a copy of all components of their application for the consular officer's adjudication, and presumably, the barcode with the record locator will be included in this.  The consular officer will scan the barcode to retrieve the electronic record of the application from the database.  The electronic form will provide consular officers information needed to determine the eligibility of the applicant for a visa and will significantly reduce the need to solicit information during the applicant's interview.  The electronic submission of the application to the Department will allow the information to be reviewed prior to an interview.  The consular officer obtains the applicant's sworn affirmation and biometric signature at the time of the interview.

The Department will retain form DS-156, the paper version of form DS-160, to be used only when:

- An applicant has an urgent medical or humanitarian travel need and the consular officer has received explicit permission from the Bureau of Consular Affairs Visa Office to accept form DS-156;
- The applicant is a student or exchange visitor who must leave immediately in order to arrive on time for his/her course and the consular officer has explicit permission from the Visa Office to accept form DS-156;
- The applicant is a diplomatic or official traveler with urgent government business and form DS-160 has been unavailable for more than four hours; or
- Form DS-160 has been unavailable for more than three days and the officer receives explicit permission from the Visa Office.

4. *Does this collection duplicate any other collection of information?*

To our knowledge, this collection is not duplicative of another existing collection. To the extent the DS-5535 (OMB Control Number 1405-0226) duplicates some questions posed in this collection, applicants completing the DS-5535 will be advised not to provide information already reported in this collection. If this revision is approved, the Department will seek amendments to the DS-5535 to further avoid duplication. The paper back-up version of this collection is currently maintained under OMB Control Number 1405-0018, but is being consolidated into this collection to avoid duplication.

5. *Describe any impacts on small business.*

This information collection does not involve small businesses or other small entities.

6. *What are the consequences if this collection is not done?*

This information collection is essential for confirming the applicant's identity and determining whether an applicant is eligible for a nonimmigrant visa. An applicant completes the form once per visa application. It is not possible to collect the information less frequently, as consular officers need up-to-date information to determine whether an applicant is eligible to receive a visa.

7. *Are there any special collection circumstances?*

No special circumstances exist.

8. *Document publication (or intent to publish) a request for public comments in the Federal Register.*

The Department of State (Visa Office, Bureau of Consular Affairs) published a 60-day notice in the Federal Register on March 30, 2018 (83 FR 13807), and a 30-day notice in the Federal Register on August 28, 2018 (83 FR 43951), soliciting public comment on this collection. The Department received a total of 10,086 combined comments on this publication and on the simultaneous publication of the Electronic Application for Immigrant Visa and Alien Registration (OMB Control No 1405-185) via email and posts to regulations.gov during the 60-day comment period. Many commenters submitted a single comment addressing both collections, while some commenters submitted identical or similar comments on each collection. The Department received 569 comments that were exact duplicates by the same commenter on the same collection that were excluded from the tallies below. Given the

overlapping comments on the two proposals, the Department totals below include the total on both collections.

349 comments were non-responsive, and 2,218 additional comments simply opposed the proposal without detailed explanation. Numerous comments were substantively similar and commenters raised many overlapping issues. In those situations, the Department presents below a uniform response. Below are descriptions of the comments received during the 60-day comment period, followed by Department responses:

a) Time estimate "contains the implicit assumption that applicants would have no trouble complying with the new proposed social media questions in this information collection." American Hotel & Lodging Association, et al and 15 other commenters. The American Immigration Lawyers Association (AILA) raised a general concern that the burden estimate for the DS-160 and DS-156 was too low. Some commenters believed that the estimated burden was based solely on the additional questions.

**Response**:

The Department's estimated burden on affected visa applicants represents the anticipated average response time to complete the entire application. The Department recognizes that some applicants may take longer to complete the application, while other applicants may be able to compile the information more rapidly. The estimated burden for the United States government and for respondents represents the total burden, not simply the increase based on the additional questions being proposed.

b) Many commenters expressed concerns related to the request for social media identifiers and how they will be examined during a visa adjudication. These inquiries and comments included:

- "Neither the Federal Register notice proposing these new questions, nor the supporting statement associated with this information collection, provide a list of social media platforms for which usernames and handles would be sought in this revised information collection." American Hotel and Lodging Association, et al. 197 other commenters expressed a concern that there was no definition of "social media."

- An anonymous commenter stated that there would be confusion with the optional social media question: "a lot of social media [sic] nowadays do not have their [sic] authorization system and rely [sic] on authentication services provided by Twitter, Facebook, Google, etc. It will be not clear which ID/login to provide if I registered on some platform and my account linked to 2 authentication options, for example, Google and Facebook. I suggest to cancel this initiative or limit it only to first field, where applicants will need to add usernames only for social media choose[n] by Department of State."

- "[T]he proposed 'option to provide information about any social media identifiers associated with any platforms other than those that are listed' is also unclear how incomplete responses or leaving it blank will affect an individual's application (for example, whether it will result in additional screening procedures or alternative forms of scrutiny)." – UN Special Rapporteur.

- Some commenters expressed concern about the number of accounts an individual could maintain, including accounts for which applicants may not be solely in control. For example, a number of organizations cosigned a comment stating that "because performing artists are public figures, their social media is often voluminous, and the content is largely beyond the control of the artists themselves." Raised by Tamizdat, et al.

- "Are we going to refuse to give a visa to people who don't use social media?" Raised by Anthony Caggiano. 304 additional commenters also questioned whether individuals who lack social media presence will be denied visas as a result.

- Many commenters requested clarification on how social media information would be reviewed and assessed. For example, anonymous commenters asked "Will records of all personal and professional interactions be searched?" 318 other commenters also requested clarification of how social media will be reviewed or verified. 22 commenters queried whether private pages would be reviewed.

- "Even the most basic machine-based translation tools do not operate with sufficient accuracy to generate reliable translations, much less inferences based on those translations. Most commercially available natural language processing tools are only effective for English-language text, and will likely misinterpret non-English text." Raised by Muslim Advocates, and 89 other commenters expressed substantively similar concerns about the efficacy of social media review.

- "[T]here is no evidence that either robotic or human 'pre-cogs', or any algorithmic profiling ruleset, have any actual utility for predicting which individuals will engage in extremely rare acts of terrorism – regardless of the biographic data they are fed." Raised by the Identity Project, et al. 70 other commenters raised substantively similar concerns, specifically citing DHS efforts at social media screening efforts, including a DHS OIG report on the efficacy of vetting initiatives.

**Response:** With the questions on the application relating to social media identifiers and platforms, the Department is requesting that applicants provide their identifiers for specific platforms listed on the application. The Department may update the list of platforms with the approval of OMB, if the intended use is consistent with that described in this collection. By using a list of specific platforms, it will be clear to applicants what is expected in response. Applicants are not expected to include accounts designed for use by multiple users within a business or other organization. Providing social media identifiers for non-listed platforms is purely optional. Applicants will be instructed that this does not include private messaging on person-to-person messaging services, such as WhatsApp. Failure to answer the optional question will have no negative impact upon the visa adjudication. Visa applicants credibly representing that they have not used social media will not be adversely affected by not providing a social media handle.

The additional information requested, including social media platforms and identifiers, will be used to resolve questions about the applicant's identity or to determine visa eligibility.

The information will be assessed in the context of existing U.S. government information holdings, responsible U.S. agencies' knowledge of the identity of applicants, and an understanding of existing and evolving threats to national security, to enable more rigorous evaluation of applicants.  Within consular and fraud prevention sections of the Department's overseas posts, public-facing social media information may be reviewed to assess potential visa fraud that would lead to a conclusion that the applicant is not eligible for a visa.  For example, information on social media pages or posts may be used to validate legitimate relationships or employment required for visa eligibility, to identify indicia of fraud, or to identify misrepresentations that disguise potential threats.

The Department is aware of the February 2017 DHS Office of Inspector General Report on DHS' pilot programs for social media screening referenced by some commenters. Social media screening capabilities and effectiveness continue to evolve.  The Department is constantly working to find mechanisms to improve our screening processes.  Social media identifiers will provide U.S. consular officers an effective additional means for vetting visa applicants for identity resolution or specific visa ineligibility grounds.

c) The Department received numerous comments expressing concern about the privacy implications of the proposed collection, largely related to the collection of social media identifiers, and the possibility that it may chill free expression.  These inquiries and comments included:

- The collection is an invasion of privacy.  "[I]f the login and password are required as identifiers there would be significant privacy concerns."  Raised by the Federation of Employers and Workers of America (FEWA).  3,181 commenters raised general privacy concerns or noted that the collection appeared invasive.

- "[T]he seizure of an extraordinary and forensic level of detail on five years of one's travel patterns, associations, social media handles, email addresses used, and telephone numbers used, should require reasonable suspicion of involvement of the individual in a crime, rather than being a non-negotiable condition for the granting of a visa." Raised by the Identity Project, et al.  197 other commenters raised general Fourth Amendment concerns with the proposal.

- "The notice provides no clarity regarding how the Department intends to comply with existing privacy laws, such as the Privacy Act or Judicial Redress Act, which provide certain protections for U.S. citizens, green card holders, and some non-U.S. citizens." Raised by the American Civil Liberties Union (ACLU) and 40 other commenters raised substantively similar concerns.

- 1,388 commenters were particularly concerned about potential chilling impacts on speech.  For example:

- o "The collection of social media platform identifiers from nonimmigrant visa applicants, including Twitter handles, could have a chilling effect on free speech and the willingness of people who use Twitter to engage in free expression and conversation on the platform. Indeed, one of Twitter's hallmarks is that users may engage in anonymous speech to express opinions that may be challenging or unpopular, or otherwise comment on issues without fear of reprisal. However, if users applying for a nonimmigrant visa are forced to disclose Twitter handles associated with otherwise anonymous accounts, the value of Twitter's platform for such users evaporates. This may, in turn, chill global conversation and negatively impact the utility and value of Twitter's platform for **all** users." Raised by Twitter (emphasis in original).

- o "We are deeply concerned that the proposed rules will have a chilling effect on speech, and universities will be especially impacted. Universities are places where students and faculty engage in ongoing debate, questions, criticism and collaboration." Raised by the University of Minnesota-Twin Cities

- o "The most effective way for all working people to improve their conditions and treatment on the job is through collective action, most of which happens on-line in our modern world. Requiring already vulnerable workers to surrender their social media information could have a direct chilling effect on workers organizing, particularly at a time when immigration enforcement is actively targeting organizers." Raised by the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO).

- Some commenters raised concerns related to First Amendment rights to freedom of speech and association. For example, the Brennan Center and cosigning organizations state that "[p]roposed revisions will undermine First Amendment rights of speech, expression, and association" The ACLU expressed similar concerns: "[c]ollection of this information raises several First Amendment concerns. First, it will chill freedom of association by allowing the government to chart and amass connections between individuals living in the United States, including U.S. citizens, and applicants." 6,366 commenters raised substantively similar First Amendment concerns.

- "Even for travelers who might not have First Amendment rights before they arrive in the United States, a system that may penalize people for speech they engage in online and deprive their audience of the ability to hear it, is profoundly incompatible with core American constitutional values." Raised by the Brennan Center, et al. 1,248 commenters raised similar sentiments that the proposal was contrary to the values or founding principles of the United States.

- Some commenters expressed concern with the data of United States citizens being involved in the collection. For example, Twitter stated that "[g]iven the

way our users interact across borders, and the lack of clarity surrounding the proposal, Twitter is concerned that information pertaining to United States citizens could be inadvertently collected and United States citizens' constitutional rights could be jeopardized." The ACLU stated that "[i]f the Department or another agency identifies individuals living in the United States through the use of social media identifiers provided on a visa application, it should promptly purge any record of that person's identifiable information. It should also make clear that that information will not be used in any immigration adjudication of that third party nor stored or retained by other agencies or components." 331 commenters raised substantively similar concerns.

- "Based upon this notice, applicants also have no idea how the information they provide might be used by other agencies or components-such as the Federal Bureau of Investigation (FBI), Immigration and Customs Enforcement (ICE), or even local law enforcement – once the applicants enter the United States." Raised by the ACLU. The University of Minnesota Twin Cities also stated "[i]t is unknown how the government will use this information and how long it will be stored." 128 other commenters raised substantively similar concerns.

- "[B]oth OMB [sic] and the Department have dealt with data breaches in recent years, highlighting the challenge of protecting information in the current climate of digital warfare." Raised by Muslim Advocates. 39 other commenters raised substantively similar concerns about the safeguards protecting the collected information.

- One commenter attached as a comment a copy of a comment that NAFSA submitted in response to the 2017 Department proposal to collect social media identifiers on the Supplemental Questions for Visa Applicants, DS-5535, stating "disclosing personal information shared on social media and travel history would place an added burden on vulnerable individuals, such as those who have fled terrorism and human rights abuses; those who have travelled to areas of concern for the purpose of gathering evidence, reporting what they have witnessed, and/or providing assistance to the local population; and those who are subject to persecution or negative consequences from their government or communities based on their faith, gender, sexual orientation, or other factors." 53 additional commenters raised similar concerns about vulnerable populations being at risk.

**Response:**

The Department respects First Amendment rights of speech, expression, and association; the value of the exchange of ideas; and privacy rights.

The Department is not requesting, and does not intend to request, passwords for social media accounts. The Department will add instructions stating "Please do not provide passwords." Consular staff are directed not to engage or interact with individual visa applicants on or through social media when conducting assessments of visa eligibility; not to request user passwords in furtherance of this collection; not to violate or attempt to

Case 1:19-cv-03632-TJK   Document 31-9   Filed 04/15/20   Page 10 of 25
USCA Case #23-5232      Document #2038310      Filed: 01/31/2024      Page 109 of 223

9

subvert individual privacy settings or controls the applicants may have implemented on social media platforms; and not to use social media or assess an individual's social media presence beyond established Department guidance. The Department is aware that, unlike some other forms of personal information required from visa applicants, social media identifiers may afford the user anonymity. Posts will assess their respective operating environments and collect the social media identifier information from applicants in a manner that best safeguards its transmission from applicant to post. Only that content which a social media account holder shares publicly will be viewed by the Department. Department employees who set up an account on a social media website for the purpose of visa eligibility assessments must abide by the contractual rules of that service or platform provider. With regard to concerns that United States citizen communications may become involved in the collection, the Department limits its collection to information relevant to a visa adjudication. Consular staff will be directed in connection with this collection to take particular care to avoid collection of third-party information unless relevant and necessary when conducting any review of social media information. Other U.S. government agencies authorized to access visa records are subject to other legal restrictions. Further, the Department of State intends to undergo internal review processes to ensure that the collection, retention, and review of this content is done in accordance with all privacy related statutory, regulatory, and department policy requirements and guidelines.

To the extent that some commenters expressed concern with reports of requests for passwords by customs officials or perceived violations of the Fourth Amendment, the Department reiterates that it is not requesting passwords and will only review information that users have allowed to be viewable to the public.

The Department is mindful that personal information provided in visa applications may be of a sensitive nature. All information collected as a part of this collection is confidential under INA section 222(f), 8 U.S.C. § 1202(f) and will be protected accordingly. By law, such information may be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States, except that, in the discretion of the Secretary of State, it may be made available to a court or provided to a foreign government if the relevant requirements stated in INA section 222(f), 8 U.S.C. § 1202(f), are satisfied.

The Department takes its responsibilities to protect the confidentiality of visa records and compliance with various privacy laws seriously. With regard to the Judicial Redress Act of 2015, Public Law 114-226, the Department's Bureau of Consular Affairs is not a designated federal agency or component under that law. *See* 83 Fed. Reg. 28062. The Department's System of Record Notice (SORN) on Visa Records (STATE-39) describes the safeguards that protect certain visa records that are governed by the Privacy Act. These safeguards include thorough background investigations of Department staff, controlled access to Department systems, and annual training on the protection of sensitive but unclassified information. While the Department's Visa Records SORN applies only to certain visa records, the safeguards described therein also help to ensure the protection of all visa records maintained in Department systems.

d) Many comments focused on what information from social media might impact visa decisions, including political statements or loose connections on social media platforms. These inquiries and comments included:

- "The only thing that this measure would do is to restrict entry to our country to people whose thoughts that the State Department agrees with." Raised by Melina Minch. 572 other commenters similarly asked whether statements in opposition to the administration would result in visa denials or asked for specifics regarding what information contained in social media postings or pages may result in a denial.

- Several commenters queried what impact associations, friendships, or likes on social media would have upon a visa application. For instance, "[o]ne Pulitzer Prize-nominated journalist who reports on extremist groups connects with sources through Twitter, Instagram, Tumbler, and Telegram. An agent looking at her social media presence out of context might misunderstand the nature of such online relationships." Raised by Muslim Advocates and 45 commenters raised substantively similar concerns.

- "Given the context-specific nature of social media it could lead to misconstrued communications being treated as nefarious and result in rejected visa applications with personal and economic impact." Raised by Privacy International and 615 other commenters raised substantively similar concerns

- "For example, notes taken by a consular officer about a visa applicant's social media profile – that might be imperfectly translated, include conclusions without disclosure of the source on which they are based, or are not accompanied by contextualizing information from the visa interview – might later be introduced against them in a removal proceeding without an opportunity for verification or cross-examination, with serious consequences for the person affected." Raised by the Brennan Center.

- Several commenters requested information on what type of oversight or ability to correct information contained in Department systems visa applicants may have. "If this program is to be implemented at all, meaningful oversight mechanisms should be built into it, including periodic audits and reviews as well as a formal dispute resolution mechanism for affected persons." Raised by Muslim Advocates. "Both notices state that 'the "Sign and Submit" statement will provide applicants additional information related to correcting records with the Federal Bureau of Investigation databases,' but what about correcting records contained in other government security databases?" Raised by NAFSA: Association of International Educators, et al. 42 additional commenters raised similar concerns.

**Response:** The Department respects First Amendment rights of speech, expression, and association; the value of the exchange of ideas; and privacy rights. Visa denials must be based on specific statutory visa ineligibilities. In accordance with existing authorities, visas may not be denied on the basis of race, religion, ethnicity, national origin, political views, gender, or sexual orientation. Consular officers determine visa eligibility based on standards set out in the INA and other applicable U.S. law. Most of these standards are in

INA section 212(a), 8 U.S.C. § 1182(a), which describes activities that trigger visa ineligibility. To determine an applicant's visa eligibility under the INA, consular officers evaluate all available information, including the responses and perceived credibility of the visa applicant during any visa interview. The adjudicating officer makes a determination based on the totality of the circumstances, in light of the legal standards. Some social media activity may be evidence of activity, ties, or intent that are grounds for visa denial under the INA, and although the political motivation behind a visa applicant's posting would generally be irrelevant to the visa adjudication, political motivation behind illegal acts does not mitigate ineligibility. For example, the INA makes inadmissible an individual convicted of a crime that is a crime involving moral turpitude under INA section 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I), and is not a purely political offense, whether or not the applicant had some political motivation for the crime.

The collection of social media identifier information is an additional tool for identity resolution and to screen visa applicants for visa ineligibility. The Department acknowledges that the context and circumstances of the applicant, culture, country conditions, the nature of the account, and other postings will inform the interpretation of any social media post and recognizes the challenge presented by the various contexts in which individuals post to social media.

Under INA section 212(b), 8 U.S.C. § 1182(b), an alien denied a visa based on inadmissibility under INA section 212(a), 8 U.S.C. § 1182(a), generally is entitled to notice of the determination including "the specific provision or provisions of law under which the alien is inadmissible," with the exception of denials under INA section § 1182(a)(2) or (3), for which such notice is not required. If a nonimmigrant visa applicant believes such a decision to be incorrect, the applicant can provide additional evidence to the consular section where he or she applied for the visa, within one year of the refusal, to demonstrate that he or she overcomes the ground of ineligibility. Where an applicant believes that the immigration laws were applied incorrectly, the applicant or representative may pose legal questions regarding pending or recently completed visa cases by email to the Department at LegalNet@State.gov.

e) The Department received various comments related to the burden and chilling effect on applicants, the burden on the government, and the possibility of backlogs resulting from increased information collection. Some comments also questioned the utility of the information collected and how it improved the vetting procedures. These inquiries and comments included:

- 1,891 comments were concerned that the proposal would chill or deter travel to the United States, particularly certain classes of visa applicants. The commenters were particularly concerned with the economic consequences of reduced travel to the United States. For example:

  o "Adding unnecessary layers of inspection delays travelers' entry into the country, which imposes a cost on the United States economy. Tourists will have less time (or will) to travel to and spend money in the United States. American business relying on members of the workforce who must retain visas will lose productivity, talent, and diversity." - Muslim Advocates.

  o "Combined with worldwide coverage of reports of poor treatment at
    U.S. ports of entry, increasing numbers of international students,
    researchers, and scientists are making the decision to stay away or go
    elsewhere.   Such decisions will result in the loss of valuable
    intellectual content and collaboration that our nation needs, both
    academically and economically." - NAFSA

  o "This decline in tourism must not be taken lightly as it has cost the
    U.S. billions; in 2017 international spending directly supported 15.6
    million American jobs and generated a total of $2.4 trillion in
    economic output." – Rep. Bennie Thompson

  o "[C]oncerned that these changes will further discourage scientists,
    engineers, physician-scientists, and students from other countries from
    pursuing research and education in the United States.   These
    collaborations and exchanges are crucial to U.S. science, technology,
    and innovation, and to U.S. international leadership." – National
    Academies of the Sciences, Engineering, Medicine.

- 252 commenters expressed concerns that the proposal was xenophobic,
  discriminatory, or otherwise designed to deter immigration.  For example, an
  anonymous commenter stated, "[t]his proposal is a thinly veiled excuse to
  grind to a halt basic immigration procedures with the political goal of
  preventing lawful immigration."

- "Implementation of these additional requirements will likely result in an even
  larger backlog which impacts appointed faculty who need to be in the United
  States to begin teaching, students who have been admitted to degree
  programs, and researchers pursuing scientific collaboration." Raised by
  Indiana University.  Jill Leukhardt also stated that "[t]he collection of
  additional data is likely to stretch the resources of our consular officers, likely
  resulting in slower processing times."  369 other commenters raised
  substantively similar concerns about the amount of information collected and
  anticipated backlogs.

- "The new requirement to list social media identifiers, telephone numbers,
  email addresses, and international travel demands provided a considerable
  amount of information.   Inadvertent omissions will provide the basis for
  pretextual denials."  Raised by the National Immigration Law Center and 291
  other commenters raised substantively similar concerns.

- "We are concerned that the high burden placed on consular officers as a result
  of this proposed information collection would leave little scope for these and
  other actions that would both heighten security and facilitate travel.  To be
  clear, we strongly endorse increases in the number of both consular officers to
  process visa applications and U.S. Customs and Border Protection officers at
  ports of entry, as well as improving the physical and technical infrastructure
  each group requires for its critical security tasks."  Raised by the American
  Hotel & Lodging Association.  1,006 other commenters raised similar
  concerns about the burden on consular officers and the resources that would

be spent related to this collection, stating it was a waste of valuable government resources.

- 485 comments stated that additional information being collected does not appear useful to the vetting process. For example:
  - "The Department of State has been processing applications for visas for admission to the U.S. for almost two hundred years without collecting this information. There is no indication in the notice of any circumstances in which not collecting any specific item on this list which would not already be available to the Department of State, much less all of the items on the list, would in any way prevent the Department from properly adjudicating a visa application." Raised by Identity Project
  - The ACLU commented that the need for the information is not fully explained and it was "not made clear how matches obtained from intelligence holdings will be interpreted or will impact immigration determinations." The ACLU continued that the "use of identifiers to match against intelligence holdings is likely to lead to inconsistent, arbitrary, or discriminatory determinations." Finally, the ACLU stated that "the Department offers no indication how an applicant's international travel over the last five years has weight on their adjudication, particular given that this information has not been necessary in the past."

- "It is doubtful that an individual who promotes terrorism online will disclose information about the social media profile he is using to do so, or will retain postings that might get flagged as problematic." Raised by the Brennan Center, et al, and 271 other commenters expressed substantively similar concerns that individuals with troublesome social media would not disclose it.

- 329 commenters felt the proposal was counterproductive by reducing the United States standing and reputation in the world. For example, "[s]teps intended to protect national security may have the unintended consequence of inadvertently depriving our nation of extending our democratic values through contact of Americans with visitors from other countries – as tourists, in classrooms, labs, lecture halls, and the workplace. Without these contacts, America is more susceptible to the distortions of extremist organizations and movements." - Jill Leukhardt

**Response:** National security is our top priority when adjudicating visa applications. Every applicant for a U.S. visa undergoes extensive security screening. Maintaining robust screening standards for visa applicants is a dynamic practice that must adapt to emerging threats. The Department is constantly working to find mechanisms to improve our screening processes to protect our borders.

With the visa application process, the Department seeks to balance its primary goal of securing the U.S. border with its goal of facilitating legitimate travel. The Department does not aim to unnecessarily burden visa applicants, but to obtain all information

necessary to appropriately screen all prospective travelers. The additional information, including social media identifiers, will provide an effective additional means for screening visa applicants for specific visa ineligibility grounds or for verifying the applicant's identity. The Department does not anticipate that it will significantly impact processing times for the vast majority of visa applicants.

While the Department appreciates that some individuals may not be entirely truthful in responding to the additional questions, that is true for existing questions and does not render the collection unnecessary. The Department similarly acknowledges that some applicants may transition their social media accounts from public-facing to protected, non-public settings.

In specific regard to student and exchange visitors, the Department recognizes the many potential benefits of foreign visitors in these categories, including significant contributions to the U.S. economy. With that in mind, the Department's goal is that every eligible student visa applicant is able to begin his or her program of study on time. When consistent with other demands, our embassies and consulates give priority to appointments for student and exchange visitor visa applicants. Student visas now can be issued 120 days before studies begin and applicants are encouraged to apply as soon as possible.

The Department recognizes the economic and cultural value of eligible visa applicants and intended visitors. Consistent with the Department's mission, this proposal seeks to balance its goals of securing the U.S. border while facilitating legitimate travel that significantly contributes to economic and cultural exchange. The Department aims to manage the visa process strictly, but fairly, in order to best protect the United States. Travel to the United States continues to be welcomed and encouraged.

f) The Department received comments related to situations when a visa applicant may be unable to provide certain information, and the impact of the failure to report such information. 178 commenters raised concerns on these topics. Comments related to these concerns included:

- "Many people, including international students, are active on social media and have numerous accounts that frequently change over the years. The notice does not address the consequences should an applicant inadvertently omit an active account or forget a dormant one." Raised by NAFSA

- "[E]ven sophisticated social media users do not know their identifiers due to the manner in which these identifiers are assigned and used." Raised by FEWA. Some commenters echoed similar concerns about defunct accounts with five-year lookback period.

- "Visa applicants can easily overlook or forget that they own certain accounts. As an example, when a person creates a Gmail account, Google automatically creates a YouTube account for that user; this person may not realize that he has a YouTube account that he would need to report." Raised by the Center for Democracy and Technology (CDT).

- "For example, if a visa applicant simply does not include social media information on the application, how does the Department plan to determine

whether that is because the applicant does not use social media or because the applicant is not being fully truthful in the application?  At a minimum, we request the Department to enunciate an unclassified policy for how it plans to verify applicants' truthfulness and the standards it will use to judge non-response." Raised by the American Hotel & Lodging Association, et al.

**Response:** The Department acknowledges that human memory is imperfect.  The Department is also aware that historical information, including address history, birthdates, and familial relationships, will take a variety of forms in different nations around the world, and may in some cases be difficult to obtain.  Applicants are instructed to provide the information to the best of their knowledge.  The Department adjudicates visa applications around the world, and the Department and its consular officers are cognizant that not every individual has a social media presence, just as not every individual has children or a spouse.  Answers on a visa application are not automatically suspect because an individual does not have information to provide.  Consular officers may note any corrections an applicant makes during the consular interview.

An applicant who willfully misrepresents a material fact in a visa application may face immigration or criminal consequences.  In any visa application, the determination of whether an applicant's statement constitutes a willful misrepresentation of material fact for purpose of visa ineligibility is determined by a consular officer on a case-by-case basis.  A willful misrepresentation is distinct from an accidental or inadvertent mistake and requires intent by a visa applicant.  Materiality is determined in the context of individual cases, and whether the misrepresentation would have impacted the proper resolution of the alien's application for a visa.  An inadvertent error should not impact an applicant's ability to receive a visa or immigration benefits.

g)  Some commenters were concerned that the proposal was part of a larger endeavor involving monitoring of applicants or discriminatory motives.  For example:

- "The Department of State's (DOS') proposed access to social media use is part of a larger Trump Administration scheme of continuous, open-ended monitoring of non-citizens and naturalized citizens.  This monitoring will occur without probable cause or reasonable suspicion of wrongdoing and without transparency, oversight, or accountability." NILC (emphasis in original)

- Commenters were concerned about how the proposal interacts with DHS proposals related to continuous vetting.  "Approval of DOS's proposed information collection seems premature when it is clear there is no agreement among the relevant agencies on the information to be collected and how or how often it is to be reviewed."  Raised by NAFSA.

- Opposed to "extreme vetting initiative" – "It would have been targeted at 'evaluating an applicant's probability of becoming a positively contributing member of society as well as their ability to contribute to national interests,' and predicting whether those entering the U.S. intended to commit a crime or terrorist attack once they arrived here." Brennan Center, et al.

**Response:** The collection seeks only information necessary to determine visa eligibility.  Visa denials must be based on standards set out in the INA section 212(a), 8 U.S.C. §

1182(a) and other applicable U.S. law. Visas may not be denied on the basis of race, religion, ethnicity, national origin, political views, gender, or sexual orientation. To determine an applicant's visa eligibility, consular officers evaluate all available information, including the responses and perceived credibility of the visa applicant during any visa interview. The adjudicating officer makes a determination based on the totality of the circumstances, in light of the legal standards.

h) "Clan/tribe identity cannot be used as a basis to grant a visa to the United States and is not dispositive of statutory eligibility for a nonimmigrant or immigrant visa. This is discriminatory on its face and indirectly violates the anti-discrimination clause under the Immigration and Nationality Act." Raised by the American-Arab Anti-Discrimination Committee. The Identity Project, et al also raised concerns with the definition of clan or tribe.

**Response**: The collection seeks information necessary to confirm an applicant's identity and determine visa eligibility. There are many fields on the visa application, such as sex, employment history, and marital status that assist consular officers in resolving identity and are not grounds for visa denial. The question related to whether an applicant is a member of a clan or tribe is an identity-related question and has been requested from some visa applicants since at least 2011.

i) In arguing that the collection has discriminatory intent, the Brennan Center raised that "the statement supporting the revision of this collection with respect to immigrant visas includes a provision to include in the application form "a link…to an electronic pamphlet that covers the illegality of [female genital mutilation], a practice that is not especially Islamic but is framed as such by anti-Muslim voices who have considerable influence in this administration."

**Response**: The United States is committed to ending female genital mutilation or cutting (FGM/C). Section 644 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Public Law 104-208 (8 U.S.C. 1374), requires the Department of Homeland Security (DHS), with the cooperation from the Department of State, to notify visa recipients of the severe harm to physical and psychological health caused by Female Genital Mutilation (FGM/C). Consistent with these obligations, written notice is given to visa applicants in countries where FGM/C is a common practice. The proposal to provide the informational pamphlet electronically, rather than in the existing paper based form, will increase efficiency and streamline the process for such notification. The informational pamphlet is already provided to nonimmigrant visa applicants electronically.

j) "Next, while a question on why an individual may have been deported from another country may potentially be appropriate for security purposes, it should not be asked as a simple yes or no question. Applicants must have an opportunity to explain their answer, especially as the reason an applicant may have been deported from another country may not be relevant to US authorities, such as a situation where an individual was deported for something that is not a crime in the US, for example by a regime that sought to punish a traveler for a comment they made that would normally be protected by the First Amendment in the US." Raised by Harrison Gill.

**Response**: Applicants who indicate a prior deportation from any country will be prompted to provide additional details within the application.

k) Some commenters expressed concern that the request was not targeted to specific applicants. For example:

- "This only targets those from visa-required nations, and is for all visa types. This leaves open many potential other avenues for entry where one does not have to submit documentation. I do not believe the policy should be broadened to include additional nations. I believe if ANY policy of this sort is to be enacted (which I feel uncomfortable with, see points below) that it should be done based on visa type alone - perhaps someone getting a green card, regardless of country of origin is subjected to this, but someone coming on a two week business trip is not." Raised by Elizabeth Sherman.

- The National Council of Agricultural Employers (NCAE) cited the interagency involvement in H-2A and H-2B visas and asked that these visa classifications be exempted from the social media question similar to diplomatic or official travelers: "NCAE, on behalf of H-2 employers that it represents, respectfully proposes a similar practice of 'non-routine' inquiry on issue for H-2 visa applicants."

**Response**: The Department is constantly working to find mechanisms to improve our screening processes while not unduly burdening legitimate travel and immigration to the United States. This collection is intended to strike that balance.

l) The request for 5 years of telephone numbers used in the last five years "could potentially encompass any telephone number that a visa applicant has ever used to place or receive a phone call within the past five years, including all hotel rooms, hostels, bed and breakfasts, inns, motels, work phone numbers, and potentially even conference call bridge lines." Raised by AILA who suggested the Department "reframe the question as specifically and narrowly as possible." Similar concerns were raised on requests for email addresses. The American Hotel & Lodging Association also raised these concerns.

**Response**: The Department believes the term "use" in this context is clear and means a regularly used telephone number owned or operated by the applicant, such as home, work, or mobile number. The Department will insert a help box or public guidance through travel.state.gov to advise applicants that such transitory phone numbers or email addresses are not expected to be provided.

m) AILA relayed concerns relating to updated sign and submit language related to the Australian Department of Home Affairs: "In the event the language is correct and medical examinations of visa applicants will be collected and temporarily stored in the eMedical system hosted, operated and maintained by the Australian Department of Home Affairs, this raises concerns about the privacy and security of medical examination records when they are outside the control of the U.S. government."

**Response**: The eMedical system serves as a conduit for panel physicians to submit medical exam information to the Department. The eMedical system is hosted, operated, and maintained by the Australian Department of Home Affairs (DHA) (formerly the

Department of Immigration and Border Protection), which is being held to the same high standards of confidentiality that the Department would require if a private company would have hosted the service.

Approved panel physicians will be granted access to the eMedical system by the Department. The medical examination information is input by these approved panel physicians and then transferred to the Department for the purposes of enabling consular officers to determine applicants' eligibility for a visa. Access to visa applicant information in eMedical is password controlled and DHA and those operating under its auspices may only access the information to provide technical support to the U.S. government or its panel physicians on an as-needed basis. The eMedical system is approved as an information collection under OMB Control Number 1405-0230, and further details related to this collection are available at reginfo.gov.

n)  AILA pointed out that the DS-156 contained several duplicate questions.

**Response**: The Department will remove the duplicate questions identified.

o)  AILA stated a question related to previous employment information on the DS-156 lacked clarity. Specifically, the question "Provide your employment information for the last five years that you were employed, if applicable" might require applicants to provide duplicate information because current employment is requested elsewhere in the form.

**Response:**  The Department will rephrase the question to "Provide your employment information for the last five years that you were employed, if applicable. Do not list your current employment listed elsewhere in this application."

p)  AILA expressed concern about the use of the term "immediate relative" in the DS-160 and DS-156, and that it did not align with the definition of immediate relative in the Immigration and Nationality Act.

**Response**: The Department appreciates that the term is not a precise match to the Immigration and Nationality Act; however, the existing help box in the DS-160 provides clarity to what is expected of visa applicants. The Department appreciates the suggestion to use the term "close family relatives," but believes that this terminology would invite more confusion to visa applicants. With regards to the lack of definition of "immediate relative" on the DS-156, the Department will add a parenthetical to mimic the help box in the DS-160.

q)  With regard to the E visa profile, and proposed new question, AILA had a number of concerns. First, that the use of the word "principal" in the proposed new question was confusing. AILA was further concerned that the question would require visa applicants to have sensitive information about another visa applicant. There were also a number of concerns about the E Visa Business Profile, and requests clarity on whether certain E visa enterprises will still be required to complete the DS-156E.

**Response**: The Department seeks to streamline the E visa application process and incorporate the contents of the DS-156E into the DS-160. This process will promote efficiency and allow applicants to complete only those portions of the E visa profile applicable to their visa application. The Department appreciates that the date of birth of

the principal E visa applicant involves personally identifiable information, and will make that portion of the question optional.

r) "The Department of State has reiterated in its most recent report to the United States Human Rights Committee that, 'As reported in the Initial Report, in the United States, the right to travel – both domestically and internationally – is constitutionally protected.' This statement was made in the context of review of U.S. implementation of the ICCPR, and in that context was clearly intended to indicate that, in the opinion of the Department of State, protection of the right to travel in the U.S. extends to all individuals regardless of citizenship." Raised by the Identity Project, et al.

**Response**: A citizen of a foreign country who seeks to enter the United States must comply with the immigration laws of the United States. This often means that an individual must first apply and be found eligible for a United States visa. A visa does not guarantee entry to the United States. The Department aims to manage the visa process through a rigorous enforcement of applicable laws, to best protect the United States in accordance with those laws. Travel to the United States continues to be welcomed and encouraged for legitimate travelers. Aliens outside the United States generally do not have a constitutional right to travel to the United States.

s) "[I]nstituting this question may compel other national governments to require American travelers to disclose their social media history as a precondition to travel abroad." Raised by the AFL-CIO and 345 other commenters raised similar concerns related to the reciprocal treatment of United States citizens.

**Response:** In developing the proposal, the Department was mindful that other countries may impose reciprocal requirements on U.S. travelers bound for their countries. The Department seeks to balance its multiple missions: protecting U.S. citizens, securing the U.S. border, and facilitating legitimate travel to and from the United States. This additional information, including social media identifiers, will provide U.S. consular officers an effective additional means for vetting visa applicants for specific visa ineligibility grounds.

t) There were 87 commenters who expressed support for the changes.

**Response**: The Department is constantly working to find mechanisms to improve our screening processes to protect U.S. borders and citizens, without unduly burdening legitimate travel and immigration to the United States. This collection is intended to strike that balance.

*9. Are payments or gifts given to the respondents?*

No payment or gift is provided to respondents.

*10. Describe assurances of privacy/confidentiality.*

The Department employs industry standard encryption technology to maintain a secure connection during the online application process. In accordance with INA section 222(f), 8 U.S.C. § 1202(f), information obtained from applicants in the nonimmigrant visa application process is considered confidential and is to be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United

States, except that, in the discretion of the Secretary of State, it may be made available to a court or provided to a foreign government if the relevant requirements stated in INA section 222(f), 8 U.S.C. § 1202(f) are satisfied. The same safeguards and confidentiality provisions that protect information in a visa application that is received by the United States will remain in effect for social media platforms and identifier information. The collection of social media platforms and identifiers will not be used to deny visas based on applicants' race, religion, ethnicity, national origin, political views, gender, or sexual orientation. Consular officers will not request user passwords and will not attempt to subvert any privacy controls the applicants may have implemented on these platforms. As noted in paragraph 10 above, such information once collected is confidential under INA section 222(f), 8 U.S.C. § 1202(f).

11. *Are any questions of a sensitive nature asked?*

The questions in the collection are designed to elicit the information necessary to determine whether an applicant is eligible for a nonimmigrant visa under the INA, 8 U.S.C. § 1101 *et seq.*. Consular officers may not issue a visa to an alien who is ineligible under applicable provisions of INA section 212, 8 U.S.C. § 1182, or any other provision of law, unless where authorized under the INA or if the Department of Homeland Security grants a waiver. In order to adjudicate visa eligibility, the application form specifically asks for biographical information on a variety of issues, including information concerning the alien's health, criminal offenses, narcotics addiction, political affiliation with subversive organizations, and participation in genocide or terrorist activities. In addition, questions concerning the applicant's marital status, employment, social media use, and financial support are necessary to identify the applicant and to assist in determining eligibility for a nonimmigrant visa. As noted in paragraph 10 above, such information is confidential under INA section 222(f), 8 U.S.C. § 1202(f).

The Department recognizes the sensitivity of social media information for some visa applicants. Consular officers are already directed not to engage or interact with individual visa applicants on or through social media when conducting assessments of visa eligibility; not to violate or attempt to violate individual privacy settings and platform terms of service; and to adhere to Department guidance limiting use of social media and assessments of an individual's social media presence. Consular officers will be mindful that, unlike some other forms of personal information required from visa applicants, social media identifiers may afford the user anonymity. The Department employs industry standard encryption technology to maintain a secure connection during the online application process. Consular staff will be directed in connection with this collection to take particular care to avoid collection of third-party information.

12. *Describe the hour time burden and the hour cost burden on the respondent needed to complete this collection.*

The Department estimates that 14,000,000 applicants annually will complete this collection. The Department estimates that each applicant will spend 90 minutes, or 15 minutes longer than the current 75 minute estimate, to complete this collection. Therefore, the Department of State estimates that the annual hour burden to visa applicants posed by the collection is 21,000,000 hours (14,000,000 applicants x 90 minutes). The weighted wage

hour cost burden for this collection is \$715,596,000, based on the calculation of \$24.34[1] (average hourly wage) x 1.4 (weighted wage multiplier) x 21,000,000 hours.

13. *Describe the monetary burden to respondents (out of pocket costs) needed to complete this collection.*

The applicant must submit a digital photo, which may result in a cost. Based on a survey of various overseas embassies, the Department estimates that the average cost to an alien of obtaining a digital photograph will be five dollars. We therefore estimate that the total cost burden for the collection is \$70,000,000 (\$5 x 14,000,000 applicants).

14. *Describe the cost incurred by the federal government to complete this collection.*

The annual cost burden to the federal government for the DS-160 and DS-156 in fiscal year 2018 is \$1,062,740,000. The Department acknowledges that this estimate may be low as the cost model does not incorporate the new additions to the form. However, while the cost to the federal government will increase because of the new information collected, the Department assumes this increase amount will be *de minimis*. This estimate is based on the Consular Affairs fiscal year 2016 update to the Cost of Service Model, which calculates the cost to the U.S. government of providing consular services including visas. This estimate includes all nonimmigrant visa types that use the DS-160 and DS-156. The application fees, which vary based on the nonimmigrant visa category, generally are computed to recover the costs associated with nonimmigrant visas.

15. *Explain any changes/adjustments to this collection since the previous submission.*

This collection is being revised to include both nonimmigrant visa application methods: the online version (form DS-160) which is used by the vast majority of applications, and the paper version (form DS-156) which is used in limited circumstances. Currently, the online application and paper application are approved under two separate collections. With this renewal, the Department seeks to combine these into a single collection. Upon approval, the Department will seek to discontinue OMB Control Number 1405-0018, the existing collection for form DS-156. As a result of the additional questions detailed below, the Department is increasing its burden estimate by 15 minutes to accommodate the additional time a visa applicant will spend completing the collection. This and a slight increase in the number of forms received resulted in an overall burden increase for the collection.

The additional information requested in the below changes could reasonably lead to information about whether the applicant is eligible for a visa, including resolving the identity of an applicant. Additionally, the Department will make the following changes:

a. For most applicants, a new required question labeled "Social Media" and will instruct:

Select from the list below each social media platform you have used within the last five years. In the space next to the platform's name, enter the username or handle

---

[1] Source: Data from the U.S. Bureau of Labor Statistics' May 2017 National Occupational Employment and Wage Estimates for all occupations (http://www.bls.gov/oes). Retrieved August 13, 2018.

you have used on that platform.  If you have used more than one platform or more than one username or handle on a single platform, click the "Add Another" button to list each one separately.  If you have not used any of the listed social media platforms in the last five years, select "None."

The form will include a data field labeled "Social Media Identifier" for the applicant to type in his or her social media "handle" or identifier. The applicant may select "Add Another" if the applicant has more than one provider/platform or social media identifier to disclose.  Applicants will be advised they do not need to list accounts designated for multiple users within a business or other organization.  Applicants will be provided help boxes or public guidance through travel.state.gov to assist in common questions, such as how to find the "social media identifier" of an account.  Applicants will be advised to list each identifier used, including multiple identifiers on a single platform.  No visa application is guaranteed approval, and all can be denied for a variety of reasons, but an applicant who does not have a social media presence will not be denied on that basis.

Similarly on the DS-156, a field will be added stating "Social Media" and will ask the applicant, "Have you used any of the following social media platforms during the last five years?" This will be followed by a list of specific platforms.  The form will provide a field in which the applicant will specify the social media platform used and another field for listing his or her social media identifier(s).

The platforms listed may be updated by the Department by adding or removing platforms.  Additional platforms will be added only if collection is consistent with the uses described in the Supporting Statement and after Office of Management and Budget approval.  The Department will not collect applicant passwords for these social media platforms.  The Department is only collecting public-facing identifiers from designated platforms, and will not go beyond public available information.

In addition, a new optional question on the DS-160 and DS-156 will ask applicants if they wish to provide any other social media identifiers for platforms they have used within the last five years to create or share content (photos, videos, status updates, etc.) not listed in the initial social media question.  The question will require applicants to respond "yes" or "no," but applicants who decline will not be required to provide any additional identifiers.

The Department will collect this information from visa applicants for identity resolution and vetting purposes based on statutory visa eligibility standards; however, the Department intends not to routinely ask the question of applicants for specific visa classifications, such as most diplomatic and official visa applicants.

b. Applicants will be asked about prior immigration violations.  Specifically, applicants will be asked "Have you ever been removed or deported from any country?"  An affirmative response will prompt the applicant to provide further details.

c. Applicants will be asked: "Are you the spouse, son, or daughter of an individual who has engaged in terrorist activity, including providing financial assistance or other

support to terrorists or terrorist organizations, in the last five years?"  An affirmative response will prompt the applicant to provide further details.

d. Applicants are currently asked for their current, secondary, and work telephone numbers.  Applicants will be asked "Have you used any other telephone numbers during the last five years?"  An affirmative response will prompt applicants to add additional numbers used.  The Department will permit applicants to add additional numbers used.

e. Applicants are currently asked for their current email address.  Applicants will be asked "Have you used any other email addresses for personal purposes during the last five years?"  An affirmative response will permit applicants to add additional addresses used. The Department will collect this information from visa applicants for identity resolution and vetting purposes based on statutory visa eligibility standards; however, the Department intends not to routinely ask the question of applicants for specific visa classifications, such as most diplomatic and official visa applicants.

f. The "Sign and Submit" section of the DS-160 will add an additional notification for applicants related to the Federal Bureau of Investigation's fingerprinting system.  In addition to the existing information about fingerprinting, applicants will be informed that "Procedures for obtaining a change, correction, or update of an FBI identification record are set forth in Title 28, CFR 16.34."

g. E-1 and E-2 visa applicants completing the DS-160 who indicate that they are a manager, supervisor, or essential employee will be asked whether a principal E-1 or E-2 treaty trader applicant was already issued a visa.  An affirmative response will eliminate the trigger for those applicants to complete the E business profile.

h. The Confidentiality Statement will add an additional line that reads: "The information asked for on this form is requested pursuant to Section 222 of the Immigration and Nationality Act."

i. In light of changes to the medical examination process for some applicants, the Department will provide information about the new system to applicants.  While the vast majority of nonimmigrant visa applicants are not required to undergo medical examinations, providing this information at the outset will give applicants required to undergo a medical examination ample notice.  The Department intends to add the following language to the "Sign and Submit" page to inform applicants about the requirements:

Some visa applicants are required to undergo a medical examination with an authorized physician to assess visa eligibility consistent with INA Sections 212(a) and 221(d).  I understand that failure to provide required information may cause delay or denial of my visa application.  If required to undergo a medical examination, I understand that my medical examination information may be collected and temporarily stored in the eMedical system hosted, operated, and maintained by the Australian Department of Home Affairs.  If my medical examination is collected in eMedical, I understand and consent to its collection

Case 1:19-cv-03632-TJK   Document 31-9   Filed 04/15/20   Page 25 of 25
USCA Case #23-5232      Document #2038310      Filed: 01/31/2024      Page 124 of 223

24

and temporary storage in such system, and being transferred to the U.S. Government for the purposes of enabling the U.S. Department of State to determine my medical eligibility and for the U.S. Centers for Disease Control and Prevention to undertake public health functions under the Public Health Service Act Section 325 and INA Section 212(a).

16. *Specify if the data gathered by this collection will be published.*

The data gathered will not be published; however, a quantitative summary of all Department of State visa activities is published in the annual <u>Report of the Visa Office</u>. The Report of the Visa Office is an annual report providing statistical information on immigrant and non-immigrant visa issuances by consular offices, as well as information on the use of visa numbers in numerically limited categories. The Visa Office currently has annual reports available from 2000 to 2017. The link to the site is: <u>https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics.html</u>.

17. *If applicable, explain the reason(s) for seeking approval to not display the OMB expiration date.*

The Department of State will display the expiration date for OMB approval on the information collection.

18. *Explain any exceptions to the OMB certification statement below.*

The Department of State is not requesting any exceptions to the certification statement requirements.

**B.      COLLECTION OF INFORMATION EMPLOYING STATISTICAL METHODS**

This collection does not employ statistical methods.

# EXHIBIT 9:

# OMB Submission for Immigrant Visa Application Change

USCA Case #25-5212   Document #2123   Filed 08/13/25   Page 126 of 223

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date    04/11/2019

Department of State
Administration of Foreign Affairs

FOR CERTIFYING OFFICIAL:    Karen Mummaw
FOR CLEARANCE OFFICER:    Janet Freer

In accordance with the Paperwork Reduction Act, OMB has taken action on your request received
08/30/2018

ACTION REQUESTED:    Revision of a currently approved collection
TYPE OF REVIEW REQUESTED:    Regular
ICR REFERENCE NUMBER:    201808-1405-009
AGENCY ICR TRACKING NUMBER:

TITLE:    Electronic Application for Immigrant Visa and Alien Registration
LIST OF INFORMATION COLLECTIONS:  See next page

OMB ACTION:  Approved with change

OMB CONTROL NUMBER:    1405-0185
The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).

EXPIRATION DATE:  04/30/2022                    DISCONTINUE DATE:

| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 581,642 | 1,163,284 | 2,908,210 |
| New | 710,000 | 1,834,167 | 3,550,000 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | 128,358 | 670,883 | 641,790 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:    The agency has updated the supporting statement to discuss its plans to protect statutory privacy rights and to clarify that the agency will be looking at public-facing content only and will not be requesting passwords for social media accounts.

OMB Authorizing Official:    Neomi Rao
Administrator,
Office Of Information And Regulatory Affairs

List of ICs

| IC Title | Form No. | Form Name | CFR Citation |
|---|---|---|---|
| Electronic Application for Immigrant Visa and Alien Registration | DS-260 | Online Immigrant Visa and Alien Registration Application | 22 CFR 42.63 |

# EXHIBIT 10:

# Screenshots of Nonimmigrant Visa Application

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date    04/11/2019

Department of State
Administration of Foreign Affairs

FOR CERTIFYING OFFICIAL:    Karen Mummaw
FOR CLEARANCE OFFICER:    Janet Freer

In accordance with the Paperwork Reduction Act, OMB has taken action on your request received
08/29/2018

ACTION REQUESTED:    Revision of a currently approved collection
TYPE OF REVIEW REQUESTED:    Regular
ICR REFERENCE NUMBER:    201808-1405-004
AGENCY ICR TRACKING NUMBER:

TITLE:    Online Application for Nonimmigrant Visa
LIST OF INFORMATION COLLECTIONS:  See next page

OMB ACTION:  Approved with change

OMB CONTROL NUMBER:    1405-0182

The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).

EXPIRATION DATE:  04/30/2022                      DISCONTINUE DATE:

| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 13,345,785 | 16,682,231 | 0 |
| New | 14,000,000 | 21,000,000 | 70,000,000 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | 654,215 | 4,317,769 | 70,000,000 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:    The agency has updated the supporting statement to discuss its plans to protect statutory privacy rights and to clarify that the agency will be looking at public-facing content only and will not be requesting passwords for social media accounts.

OMB Authorizing Official:    Neomi Rao
Administrator,
Office Of Information And Regulatory Affairs

List of ICs

| IC Title | Form No. | Form Name | CFR Citation |
|---|---|---|---|
| Online Application for Nonimmigrant Visa | DS-156 | CONSOLIDATED NONIMMIGRANT VISA APPLICATION | 22 CFR 41 |

USCA Case #23-5232     Document #2038310     Filed: 01/31/2024     Page 131 of 223

# EXHIBIT 11:

# OMB Approval of Change to Immigrant Visa Application

# DS-260
# IV Application
# OMB Submission



JA128
March 2018

Bureau of Consular Affairs
Consular Systems and Technology

# Sign In Page



CEAC IV Form DS-260                                                                1

# Sign In Page



# Sign In Page



**Immigrant Visa**

## Sign In

Welcome to the Consular Electronic Application Center – Immigrant/Diversity Visa portal. To access your case, please enter your case number below.

**Please do not use the browser's back or refresh buttons while using the CEAC site. Instead, use the navigation links on the page. You will lose information if you use the browser's back or refresh button, and will need to log back into the application.**

Case Number
CSB2011552014

Enter the Invoice ID Number that the National Visa Center sent you
000027548298

I am the
-- SELECT ONE --
-- SELECT ONE --
APPLICANT
ATTORNEY
PETITIONER
THIRD-PARTY AGENT

Enter the characters as shown:

**Important:** Before You Begin

Browser Requirements

**Please be patient. Download times may vary depending on your internet connection speed.**

Continue



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information    Disclaimers                                          [124]

# Summary Information Page

New design of the Summary Page, to be deployed when the piVot system is deployed.



## Summary Information

Before we can process your Diversity Visa application, each applicant in your case must complete Form DS-260, the online immigrant visa application form. To access the online form, click on the link to the right of an applicant's name below, under the "IV Application" heading.

If a person in your family is not listed below, click the "Add Applicant" button to add him or her. Derivative applicants for the DV program include spouses or children under the age of 21 who meet the requirements of U.S. immigration law. Filling out an application does not guarantee that an individual will qualify as a derivative in your case. This can only be decided by a consular officer at your visa interview.

If you have any questions, please contact the Kentucky Consular Center (KCC) by email (kccdv@state.gov) or by phone (Public Inquiry Phone Number 606-526-7500 7:30 a.m. to 4:00 p.m. EDT Monday – Friday).

| APPLICANT INFORMATION | Status | IV Fee | IV Application | Civil Documents |
|---|---|---|---|---|
| STEVENSON, CLEMENT<br>PRINCIPAL | N/A | N/A | NOT STARTED | N/A |
| MORRIS, DONAVEEN<br>SPOUSE | ACCOMPANY | N/A | NOT STARTED | N/A |
| STEVENSON, MYSTIQUE<br>CHILD | ACCOMPANY | N/A | NOT STARTED | N/A |



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information 🗗  Disclaimers 🗗

# Getting Started Page – Immigration Visa and Alien Registration Application



CEAC IV Form DS-260                                              5

# Personal Information 1 Page

Displayed for all applicants. Answered 'No' to the question "Have you ever used other names (i.e., maiden, religious, professional, alias, etc.)?".



# Personal Information 1 Page

Displayed for all applicants. Answered 'Yes' to the question 'Have you ever used other names (i.e., maiden, religious, professional, aliases, etc.)?'.



JA135

# Personal Information 2 Page

Displayed for all applicants. Answered "Passport" for "Document Type".  Answered 'No' to the question 'Do you hold or have you held any nationality other than the one you have indicated above?'.



# Personal Information 2 Page

Displayed for all applicants. Answered "Other Travel Document" for "Document Type"'. Answered 'Yes' to the questions 'Do you hold or have you held any nationality other than the one indicated in question above on nationality?' and 'answer "No" to the question " Do you hold a passport for the other nationality above?'.



# Personal Information 2 Page

Displayed for all applicants. Answered "Other Travel Document" for "Document Type".  Answered 'Yes' to the
questions 'Do you hold or have you held any nationality other than the one indicated in question above on
nationality?' and 'Do you hold a passport for the other nationality above?'.



# Present and Previous Address Information Page

Displayed for all applicants. All questions answered 'No' and Social Media Provider/Platform is 'NONE'.



# Present and Previous Address Information Page

Displayed for all applicants. All questions answered 'Yes' and Social Media Provider/Platform is not 'NONE'.



# Mailing and Permanent Address Page

Displayed for all applicants who do not list "United States of America" as their Present Address Country/Region. All questions answered 'Yes'.



# Mailing and Permanent Address Page



Displayed for all applicants who do not list "United States of America" as their Present Address Country/Region.. All questions answered 'No'.

# Mailing and Permanent Address

Displayed for all applicants who list "United States of America" as their Present Address Country/Region. .
All questions answered 'Yes'.



# Mailing and Permanent Address Page

Displayed for all applicants who list "United States of America" as their Present Address Country/Region. Answered 'No' to the question 'Is this address where you want your Permanent Residence Card (Green Card) mailed?'.

# Family Information: Parents Page

Displayed for all applicants.



# Family Information: Parents Page

Displayed for all applicants.   Answers to all questions are "Yes".



# Family Information: Parents Page

Displayed for all applicants.  Answers to all questions are "No".



# Family Information: Parents Page



Displayed for all applicants. Answered 'Yes' to "Is your father/mother still living?" and answered 'No' to the question "If your mother's address is the same as your father's?"

# Family Information: Parents Page

Displayed for all applicants. Answered 'Do Not Know' to the questions 'Surname' and 'Given Name'.



# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Answered 'No' to the question 'Is your spouse immigrating to the U.S. with you?'.



# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Answered 'Yes' to the question 'Is your spouse immigrating to the U.S. with you?'.



# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Selected 'Same as Present Address' and 'Not Employed' for 'Occupation'.



# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Selected 'Other (Specify Address)' for 'Spouse's Address' and 'Other' for 'Occupation'.



# Family Information: Previous Spouse Page

Displayed for all applicants. Answered 'No' to the question 'Do you have any previous spouses?'.



# Family Information: Previous Spouse Page

Displayed for all applicants. Answered 'Yes' to the question 'Do you have any previous spouses?'.
Answered 'Other' to the question 'How was your marriage terminated?'.



# Family Information: Children Page

Displayed for all applicants. Answered 'No' to the question 'Do you have any children?'.



# Family Information: Children Page

Displayed for all applicants. Answered 'Yes' to all questions.



# Family Information: Children Page

Displayed for all applicants. Answered 'Yes' to the question 'Do you have any children?'. Answered 'No' to the question 'Is this child immigrating to the U.S. with you?'.



# Previous U.S. Travel Information Page

Displayed for all applicants. All questions are answered 'No'.



# Previous U.S. Travel Information Page

Displayed for all applicants. All questions are answered 'Yes'.



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14.



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14.  Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Agriculture', 'Business', 'Communications', 'Computer Science', 'Culinary/Food Services', 'Education', 'Engineering', 'Government', 'Homemaker', 'Legal Profession', 'Medical/Health', 'Military', 'Natural Science', 'Physical Sciences', 'Religious Vocation', 'Research', 'Social Science', or 'Student'.  Answer to 'Do you have other occupations?' is 'No'.



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Agriculture', 'Business', 'Communications', 'Computer Science', 'Culinary/Food Services', 'Education', 'Engineering', 'Government', 'Homemaker', 'Legal Profession', 'Medical/Health', 'Military', 'Natural Science', 'Physical Sciences', 'Religious Vocation', 'Research', 'Social Science', or 'Student'. Answer to 'Do you have other occupations?' is 'Yes' and 'Other Occupation' is not 'Other' or 'Homemaker'.



# Present Work/Education/Training Information Page

Displayed for all applicants. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Agriculture', 'Business', 'Communications', 'Computer Science', 'Culinary/Food Services', 'Education', 'Engineering', 'Government', 'Homemaker', 'Legal Profession', 'Medical/Health', 'Military', 'Natural Science', 'Physical Sciences', 'Religious Vocation', 'Research', 'Social Science', or 'Student'.  Answer to 'Do you have other occupations?' is 'Yes' and 'Other Occupation' is 'Homemaker'.



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14. . Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Other'.



# Present Work/Education/Training Information Page

Displayed for all applicants. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Not Employed'.



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Homemaker' or 'Retired'.



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Homemaker' or 'Retired'.



# Present Work/Education/Training Information Page



Displayed only for Diversity Visa (DV) principal applicants when Primary Occupation is not "HOMEMAKER", "NOT EMPLOYED" or "STUDENT".

# Present Work/Education/Training Information Page



Displayed only for Diversity Visa (DV) principal applicants when Primary Occupation is not "HOMEMAKER", "NOT EMPLOYED" or "STUDENT". Answer to "Do you have other occupations?" is "Yes".

# Present Work/Education/Training Information Page



Displayed only for Diversity Visa (DV) principal applicants when Primary Occupation is not "HOMEMAKER", "NOT EMPLOYED" or "STUDENT". Answer to "Do you have other occupations?" is "Yes".  Other Occupation is "OTHER".

# Previous Work/Education/Training Information Page

Displayed for all applicants who meet one of the following criteria:
•The applicant is male and age is between 14 and 60
•The applicant is over the age of 14 and is from Burma, China, Cuba, India, Iran, North Korea, Pakistan, Saudi Arabia, Sudan, Syria, or Stateless
•The applicant is retired, not employed, or is a homemaker
•The applicant is a principal applicant and is applying for any of the following visa classes: E11, E12, E13, E21, E31, E32, EW3, SD1, SR1, SE1, C51, T51, SI1, SQ1, SF1, SG1, SH1, SJ1, SK1, SN1, R51, and I51, DV-1.

The answer to both questions is 'No'.



# Previous Work/Education/Training Information Page

Displayed for all applicants who meet one of the following criteria:
• The applicant is male and age is between 14 and 60
• The applicant is over the age of 14 and is from Burma, China, Cuba, India, Iran, North Korea, Pakistan, Saudi Arabia, Sudan, Syria, or Stateless
• The applicant is retired, not employed, or is a homemaker
• The applicant is a principal applicant and is applying for any of the following visa classes: E11, E12, E13, E21, E31, E32, EW3, SD1, SR1, SE1, C51, T51, SI1, SQ1, SF1, SG1, SH1, SJ1, SK1, SN1, R51, and I51, DV-1.

Answer to both questions is 'Yes'.



# Previous Work/Education/Training Information Page

Displayed for all applicants who selected 'Afghanistan' for 'Nationality' and is over the age of 14. The answer to both questions is 'Yes'.



# Previous Work/Education/Training Information Page

Displayed for all applicants who selected 'Iraq' for 'Nationality' and is over the age of 14. . The answer to both questions is 'Yes'.

CEAC IV Form DS-260

# Previous Work/Education/Training Information Page

Displayed for all DV principal applicants who answer "Yes" to the first question and "No" to the other questions on the page.



# Previous Work/Education/Training Information Page



Displayed for all DV principal applicants who answer "Yes" to all questions on the page.

# Additional Work/Education/Training Information Page

Displayed for all applicants who are 14 years or older. The answer to the question is unanswered.  No additional questions are triggered if answered 'No'.



# Additional Work/Education/Training Information Page

Displayed for all applicants who are 14 years or older. The answer to the question is 'Yes'.



# Additional Work/Education/Training Information Page

Displayed for all applicants who selected 'Iraq' for 'Nationality' or 'Other Nationality, is 14 years or older, and is Male. Answers to questions are 'No'.



# Additional Work/Education/Training Information Page

Displayed for all applicants who meet one of the following two criteria:
•The applicant is Male and age is between 14 and 60 and Nationality (or Other Nationality) is NOT AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAQ, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS
•The applicant is 14 years or older and Nationality (or Other Nationality) is AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS.
•The applicant is 14 years or older, Nationality is IRAQ, and is Female.
Answers to questions are 'No'.



| | Home | Contact Us | Help | Sign Out |

**U.S. DEPARTMENT of STATE**
CONSULAR ELECTRONIC APPLICATION CENTER

| COMPLETE | REVIEW | SIGN |

Online Immigrant Visa and Alien Registration Application (DS-260)

## Additional Work/Education/Training Information

- ✔ Getting Started
- ✔ Personal
- ✔ Address and Phone
- ✔ Family
- ✔ Previous U.S. Travel
- Work / Education / Training ▶
  - Present
  - Previous
  - ▪ Additional
- Petitioner
- Security and Background
- Social Security Number

NOTE: Provide the following work, education, or training related information. Provide complete and accurate information to all questions that require an explanation.

**Q:** Have you ever served in the military?
**A:** ○ Yes ● No

**Q:** Have you belonged to, contributed to, or worked for any professional, social, or charitable organization?
**A:** ○ Yes ● No

**Q:** Do you have any specialized skills or training, such as firearms, explosives, nuclear, biological, or chemical experience?
**A:** ○ Yes ● No

**Q:** Have you ever served in, been a member of, or been involved with a paramilitary unit, vigilante unit, rebel group, guerrilla group, or insurgent organization?
**A:** ○ Yes ● No

**Q:** Can you speak and/or read languages other than your native language?
**A:** ○ Yes ● No

**Q:** Have you traveled to any countries/regions within the last five years?
**A:** ○ Yes ● No

| ◀ Back: Work/Education: Previous | 🖫 Save | Next: Petitioner ▶ |



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information ⧉   Disclaimers ⧉   Paperwork Reduction Act and Confidentiality Statement ⧉

# Additional Work/Education/Training Information Page

Displayed for all applicants who meet one of the following two criteria:
- The applicant is Male and age is between 14 and 60 and Nationality (or Other Nationality) is NOT AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAQ, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS
- The applicant is 14 years or older and Nationality (or Other Nationality) is AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAQ, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS.

Answers to questions are 'Yes'.



# Additional Work/Education/Training Information Page

Displayed for all applicants who meet one of the following two criteria:
•The applicant is Male and age is between 14 and 60 and Nationality (or Other Nationality) is NOT AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAQ, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS
•The applicant is 14 years or older and Nationality (or Other Nationality) is AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAQ, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS.

'Iraq' is selected for 'Name of Country/Region'.
Answers to questions are 'No' except for 'Have you ever served in the military?'. 'Name of Country/Region' is 'Iraq'.



# Petitioner Information Page

Displayed for all applicants.



# Petitioner Information Page

Displayed for all applicants. Answered 'Father' to 'Petitioner is my'. The same questions display if 'Mother',
'Brother', 'Sister', 'Spouse', 'Child', 'Stepfather', 'Stepmother', 'Uncle', 'Aunt', 'Grandparent', or 'In-law' is selected.



# Petitioner Information Page

Displayed for all applicants. Answered 'Employer' to the question 'Petitioner is my'.  The same questions display if 'Prospective Employer' is selected.  If 'Other' is selected, an additional 'Specify Other' box is displayed.



# Petitioner Information Page

Displayed for all applicants. Answered 'Self' to the question 'Petitioner is my'.



CEAC IV Form DS-260                                                                 59

# Security and Background: Medical and Health Information Page

Displayed for all applicants. Answers to questions are 'No'.



# Security and Background: Medical and Health Information Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Security and Background: Criminal Information Page

Displayed for all applicants. Answers to questions are 'No'.



# Security and Background: Criminal Information Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Security and Background: Security Information 1 Page

Displayed for all applicants. Answers to questions are 'No'.



# Security and Background: Security Information 1 Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Security and Background: Security Information 2 Page

Displayed for all applicants. Answers to questions are 'No'.



# Security and Background: Security Information 2 Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered "No" to "Have you ever been to the U.S.?" on the Previous U.S. Travel page.



# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered "No" to "Have you ever been to the U.S.?" on the Previous U.S. Travel page.



# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel page. Answers to questions are 'No'.



# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel page. Answers to questions are 'Yes'.



JA199

# Security and Background: Immigration Law Violation Information 2 Page

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel page. Answers to questions are 'No'.



# Security and Background: Immigration Law Violation Information 2 Page

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel page.  Answers to questions are 'Yes'.



# Security and Background: Miscellaneous Information 1 Page

Displayed for all applicants. Answers to questions are 'No'.





# Security and Background: Miscellaneous Information 1 Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Security and Background: Miscellaneous Information 2 Page

Displayed for all applicants. Answers to questions are 'No'.



# Security and Background: Miscellaneous Information 2 Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Social Security Number Information Page

Displayed for all applicants. Answers to questions are 'No'.



# Social Security Number Information Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Social Security Number Information Page

Displayed for all applicants. Answers to the first three questions are 'Yes' with the last question answered 'No'.



# Sign and Submit Page

Displayed for all applicants. Answered 'No' to the question 'Did anyone assist you in filling out this application?'.



# Sign and Submit Page

Displayed for all applicants. Answered 'Yes' to the question 'Did anyone assist you in filling out this application?'.



# Sign and Submit Page

Displayed for applicants from high FGM prevalence countries. Answered 'No' to the question 'Did anyone assist you in filling out this application?'.



# Sign and Submit Page

Displayed for applicants from high FGM prevalence countries. Answered 'Yes' to the question 'Did anyone assist you in filling out this application?'.



CEAC IV Form DS-260

84

# Confirmation Page

Displayed for applicants when the case is at NVC



This confirms the submission of the Immigrant Visa and Alien Registration application for:

| | |
|---|---|
| Name Provided: | TEST, TEST |
| Country/Region of Origin (Nationality): | ANTIGUA AND BARBUDA |
| Completed On: | 19 MAR 2018 |
| Case No: | CSB2011552014 |
| Confirmation No: | AA0001IIU6 |

**THIS IS NOT A VISA**

Version 01.02.00

# Confirmation Page

Displayed for applicants when the case is at Post



# Confirmation Page

Displayed for DV applicants when the case is at KCC





# Confirmation Page
Displayed for DV applicants when the case is at Post



# Copyright Page – Immigrant Visa and Alien Registration Application



# Disclaimer Page – Immigrant Visa and Alien Registration Application



### Online Immigrant Visa and Alien Registration Application (DS-260)

## Disclaimer

For site management, see Privacy and Computer Fraud and Abuse Act Notices

The information content and design/organization of the web site launched in 1995.

The Federal Depository Library at the University of Illinois at Chicago provides technical and reference support for the web site at http://travel.state.gov. Please direct technical questions about http://travel.state.gov to our contact us page.

Some bureaus/offices maintain servers separately from the site maintained by CA/EX/CSD/DO. However, CA/EX/CSD/DO coordinates release of information on those servers to ensure that it is linked appropriately with the site at contact us page; your message will be forwarded to the appropriate office or bureau.

ca-travel-webmaster@state.gov.

Links to External Web Sites
Links to web sites outside the U.S. Federal Government or the use of trade, firm, or corporation names within the State Department web sites are for the convenience of the user. Such use does not constitute an official endorsement or approval by the U.S. State Department of any private sector web site, product, or service.

Computer Fraud and Abuse Act Unauthorized attempts to upload information and/or change information on these web sites are strictly prohibited and are subject to prosecution under the Computer Fraud and Abuse Act of 1986 and Title 18 U.S.C. Sec.1001 and 1030.

Disclaimer of Liability Every effort is made to provide accurate and complete information. However, with the thousands of documents available, often uploaded within short deadlines, we cannot guarantee that there will be no errors. With respect to documents and information on the current and archive State Department web sites, neither the U.S. Government, the U.S. Department of State, the University of Illinois at Chicago (UIC), Digex (web host), ClearBlue Technologies (formerly Applied Theory, an independent software development contractor), nor their employees and contractors make any warranty, expressed or implied, including the warranties of merchantability and fitness for a particular purpose with respect to documents available from State Department web sites. Additionally, the U.S. Government, U.S. State Department, Digex, ClearBlue Technologies, and UIC assume no legal liability for the accuracy, completeness, or usefulness of any information, product, or process disclosed herein and do not represent that use of such information, product, or process would not infringe on privately owned rights.

Please read the State Department's guidelines pursuant to the Data Quality Information Act before submitting inquiries under this Act.

If you would like verification or a hard copy of information released on State Department web sites or if you have any questions or comments about the information presented here, please contact the public information staff in the Bureau of Public Affairs.

Public Communication Division
PA/PL, Room 2206
U.S. Department of State
Washington, D.C. 20520
202-647-6575
Also see http://contact-us.state.gov/

Non Compliance with LEP

Translations are not available for most of the material on this site as it is updated frequently. Travel.State.Gov will be offering some translations in the future when we are able to keep tranlations up-to-date and therefore accurate.

OK



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

# Paperwork Reduction Act Page – Immigrant Visa and Alien Registration Application



**U.S. DEPARTMENT *of* STATE**
CONSULAR ELECTRONIC APPLICATION CENTER

Online Immigrant Visa and Alien Registration Application (DS-260)

## Paperwork Reduction Act and Confidentiality Statement

**PAPERWORK REDUCTION ACT:** Public reporting burden for this collection of information is estimated to average 155 minutes per response, including time required for searching existing data sources, gathering the necessary documentation, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: **PRA_BurdenComments@state.gov**

**CONFIDENTIALITY STATEMENT:** The information asked for on this form is requested pursuant to Section 222 of the Immigration and Nationality Act. Section 222(f) provides that the records of the Department of State and of diplomatic and consular offices of the United States pertaining to the issuance and refusal of visas or permits to enter the United States shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States. Certified copies of such records may be made available to a court provided the court certifies that the information contained in such records is needed in a case pending before the court. The U.S. Department of State uses the facts you provide on this form primarily to determine your classification and eligibility for a U.S. immigrant visa. Individuals who fail to submit this form or who do not provide all the requested information may be denied a U.S. immigrant visa. Although furnishing this information is voluntary, failure to provide this information may delay or prevent the processing of your case. If you are issued an immigrant visa and are subsequently admitted to the United States as an immigrant, the Department of Homeland Security will use the information on this form to issue you a Permanent Resident Card, and, if you so indicate, the Social Security Administration will use the information to issue a social security number. The information provided may also be released to federal agencies for law enforcement, counterterrorism and homeland security purposes; to Congress and courts within their sphere of jurisdiction; and to other federal agencies who may need the information to administer or enforce U.S. laws.