NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-5232

===========================================================

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

Doc Society and International Documentary Association,

*Plaintiffs–Appellants*,

v.

Antony J. Blinken, in his official capacity as Secretary of State, and
Alejandro N. Mayorkas, in his official capacity as Secretary of
Homeland Security,

*Defendants–Appellees*.

———————————

On appeal from the United States District Court for the
District of Columbia — No. 1:19-cv-03632 (Kelly, T.)

===========================================================

## CORRECTED BRIEF FOR PLAINTIFFS–APPELLANTS

Carrie DeCell
Jameel Jaffer
Katie Fallow
Anna Diakun
Knight First Amendment
  Institute at Columbia
  University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
carrie.decell@knightcolumbia.org

Joshua Polster
Evan Gilbert
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
joshua.polster@stblaw.com

*Counsel for Plaintiffs–Appellants*
*(Additional counsel on next page)*

Faiza Patel
Emile Ayoub
Brennan Center for Justice
   at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
patelf@brennan.law.nyu.edu

Rachel Levinson-Waldman
   Brennan Center for Justice
   at NYU School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
Washington, D.C. 20036
(202) 249-7190
levinsonr@brennan.law.nyu.edu

*Counsel for Plaintiffs–Appellants*

### Appellants' Certificate as to Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1), Appellants submit this Certificate as to Parties, Rulings, and Related Cases.

**(A)    Parties and Amici.** Appellants, who were plaintiffs in the district court, are Doc Society and International Documentary Association ("IDA") (collectively, "Plaintiffs"). Appellees, who were defendants in the district court, are Antony J. Blinken, in his official capacity as Secretary of State, and Alejandro N. Mayorkas, in his official capacity as Secretary of Homeland Security (collectively, the "Government"). No intervenors appeared in the district court. Twitter, Inc., Reddit, Inc., and Internet Association; Muslim Advocates, American Friends Service Committee, T'ruah: the Rabbinic Call for Human Rights, and the Reconstructionist Rabbinical Association; and the Electronic Frontier Foundation appeared as *amici curiae* before the district court. No *amici curiae* have yet appeared before this Court.

**(B)    Rulings Under Review.** On August 11, 2023, United States District Judge Timothy J. Kelly issued a memorandum opinion and order granting in part and denying in part the Government's motion to dismiss, and dismissing Plaintiffs' complaint with prejudice. *Doc Society v. Blinken*, No. 19-3632 (D.D.C. Aug. 11, 2023), ECF Nos. 66, 67. The August 11, 2023 opinion is not published in the federal reporter but is available at 2023 WL 5174304, attached to Plaintiffs' Notice of Appeal, and included in the Joint Appendix, beginning at JA333.

**(C)** **Related Cases.** The appealed ruling has not previously been before this Court or any other court. There are no related cases pending before this Court or any other court of which counsel is aware.

## Rule 26.1 Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, undersigned counsel certify as follows:

Appellant Doc Society has no parent corporation, and no publicly held corporation owns 10 percent or more of the organization's stock. Doc Society is a non-profit organization committed to supporting documentary filmmakers and connecting them with global audiences. Doc Society is based in New York, New York, and London, England.

Appellant IDA has no parent corporation, and no publicly held corporation owns 10 percent or more of the organization's stock. IDA is a non-profit, membership-based association of documentary filmmakers from around the world. IDA is based in Los Angeles, California.

## Table of Contents

Appellants' Certificate as to Parties, Rulings, and Related Cases............................i

Rule 26.1 Corporate Disclosure Statement.............................................................. iii

Table of Authorities ......................................................................................................vi

Glossary........................................................................................................................ xii

Introduction ....................................................................................................................1

Statement of Jurisdiction...............................................................................................2

Pertinent Statutes and Regulations..............................................................................2

Statement of Issues on Appeal .....................................................................................2

Statement of the Case....................................................................................................3

    I.     Statutory and Regulatory Background ...........................................3

    II.    Procedural History and the District Court's Decision...............6

Summary of Argument .................................................................................................9

Standard of Review.......................................................................................................13

Argument........................................................................................................................13

    I.     The district court erred in ruling that the Disclosure
        Requirement is not subject to review under the APA. ..............13

        A.     The district court's decision conflicts with the
              text of the INA. ..............................................................15

        B.     The district court erred in concluding that visa
              application regulations are not fit for judicial
              review. ..............................................................................18

        C.     The district court erred in concluding that it
              could not evaluate Plaintiffs' APA claims

without intruding on the executive's discretion over individual enforcement actions. ...........................................23

II.   The district court erred in concluding that the Disclosure Requirement is subject to only deferential review under the First Amendment. .........................................26

    A.   The Disclosure Requirement is subject to exacting scrutiny. .........................................................26

    B.   *Kleindienst v. Mandel* and *Trump v. Hawaii* do not control this case. ......................................................30

III.   Plaintiffs adequately allege that the Disclosure Requirement is unlawful. ..........................................................42

    A.   The Disclosure Requirement violates the APA because it is arbitrary and capricious and exceeds the Secretary's statutory authority. ....................42

    B.   The Disclosure Requirement violates the First Amendment because it is not sufficiently tailored to any legitimate government interest. ............................46

Conclusion ............................................................................................50

Certificate of Compliance ...................................................................51

Certificate of Service ...........................................................................52

# Table of Authorities

## Cases

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986)...............................2, 9, 21, 22

*ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015) ............................................26

*AFL-CIO v. Chao*, 409 F.3d 377 (D.C. Cir. 2005) ...........................................25, 45

*Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F.Supp.3d 1
(D.D.C. 2022) ................................................................37

*Allen v. Milas*, 896 F.3d 1094 (9th Cir. 2018) .........................................33

*Am. Acad. of Religion v. Napolitano*, 573 F.3d 115
(2d Cir. 2009).................................................................28

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914
(D.C. Cir. 2017) ................................................................44

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ...............................43

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373
(2021).................................................................9, 12, 27, 30, 46, 49

*Animal Legal Def. Fund, Inc. v. Purdue*, 872 F.3d 602
(D.C. Cir. 2017) ................................................................43

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................42

*Barton v. Barr*, 140 S. Ct. 1442 (2020) ....................................................1

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).......................................45

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667 (1986).....................13, 18

*Bridges v. Wixon*, 326 U.S. 135 (1945) ..................................................27

*Broadley v. U.S. Dep't of Interior*, 615 F.3d 508
(D.C. Cir. 2010) ................................................................48

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................30

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ......................................17

*City of New York v. Baker*, 878 F.2d 507 (D.C. Cir. 1989) ....................36

*Clark v. Libr. of Congress*, 750 F.2d 89 (D.C. Cir. 1984).......................46

*Colindres v. Dep't of State*, 71 F.4th 1018 (D.C. Cir. 2023)...................33

*Cook Cnty. v. Wolf*, 461 F. Supp. 3d 779 (N.D. Ill. 2020)................35, 42

*Cook Cnty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020) ...................................22

*Crowley Caribbean Transp. v. Pena*, 37 F.3d 671
    (D.C. Cir. 1994) ...................................................................................23

*Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11
    (D.D.C. 2020) .......................................................................................19

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
    77 F.4th 679 (D.C. Cir. 2023)..............................................................13

*Curran v. Laird*, 420 F.2d 122 (D.C. Cir. 1969) ....................................20

*Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) ..........................41

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ...............................25

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)..........................................................................22

*Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002)...............37, 38, 41, 49

*Didban v. Pompeo*, 435 F. Supp. 3d 168 (D.D.C. 2020)..........................33

*Din v. Kerry*, 718 F.3d 856 (9th Cir. 2013) .............................................40

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v.
    Mar. Admin.*, 215 F.3d 37 (D.C. Cir. 2000) ...................................19, 21

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275,
(D.C. Cir. 1989) ...................................................................28

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640
(9th Cir. 2021)....................................................................22

*Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014)....................48, 49

*El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C.
Cir. 2010) ...........................................................................19

*Escobar v. INS*, 896 F.2d 564 (D.C. Cir. 1990)........................................38

*Fiallo v. Bell*, 430 U.S. 787 (1977).......................................35, 36, 37, 39

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)................................................................9

*Genuine Parts Co. v. EPA*, 890 F.3d 304 (D.C. Cir. 2018)....................................43

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020)................................25, 44

*GTE Serv. Corp. v. FCC*, 205 F.3d 416 (D.C. Cir. 2000) ................................16, 45

*Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062 (2020) ................................21

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................14

*INS v. Chadha*, 462 U.S. 919(1983) ................................41, 42

*Inv. Annuity v. Blumenthal*, 609 F.2d 1 (D.C. Cir. 1979)........................................19

*Joorabi v. Pompeo*, 464 F. Supp. 3d 93 (D.D.C. 2020) ................................34

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ................................17

*Kerry v. Din*, 576 U.S. 86 (2015)................................36, 39, 40

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)............. 11, 21, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41

*La Clinica de la Raza v. Trump*, No. 19-cv-04980, 2020 WL
6940934 (N.D. Cal. Nov. 25, 2020) ..................................................35

*Lamont v. Postmaster Gen.*, 381 U.S. 301, 302 (1965)...........................................28

*Make the Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ..............................14, 16

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ..............................27, 30

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ........................9, 27, 30

*Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400
(D.C. Cir. 1990) ...........................................................................19, 20, 21

*Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016)..............................34

*OSG Bulk Ships v. United States*, 132 F.3d 808 (D.C. Cir. 1998)...........................23

*Overseas Media Corp. v. McNamara*, 385 F.2d 308 (D.C.
Cir. 1967) .....................................................................................21, 22

*Regents of the Univ. of Calif. v. DHS*, 908 F.3d 476
(9th Cir. 2018)...............................................................................35, 42

*Reno v. ACLU*, 521 U.S. 844 (1997) ......................................................................48

*Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706
(D.C. Cir. 2022) ......................................................................................13

*Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999) ................................32

*Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007) .................................14

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 159 (1993).........................................22

*Shelton v. Tucker*, 364 U.S. 479, 485–86 (1960)....................................27, 30, 48, 49

*State v. U.S. Dep't of Com.*, 315 F. Supp. 3d 766
(S.D.N.Y. 2018).......................................................................................34

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)......................11, 30, 31, 33, 34, 35, 36, 41

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ...........................................47

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) ................................................................................................32

*United States ex rel. Ulrich v. Kellogg*, 30 F.2d 984 (D.C. Cir. 1929) ....................................................................................32

*United States v. Brigoni-Ponce*, 422 U.S. 873 (1975)...............................................41

*United States v. Witkovich*, 353 U.S. 194 (1957) ....................................................41

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ...........................................................................24, 43

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)...................................................................29

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018) ..............................................................................................14

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...........................................................41, 46

**Statutes**

22 C.F.R. § 41.103 ................................................................3, 4, 24, 49

22 C.F.R. § 42.63 ...............................................................................3

28 U.S.C. § 1291 ...............................................................................2

5 U.S.C. § 701 .................................................................................13

8 U.S.C. § 1101 ................................................................................3

8 U.S.C. § 1154 ...............................................................................16

8 U.S.C. § 1202................................................................ 3, 10, 12, 14, 15, 17, 18

8 U.S.C. § 1225 ...............................................................................16

8 U.S.C. § 1252 ...............................................................................16

*Ending Discriminatory Bans on Entry to the United States*,
    Proclamation No. 10141 § 1, 86 Fed. Reg. 7005, 7005
    (Jan. 20, 2021) ...................................................................................... 6

## Other Authorities

*April 8–9, 2021 ODNI Email Chain*, Knight First Amendment
    Institute at Columbia University, https://perma.cc/3TBN-
    K9ZS ............................................................................................... 6, 47

Asian Americans Advancing Justice, Comment Letter on
    Proposed Information Collection: Application for
    Nonimmigrant Visa 3 (May 29, 2018) , *available at*
    https://perma.cc/2ZFA-ABFD .................................................4, 44, 48

Charlie Savage, *Visa Applicants' Social Media Data Doesn't
    Help Screen for Terrorism, Documents Show*, N.Y. Times
    (Oct. 5, 2023), https://perma.cc/5KZX-WS9M ............................. 6, 47

Muslim Advocates, Comment Letter on Proposed Information
    Collections: Applications for Immigrant Visa and
    Nonimmigrant Visa 12−13 (May 29, 2018), *available at*
    https://perma.cc/2ZFA-ABFD ...................................................... 5, 44

## Glossary

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of abbreviations and acronyms used in this brief.

APA             Administrative Procedure Act

DHS             Department of Homeland Security

IDA             International Documentary Association

INA             Immigration and Nationality Act

JA              Joint Appendix

## Introduction

This case concerns U.S. Department of State ("State Department") rules requiring millions of visa applicants each year to disclose their social media activity to the U.S. government (the "Disclosure Requirement"), as well as related policies that provide for the indefinite retention and broad dissemination of that information. Plaintiffs Doc Society and IDA filed this case because the Disclosure Requirement imposes a serious burden on the expressive and associational rights of their members and partners both inside and outside the United States, including foreign citizens who currently live in the United States but will travel abroad in order to apply for new or renewed visas. The Government has offered no evidence that the Disclosure Requirement is effective, let alone necessary, in serving the Government's stated interests. The Disclosure Requirement therefore violates both the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and the First Amendment.

The district court below ruled that the Disclosure Requirement is not subject to review under the APA, and that it is subject to only deferential review under the First Amendment. These conclusions are incorrect. As this Court has long recognized, "[t]he Executive has broad discretion over the admission and exclusion of [noncitizens],[1] but that discretion is not boundless. It extends only as far as the

---

[1] This brief uses the term "noncitizen" instead of "alien." *See, e.g.*, *Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (replacing statutory term "alien" with "noncitizen").

1

statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). The district court declined to carry out this duty in this case.

This Court should reverse the district court's decision and remand the case for further proceedings.

## Statement of Jurisdiction

The district court had jurisdiction pursuant to 5 U.S.C. § 702, 28 U.S.C. § 1331, and the U.S. Constitution. On August 11, 2023, the district court entered a final order granting in part and denying in part the Government's motion to dismiss. JA332. Plaintiffs timely filed a notice of appeal on October 10, 2023. JA373. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## Pertinent Statutes and Regulations

The pertinent statutes and regulations are set forth in the Addendum to this brief.

## Statement of Issues on Appeal

1.    Whether regulations prescribing what information visa applicants must disclose on their visa applications are subject to review under the Administrative Procedure Act.

2

2.    Whether the district court erred in applying rational basis review, rather than exacting scrutiny, to regulations requiring visa applicants to disclose social media identifiers on their visa applications, which infringe on the First Amendment rights of individuals inside the United States.

## Statement of the Case

## I.    Statutory and Regulatory Background

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, requires applicants seeking immigrant or nonimmigrant visas to submit for review their basic biographical information, such as name and birthdate, as well as "such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed." *Id.* § 1202(a) (immigrant visas); *see id.* § 1202(c) (nonimmigrant visas). Noncitizens who apply for visas from abroad must provide this information on Form DS-160 for nonimmigrant visas, 22 C.F.R. § 41.103(a)(1), or Form DS-260 for immigrant visas, *id.* § 42.63(a)(1). Those who currently live in the United States, but who apply for new visas or renewed visas from abroad, must complete the same forms. JA018 (Compl. ¶ 23). State Department regulations also permit a consular officer to require an applicant to provide "additional necessary information" if "the consular officer believes that the information provided in the application is inadequate" to determine that particular applicant's visa eligibility. 22 C.F.R.

§§ 41.103(b)(2), 42.63(c). The State Department and Department of Homeland Security ("DHS") retain the information provided in visa applications in various databases and may disseminate it for a range of purposes to Congress; state, local, and tribal governments; and foreign governments. JA023–24 (Compl. ¶¶ 35–37).

On March 6, 2017, President Trump issued an executive order and memorandum directing the Secretary of State to implement procedures for "enhanced" vetting of visa applicants. JA058; *see* JA052. The State Department subsequently issued notices proposing to require nearly all visa applicants to include on their Form DS-160 or Form DS-260 all of the social media identifiers they had used on specified social media platforms during the preceding five years (the "Disclosure Requirement"). JA062; JA065. These notices generated more than 10,000 comments, all but 87 of which opposed the Disclosure Requirement. JA075; JA090. Many comments expressed concerns that the Requirement would undermine the freedoms of speech, expression, and association; invade privacy; and deter travel to the United States. JA078–86; JA102–111. Other comments explained that social media activity is difficult to interpret accurately, especially across different languages and cultures. JA077; *see, e.g.*, Asian Americans Advancing Justice, Comment Letter on Proposed Information Collection: Application for Nonimmigrant Visa 3 (May 29, 2018), *available at* https://perma.cc/2ZFA-ABFD. Still other comments cited to the Government's own internal reports, including a

2017 DHS Inspector General report, which concluded that pilot programs had failed to establish that social media screening was an effective means of confirming applicants' identities, determining their visa eligibility, or assessing national security threats. JA102; *see, e.g.*, Muslim Advocates, Comment Letter on Proposed Information Collections: Applications for Immigrant Visa and Nonimmigrant Visa 12−13 (May 29, 2018), *available at* https://perma.cc/2ZFA-ABFD; *see also* JA295–310 (2017 DHS IG report).

Nonetheless, the State Department implemented the proposals on May 19, 2019, imposing the Disclosure Requirement on an estimated 14.7 million visa applicants each year. *See* JA020 (Compl. ¶ 27); JA062; JA065. In its final supporting statements, the State Department cited no evidence that the Disclosure Requirement would be an effective means of confirming applicants' identities, determining their visa eligibility, or assessing national security threats. *See generally* JA073–95; JA097–120. Instead, it simply asserted that the Requirement "will provide an effective additional means for screening visa applicants for specific visa ineligibility grounds or for verifying the applicant's identity." JA110.

More recent government documents confirm that the Disclosure Requirement does not serve its stated purposes. The day President Biden took office, he revoked the executive order underlying the Disclosure Requirement and called for a review of the use of social media identifiers in the visa vetting process. *Ending*

*Discriminatory Bans on Entry to the United States*, Proclamation No. 10141 § 1, 86 Fed. Reg. 7005, 7005 (Jan. 20, 2021). The Knight First Amendment Institute at Columbia University filed a Freedom of Information Act request for records relating to that review. In response, the Institute received an April 2021 email exchange in which officials discussed the review. In one email, an official in the Office of the Director of National Intelligence expressed concern that the resulting report "will reflect a negative perspective on the usefulness of social media identifiers," and summarizes internal discussions that concluded that the collection of these identifiers "add[s] no value" to the visa vetting process.[2]

## II.    Procedural History and the District Court's Decision

Plaintiffs filed this suit on December 5, 2019. In their complaint, they explained that they are U.S.-based documentary film organizations that support filmmakers from around the world. Doc Society works with partners to "enable the creation of documentary films that drive social change" through "funding for film

---

[2] Plaintiffs respectfully request that the Court take judicial notice, pursuant to Federal Rule of Evidence 201 and the Court's inherent equitable authority, of these government emails, which are available at: *April 8–9, 2021 ODNI Email Chain*, Knight First Amendment Institute at Columbia University, https://perma.cc/3TBN-K9ZS. *See also* Charlie Savage, *Visa Applicants' Social Media Data Doesn't Help Screen for Terrorism, Documents Show*, N.Y. Times (Oct. 5, 2023), https://perma.cc/5KZX-WS9M ("A disputed rule that forces millions of applicants for a visa to enter the United States to disclose their social media profiles to the government has done little to help screen for possible terrorists, newly disclosed documents show.").

projects, educational and promotional resources, and cross-sector networking opportunities." JA025 (Compl. ¶ 40). IDA is a membership-based organization that "support[s] a global community of documentary filmmakers" by "fund[ing] films and filmmakers and host[ing] dozens of screenings, conferences, workshops, and other events throughout the United States each year." JA026 (Compl. ¶ 41).

Plaintiffs' members and partners include foreign filmmakers who reside in the United States and abroad. JA027 (Compl. ¶¶ 42–44). These filmmakers use social media to promote their work, learn about new projects, and engage with others about political and social issues. JA029 (Compl. ¶¶ 49–50). Plaintiffs themselves use social media to learn about new projects, conduct research, share resources, and promote their events. JA037–39 (Compl. ¶¶ 67–68). Many of Plaintiffs' members and partners who reside outside the United States travel to the United States to participate in Plaintiffs' events. JA027 (Compl. ¶ 42). Others already live and work in the United States but require visas to do so. JA027 (Compl. ¶ 43).

Plaintiffs' complaint alleges that the Disclosure Requirement and related retention and dissemination policies violate the APA and the First Amendment. JA042–43 (Compl. ¶¶ 77–78). Since the Disclosure Requirement went into effect, some of Plaintiffs' foreign members and partners, including those who currently live in the United States but will travel abroad to apply for new or renewed visas, have been forced to engage in significant self-censorship online—deleting past posts,

limiting or altering what they say, or even ceasing engagement with certain groups or individuals on social media altogether. JA031–32 (Compl. ¶¶ 54–55). Others have been deterred from traveling to the United States, in some cases because they feared that information disclosed to the U.S. government might be shared with other governments, including those that persecute artists and activists. JA032; JA039–40 (Compl. ¶¶ 56, 71–72). As a result, Plaintiffs and their U.S. members and partners have been deprived of opportunities to hear from and associate with their foreign members and partners, both online and in person. This loss has compromised the success of Plaintiffs' U.S.-based events and hampered their work more broadly. JA037–42 (Compl. ¶¶ 65–74). To remedy these harms, Plaintiffs seek declaratory and injunctive relief and expungement of all information collected through the Disclosure Requirement. JA043 (Compl. ¶ 34).

On April 15, 2020, the Government filed a motion to dismiss Plaintiffs' claims, asserting that Plaintiffs lacked standing and that Plaintiffs had failed to state a claim under either the APA or the First Amendment. JA004 (ECF Nos. 31 & 31-1). Plaintiffs opposed the Government's motion on May 27, 2020. JA004 (ECF No. 32).

On August 11, 2023, the district court granted in part and denied in part the Government's motion to dismiss and dismissed Plaintiffs' complaint with prejudice. JA332–33. Though the district court ruled that Plaintiffs had sufficiently alleged

organizational standing, JA341–49, it rejected Plaintiffs' claims that the Disclosure Requirement violates the APA and the First Amendment. JA355; JA371.

On October 10, 2023, Plaintiffs timely filed a notice of appeal. JA373.

## Summary of Argument

As Plaintiffs amply allege in their complaint, the Disclosure Requirement violates the APA and the First Amendment. The district court erred in concluding that the Disclosure Requirement is not subject to review under the APA at all, and that it is subject to only the most deferential review under the First Amendment.[3] These conclusions conflict with case law from the Supreme Court, this Court, and

---

[3] The district court properly concluded that Plaintiffs have organizational standing. JA341–49. While the district court found it unnecessary to reach the question, Plaintiff IDA has associational standing as well. First, the Disclosure Requirement injures IDA's foreign members who live in the United States but must travel abroad to apply for new or renewed visas by depriving them of their First Amendment–protected rights to anonymous speech and free association and chilling their online expressive activities more broadly. Second, the Disclosure Requirement injures IDA's U.S. members by deterring IDA's foreign members who live abroad from engaging with IDA online and from applying for visas that would permit them to engage with IDA's U.S. members in person at IDA's events. These burdens constitute cognizable injuries sufficient for standing. *See, e.g.*, *Ams. for Prosperity Found. v. Bonta* ("*AFPF*"), 141 S. Ct. 2373, 2388–89 (2021); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958); *Abourezk*, 785 F.2d at 1050–51. Because the expressive and associational interests of IDA's members are clearly germane to IDA's purpose, which is "to support a global community of documentary filmmakers in order to foster a more informed, compassionate, and connected world," JA026 (Compl. ¶ 41), and because this lawsuit does not require the participation of individual members, IDA has associational standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

courts across the country. This Court should therefore reverse the district court's grant of the Government's motion to dismiss and allow Plaintiffs' claims to proceed.

*First*, the district court erred in concluding that the Disclosure Requirement is not subject to review under the APA because the relevant sections of the INA present a "judicially unmanageable standard." JA349. Although it acknowledged that the text of subsections 1202(a) and 1202(c) provides "a focus for judicial review" and that the term "necessary" "limits the Secretary's discretion," JA353, it nonetheless reasoned that "[e]valuating Plaintiffs' APA claim would require" it "to intrude on a . . . policy decision entrusted to another branch of government," and concluded that the Disclosure Requirement was not "fit for judicial involvement." JA355. The district court was incorrect. Agency action is presumptively reviewable under the APA, and the Government identified no persuasive reason why that presumption should not control here. As the district court itself recognized, the relevant statutory provisions make absolutely clear that Congress intended to limit the Secretary's authority to require additional information on visa applications. And the court was wrong to conclude that it could not assess whether the Secretary engaged in reasoned rulemaking without intruding on the merits of individual visa application decisions. Plaintiffs' APA claims go to the adequacy of the Secretary's reasons for adopting the Disclosure Requirement, not to the validity of any visa decision.

*Second*, the district court erred in applying a highly deferential standard of review to the Disclosure Requirement, rather than the exacting scrutiny required by the First Amendment. The court correctly recognized that Plaintiffs had adequately alleged that the Disclosure Requirement burdens the First Amendment rights of their foreign members and partners who currently live in the United States, and that exacting scrutiny would ordinarily apply. JA362; JA364. Rather than subject the Disclosure Requirement to exacting scrutiny, however, it conducted only a "circumscribed judicial inquiry," relying on cases addressing constitutional challenges to government decisions to exclude foreign citizens from the country. JA356; JA365; *see Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *Kleindienst v. Mandel*, 408 U.S. 753 (1972). But those cases do not apply beyond those circumstances. Because Plaintiffs do not challenge any exclusion decision, but rather a procedural requirement that burdens First Amendment rights independently of any exclusion decision, those cases do not control this one.

*Third*, Plaintiffs adequately allege that the Disclosure Requirement is unlawful under both the APA and the First Amendment. The Government adopted the Disclosure Requirement in the absence of any evidence establishing its effectiveness for visa vetting purposes and without adequately addressing the concerns raised in thousands of public comments opposing the Requirement. The Disclosure Requirement is therefore arbitrary and capricious within the meaning of

11

the APA. It also exceeds the Secretary of State's authority under the INA, which provides that the Secretary may require visa applicants to submit additional information that is "necessary" for visa adjudication purposes. 8 U.S.C. § 1202(a), (c). Information that is not even useful for visa adjudication purposes can hardly be necessary for those purposes. For these reasons, the Disclosure Requirement should be set aside under the APA.

The Disclosure Requirement also violates the First Amendment. As Plaintiffs' complaint makes clear, the Disclosure Requirement significantly burdens the expressive and associational rights of Plaintiffs and their members and partners, including their foreign members and partners who currently live in the United States. The Supreme Court has recently invalidated similar disclosure requirements under exacting scrutiny, a standard of review that requires the challenged regulation to have at least "a substantial relation" to "a sufficiently important governmental interest." *AFPF*, 141 S. Ct. at 2383 (citation omitted). The Government asserts that the Disclosure Requirement is necessary to confirm visa applicants' identities and determine their visa eligibility, but it has failed to demonstrate that the Requirement actually serves those purposes—and, as noted above, all of the available evidence suggests it does not. Further, any interest actually served by the Disclosure Requirement could be achieved with narrower means. Consular officers already have the authority to demand social media identifiers from individual visa applicants

12

if they believe that information is necessary to determine their visa eligibility. That fact alone should be fatal to the Disclosure Requirement.

## Standard of Review

This Court's review of the district court's decision is *de novo*. *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir. 2023). In reviewing a dismissal for failure to state a claim, the Court "must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor, and presuming that general allegations embrace those specific facts that are necessary to support the claim." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 709 (D.C. Cir. 2022) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)).

## Argument

### I. The district court erred in ruling that the Disclosure Requirement is not subject to review under the APA.

The district court's conclusion that judicial review of the Disclosure Requirement is foreclosed conflicts with "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). As relevant here, the presumption of reviewability under the APA is overcome only when the agency action has been "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This "general exception to reviewability" is "a narrow one." *Heckler v. Chaney*, 470 U.S. 821, 838

(1985). It applies only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citation omitted); *see Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 633 (D.C. Cir. 2020) ("[T]he question becomes whether the language or structure of the statute provides substantive legal standards for a court to apply.").[4]

This narrow exception is inapplicable here. Subsections 1202(a) and (c) of the INA expressly cabin the Secretary's discretion by authorizing the collection of "such additional information *necessary* to the identification" of visa applicants and to "the enforcement of the immigration and nationality laws." 8 U.S.C. § 1202(a), (c) (emphasis added). And as the district court recognized, the term "necessary" is a judicially manageable standard against which to judge the Disclosure Requirement. JA354; *see, e.g.*, *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 601 (D.C. Cir. 2007) (finding judicially manageable the statutory standard "necessary for safety")*.*

The district court erred in ruling that the Disclosure Requirement is unreviewable because applying the statutory standard in this case would "intrude on

---

[4] Although not relevant here, there is a category of agency actions that are "presumptively committed to agency discretion," including "refusals to initiate enforcement proceedings" and "criminal charging decisions." *Make the Rd. N.Y.*, 962 F.3d at 632. The district court properly found that the Disclosure Requirement is "not the sort of decision 'traditionally committed to agency discretion.'" JA352 (citation omitted).

a [] policy decision entrusted to another branch of government." JA355. In reaching this conclusion, the district court reasoned that "the law-enforcement value of the information at issue, if any, materializes only in the individual decisions whether to admit a particular noncitizen or to revoke a particular noncitizen's visa," *id.*, noting that "the merits of the government's enforcement decisions in this area are judicially unreviewable," *id.* The district court ruled that it "could not judge the necessity of the information [at issue in the Disclosure Requirement] without impermissibly second guessing the Secretary's assessment of its law-enforcement value to officials in their exercise of judicially unreviewable executive power." *Id.* (internal quotation marks and citation omitted).

This ruling (1) contradicts the plain text of the INA, which expresses Congress's intent to limit the Secretary's discretion; (2) contravenes this Court's precedent, which bars judicial review only in exceptional circumstances not present here; and (3) ignores that courts can review whether the Secretary engaged in reasoned rulemaking without intruding into individual visa application decisions.

## A.     The district court's decision conflicts with the text of the INA.

The district court's conclusion that the Disclosure Requirement is judicially unreviewable is inconsistent with the text of the INA. Pursuant to subsections 1202(a) and (c), the Secretary can require the disclosure only of "additional information *necessary*" to the stated purposes. 8 U.S.C. § 1202(a), (c) (emphasis

15

added); *see, e.g.*, *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000) ("[A] statutory reference to 'necessary' must be construed" as "that which is required to achieve a desired goal."). The district court's opinion effectively strikes this language from the statute by concluding that courts cannot enforce the limitation on executive discretion imposed by Congress.

Where Congress has intended to shield immigration regulations from judicial review, it has done so expressly. For example, the INA commits certain decisions to the "sole and *unreviewable*" discretion of the Secretary. 8 U.S.C. § 1225(b)(1)(A)(iii)(I) (emphasis added); *see id.* § 1154(a)(l)(1) ("The determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General."); *id.* § 1154(I) (providing for visa adjudication "unless the Secretary of Homeland Security determines, in the unreviewable discretion of the Secretary, that approval would not be in the public interest"); *see also Make the Rd. N.Y.*, 962 F.3d at 633 ("Congress deliberately chose in the Designation Provision to commit such enforcement and resource judgments to the Secretary's 'sole and unreviewable discretion[.]'"). The INA also expressly exempts certain categories of agency action from judicial review. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(A) (providing that "no court shall have jurisdiction to review" matters relating to expedited removal); *id.* § 1252(g) (depriving courts of jurisdiction to hear "any cause or claim . . . arising from the decision or action by the

Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen]").

But Congress did not categorically commit regulations under section 1202 to the Secretary's unreviewable discretion. Nor did Congress establish any bar to review of such regulations. Congress's decision not to bar review of regulations under section 1202 is presumed to be intentional. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."); *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

Further, Congress's use of the term "necessary" in subsections 1202(a) and (c) reflects an intent to limit the Secretary's discretion when read in context of section 1202 as a whole. In subsections 1202(a) and (c), Congress provided that visa applications shall include "such additional information necessary" to the identification of the applicant and to "the enforcement of the immigration and nationality laws as may be by regulations prescribed." 8 U.S.C. § 1202(a), (c). By contrast, other provisions in section 1202 identify agency actions left to "the discretion of" the Secretary. *See id.* § 1202(c) ("At the discretion of the Secretary of

17

State, application forms for [certain] classes of nonimmigrant admissions . . . may vary according to the class of visa being requested"); *id.* § 1202(f)(1) ("[I]n the discretion of the Secretary of State certified copies of such records may be made available . . . ."). Indeed, section 1202(f)(2) expressly distinguishes between actions "in the Secretary's discretion" and those that are "necessary." *See id.* § 1202(f)(2) ("[T]he Secretary of State, *in the Secretary's discretion* . . . may provide to a foreign government information in the Department of State's computerized visa lookout database and, *when necessary and appropriate*, other records . . . .") (emphasis added). Accordingly, section 1202 delegates certain decisions to the Secretary's subjective discretion, whereas other decisions—such as the adoption of the Disclosure Requirement—must meet the objective standard imposed by Congress.

Congress's clear intent to subject regulations such as the Disclosure Requirement to review—as demonstrated through the plain text of the INA—is dispositive because "judicial review of a final agency action by an aggrieved person *will not be cut off* unless there is persuasive reason to believe that such was the *purpose of Congress*." *Bowen*, 476 U.S. at 670 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)) (emphasis added).

### B.    The district court erred in concluding that visa application regulations are not fit for judicial review.

Where, as here, an agency's discretion is cabined by a meaningful standard, the agency's exercise of that discretion has been found unreviewable only in

"extraordinary circumstances, such as those requiring flexibility in managing the resources of national defense." *Inv. Annuity v. Blumenthal*, 609 F.2d 1, 8 (D.C. Cir. 1979); *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) ("In military matters in particular, the courts lack the competence to assess the strategic decision to deploy force[.]"). Relying on three cases concerning the management of military resources, the district court concluded that the Disclosure Requirement was unreviewable because determining whether information was necessary for enforcement of the INA implicated "the Executive's . . . judgments on questions of foreign policy[,] national interest, and enforcement discretion." JA355 (citation omitted); *see Nat'l Fed'n of Fed. Emps. v. United States* ("*NFFE*"), 905 F.2d 400, 406 (D.C. Cir. 1990) (holding that the Secretary of Defense's military base closing decisions were not reviewable under the APA); *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000) ("Were we to decide whether the [Maritime Administration's] order is reasonable, we would necessarily be 'second guessing' not only the Executive's determinations *regarding the military value of the eight vessels* but also its judgments on questions of foreign policy and national interest." (emphasis added)); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 37–38 (D.D.C. 2020) (ruling court could not determine whether military construction is necessary without "cross[ing] the line

into military policy" and "second guessing the Secretary's assessment of . . . the military value" (citation omitted)). But those cases are inapposite.

The principle in the line of cases on which the district court relied was first established in *Curran v. Laird*, 420 F.2d 122 (D.C. Cir. 1969). *See NFFE*, 905 F.2d at 406 (citing *Curran*). In *Curran*, an en banc panel of this Court held that the executive's decision to transport military cargo on foreign vessels was unreviewable under the APA. 420 F.2d at 128. The Court first held that the decisions were committed to agency discretion by law because the relevant statute "does not contain a mandate that overrides the judgment of the executive." *Id.* It further held that, although courts generally have the "power to inquire into a claim of abuse of discretion," "there is a narrow band of matters that are wholly committed to official discretion" such that "any consideration of whether the official action is 'arbitrary' or constitutes an abuse of discretion" is "withdrawn from the judicial ambit." *Id.* at 131. That exception applied because "the[] decisions [we]re inextricably intertwined with and permeated by assumptions and conclusions of national defense strategy," because "[i]n time of stress and emergency our officials need freedom to act," and because "Congress gave the executive such freedom . . . ." *Id.* at 131–32. In all, *Curran* and its progeny establish that, where Congress has given the executive discretion over certain military matters, the executive's actions are "not subject to judicial surveillance." *Id.* at 128; *see also Overseas Media Corp. v. McNamara*, 385

F.2d 308, 314 (D.C. Cir. 1967) ("It is—and must—be true that the Executive should be accorded wide and normally unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means.").

But the unique concerns that caution against judicial review of strategic military decisions do not apply here.[5] Congress—not the executive—has plenary power over immigration policy. *See Mandel*, 408 U.S. at 766 (observing that it is Congress's authority to "exclude those who possess those characteristics which [it] has forbidden" and "to have its declared policy in that regard enforced exclusively through executive officers") (internal quotation marks and citations omitted). Accordingly, the executive's authority over immigration matters "extends only as far as the statutory authority conferred by Congress," and it "is the duty of the courts . . . to say where those statutory . . . boundaries lie." *Abourezk*, 785 F.2d at 1061. For that reason, the Supreme Court has "'consistently applied' the presumption of reviewability to immigration statutes." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)).

---

[5] Further, this Court has never relied on the *Curran/NFFE* line of cases to insulate forward-looking rules of general applicability from judicial review under the APA. To the contrary, this Court has only applied the doctrine to discrete strategic decisions. *See, e.g.*, *NFFE*, 905 F.2d at 406 (Secretary's decision to close or realign military bases); *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n.*, 215 F.3d at 42 (Maritime Administration's order to transfer the registry of eight vessels).

Indeed, courts have routinely reached the merits of APA claims challenging agency action in the immigration context. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (holding that rescission of the Deferred Action for Childhood Arrivals program was subject to judicial review under the APA); *Abourezk*, 785 F.2d at 1051 ("[T]he Immigration Act emphatically did not commit the decision to exclude [a noncitizen] to standardless agency discretion."); *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 665–66 (9th Cir. 2021) (holding that courts are "responsible for reviewing whether the government has overstepped its delegated authority under the INA"); *Cook Cnty. v. Wolf*, 962 F.3d 208, 215 (7th Cir. 2020) (holding that plaintiffs were likely to succeed on the merits of an APA claim challenging DHS rule defining "public charge" for purposes of the INA); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 159 (1993) (addressing merits of claim that an executive order violated the INA and the United Nations Convention Relating to the Status of Refugees).

In all, unlike in the military context, the Secretary does not have "unassailable discretion," *Overseas Media Corp.*, 385 F.2d at 314, to promulgate immigration policy. Where, as here, the Secretary's discretion is subject to statutory limits, it is similarly subject to judicial review.

C.    **The district court erred in concluding that it could not evaluate Plaintiffs' APA claims without intruding on the executive's discretion over individual enforcement actions.**

The district court also erred in ruling that it could not evaluate the necessity of the Disclosure Requirement without "second guessing the Secretary's assessment of its law-enforcement value" in "individual decisions whether to admit a particular noncitizen or to revoke a particular noncitizen's visa." JA355 (citation omitted). Judicial review of whether the Disclosure Requirement was a product of reasoned decisionmaking would not intrude on individual visa determinations.

*First*, even though individual visa determinations may often be "judicially unreviewable," JA355, generally applicable visa regulations are not. "By definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings." *Crowley Caribbean Transp. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994). For that reason, in considering reviewability, this Court has distinguished between "single-shot non-enforcement decision[s]" and "general enforcement polic[ies]." *Id.* at 676. The latter are reviewable under the APA. *Id.* ("[A]n agency's statement of a *general enforcement policy* may be reviewable for legal sufficiency where the agency has expressed the policy as a formal regulation . . . ." (citations omitted)); *OSG Bulk Ships v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) ("Because [the agency's] action was not such a single-shot non-enforcement

23

decision, the district court had jurisdiction [under the APA].”). Accordingly, a regulation's connection to unreviewable individual enforcement decisions does not render the regulation itself unreviewable.

The district court's reasoning is even less compelling here, where consular officers already have the authority to require social media information when they believe it is necessary for the adjudication of any individual visa application. 22 C.F.R. §§ 41.103(b)(2), 42.63(c). The courts can evaluate whether requiring certain information on visa applications is “necessary” to enforce the INA as a general matter without intruding on officers' determination of what information may be necessary to enforce the INA “in a particular situation.” JA355.

*Second*, Plaintiffs' APA claims go to the adequacy of the Secretary's decisionmaking in adopting the Disclosure Requirement, not to the validity of any individual visa determination. Plaintiffs allege, among other things, that the Secretary failed to provide an adequate rationale for the Disclosure Requirement. JA020 (Compl. ¶ 27); *see United Steel v. Mine Safety & Health Admin*., 925 F.3d 1279, 1285 (D.C. Cir. 2019) (invalidating agency action because “the record lacks a reasonable justification”). Plaintiffs also allege that, in promulgating the Disclosure Requirement, the Secretary failed adequately to respond to the hundreds of public comments regarding the unreliability of social media screening for confirming applicants' identities or determining their visa eligibility, *see* JA019 (Compl. ¶ 26),

including comments citing the government's prior conclusion that pilot programs had failed to demonstrate the effectiveness of social media screening as a visa vetting tool, JA018; JA020 (Compl. ¶¶ 24, 27). *See, e.g.*, *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) (holding that an agency action was arbitrary and capricious because "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking").

Courts routinely assess whether an agency's decision to collect information "necessary" for a statutory purpose is properly supported by the administrative record. This Court's decision in *AFL-CIO v. Chao* is instructive. 409 F.3d 377 (D.C. Cir. 2005). The Secretary of Labor enacted a rule pursuant to her authority to issue regulations "as she may find necessary to prevent the circumvention or evasion of [Title II's] reporting requirements." *Id.* at 386. This Court invalidated the rule because "the Secretary has not so found, much less made a determination that such [information] would be necessary to prevent circumvention or evasion of" such reporting requirements. *Id.* at 390. Similarly, the Supreme Court has held that the Secretary of Commerce's decision to include questions on a census questionnaire is reviewable under the APA where the relevant statute "authorize[d] the Secretary" to "obtain such other census information as necessary" in "connection with any []] census." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019) (holding that the Census Act is not "drawn so that it furnishes no meaningful standard by which to

judge the Secretary's action"); *id.* at 2575 (remanding in view of "the disconnect between the decision made and the explanation given"). In fact, courts have reviewed policies and programs involving an agency's collection of information, even where such collection implicated national security. *See, e.g.*, *ACLU v. Clapper*, 785 F.3d 787, 792 (2d Cir. 2015) (holding that the National Security Agency's "bulk telephone metadata collection program" is subject to review under the APA).

In all, the Secretary's determination of what information is "necessary" for the enforcement of the INA must be adequately explained and the product of reasoned decisionmaking. That is the crux of Plaintiffs' APA claims. The district court therefore erred by ruling that the Secretary's decision to adopt the Disclosure Requirement was a subject not "fit for judicial involvement." JA355.

## II. The district court erred in concluding that the Disclosure Requirement is subject to only deferential review under the First Amendment.

The district court correctly credited Plaintiffs' allegations that the Disclosure Requirement burdens core First Amendment rights. Rather than applying exacting scrutiny, however, the court conducted only a "circumscribed judicial inquiry." JA356 (citation omitted). It erred in doing so, as explained below.

### A. The Disclosure Requirement is subject to exacting scrutiny.

As the district court correctly concluded, Plaintiffs adequately allege that the Disclosure Requirement burdens the First Amendment rights of some of their foreign members and partners—those who currently live in the United States—to

speak and associate freely. Contrary to the district court's conclusion, however, Plaintiffs also adequately allege that the Disclosure Requirement burdens their own First Amendment right (as well as the right of their U.S. members and partners) to hear from Plaintiffs' foreign members and partners. Government action that burdens these core First Amendment rights must be subject to exacting scrutiny.

*First*, as the district court correctly concluded, Plaintiffs adequately allege that the Disclosure Requirement burdens the First Amendment rights of their members and partners who already reside in the United States but must apply for new visas in order to continue their lives and their work here. JA361–62; JA364. Those members and partners are unquestionably entitled to First Amendment protections. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945). By compelling them to disclose social media identifiers they have used on specified platforms during the preceding five years—including pseudonymous identifiers—the Disclosure Requirement burdens their rights to speak anonymously and associate freely online. *See, e.g.*, *AFPF*, 141 S. Ct. at 2389; *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42, 347 (1995); *Shelton v. Tucker*, 364 U.S. 479, 485–86, 490 (1960); *NAACP*, 357 U.S. at 462 ("[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action."). Importantly, the chilling effect is felt *now*, even if the visa application need not be submitted until later. As the complaint alleges, these

27

members' and partners' First Amendment–protected activity is presently chilled by "fears that they will suffer reprisals because of their speech or associations, whether from the United States or from foreign governments," after they comply with the Disclosure Requirement in applying for a new or renewed visa. JA364; *see, e.g.*, JA027; JA031–32; JA035 (Compl. ¶¶ 43, 55, 60). The district court rightly recognized that Plaintiffs had adequately alleged that the Disclosure Requirement bears directly on these members' First Amendment rights "[b]ecause the accompanying harms occur while the noncitizens are still in the United States." JA362.

*Second*, although the district court concluded otherwise, Plaintiffs adequately allege that the Disclosure Requirement burdens their own right, as organizations, and the right of their U.S. members and partners to hear from foreign members and partners outside the United States. "The first amendment secures to persons in the United States . . . their right to communicate and associate with foreign individuals and organizations, as well as with individuals and organizations stateside." *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 303 (D.C. Cir. 1989) (Ginsburg, J., concurring in part and dissenting in part); *see Lamont v. Postmaster Gen.*, 381 U.S. 301, 302, 305–07 (1965) (recognizing First Amendment interest in receiving information from abroad); *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 117–18 (2d Cir. 2009). The Disclosure Requirement conditions the ability of

Plaintiffs' foreign members and partners to obtain U.S. visas on their willingness to disclose their speech and associations to the Government, and to expose themselves to possible surveillance even after they have been granted those visas. This condition deters some from speaking and associating freely online and deters others from applying for U.S. visas to attend Plaintiffs' U.S.-based events, thereby burdening Plaintiffs' rights to hear from those members and partners online or in person.

The district court faulted Plaintiffs for "fail[ing] to identify a particular instance of speech that any person wishes to—but cannot—hear." JA359. But Plaintiffs *did* identify foreign members and partners whose speech they wanted to hear and would have heard, whether online or in person, but for the chilling effects of the Disclosure Requirement. *See* JA031–32 (Compl. ¶¶ 55–56) (describing several different filmmakers who have deleted social media posts, ceased posting on social media, or decided not to apply for U.S. visas because of the Disclosure Requirement). The First Amendment requires no more. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 n.14 (1976) (accepting evidence of willing speaker from stipulation that, "[i]n the absence of [the challenged regulation], some pharmacies in Virginia would advertise, publish and promote price information regarding prescription drugs").

Thus, Plaintiffs adequately allege that the Disclosure Requirement burdens core First Amendment rights, including the rights to speak anonymously, to

associate freely, and to receive information and ideas. Regulations that impose these kinds of burdens on First Amendment activity are ordinarily subject to exacting scrutiny. *See AFPF*, 141 S. Ct. at 2383 (concluding that, "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny"); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (reviewing disclosure requirement under exacting scrutiny); *McIntyre*, 514 U.S. at 347 (same); *NAACP*, 357 U.S. at 460–61 (reviewing "state action which may have the effect of curtailing the freedom to associate" under "the closest scrutiny"); *Shelton*, 364 U.S. at 488 (reviewing disclosure requirement for narrow tailoring).

### B.    *Kleindienst v. Mandel* and *Trump v. Hawaii* do not control this case.

The district court recognized that its "conclusion that the disclosure requirement burdens First Amendment rights" would "[o]rdinarily . . . compel 'exacting scrutiny' of the rule," JA364 (citing *AFPF*, 141 S. Ct. at 2382–83), but ultimately it conducted only a "circumscribed judicial inquiry," *id*. (quoting *Hawaii*, 138 S. Ct. at 2418). The court reasoned that the deferential standard of review articulated in *Kleindienst v. Mandel*—under which courts ask only whether the challenged action was "facially legitimate and bona fide," *Mandel*, 408 U.S. at 770—applies whenever "courts are asked to 'probe and test the justifications' of immigration policies," JA366 (quoting *Hawaii*, 138 S. Ct. at 2419). And although the court found "no reason to think that *Mandel* review ha[d] been displaced," it

30

"follow[ed] the Supreme Court's lead in *Trump v. Hawaii*" and conducted rational-basis review. JA369.[6]

The district court was wrong to extend *Mandel* and *Hawaii* to this case. The "highly constrained" review that *Mandel* established, *Hawaii*, 138 S. Ct. at 2420—and which *Hawaii* "did not 'purport to alter,'" JA366 (quoting *Yafai v. Pompeo*, 924 F.3d 969, 973–74 (7th Cir. 2019))—applies when plaintiffs challenge the Government's decision to exclude noncitizens from this country. And neither the district court, nor the Government in its briefing below, cited to any case applying *Mandel* review, or rational-basis review under *Hawaii*, outside of those circumstances. Here, Plaintiffs do not challenge any exclusion decision, but rather a procedural requirement that burdens their First Amendment rights regardless of the outcome of any visa application. The district court erred in conducting only a "circumscribed judicial inquiry" in this case.

### 1. Neither *Mandel* nor *Hawaii* applies to this case because Plaintiffs do not challenge the exclusion of any noncitizen.

The deferential standards of review applied in *Mandel* and *Hawaii* are justified only in the context of exclusion decisions, which are not at issue in this

---

[6] In *Hawaii*, the Court explained that a "conventional application of *Mandel*" would ask "only whether the policy is facially legitimate and bona fide," but, at the Government's suggestion, the court "assume[d] that [it could] look behind the face of the [challenged order] to the extent of applying rational basis review." 138 S. Ct. at 2420.

case. In *Mandel*, U.S. citizens challenged the denial of a visa to Ernest Mandel, a Belgian Marxist who had been invited to speak at a U.S. conference. 408 U.S. at 756–57. That case "c[ame] down to [a] narrow issue": whether, because plaintiffs "wish[ed] to hear, speak, and debate with Mandel in person," the First Amendment "confer[red] upon [them] . . . the ability to determine that Mandel should be permitted to enter the country." *Id.* at 762. Reasoning that the authority Congress had delegated to the executive to render visa decisions would "become[] a nullity" if U.S. citizens could simply obtain court orders compelling noncitizens' admission, the Court determined that it would not "look behind" the executive's decision to exclude a particular noncitizen so long as there was a "facially legitimate and bona fide" reason. *Mandel*, 408 U.S. at 768–70.

*Mandel* is rooted in the doctrine of consular nonreviewability, and its application is limited to cases where that doctrine applies. As this Court has explained, the doctrine of consular nonreviewability bars judicial review of a "consular official's decision to issue or withhold a visa." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) ("[I]t is not within the province of any court . . . to review the determination of the political branch of the Government to exclude a given [noncitizen]."); *see also United States ex rel. Ulrich v. Kellogg*, 30 F.2d 984, 986 (D.C. Cir. 1929). Similarly, the Government has recently defined the

doctrine of consular nonreviewability as "the rule that, in the absence of affirmative congressional authorization, a noncitizen cannot assert any right to review of a visa determination." Brief for the Respondents at 4, *Colindres v. Dep't of State*, No. 23-348 (Nov. 22, 2023); Petition of Writ of Certiorari at 4, *Dep't of State v. Muñoz*, No. 23-334 (Sept. 29, 2023).

*Mandel* established an exception to this rule, permitting a "circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Hawaii*, 138 S. Ct. at 2419; *see Colindres v. Dep't of State*, 71 F.4th 1018, 1021 (D.C. Cir. 2023) (describing *Mandel* review as one of "two narrow exceptions" to the doctrine of consular nonreviewability), *petition for cert. pending*, No. 23-334 (Nov. 22, 2023); *see also Allen v. Milas*, 896 F.3d 1094, 1104 (9th Cir. 2018) ("*Mandel* supplies the only standard by which the federal courts can review a consular officer's decision on the merits." (citing *Saavedra Bruno*, 197 F.3d at 1162–63)). But this Court has never applied *Mandel* outside of a challenge to an exclusion decision. Indeed, courts in this Circuit have repeatedly emphasized that the doctrine of consular nonreviewability applies only to final exclusion decisions, not to other aspects of the visa application process—even those "significantly related to [its] resolution," JA368 n.12. *See, e.g.*, *Didban v. Pompeo*, 435 F. Supp. 3d 168, 174 (D.D.C. 2020) (explaining that doctrine of consular nonreviewability does not apply to claim that the Government "unreasonably delayed rendering a [visa]

decision"); *Joorabi v. Pompeo*, 464 F. Supp. 3d 93, 100 (D.D.C. 2020) ("[T]he doctrine of consular nonreviewability . . . does not apply to challenges regarding [consular] decisions that are not yet final."); *Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) ("[T]he doctrine of consular nonreviewability is not triggered until a consular officer has made a *decision* with respect to a particular visa application." (emphasis added)). And neither the district court, nor the Government in its briefing below, cited any cases applying *Mandel* outside of a challenge to an exclusion decision.

*Trump v. Hawaii* did not alter this premise, and the district court was wrong to "follow [its] lead." JA369. In *Hawaii*, the Supreme Court invoked *Mandel* in addressing President Trump's categorical exclusion of individuals from certain Muslim-majority countries—even though, at the Government's invitation, it ultimately conducted rational basis review. 138 S. Ct. at 2418–20. The Court held that the "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications" for the exclusion order was "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Id.* at 2409. Because *Hawaii*, too, addressed an exclusion decision—albeit a categorical one—it bears no lesson for this case. *See State v. U.S. Dep't of Com.*, 315 F. Supp. 3d 766, 810 (S.D.N.Y. 2018) ("[T]he deferential review referenced by the Court in *Hawaii* is that established by *Kleindienst v. Mandel* . . . for challenges

to the exclusion of foreign nationals from the country."). Indeed, federal courts have understood *Hawaii* narrowly, rejecting its application even to immigration policies that are closely related to admission. *See, e.g.*, *Cook Cnty. v. Wolf*, 461 F. Supp. 3d 779, 787–89 (N.D. Ill. 2020) (applying heightened scrutiny to equal protection challenge to DHS interpretation of inadmissibility on public charge grounds); *La Clinica de la Raza v. Trump*, No. 19-cv-04980, 2020 WL 6940934, at *18 (N.D. Cal. Nov. 25, 2020) (same); *see also Regents of the Univ. of Calif. v. DHS*, 908 F.3d 476, 519–20 (9th Cir. 2018) (concluding that *Hawaii* did "not foreclose" plaintiffs' equal protection claim and applying heightened scrutiny), *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020).

Because this case does not challenge the exclusion of any noncitizen, the doctrine of consular nonreviewability does not apply, and neither does *Mandel* or *Hawaii*.

### 2. Deferential review is inappropriate in this case because Plaintiffs do not seek relief that would upset the Government's substantive admissibility decisions.

The reason that courts defer to the Government in exclusion cases like *Mandel* is because granting relief would upset substantive decisions as to "*who* shall be admitted" to the country. *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977) (emphasis added). In each of the cases on which the district court relied, plaintiffs sought the admission into the country of certain noncitizens subject to exclusion. *See Hawaii*,

138 S. Ct. at 2416 (noting that individual plaintiffs had alleged injury from separation from relatives seeking entry to the country); *Kerry v. Din*, 576 U.S. 86, 88 (2015) (plurality op.) (noting that plaintiff had alleged deprivation of her "constitutional right to live in the United States with her spouse"); *Fiallo*, 430 U.S. at 790 (addressing challenge by noncitizen plaintiffs deemed "ineligible" for entry and their U.S. citizen fathers); *Mandel*, 408 U.S. at 760. Granting the relief sought in those cases would therefore have interfered with the Government's decisions as to "*which classes* of [noncitizens] may lawfully enter the country"—decisions that depend on "changing political and economic circumstances" and so are "frequently of a character more appropriate to [the political branches]." *Fiallo*, 430 U.S. at 794, 796 (emphasis added); *Hawaii*, 138 S. Ct. at 2418–19; *see Din*, 576 U.S. at 103 (Kennedy, J., concurring); *Mandel*, 408 U.S. at 769 (affirming "plenary congressional power to make policies and rules for exclusion of aliens"); *see also City of New York v. Baker*, 878 F.2d 507, 512 (D.C. Cir. 1989) ("[A] court has no power to serve as a proxy consular officer," and may not "direct the issuance of visas.").

Granting the relief Plaintiffs seek here, however, would not upset any substantive admissibility decisions. Plaintiffs seek the invalidation of a procedural requirement—not the entry of anyone subject to it. They allege that the Disclosure Requirement burdens the First Amendment rights even of those noncitizens that the

Government ultimately deems admissible. After all, as the district court recognized, Plaintiffs allege that the Disclosure Requirement chills protected speech regardless of whether an applicant is ultimately granted or denied entry into the United States. *See* JA364 ("[T]h[e] chilling effect materializes . . . long before a noncitizen must apply for a visa, including while he lives in the United States and is protected by the Constitution."). Therefore, unlike in cases where *Mandel* applies, the Court can review the Disclosure Requirement under exacting scrutiny without second-guessing any substantive judgments about "who shall be admitted." *Fiallo*, 430 U.S. at 795 n.6; *see Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F.Supp.3d 1, 12 (D.D.C. 2022) ("Although these constitutional and statutory principles explain why the consular nonreviewability doctrine applies to a consular officer's *substantive* decisions to approve or deny a visa application, that same reasoning does not extend to the *procedural* considerations at issue here." (emphasis in original)).

The Sixth Circuit's decision in *Detroit Free Press v. Ashcroft* is instructive. 303 F.3d 681 (6th Cir. 2002). Addressing the question of whether the First Amendment provides a public right of access to deportation hearings, the Sixth Circuit held "that the Constitution meaningfully limits non-substantive immigration laws and does not require special deference to the Government." *Id.* at 685. In contrast to "non-substantive" immigration laws, it explained, "substantive immigration laws answer the questions, 'who is allowed entry' or 'who can be

deported.'" *Id.* at 686 n.6. And it specifically rejected the Government's argument that *Mandel* supplied the appropriate standard of review for non-substantive immigration policies, emphasizing that *Mandel* "involved a substantive immigration decision." *Id.* at 687; *see also id.* at 693 (rejecting the Government's argument that "this distinction between substantive and non-substantive immigration laws 'fails to acknowledge that procedural requirements often reflect, and encompass, substantive choices'"). Reviewing the numerous cases in which the "Supreme Court ha[d] . . . interpreted the Constitution meaningfully to limit non-substantive immigration laws, without granting the Government special deference," *id.* at 687–88, the court proceeded to apply strict scrutiny, *id.* at 693. This Court employed the same distinction between substantive and non-substantive, or procedural, immigration requirements, albeit in a case ultimately dismissed as moot. *Escobar v. INS*, 896 F.2d 564, 567 (D.C. Cir. 1990), *vacated and reh'g en banc granted* (D.C. Cir. Apr. 25, 1990), *appeal dismissed*, 925 F.2d 488 (D.C. Cir. 1991) (mem.) (explaining that "a substantive provision is one that grants a status, whereas a procedural provision is one subordinate to the substantive grant and focusing on how or when a decision is to be made to award the previously authorized substantive status").

The district court elided the distinction between substantive admissibility decisions and procedural requirements in two ways. *First*, it fashioned the Disclosure Requirement as a "condition[] of entry," which it erroneously stated has

been "explicitly recognized as a type of action subject to *Mandel* review." JA368. The court cited to *Fiallo v. Bell* in making this assertion, but because *Fiallo* dealt only with Congress's power to make "*substantive* polic[ies] regulating the admission of [noncitizens]," the Supreme Court reached no conclusion about the level of scrutiny applicable to procedural requirements. 430 U.S. at 793 n.5 (emphasis added). Moreover, *Fiallo* never described the challenged entry classification as a "condition[] of entry"; the majority mentioned the term only once, in dicta block-quoting a non-controlling concurring opinion from an earlier case, without defining the term or suggesting in any way that it might encompass the procedural elements of a visa application. *Id.* at 796 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97 (1952) (Frankfurter, J., concurring)). It is therefore immaterial that satisfying the Disclosure Requirement is an element of a "proper [visa] application." JA368 (quoting 8 U.S.C. § 1201(a)(1)).

*Second*, the district court conflated the question of *whether* Mandel applies to procedural requirements with the question of what process is due *when* Mandel applies, pointing to Justice Kennedy's concurring opinion in *Kerry v. Din*, 576 U.S. 86 (2015). JA369. In that case, the plaintiff challenged the denial of her husband's visa application, arguing that it deprived her of a protected liberty interest without due process. 576 U.S. at 88 (plurality op.); *see also id.* at 90 (explaining that Din sought an order "directing the [government] to properly adjudicate [her husband's]

39

visa application"). The district court had dismissed Din's claim on the basis of consular nonreviewability, but the Ninth Circuit reversed, holding that the Government had failed to provide an adequate explanation for the denial under *Mandel*. *See Din v. Kerry*, 718 F.3d 856, 858 (9th Cir. 2013). Writing for the plurality, Justice Scalia concluded that Din had no right to live with her spouse in the United States, so she was owed no explanation whatsoever. *Din*, 576 U.S. at 88, 101 (plurality op.). In his concurrence, Justice Kennedy assumed that Din had alleged a protected liberty interest such that *Mandel* applied, but he concluded that the explanation she had received was all that *Mandel* required. *Id.* at 102–03 (Kennedy, J., concurring). In other words, because Din invoked the right to due process in challenging the denial of her husband's visa application, Justice Kennedy opined on what process was due assuming that *Mandel* applied. *Id.* at 103–04 (Kennedy, J., concurring). Justice Kennedy had no occasion to decide whether *Mandel* applies to procedural requirements, because the case challenged only a substantive admissibility decision. The district court neglected this critical context in asserting that "[t]he amount and type of information an applicant receives after a denial cannot possibly be more substantive than the amount and type of information an applicant must provide to be considered for admission." JA369. This observation thus misses the mark.

40

To accept the district court's expansive reading of *Mandel* and its progeny would constrain judicial review of nearly all of immigration policy. The district court based its decision on its understanding that *Mandel*'s rationale "applies to *all cases* 'in the area of immigration and naturalization,'" JA366 (quoting *Fiallo*, 430 U.S. at 795–96) (emphasis added), and is justified with regard to "[*a*]*ny policy* toward [noncitizens]," JA368 (quoting *Hawaii*, 138 S. Ct. at 2418). But as the Supreme Court and courts across the country have held, immigration policy is not categorically cordoned off from ordinary constitutional review. *See Detroit Free Press*, 303 F.3d at 685 (rejecting "the Government's claim, which would require complete deference in all facets of immigration law, including non-substantive immigration laws that infringe upon the Constitution"); *see, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (explaining that immigration powers are "subject to important constitutional limitations"); *INS v. Chadha*, 462 U.S. 919, 941–42 (1983) (requiring Congress to choose "a constitutionally permissible means of implementing" its immigration power); *United States v. Brigoni-Ponce*, 422 U.S. 873, 884 (1975) (concluding that "broad congressional power over immigration" does not categorically alter the demands of the Fourth Amendment); *United States v. Witkovich*, 353 U.S. 194 (1957) (applying canon of constitutional avoidance to INA provision for expedited deportation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (explaining that "[a] challenged law does not receive minimal

scrutiny merely because it is related to immigration"); *Regents*, 908 F.3d at 519–20; *Cook Cnty.*, 461 F. Supp. 3d at 787–89. To the contrary, where judicial review does not intrude into specific legislative or executive decisions about "who shall be admitted," it remains the province of the courts to say what the Constitution requires. *Cf. Chadha*, 462 U.S. at 942 ("[Neither] Congress [n]or the Executive . . . can decide the constitutionality of a statute; that is a decision for the courts.").

Because Plaintiffs' challenge presents none of the concerns underlying deferential review, the district court should have applied exacting scrutiny to their First Amendment claims.

## III.    Plaintiffs adequately allege that the Disclosure Requirement is unlawful.

To survive a motion to dismiss, Plaintiffs' complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Under a correct interpretation of the applicable law, Plaintiffs' APA and First Amendment claims readily meet the pleading requirements.

### A.    The Disclosure Requirement violates the APA because it is arbitrary and capricious and exceeds the Secretary's statutory authority.

Plaintiffs adequately allege that the Secretary failed to articulate a cogent explanation for the Disclosure Requirement. An agency's actions are arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the

problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Animal Legal Def. Fund, Inc. v. Purdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (alteration in original) (citation omitted). Accordingly, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *United Steel*, 925 F.3d at 1285; *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation.").

Here, the Secretary failed to provide a "reasonable justification" for his actions. *United Steel*, 925 F.3d at 1285 (invalidating agency action because "the record lacks a reasonable justification"). The only rationale the Secretary provided in support of the Disclosure Requirement is the conclusory statement that "[t]his information collection is essential for confirming the applicant's identity and determining whether an applicant is eligible for a . . . visa." JA075; JA099; *see* JA020 (Compl. ¶ 27). But such "[c]onclusory statements will not do" under the arbitrary and capricious standard. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

Moreover, the conclusory justification for the Disclosure Requirement is plainly insufficient in light of comments providing evidence that the Disclosure Requirement is ineffective. Instead of substantively responding to these comments,

the Secretary "[n]odd[ed] to concerns raised by commenters only to dismiss them in a conclusory manner," which "is not a hallmark of reasoned decisionmaking." *Gresham*, 950 F.3d at 103; *see Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). As Plaintiffs allege, "[h]undreds of comments highlighted evidence showing that social media communications," which "are difficult, if not impossible, to interpret accurately," are "an ineffective and unreliable means of verifying individuals' identities, confirming their eligibility for visas, and assessing any threat they might pose to national security." JA019 (Compl. ¶ 26); *see, e.g.*, Asian Americans Advancing Justice, Comment Letter on Proposed Information Collection: Application for Nonimmigrant Visa 3, *supra,* at 5 (noting that "social media presence is a poor metric for determining security risks" given its "highly idiosyncratic" and "context-, conversation-, language-, and culture-specific" characteristics). As other commentators noted, a 2017 DHS report concluded that pilot programs had failed to establish the effectiveness of social media screening in the visa vetting process. *See, e.g.*, Muslim Advocates, Comment Letter on Proposed Information Collections: Applications for Immigrant Visa and Nonimmigrant Visa 12−13, *supra,* at 5.

In response to comments regarding the challenges of interpreting social media information, the Secretary merely "acknowledge[d] that the context and circumstances of the applicant, culture, country conditions, the nature of the account,

and other postings will inform the interpretation of any social media post." JA082–83; JA107. And in response to comments regarding the 2017 DHS Inspector General report, he simply stated that "[s]ocial media screening capabilities and effectiveness continue to evolve." JA077. The Secretary's failure to meaningfully address commenters' significant concerns demonstrates a lack of reasoned decisionmaking that is, at its core, arbitrary and capricious.

Plaintiffs also plausibly allege that the Disclosure Requirement exceeds the Secretary's statutory authority. JA005; JA020; JA042–43 (Compl. ¶¶ 8, 27, 77). "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Here, as explained above, Congress constrained the Secretary's rulemaking authority to collect additional information only as necessary to identify visa applicants or enforce the immigration laws. *See supra* Section I.A. This Court has repeatedly held that Congress's use of the word "necessary" is limiting. *See, e.g.*, *GTE Serv. Corp.*, 205 F.3d at 422 ("Something is necessary if it is required or indispensable to achieve a certain result."); *see also AFL-CIO*, 409 F.3d at 384 ("Even when Congress has stated that the agency may do what is 'necessary,' whatever ambiguity may exist cannot render nugatory restrictions that Congress has imposed." (citations omitted)). But the Secretary made no attempt to justify the dragnet collection of visa applicants' social media identifiers

as necessary to enforcing the immigration laws or identifying visa applicants, especially in light of the evidence establishing that social media vetting was not even an effective means of serving those ends in the visa vetting process. *See* JA016–18; JA020 (Compl. ¶¶ 18–22, 27).[7]

### B.     The Disclosure Requirement violates the First Amendment because it is not sufficiently tailored to any legitimate government interest.

As Plaintiffs' complaint makes clear, the Disclosure Requirement quickly fails when reviewed under the appropriate level of scrutiny. As explained above, disclosure requirements that chill First Amendment–protected activity must face at least exacting scrutiny. "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored" to "a sufficiently important governmental interest." *AFPF*, 141 S. Ct. at 2383, 2385. The Government bears the burden of meeting that standard. *Clark v. Libr. of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984). For that reason, the district court noted, it "would likely" have denied the Government's motion to dismiss had it applied exacting scrutiny. JA365. Plaintiffs do not contest the importance of the Government's asserted interests in confirming visa applicants'

---

[7] In addition, as Plaintiffs argued below, the Secretary's broad interpretation of "necessary" raises serious First Amendment concerns. *See Zadvydas*, 533 U.S. at 689 (The Court has "read significant limitations into other immigration statutes in order to avoid their constitutional invalidation.").

identities, determining their visa eligibility, or uncovering national security threats. But the Disclosure Requirement is a poor fit for those purposes.

*First*, as the Government itself has acknowledged, the Disclosure Requirement is not an effective means of achieving its stated ends. Even under intermediate scrutiny, the Government must show that the harms it seeks to address "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also id.* at 666 ("[W]hen trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures." (quoting *Century Commc'ns Corp. v. FCC*, 835 F.2d 292, 304 (D.C. Cir. 1987)). The Government has provided no evidence that the Disclosure Requirement will serve its interests in any direct and material way. To the contrary, government officials have concluded that the collection of social media identifiers "add[s] no value" to the visa vetting process. *See April 8–9, 2021 ODNI Email Chain*, *supra* note 2; Savage, *supra* note 2.

This conclusion should have come as no surprise, given that the Government's own pilot programs had failed to establish the effectiveness of social media screening for visa vetting purposes. *See* JA299–301. It also reflects the evidence, cited in hundreds of comments opposing the Disclosure Requirement, that it is extremely difficult to interpret social media communications accurately—

particularly across different languages and cultures. *See* JA077; *see, e.g.*, Asian Americans Advancing Justice, Comment Letter on Proposed Information Collection: Application for Nonimmigrant Visa 3 (May 29, 2018), *supra,* at 5. To justify its adoption of the Disclosure Requirement despite this evidence, the Government offered nothing but conclusory assertions, *see, e.g.*, JA075; JA099 (simply stating that social media identifier collection is "essential" for confirming visa applicants' identities and determining their visa eligibility), which are plainly inadequate to carry its burden here, *see Reno v. ACLU*, 521 U.S. 844, 879 (1997) ("Particularly in the light of the absence of any detailed findings . . . we are persuaded that the [statute] is not narrowly tailored if that requirement has any meaning at all."); *Edwards v. District of Columbia*, 755 F.3d 996, 1005–06 (D.C. Cir. 2014); *Broadley v. U.S. Dep't of Interior*, 615 F.3d 508, 522 (D.C. Cir. 2010) ("It is not sufficient that a 'regulation . . . contributes marginally to [the government's] interest.'" (alterations in original) (citation omitted)).

    *Second*, even if social media surveillance were an effective tool, the Disclosure Requirement casts a dragnet far wider than necessary to achieve the Government's ends. To determine whether the Disclosure Requirement is sufficiently tailored to the task at hand, the Court must "ask whether it is possible substantially to achieve the Government's objective in less burdensome ways." *Edwards*, 755 F.3d at 1009 (citation omitted); *see Shelton*, 364 U.S. at 488. It is.

Preexisting regulations authorize consular officers to request any additional information—including social media information—they believe is necessary to determine individual applicants' visa eligibility. 22 C.F.R. §§ 41.103(b)(2), 42.63(c). Individual requests for this information are both more efficient and far less burdensome than dragnet collection, a fact which is "fatal" to the latter. *Edwards*, 755 F.3d at 1009; *cf. Detroit Free Press*, 303 F.3d at 692–93 (while acknowledging "the Government's fear that dangerous information might be disclosed in some" deportation hearings, concluding "that the ordinary process of determining whether closure is warranted on a case-by-case basis sufficiently addresses their concerns").

The Disclosure Requirement thus subjects to undue Government surveillance the online speech and associations of millions of individuals whose visa applications raise no questions for consular officers, not to mention the speech and associations of their online contacts (including U.S. citizens). Pursuant to related retention policies, that surveillance can extend far into the future, JA023–35 (Compl. ¶¶ 34–38), chilling visa applicants' speech and associations long before and long after they have been admitted to the country, *see* JA036 (Compl. ¶ 63). Given the "dramatic mismatch" between the Government's stated interests and the Disclosure Requirement, it fails exacting scrutiny. *AFPF*, 141 S. Ct. at 2386–87; *see Shelton*, 364 U.S. at 490 ("The unlimited and indiscriminate sweep of the statute now before us brings it within the ban of our prior cases.").

## Conclusion

For the foregoing reasons, this Court should reverse the district court's decision and remand the case for further proceedings.

Dated: February 2, 2024

Respectfully submitted,

/s/ *Faiza Patel*

Faiza Patel
Emile Ayoub
Brennan Center for Justice
  at NYU School of Law[8]
120 Broadway, Suite 1750
  New York, NY 10271
patelf@brennan.law.nyu.edu
(646) 292-8310

/s/ *Caroline DeCell*

Caroline DeCell
Jameel Jaffer
Katherine Fallow
Anna Diakun
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302–304
New York, NY 10115
carrie.decell@knightcolumbia.org
(646) 745-8500

/s/ *Rachel Levinson-Waldman*

Rachel Levinson-Waldman
Brennan Center for Justice
  at NYU School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
  Washington, D.C. 20036
levinsonr@brennan.law.nyu.edu
(202) 249-7190

/s/ *Joshua Polster*

Joshua Polster
Evan Gilbert
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
joshua.polster@stblaw.com
(212) 455-2000

*Counsel for Appellants*

---

[8] This brief does not purport to convey the position, if any, of the New York University School of Law.

50

**Certificate of Compliance**

This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2) because it contains 11,740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-counting function.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: February 2, 2024

_/s/ Joshua Polster_
Joshua Polster

**Certificate of Service**

I, Joshua Polster, certify that on February 2, 2024, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: February 2, 2024

/s/ *Joshua Polster*
Joshua Polster

**ADDENDUM**

## Table of Contents

8 U.S.C. § 1202(a)..................................................................A1

8 U.S.C. § 1202(c)..................................................................A2

22 C.F.R. § 41.103(a)(1) .........................................................A3

22 C.F.R. § 41.103(b)(2) .........................................................A4

22 C.F.R. § 42.63(a)(1) ...........................................................A5

22 C.F.R. § 42.63(c) ...............................................................A6

**8 U.S.C. § 1202(a)**

§ 1202. Application for visas

**(a) Immigrant visas**

Every alien applying for an immigrant visa and for alien registration shall make application therefor in such form and manner and at such place as shall be by regulations prescribed. In the application the alien shall state his full and true name, and any other name which he has used or by which he has been known; age and sex; the date and place of his birth; and such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

. . . .

8 U.S.C. § 1202(c)

§ 1202. Application for visas

. . . .

## (c) Nonimmigrant visas; nonimmigrant registration; form, manner and contents of application

Every alien applying for a nonimmigrant visa and for alien registration shall make application therefor in such form and manner as shall be by regulations prescribed. In the application the alien shall state his full and true name, the date and place of birth, his nationality, the purpose and length of his intended stay in the United States; his marital status; and such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed. The alien shall provide complete and accurate information in response to any request for information contained in the application. At the discretion of the Secretary of State, application forms for the various classes of nonimmigrant admissions described in section 1101(a)(15) of this title may vary according to the class of visa being requested.

. . . .

**22 C.F.R. § 41.103(a)(1)**

**§ 41.103 Filing an application.**

(a) ***Filing an application*** —

    **(1)** ***Filing of application required.*** Every alien seeking a nonimmigrant visa must make an electronic application on Form DS–160 or, as directed by a consular officer, an application on Form DS–156. The Form DS–160 must be signed electronically by clicking the box designated "Sign Application" in the certification section of the application.

. . . .

A3

22 C.F.R. § 41.103(b)(2)

§ 41.103 Filing an application.

. . . .

**(b)** *Application* —

. . . .

    **(2)** *Additional requirements and information as part of application.* Applicants who are required to appear for a personal interview must provide a biometric, which will serve to authenticate identity and additionally verify the accuracy and truthfulness of the statements in the application at the time of interview. The consular officer may require the submission of additional necessary information or question an alien on any relevant matter whenever the consular officer believes that the information provided in the application is inadequate to permit a determination of the alien's eligibility to receive a nonimmigrant visa. Additional statements made by the alien become a part of the visa application. All documents required by the consular officer under the authority of § 41.105(a) are considered papers submitted with the alien's application within the meaning of INA 221(g)(1).

. . . .

22 C.F.R. § 42.63(a)(1)

§ 42.63 Definitions.

**(a)** *Application forms* —

> **(1)** *Application on Form DS–230 or Form DS–260 required.* Every alien applying for an immigrant visa must make application, as directed by the consular officer, on Form DS–230, Application for Immigrant Visa and Alien Registration, or on Form DS–260, Electronic Application for Immigrant Visa and Alien Registration. This requirement may not be waived. Form DS–230 consists of parts I and II which, together, are meant in any reference to this Form.

. . . .

22 C.F.R. § 42.63(c)

§ 42.63 Definitions

. . . .

**(c)** *Additional information as part of application.* The officer may require the submission of additional information or question the alien on any relevant matter whenever the officer believes that the information provided in Form DS–230 or Form DS–260 is inadequate to determine the alien's eligibility to receive an immigrant visa. Additional statements made by the alien become a part of the visa application. All documents required under the authority of § 42.62 are considered papers submitted with the alien's application within the meaning of INA 221(g)(1).