**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5232**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————————————

DOC SOCIETY and INTERNATIONAL DOCUMENTARY ASSOCIATION,

Plaintiffs-Appellants,

v.

ANTONY J. BLINKEN, in his official capacity as Secretary of State, and
ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of
Homeland Security,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**BRIEF FOR APPELLEES**

————————————

*Of Counsel:*

RICHARD C. VISEK
   *Principal Deputy Legal Advisor*

   *U.S. Department of State*

BRIAN M. BOYNTON
   *Principal Deputy Assistant
   Attorney General*

DANIEL TENNY
NICHOLAS S. CROWN
   *Attorneys, Appellate Staff
   Civil Division, Room 7325
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 616-5365*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Under D.C. Circuit Rule 28(a)(1), I certify the following.

## A.    Parties and Amici

Plaintiffs-appellants are Doc Society and International Documentary Association. Defendants-appellees are Antony J. Blinken, in his official capacity as Secretary of State, and Alejandro N. Mayorkas, in his official capacity as Secretary of Homeland Security. In the district court, Twitter, Inc., Reddit, Inc., and Internet Association; Muslim Advocates, American Friends Service Committee, T'ruah: the Rabbinic Call for Human Rights, and the Reconstructionist Rabbinical Association; and the Electronic Frontier Foundation appeared as *amici curiae*.

In this Court, Electronic Frontier Foundation has appeared as *amicus curiae*.

## B.    Rulings Under Review

The ruling under review is the district court (Kelly, J.) order (JA332) and memorandum opinion (JA333), entered August 11, 2023, dismissing this case. The opinion is not reported but is available at 2023 WL 5174304 (D.D.C. Aug. 11, 2023).

**C.    Related Cases**

This case has not previously been before this Court or any court other than the district court. We are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Nicholas S. Crown*
Nicholas S. Crown

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. v

GLOSSARY ................................................................................. xii

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION ............................................... 2

STATEMENT OF ISSUES ........................................................... 2

PERTINENT STATUTES AND REGULATIONS ........................... 2

STATEMENT OF THE CASE ...................................................... 3

    A.   Legal Background .......................................................... 3

    B.   Factual Background ....................................................... 11

SUMMARY OF ARGUMENT ...................................................... 14

STANDARD OF REVIEW .......................................................... 17

ARGUMENT .............................................................................. 17

I.    Plaintiffs Lack Article III Standing ..................................... 17

    A.   Plaintiffs lack standing in their own right. .................... 18

    B.   Plaintiffs lack standing to sue on behalf of their members. ..... 26

II.    Plaintiffs Fail To State A Viable APA Claim ....................... 29

    A.   The district court correctly concluded that plaintiffs challenge a policy committed to agency discretion. ................ 30

    B.   Plaintiffs' asserted organizational interests fall outside of the zone of interests of the statute that they invoke. ............... 36

    C.   Plaintiffs' APA claim fails on the merits. ..................... 39

III.    Plaintiffs Fail To State A First Amendment Claim.............................45

    A.    The challenged policy is subject to and satisfies deferential
       review. ................................................................................ 46

    B.    Plaintiffs' contrary arguments lack merit. ................................ 53

CONCLUSION .............................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*AFL-CIO v. Chao,*
    409 F.3d 377 (D.C. Cir. 2005) ....................................................... 34

*American Anti-Vivisection Soc'y v. USDA,*
    946 F.3d 615 (D.C. Cir. 2020) ........................................... 22, 23

*American Soc'y for the Prevention of Cruelty to Animals v.*
    *Feld Entm't, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) ............................................. 20, 21

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) ........................................................................ 44

*Barton v. Barr,*
    140 S. Ct. 1442 (2020) ................................................................... 3

*Cardenas v. United States,*
    826 F.3d 1164 (9th Cir. 2016) ..................................................... 50

*Center for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,*
    77 F.4th 679 (D.C. Cir. 2023) ......................................................17

*Chamber of Commerce of U.S. v. EPA,*
    642 F.3d 192 (D.C. Cir. 2011) ..................................................... 27

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ......................................................................28

*Clarke v. Securities Indus. Ass'n,*
    479 U.S. 388 (1987) ..................................................................... 37

*Competitive Enter. Inst. v. National Highway Traffic Safety Admin.,*
    901 F.2d 107 (D.C. Cir. 1990) ..................................................... 22

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) .................................................................. 34

*Detroit Free Press v. Ashcroft*,
    303 F.3d 681 (6th Cir. 2002)............................................................ 56, 57

*Detroit Int'l Bridge Co. v. Government of Canada*,
    883 F.3d 895 (D.C. Cir. 2018) ...................................................... 30–31

*District No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Marine Admin.*,
    215 F.3d 37 (D.C. Cir. 2000) ............................................................ 31

*DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*,
    887 F.2d 275 (D.C. Cir. 1989) ........................................................ 44

*Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* (*EPIC*),
    878 F.3d 371 (D.C. Cir. 2017) ................................................20, 21, 23

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) .................................................................51, 53

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ....................................................................... 40

*Federal Election Comm'n v. Akins*,
    524 U.S. 11 (1998)......................................................................... 19

*Federation for American Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ...........................................................38

*Fiallo v. Bell*,
    430 U.S. 787 (1977)............................................................ 34, 48, 55, 56

*Friends of Animals v. Jewell*,
    828 F.3d 989 (D.C. Cir. 2016)...........................................................20

*Haitian Refugee Ctr. v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987) ................................................ 24, 25, 38, 39

*Hampton v. Mow Sun Wong*,
    426 U.S. 88 (1976) ......................................................................46

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1982) .................................................................31, 35, 49, 55

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ............................................................................31, 33

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ...........................................................................32, 41, 50

*Hunt v. Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ...................................................................................26

*Kerry v. Din*,
  576 U.S. 86 (2015) ......................................................................................50

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ...................................................... 29, 47, 48, 49, 53, 54

*Legal Assistance for Vietnamese Asylum Seekers v. Department of
  State* (*LAVAS*),
  104 F.3d 1349 (D.C. Cir. 1997) ....................................31, 32, 33, 34, 35, 44

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................28

*Marks v. United States*,
  430 U.S. 188 (1977) ...................................................................................50

*Marsh v. Oregon Nat. Res. Council*,
  490 U.S. 360 (1989) ...................................................................................43

*Marx v. General Revenue Corp.*,
  568 U.S. 371 (2013) ...................................................................................35

*Mathews v. Diaz*,
  426 U.S. 67 (1976) .................................................................................46, 48

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .....................................................................................40

*Narenji v. Civiletti*,
  617 F.2d 745 (D.C. Cir. 1979) .............................................................44, 51

*National Fed'n of Fed. Emps. v. United States*,
  905 F.2d 400 (D.C. Cir. 1990) ...........................................................31, 35

*National Mall Tours of Wash., Inc. v. U.S. Dep't of the Interior*,
  862 F.3d 35 (D.C. Cir. 2017) .....................................................................17

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017) .................................................................................. 35

*People for the Ethical Treatment of Animals v. USDA* (*PETA*),
  797 F.3d 1087 (D.C. Cir. 2015)..................................................... 18, 22, 23

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008)......................................................................56

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) ...................................................... 30, 34, 35

*Safe Extensions, Inc. v. FAA*,
  509 F.3d 593 (D.C. Cir. 2007) .................................................................. 33

*Sanchez v. Office of State Superintendent of Educ.*,
  45 F.4th 388 (D.C. Cir. 2022) ........................................................... 52, 53

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..................................................................................17

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...................................................................17, 27, 29

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................................ 18

*Trump v. Hawaii*,
  585 U.S. 667 (2018)................................... 32, 34, 48, 50, 51, 52, 54, 55, 56

*United States v. Texas*,
  599 U.S. 670 (2023) ...................................................... 17, 18, 19

*U.S. R.R. Ret. Bd. v. Fritz*,
  449 U.S. 166 (1980) .............................................................51

*Viasat, Inc. v. FCC*,
  47 F.4th 769 (D.C. Cir. 2022) .............................................. 37

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ............................................................. 50

**Statutes:**

Immigration and Nationality Act,
  8 U.S.C. § 1101 *et seq.* ......................................................... 3
    8 U.S.C. § 1101(a)(3) ......................................................... 3
    8 U.S.C. § 1101(a)(9) ......................................................... 4
    8 U.S.C. § 1101(a)(13)(C) ..................................................28
    8 U.S.C. § 1101(a)(15)(B) .................................................. 39
    8 U.S.C. § 1101(a)(15)(I) ................................................... 39
    8 U.S.C. § 1101(a)(16) ....................................................... 4
    8 U.S.C. § 1105(a) ............................................................. 5
    8 U.S.C. § 1181(a) ............................................................. 3
    8 U.S.C. § 1182 .................................................... 4, 40, 42
    8 U.S.C. § 1182(a) ................................................4, 8, 31, 52
    8 U.S.C. § 1182(a)(3) .........................................................51
    8 U.S.C. § 1182(a)(6)(C) .................................................. 52
    8 U.S.C. § 1182(a)(6)(C)(i) ................................................. 5
    8 U.S.C. § 1182(a)(7) ......................................................... 3
    8 U.S.C. § 1182(b) ............................................................51
    8 U.S.C. § 1182(f)........................................................8, 52
    8 U.S.C. § 1184(c)(3) ........................................................39
    8 U.S.C. § 1187(c)(2)(F) ..................................................... 6
    8 U.S.C. § 1201(a) ............................................................. 3
    8 U.S.C. § 1201(a)(1) ......................................................... 4
    8 U.S.C. § 1201(a)(1)(A) ....................................................54
    8 U.S.C. § 1201(g) ............................................................. 4
    8 U.S.C. § 1202 ........................................................... 7, 36
    8 U.S.C. § 1202(a) ..............3, 13, 16, 18, 30, 31–35, 37, 38, 39, 44, 51, 52

8 U.S.C. § 1202(c)..................3, 13, 18, 30, 31, 33, 37, 38, 39, 44, 51, 52
8 U.S.C. § 1202(e) ............................................................... 4
8 U.S.C. § 1202(f) .............................................. 9, 44, 52, 57
8 U.S.C. § 1202(f)(2) ........................................................ 6
8 U.S.C. § 1202(f)(2)(A) ................................................... 9
8 U.S.C. § 1202(h) ............................................................ 4
8 U.S.C. § 1361 .................................................................. 4

5 U.S.C. § 701(a)(2) ............................................ 14, 30, 31, 36

5 U.S.C. § 702 .................................................................. 37

6 U.S.C. § 236(b)(1) ......................................................... 4

6 U.S.C. § 236(c)(1) ......................................................... 4

8 U.S.C. § 1733 ................................................................ 6

28 U.S.C. § 1291 .............................................................. 2

28 U.S.C. § 1331 .............................................................. 2

44 U.S.C. § 3507(a) ......................................................... 7

## Regulations:

22 C.F.R. § 40.1(*l*)(2) ...................................................... 4

22 C.F.R. § 40.6 ............................................................... 4

22 C.F.R. § 41.102 ........................................................... 4

22 C.F.R. § 41.103 ........................................................... 3

22 C.F.R. § 41.103(b)(2) .................................................. 4

22 C.F.R. § 41.121 ........................................................... 4

22 C.F.R. § 42.62 ............................................................. 4

22 C.F.R. § 42.63 ............................................................................ 3

22 C.F.R. § 42.63(c) ........................................................................ 4

22 C.F.R. § 42.71 ............................................................................ 4

22 C.F.R. § 42.81 ............................................................................ 4

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .............................................................. 2

**Legislative Materials:**

*Visa Issuance and Homeland Security: Hearings Before the
    Subcomm. on Immigration, Border Security & Citizenship of
    the S. Comm. on the Judiciary,*
    108th Cong. 141 (2003) .............................................................. 6

Ruth Ellen Wasem, Cong. Research Serv., R43589,
    *Immigration: Visa Security Policies* (2015) ....................................... 5, 35

**Other Authorities:**

82 Fed. Reg. 13,209 (Mar. 9, 2017) ............................................... 50

83 Fed. Reg. 13,806 (Mar. 30, 2018) .............................................. 7

83 Fed. Reg. 43,951 (Aug. 28, 2018) ............................................. 7

86 Fed. Reg. 7005 (Jan. 25, 2021) ................................................ 10

National Sec. Council, *Strategy to Combat Transnational
    Organized Crime* (July 2011),
    https://perma.cc/8NE6-AX4B .............................................. 5, 42, 52–53

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DHS | Department of Homeland Security |
| IDA | International Documentary Association |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix |
| State Department | Department of State |

## INTRODUCTION

Since 2019 and across two presidential administrations, the Department of State has required that most visa applicants disclose their social-media identifiers for certain platforms. The State Department implemented this policy to help identify and vet applicants, and to prevent the issuance of visas to individuals who may pose threats to the Nation or would otherwise be ineligible for admission.

Plaintiffs are two documentary-film organizations that challenge the social-media policy under the Administrative Procedure Act and the First Amendment. Plaintiffs themselves are not subject to the policy. Instead, plaintiffs claim it deprives them of information because the policy may affect what third-party noncitizens say online, based on the possibility that someday those noncitizens may decide to seek a visa and be asked to provide certain social-media information.

The district court properly dismissed the complaint—and this Court should affirm, either on the same grounds or several additional ones. Plaintiffs lack Article III standing to bring this suit. Their statutory claim fails because it challenges action committed to agency discretion, because plaintiffs are not within the relevant zone of interests, and because the complaint's implausible allegations are contradicted by the documents plaintiffs cited.

Plaintiffs' constitutional claim is likewise unavailing because it implicates a deferential standard of review under which the challenged policy plainly passes muster.

## STATEMENT OF JURISDICTION

In asserting violations of the Administrative Procedure Act (APA) and First Amendment, plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA15. We contest plaintiffs' standing. *Infra* pp. 17–29.

The district court dismissed the action with prejudice on August 11, 2023. JA332. Plaintiffs timely filed a notice of appeal on October 10, 2023. JA373; Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether plaintiffs lack Article III standing.

2.    Whether plaintiffs lack a viable cause of action under the APA.

3.    Whether plaintiffs fail to state a First Amendment claim.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

2

## STATEMENT OF THE CASE

### A.    Legal Background

**1.**    Under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*., noncitizens generally may not be admitted to the United States without a visa. *See id*. §§ 1181(a), 1182(a)(7).[1] A U.S. consular officer may issue a visa to individuals who have made a "proper application," subject to pertinent conditions in the INA and regulations. *Id*. § 1201(a). Some of those requirements differ between "immigrant" and "nonimmigrant" visas, *id*. § 1202(a), (c), but for purposes of this appeal, they are materially similar.

Visa applications must be in "such form and manner and at such place as shall be by regulations prescribed," and must disclose information such as the applicant's name, age, and place of birth. 8 U.S.C. § 1202(a), (c). They must also include "such additional information necessary to the identification of the applicant" and "the enforcement of the immigration and nationality laws as may be by regulations prescribed." *Id.*

The State Department has prescribed online application forms for visas. 22 C.F.R. §§ 41.103, 42.63. Each form requests information about the applicant's characteristics, life history, and plans for residing in the United

---

[1] This brief uses "noncitizen" as equivalent to the statutory term "alien." 8 U.S.C. § 1101(a)(3); *see Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020).

States. JA128–219 (immigrant-visa application); JA221–293 (nonimmigrant-visa application). Generally, applicants must interview in person with a consular officer. 8 U.S.C. § 1202(e), (h); 22 C.F.R. §§ 40.1(*l*)(2), 41.102, 42.62. The consular officer may also require the applicant to disclose additional information that the officer deems necessary to determine the applicant's visa eligibility. 22 C.F.R. §§ 41.103(b)(2), 42.63(c).

The decision whether to grant or deny a visa generally rests with the consular officer. 8 U.S.C. §§ 1101(a)(9), (16), 1201(a)(1), 1361; 22 C.F.R. §§ 41.121, 42.71, 42.81.[2] With certain exceptions not relevant here, no visa "shall be issued" if "it appears to the consular officer" from the application that the applicant "is ineligible to receive a visa … under [8 U.S.C. § 1182] or any other provision of law," or if "the consular officer knows or has reason to believe" that the noncitizen is ineligible. 8 U.S.C. § 1201(g); *see* 22 C.F.R. § 40.6.

Section 1182 identifies grounds rendering a noncitizen "ineligible for visas or admission." 8 U.S.C. § 1182(a). Those grounds include a noncitizen's

---

[2] The Secretary of Homeland Security, exercising statutory authority "through the Secretary of State," may also "refuse visas in accordance with law." 6 U.S.C. § 236(b)(1); *see also id.* § 236(c)(1) (providing that "the Secretary of State may direct a consular officer to refuse a visa … if the Secretary of State deems such refusal necessary or advisable in the foreign policy or security interests of the United States").

health, criminal history, threat to national security (including any terrorist activities), immigration history, or permanent ineligibility for citizenship. *Id.* Any noncitizen who obtains or seeks to obtain a visa "by fraud or willfully misrepresenting a material fact" is also ineligible. *Id.* § 1182(a)(6)(C)(i).

    **2.** "The visa issuance process is widely recognized as an integral part of immigration control and border security." Ruth Ellen Wasem, Cong. Research Serv., R43589, *Immigration: Visa Security Policies* 1 (2015). For instance, transnational organized crime "poses a significant and growing threat to national and international security, with dire implications for public safety, public health, democratic institutions, and economic stability across the globe." National Sec. Council, *Strategy to Combat Transnational Organized Crime* 5 (July 2011), https://perma.cc/8NE6-AX4B. Such criminal organizations "depend on ... fraudulently obtained documents, such as ... visas" to enter the United States. *Id.* at 8.

    Visa-ineligibility determinations can be based on information that other agencies or entities, including foreign governments, provide to the Department of State. *See, e.g.*, 8 U.S.C. § 1105(a) (directing the State Department to "maintain direct and continuous liaison" with various intelligence and security offices "for the purpose of obtaining and exchanging information ... in the interest of the internal and border security of the United

5

States"); *id.* § 1187(c)(2)(F) (describing agreements with foreign countries to share information about individuals who "represent a threat to the security or welfare of the United States or its citizens"); *id.* § 1202(f)(2) (authorizing the Secretary of State to provide to foreign governments certain information "on the basis of reciprocity"); *id.* § 1733 (establishing "terrorist lookout committees" within U.S. missions abroad to increase information-sharing). The State Department has previously explained that, if consular officers were forced to act on visa applications without sufficient information, the INA's enforcement—and public safety—would be compromised. *See, e.g.*, *Visa Issuance and Homeland Security: Hearings Before the Subcomm. on Immigration, Border Security & Citizenship of the S. Comm. on the Judiciary*, 108th Cong. 141 (2003) (testimony of Janice L. Jacobs, Deputy Assistant Secretary of State for Visa Services) (explaining that "swift provision of all the best information known to the US government from whatever source to our line visa officers is essential to ensure that we stop ... dangerous persons" from entering the country).

**3.**     In 2019, the Department of State implemented the social-media policy at issue here. Under the policy, visa applicants must disclose their identifiers on enumerated social-media platforms from the preceding five

6

years.[3] The Secretary of State deemed such information necessary and formally prescribed the policy under 8 U.S.C. § 1202.

The State Department first provided notice of the proposed policy. JA61–65; 83 Fed. Reg. 13,806, 13,806–13,808 (Mar. 30, 2018). The notice explained that the collected information would be used "for identity resolution and vetting purposes based on statutory visa eligibility standards." JA62, 65. The State Department allowed for an initial 60-day comment period, *id.*, and later provided an additional period of 30 days, JA67–71; 83 Fed. Reg. 43,951, 43,951–43,592 (Aug. 28, 2018).

Because the proposed policy would involve "the collection of information," 44 U.S.C. § 3507(a), the State Department also sought approval from the Office of Information and Regulatory Affairs. In doing so, the State Department provided Supporting Statements regarding the policy. JA73–95 (concerning immigrant-visa applications); JA96–120 (concerning nonimmigrant-visa applications); *see also* JA20 (plaintiffs' complaint referencing these decisional documents).

---

[3] The social-media platforms relevant to the policy are: ASKfm, douban, Facebook, Flickr, Google+, Instagram, LinkedIn, Myspace, Pinterest, Qzone, Reddit, Sina Weibo, Tencent Weibo, Tumblr, Twitter, Twoo, Vine, VKontakte, Youku, and YouTube. *See* JA140, 225. For certain types of visas, such as most diplomatic visas, applicants are exempt from the policy. JA119.

The Supporting Statements explained the Secretary of State's justification for the social-media policy and responded to public input received during the comment periods. For example, the Secretary observed that collecting social-media identifiers from applicants would be "essential for confirming the applicant's identity and determining whether an applicant is eligible for" a "visa," JA75; *see* JA99, and consistent with a 2017 executive order concerning the need for screening and vetting protocols that "increase the safety and security of the American people," JA58; *see* JA73–74, 97–98.

The Secretary detailed that the collected information would "be assessed in the context of existing U.S. government information holdings, responsible U.S. agencies' knowledge of the identity of applicants, and an understanding of existing and evolving threats to national security, to enable more rigorous evaluation of applicants." JA77, 102. The Secretary further explained that social-media information would help verify "legitimate relationships or employment required for visa eligibility," assess "indicia of fraud," and identify "misrepresentations that disguise potential threats." *Id.*; *see also* 8 U.S.C. § 1182(a), (f) (providing grounds for ineligibility); JA82, 106–107 (explaining that social-media information could help identify "activity, ties, or intent that are grounds for visa denial under the INA," including criminal acts). The Secretary emphasized, however, that visa determinations

8

are made "based on the totality of the circumstances" and that consular of-
ficers would view social-media posts in "the context and circumstances of the
applicant, culture, country conditions, the nature of the account, and other
postings." JA82, 106–107.

The Secretary also described the policy's targeted scope. In particular,
consular officers would use social-media identifiers to review only publicly
accessible information available to all of the platform's users. JA80, 104–
105. Visa applicants would be explicitly instructed not to disclose passwords
allowing access to information not publicly available. *Id.* The Secretary like-
wise stated (JA81, 105) that social-media identifiers collected under the pol-
icy would constitute "confidential" information, 8 U.S.C. § 1202(f), and
would "be used only for the formulation, amendment, administration, or en-
forcement of the immigration, nationality, and other laws of the United
States," subject to enumerated exceptions, *see id.* § 1202(f)(2)(A) (permitting
disclosure to foreign countries "for the purpose of preventing, investigating,
or punishing acts that would constitute a crime in the United States"). Rec-
ognizing that some individuals maintain social-media accounts anony-
mously, the Secretary also emphasized that officials would be instructed to
collect the information "in a manner that best safeguards its transmission."
JA80, 105.

9

In addition, the Secretary issued a Privacy Impact Statement. JA312–331. The statement explains that information obtained through the visa-application process is stored in a database that can be accessed internally within the State Department and is shared externally with interagency partners, pursuant to safe-handling restrictions on the data's use and transmission. JA323–325. The visa-application forms notify applicants that information they provide will be retained in this database. JA321–322.

The Office of Information and Regulatory Affairs approved the social-media policy on April 11, 2019, after which the policy took effect. JA125–219, 221–292 (sample visa applications).

On January 20, 2021, President Biden revoked the executive order predating the social-media policy and instructed the Secretary of State and the Secretary of the Department of Homeland Security (DHS), "in consultation with the Director of National Intelligence," to conduct a "review of the current use of social media identifiers in the screening and vetting process, including an assessment of whether this use has meaningfully improved screening and vetting." 86 Fed. Reg. 7005, 7006 (Jan. 25, 2021). Following a policy review, the State Department determined not to make "imminent changes" to the policy. JA337. It remains in effect today.

**4.**      Other government agencies have also used social-media information as a screening tool in enforcing immigration laws. In 2015, for example, DHS created a task force to analyze the use of social media for screening and related purposes. JA295–310. That effort responded to the 2015 terrorist attack in San Bernardino, California, and a request from 25 senators that DHS expand social-media background checks to "screen[] for visa determinations." JA296, 298. Through this effort, U.S. Citizenship and Immigration Services began a pilot program to expand social-media screening of certain immigrant-benefit applicants, and U.S. Immigration and Customs Enforcement began a separate pilot program for social-media screening of nonimmigrant visa holders. JA298–299. Those programs resulted in a 2017 report by DHS's Office of Inspector General. JA296. The State Department was aware of these pilot programs and the report when the social-media policy at issue here was promulgated two years later. JA77, 102.

### B.      Factual Background

As is appropriate at the motion-to-dismiss stage, the following account assumes the truth of plaintiffs' well-pleaded allegations.

**1.**      Plaintiffs-appellants—Doc Society and International Documentary Association (IDA)—are nonprofit organizations involved in documentary filmmaking. JA25–26. Doc Society has no members, and instead

"partner[s] with filmmakers, activists, foundations, philanthropists, and policymakers around the world" to produce and support film projects. JA25; *see* JA337. IDA claims members in 53 countries, and "funds films and filmmakers" and hosts events. JA26.

Plaintiffs use social media to identify potential projects and partners, share resources, and communicate. JA28–29. Plaintiffs allege that the social-media policy "makes it more difficult" to rely on social media for research, outreach, and programming purposes. JA37–39. They also assert that the policy deprives them "of opportunities to hear from" noncitizens and prompts them to expend resources to "find and engage with members and partners." JA41–42. Some of plaintiffs' partners "use pseudonymous identifiers" to share views on social media, JA29–30, but one member of IDA residing in the United States "deleted" certain posts criticizing a prior administration "to avoid any delays on future visa applications," JA31. Some of plaintiffs' partners and members are "no longer applying for U.S. visas" because "they do not want to disclose their social media identifiers." JA32. Plaintiffs further fear that "hacking and other security breaches" of government databases could cause disclosure of applicants' identifiers. JA35.

2.    Plaintiffs filed this official-capacity suit in 2019 against the Secretary of State and the Secretary of Homeland Security. The complaint brings

12

two counts: First, plaintiffs allege that the social-media policy violates the APA because it reflects arbitrary-and-capricious decision-making and exceeds the State Department's authority under 8 U.S.C. § 1202(a) and (c). JA42–43. Second, the complaint alleges a First Amendment claim on the theory that the social-media policy "and related retention and dissemination policies" deny the right to anonymous speech, deter expressive and associational activity, and are overbroad. JA43.[4] Plaintiffs sought declaratory and injunctive relief, including an order requiring the government "to expunge all information collected" through the social-media policy, regardless of whether any applicant (or information) had any connection to plaintiffs. JA43.

**3.**     The government moved to dismiss. JA4 (Dkt. No. 31). It argued that plaintiffs could not show Article III standing, had no cause of action under the APA (because plaintiffs challenged acts committed to agency discretion and because they were outside of § 1202's zone of interests), and failed to state a plausible claim. *E.g.*, JA339.

The district court temporarily stayed the case *sua sponte*, given President Biden's proclamation calling for a policy review. JA6 (March 23, 2021

---

[4] Plaintiffs also alleged that the policy violates the APA by contravening the First Amendment, but that theory is "coterminous" with plaintiffs' freestanding constitutional claim. JA349.

order). The court later lifted the stay after it became apparent that no policy change would be forthcoming. *See* JA339.

The district court dismissed the complaint with prejudice. JA332. Although the court determined that plaintiffs had adequately alleged organizational standing, JA341–349, the court concluded that plaintiffs could not rely on the APA's cause of action because the challenged act was committed to agency discretion by law, JA349–355; 5 U.S.C. § 701(a)(2). The court did not reach the government's alternative arguments regarding the zone-of-interests test or failure to plead a plausible APA claim. The district court also dismissed the First Amendment count for failure to state a claim because the social-media policy was subject to and satisfied rational-basis review. JA355–372. Because these defects were uncurable, the district court denied leave to amend. JA371–372.

## SUMMARY OF ARGUMENT

This Court should affirm the dismissal of this case on several independent grounds.

**I.** Plaintiffs lack Article III standing.

**A.** Plaintiffs suffer no cognizable injury in their organizational capacities. They are not subject to the social-media policy. The harm that plaintiffs posit instead—a deprivation of information on which their activities

14

rely—is not legally cognizable because plaintiffs assert no legal entitlement to that information in the first place. Rather, plaintiffs rely on a limitless theory that would allow anyone with an interest in the internet to sue the government whenever a federal policy might affect what appears on the web.

Even if plaintiffs could identify a cognizable injury, it would not be fairly traceable to the challenged policy or redressable by judicial relief. Plaintiffs' attenuated chain of causation—based on how hypothetical third-party speakers may react to the policy when deciding what (if anything) to say on third-party social-media platforms, given the possibility that someday they may decide to seek a visa and be asked to identify their social-media accounts—is too indirect and speculative to support standing.

**B.** Plaintiffs also lack associational standing to sue on any member's behalf. The complaint does not identify any member subject to the policy who could assert a concrete injury. Plaintiffs' theory of associational standing also suffers from traceability and redressability defects because it relies on an attenuated causal chain concerning what third parties may (or may not) wish to say on the internet, or whether they may (or may not) apply for a visa at some unspecified point in the future.

15

**II.**    Even if plaintiffs had standing, they would lack an APA claim.

**A.**    Plaintiffs challenge action committed to agency direction by law. The social-media policy reflects the Secretary of State's judgment in sensitive foreign-affairs, national-security, and immigration-enforcement contexts. And this Court has already held that a different application of one of the two parallel subsections at issue, 8 U.S.C. § 1202(a), is subject to the APA's narrow but important carveout from judicial review. Because the challenged policy implicates even greater diplomatic, security, and immigration concerns, the result here should be the same.

**B.**    Insofar as plaintiffs bring their APA claim in their organizational capacities, they fall outside of the zone of interests of the INA provisions they invoke. Plaintiffs rely on subsections that govern visa applications. Those provisions neither protect nor regulate plaintiffs' filmmaking interests.

**C.**    On top of these flaws, the complaint does not state a plausible claim. The social-media policy is not arbitrary and capricious (because it reflects reasoned decision-making responsive to two comment periods) and it does not exceed the State Department's authority (because the INA permits collecting social-media identifiers, which plaintiffs largely concede, Br. 24).

**III.**    The complaint also fails to state a First Amendment claim. In this context, the Supreme Court has prescribed a deferential standard—at most,

16

rational-basis review—because plaintiffs challenge government policy impli-

cating sensitive questions entrusted to the political branches, not the courts.

The challenged action soars over that standard. Plaintiffs tacitly admit the

point because their arguments hinge on a misplaced demand for heightened

scrutiny.

## STANDARD OF REVIEW

The Court reviews the grant of a motion to dismiss de novo. *Center for

Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 685 (D.C. Cir.

2023). The Court "has an independent obligation to assure that standing ex-

ists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). It also "may

affirm on any ground properly raised." *National Mall Tours of Wash., Inc.

v. U.S. Dep't of the Interior*, 862 F.3d 35, 40 (D.C. Cir. 2017) (quotation

marks omitted).

## ARGUMENT

## I.   **Plaintiffs Lack Article III Standing**

To establish standing, a party must show that it "(1) suffered an injury

in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,

Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Supreme Court has "also

stressed that the alleged injury must be legally and judicially cognizable."

*United States v. Texas*, 599 U.S. 670, 676 (2023) (quotation marks omitted).

17

Standing, moreover, "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs cannot carry their burden.

### A.    Plaintiffs lack standing in their own right.

When an organization attempts to sue in its own right, it must meet the same standing requirements applicable to "an individual plaintiff." *People for the Ethical Treatment of Animals v. USDA* (*PETA*), 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quotation marks omitted).

**1.**    As an initial matter, plaintiffs lack a cognizable injury because they are not themselves subject to the social-media policy. The Secretary promulgated the challenged immigration policy under the INA. Specifically, he exercised his discretion to determine what "additional information" is "necessary" to "identif[y]" visa applicants and to "enforce[]" the "immigration and nationality laws." 8 U.S.C. § 1202(a), (c). As the Supreme Court has repeatedly recognized, "[w]hen a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed to establish standing." *Texas*, 599 U.S. at 678 (quotation marks omitted). This principle is particularly salient in the immigration context, which "implicates not only normal domestic law

18

enforcement priorities but also foreign-policy objectives." *Id.* at 679 (quotation marks omitted).

Here, moreover, plaintiffs' asserted injury is that the application of the social-media policy indirectly affects the likelihood that their organizations would receive certain kinds of information. But so-called "informational" harms are not cognizable absent a statutory right to the desired information. Plaintiffs do not allege any statutory right, and the only statute they invoke—the INA—has nothing to do with them. Although the district court concluded otherwise, JA341–342, this Court's precedent shows that plaintiffs lack standing.

In some circumstances, courts have held that a plaintiff may assert an "informational injury" when Congress provides a particularized right to disclosure of information. *See Federal Election Comm'n v. Akins*, 524 U.S. 11, 24–25 (1998). But plaintiffs in such circumstances have standing only to obtain the information to which they are entitled: "To carry its burden of demonstrating a 'sufficiently concrete and particularized informational injury,'" an organization "must show that '(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring

19

disclosure.'" *Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* (*EPIC*), 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).

Plaintiffs here made no effort to meet either requirement. They have not identified any source of law "requir[ing]" disclosure, nor have they shown that their alleged informational deprivation is a harm that such a law "sought to prevent." *EPIC*, 878 F.3d at 378 (quotation marks omitted). Instead, plaintiffs rely on an amorphous "impediment to the free flow of information," Dkt No. 32, at 16; *see* JA344, an argument that apparently would allow lawsuits whenever a federal policy affects what content appears on the internet.

Plaintiffs' limitless theory would plainly be rejected had an individual asserted it, and it fares no better when repackaged as "organizational" standing. *See EPIC*, 878 F.3d at 380 ("The doctrines of informational and organizational standing do not derogate from the elemental requirement that an alleged injury be 'concrete and particularized.'"). As this Court has held, an organization asserting informational harm "cannot ground organizational injury on a non-existent interest." *Id.* at 379 (citing *American Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't, Inc.,* 659 F.3d 13, 24–25 (D.C. Cir. 2011)).

20

In *EPIC*, this Court concluded that an organization whose stated mission was "to focus public attention on emerging privacy and civil liberties issues" could not challenge the government's alleged "failure to produce a privacy impact assessment" related to the collection of voter data, because plaintiffs had not identified any statute that "confer[red] any such informational interest on" the organization. 878 F.3d at 378–79 (quotation marks omitted). Because the organization had no "cognizable interest" in requiring the disclosure of the information they sought, "any resources [it] used to counteract the lack of" that information would have been "a self-inflicted budgetary choice that cannot qualify as an injury in fact." *Id.* at 379 (quoting *Feld*, 659 F.3d at 25).

Plaintiffs' claim to standing here is even weaker than the claim in *EPIC*. Here, plaintiffs do not assert that the government had any legal requirement to generate any information at all, but rather seek to ground standing on the indirect effects that they claim the government's policy will have on third parties. Because plaintiffs have not identified any right to the information they seek, the alleged deprivation of such information cannot constitute concrete injury. *See, e.g.*, *Feld*, 659 F.3d at 23 (rejecting informational standing where "nothing in [the statute] gives [the plaintiff] a right to any information"); *EPIC*, 878 F.3d at 378–79 (similar).

The district court thus had good reason to note that plaintiffs' theory "may well clash with the precept that an injury-in-fact is an invasion of a 'legally protected interest.'" JA344. It was mistaken, however, to consider itself "bound" by this Court's precedent to find standing anyway. JA344. In viewing itself compelled to accept plaintiffs' organizational standing, the district court principally relied on three cases, none of which endorsed such an expansion of Article III's case-or-controversy requirement. *See* JA343–345 (first citing *American Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020); then citing *Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 122 (D.C. Cir. 1990); and then citing *PETA*, 797 F.3d 1087). In fact, in *Competitive Enterprise Institute*, this Court found that an organization *lacked* standing. 901 F.2d at 123. Even though the plaintiff-organization in that case had invoked an environmental statute "creat[ing] a right to information on the environmental effects of government actions" and an interest in receiving information, the organization lacked a concrete injury because it had failed to identify an "*environmental interest[]*"—the kind of interest the statute sought to protect—in the allegedly missing information. *Id.*

In *American Anti-Vivisection Society*, the plaintiffs had standing because they had sought to compel the government to provide certain

22

information that was allegedly required by statute, presenting a classic case of informational injury that is entirely lacking here. 946 F.3d at 619. And in *PETA*, the plaintiff alleged that the government's failure to conduct inspections, create inspection reports, and provide a mechanism to seek redress for bird abuse concretely impaired its ability to carry out its activities. 797 F.3d at 1094–95. Here, by contrast, as in *EPIC*, the plaintiff "identifies no organizational harm unrelated to its alleged informational injury." 878 F.3d at 377–78. As noted, this Court in *EPIC* rejected the proposition that an organization can circumvent the limitations on informational injury by repackaging its alleged informational injury as a harm to organizational interests. *Id.* at 380.

**2.**     Even if plaintiffs could identify a cognizable injury, that harm would not be fairly traceable to the social-media policy or redressable by judicial relief.

As noted, the social-media policy does not itself deprive plaintiffs of any information. Rather, the policy reflects one of many factors that hypothetical third-party speakers could contemplate when deciding what (if anything) to say on third-party social-media platforms, based on the possibility that someday they may decide to seek a visa and be asked to provide their social-media identifiers. Likewise, plaintiffs lack standing to challenge the

23

government's *retention* of data because none of their alleged injuries would be redressed by an injunction requiring the government to delete information it has already received.

With regard to causation, plaintiffs' theory of standing is on all fours with the theory that this Court rejected in *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987). There, the Court held that "a litigant who claims injury to his ability to act together with a third party" may have standing "[i]n the absence of a legal prohibition on his relationship with a third party[] ... *only if* the governmental action he complains of has purposefully interfered with that relationship." *Id.* at 801 (emphasis added). "Without a purposeful interference," the Court explained, "the litigant would lack article III standing no matter how copious a factual showing of causation he might make." *Id.* Applying those principles, the Court held that a plaintiff-organization failed to show traceability and redressability from a policy to interdict certain vessels transporting undocumented immigrants. *Id.* Even though the organization's stated purpose was to "promote the well-being of" refugees on those ships, including through "legal representation," "education," and "social and referral services," *id.* at 799 (quotation marks omitted), the Court found no causation because "the interdiction program [wa]s not aimed at preventing [the] refugees from dealing with the [organization]," and instead

24

"[t]he prevention of that relationship [wa]s merely an unintended side effect of the program," *id.* at 801.

Similarly, here, plaintiffs do not urge that the social-media policy was designed to affect their interactions with noncitizens. Any effects on plaintiffs are incidental and unintended consequences of a foreign-affairs, national-security, and immigration policy regulating the contents of visa applications submitted by noncitizens who decide to use that process to travel to the United States. Plaintiffs thus cannot establish traceability and redressability as a matter of law.

This case differs from *Haitian Refugee Center* only insofar as plaintiffs have a far weaker claim to a factual interference with their relationship with third parties. In *Haitian Refugee Center*, the United States was directly regulating certain noncitizens, which had a clear—though indirect—effect on the plaintiff organization. *See* 809 F.2d at 799–801. Here, by contrast, the social-media policy (which governs the required contents of a visa application) does not regulate the conduct that plaintiffs are concerned with (various speech). And their factual theory is weakened further still because, as plaintiffs acknowledge (Br. 24), consular officers "already have the authority to require social media information when they believe it is necessary for the adjudication of any individual visa application." Plaintiffs' claim thus relies on

25

speculation that the difference between intermittent and consistent requests for social-media identifiers would affect the incentives for third parties to speak in a way that will, in turn, affect plaintiffs' own relationships.

### B.  Plaintiffs lack standing to sue on behalf of their members.

An organization cannot sue on its members' behalf unless at least one member "would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Because Doc Society "has no members," JA337; *see also* JA25–26, only IDA attempts to show associational standing. In a footnote (Br. 9 n.3), plaintiffs contend that the social-media policy injures: (1) "IDA's foreign members who live in the United States but must travel abroad to apply for new or renewed visas by depriving them of their First Amendment-protected rights to anonymous speech and free association and chilling their online expressive activities more broadly"; and (2) "IDA's U.S. members by deterring IDA's foreign members who live abroad from engaging with IDA online and from applying for visas that would permit them to engage with IDA's U.S. members in person at IDA's events." Although the district court did not address these theories, they lack merit.

**1.**     To show associational standing, plaintiffs must "make specific allegations establishing that at least one *identified* member had suffered or

26

would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added). "[I]t is not enough to aver that unidentified members have been injured." *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011).

The complaint does not identify any IDA members with specificity, providing only snippets of facts about a few unnamed members. *See* JA29–33, ¶¶ 51, 55–56, 58. Of these, only one is alleged to have been present in the United States when plaintiffs initiated this suit. Thus, plaintiffs' assertion (Br. 9 n.3) that they have associational standing based on "foreign members who live in the United States" must rely on the circumstances of this single member. But the terse description of this individual's circumstances does not come close to establishing standing.

In a single sentence, the complaint alleges that "[b]ecause of the [social-media policy], one IDA member currently residing in the U.S. Midwest reviewed three years of social media activity and deleted posts criticizing the current U.S. administration in order to avoid any delays on future visa applications." JA31. Plaintiffs do not describe the person's nationality, his or her visa-eligibility, and whether he or she has concrete plans to leave or apply for a visa. The complaint does not even identify this individual's immigration status. If, for example, this person is a lawful permanent resident, then the

27

visa policy generally would not apply. *See* 8 U.S.C. § 1101(a)(13)(C) (providing that lawful permanent residents are generally not "regarded as seeking an admission into the United States"). Plaintiffs' conclusory allegation of unilateral actions taken to avoid speculative harms based on "'some day' intentions" of applying for a visa in the future, "without any description of concrete plans, or indeed even any specification of when the some day will be," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992), flouts well-established limitations on standing, *see, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").

**2.**     For similar reasons, plaintiffs cannot establish standing by pointing to IDA's "U.S. members" who, according to their brief, are harmed by the social-media policy because it "deter[s] IDA's foreign members who live abroad from engaging with IDA online and from applying for visas that would permit them to engage with IDA's U.S. members in person at IDA's events." Br. 9 n.3.

This contention largely repackages plaintiffs' flawed argument concerning informational injury and fails on the same grounds. *See supra* pp. 17–26. As noted, plaintiffs cannot establish Article III injury by speculating

28

that the social-media policy may "deter" (but not prevent) some unidentified noncitizen nonresident member of IDA from communicating with U.S. members—or from attending an IDA event at some unspecified point in the future. *See, e.g.*, *Summers*, 555 U.S. at 495, 499–500 (rejecting associational standing for lack of "imminent future injury"). And there is no allegation that any such member has been denied admission to the United States, as opposed to making a voluntary choice not to apply for a visa. *Cf. Kleindienst v. Mandel*, 408 U.S. 753, 762–70 (1972) (addressing case based on alleged injuries to citizens who wanted to interact, at a specified event, with a specified noncitizen who was prohibited from entering the United States).

## II.    Plaintiffs Fail To State A Viable APA Claim

The district court correctly concluded that APA review is unavailable because the social-media policy reflects sensitive foreign-affairs, national-security, and immigration-enforcement judgments committed to agency discretion. JA354–355. Plaintiffs' claims also face two additional obstacles: plaintiffs' alleged organizational injuries fall outside of the relevant statutory zone of interests, and the complaint fails to state a plausible claim.

29

**A.    The district court correctly concluded that plaintiffs challenge a policy committed to agency discretion.**

**1.**    In implementing the social-media policy, the Secretary of State exercised his authority to determine what information is "necessary" to collect in a visa application. 8 U.S.C. § 1202(a), (c). The APA's default cause of action does not apply here because the Secretary's action was "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

National-security and diplomatic-relations concerns implicate classic examples of this narrow, but important, carveout from APA review. This Court has repeated its "long-standing recognition that 'any policy toward [noncitizens] is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government,'" and that "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1982)). Indeed, "[i]n the foreign affairs arena, the court lacks a standard to review the agency action" because "generally, 'judgments on questions of foreign policy and national interest are not subjects fit for judicial involvement.'" *Detroit Int'l Bridge Co. v. Government of*

30

*Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018) (alteration omitted) (quoting *District No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Marine Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000)); *see also National Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 405 (D.C. Cir. 1990) ("[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" (emphasis omitted) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985))).

The social-media policy is similarly committed to agency discretion. Given the sensitive security, diplomatic, and immigration concerns involved, *see* 8 U.S.C. § 1182(a) (setting grounds for ineligibility based on, *e.g.*, risks to public health or national security); *supra* pp. 4–6, Congress conferred on the Secretary of State broad discretion over the visa-application process in 8 U.S.C. § 1202(a) and (c), including discretion to prescribe by regulation what information is "necessary" to fulfill these statutory mandates.

In a prior case involving a different aspect of § 1202(a)—one of the two parallel statutory provisions at issue here—this Court held that 5 U.S.C. § 701(a)(2) precludes APA review. *Legal Assistance for Vietnamese Asylum Seekers v. Department of State* (*LAVAS*), 104 F.3d 1349 (D.C. Cir. 1997). There, certain noncitizens challenged the State Department's consular-

31

venue policy for immigrant-visa applications. *Id.* at 1350. The Secretary had promulgated the venue policy under § 1202(a), which provides that applications shall be made "in such form and manner and at such place as shall be by regulations prescribed." 8 U.S.C. § 1202(a). The policy was committed to agency discretion, the Court explained, because § 1202(a) authorizes the Secretary to "prescribe the place at which [noncitizens] apply for immigrant visas without providing substantive standards" and, importantly, the "nature of the administrative action counsel[ed] against review" because the State Department "is entrusted by a broadly worded statute with balancing complex concerns involving security and diplomacy." *LAVAS*, 104 F.3d at 1353.

The social-media policy is likewise not subject to APA review. As in *LAVAS*, the "nature of the administrative action counsels against review" because the State Department "is entrusted by a broadly worded statute with balancing complex concerns involving security and diplomacy." 104 F.3d at 1353; *see, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (observing that Executive decision-making is entitled to particular deference when it concerns the "sensitive and weighty interests of national security and foreign affairs" (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010))). In fact, the social-media policy here warrants even more deference than did the venue policy in *LAVAS*. Although the Court in *LAVAS* did not

analyze § 1202's "necessary" clause, *see* 8 U.S.C. § 1202(a), (c) (permitting Secretary to "prescribe[]" regulations requiring "such additional information necessary to the identification of the applicant" and "the enforcement of the immigration and nationality laws"), this statutory language and the "nature of the agency action at issue" necessarily require "balancing complex concerns involving security and diplomacy, State Department resources and the relative demand for visa applications," *LAVAS*, 104 F.3d at 1353. Indeed, collecting necessary information for visa-application purposes—and determining what information is necessary to begin with—more directly implicate "a complicated balancing of a number of factors which are peculiarly within the agency's expertise" than the consular-venue policy in *LAVAS* did. *Id.* (alteration omitted) (quoting *Chaney*, 470 U.S. at 831). Scrutinizing whether information is necessary in this visa context would also veer into "second-guessing" an "executive branch decision involving complicated foreign policy matters," which courts studiously avoid. *Id.*

Plaintiffs' reliance on a case involving "the statutory standard 'necessary for safety'" underscores their failure to grapple with the sensitive context in which the determinations at issue here were made. Br. 14 (quoting *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 601 (D.C. Cir. 2007)). And cases in which the relevant official was found to have engaged in the wrong inquiry

33

do not provide authority for second-guessing the Secretary's application of the proper standard in this case. *See* Br. 25–26 (first citing *AFL-CIO v. Chao*, 409 F.3d 377 (D.C. Cir. 2005); and then citing *Department of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019)).

The district court properly declined to wade into the foreign-policy and national-security questions implicated here. "For more than a century," the "admission and exclusion of foreign nationals" has been "a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Hawaii*, 585 U.S. at 702 (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977)); *see also* S*aavedra Bruno*, 197 F.3d at 1159. The Court should decline plaintiffs' invitation to abandon that practice.

**2.** Plaintiffs' objections to the district court's conclusion highlight the errors in their analysis.

To begin, plaintiffs undermine their position by arguing (Br. 18–21) that the Executive's unreviewable discretion should be limited to "military" matters or to "'managing the resources of national defense.'" The social-media policy implicates the same concerns: As this Court explained in *LAVAS*, a policy under 8 U.S.C. § 1202(a) implicates "balancing complex concerns involving security and diplomacy, State Department resources," and "foreign policy matters." 104 F.3d at 1353. And because the social-media policy

34

concerns the identification of visa applicants and the proper enforcement of immigration law, it is "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" and "the war power." S*aavedra Bruno*, 197 F.3d at 1159 (quoting *Harisiades*, 342 U.S. at 588–89); *see also, e.g.*, Wasem, *supra*, at 1 ("The visa issuance process is widely recognized as an integral part of ... border security."). Thus, for the same reasons the judiciary is "ill-equipped to conduct reviews of the nation's military policy," *National Fed'n of Fed. Emps.*, 905 F.2d at 406, it is similarly ill-equipped to appraise the policy here, as the district court recognized, JA355.

Plaintiffs also do not advance their argument by maintaining that, unlike other provisions, § 1202(a) and (c) do not use terms like "discretion" and "unreviewable." Br. 16–17. This Court has not deemed any such magic words to be necessary to conclude that § 1202 commits action to agency discretion. *See LAVAS*, 104 F.3d at 1353. "The force of any negative implication," moreover, will "depend[] on context." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (quoting *Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013)). The context described above—including the immigration, national-security, foreign-policy, and resource-allocation concerns at stake—confirms that

plaintiffs' posited negative implication provides no basis to deviate from the judiciary's tradition of avoiding such policy questions.

Likewise, plaintiffs' assertions that courts have "reached the merits of APA claims challenging agency action in the immigration context," Br. 22, or "reviewed policies and programs involving an agency's collection of information" in the "national security" context, Br. 25–26, attack a strawman. The government is not arguing that the Executive Branch's collection of information in the "immigration" or "national security" context generally is *per se* unreviewable. Rather, this specific social-media policy—which reflects, for example, the Executive's determination regarding what information from visa applicants is necessary to determine their admissibility under the INA—is unreviewable. For these reasons, plaintiffs' citations are inapposite. None of them addressed 8 U.S.C. § 1202 or the discretion conferred under that authority.

**B.    Plaintiffs' asserted organizational interests fall outside of the zone of interests of the statute that they invoke.**

Even if the social-media policy were reviewable under 5 U.S.C. § 701(a)(2), plaintiffs' organizational-capacity claims would nonetheless fail

because their asserted injuries are not within the zone of interests of 8 U.S.C. § 1202(a) and (c).[5]

The APA provides a cause of action only to plaintiffs "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "[T]he interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396 (1987) (alteration omitted) (quotation marks omitted). The "injury that supplies constitutional standing," moreover, "must be the same as the injury within the requisite 'zone of interests.'" *Viasat, Inc. v. FCC*, 47 F.4th 769, 779 (D.C. Cir. 2022) (quotation marks omitted).

The complaint fails the zone-of-interests test. As an initial matter, plaintiffs have not argued that 8 U.S.C. § 1202(a) and (c) protect or regulate plaintiffs' asserted organizational interests. Accordingly, there is a mismatch between their alleged "injury that supplies constitutional standing," and any alleged "injury within the requisite 'zone of interests.'" *Viasat*, 47 F.4th at 779 (quotation marks omitted). That alone requires dismissal of any organizational-capacity claim.

---

[5] For the reasons discussed above (at 26–29), plaintiffs' claims on behalf of any individual member fail for lack of Article III standing.

In any event, plaintiffs' asserted organizational interests are orthogonal to the statute they invoke. The complaint claims interests in interacting with foreign individuals in making documentary films and a supposed harm to those interests. JA25–26, 37–41. The INA provisions at issue, by contrast, govern visa-application requirements and visa applicants. 8 U.S.C. § 1202(a), (c).

This Court has rejected APA suits in analogous circumstances. In *Haitian Refugee Center*, the Court held that the zone of interests of the then-operative INA provisions addressing asylum, deportation, and access to counsel did not protect or regulate an organization's interests in "associating with" or "counseling and representing" noncitizens. 809 F.2d at 812–16. Rather, this Court recognized that those sections covered "only the interest of" the affected noncitizen. *Id.* at 813; *see id.* at 815–16. By the same token, in *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), this Court held that an advocacy organization's interests in limiting immigration were not protected or regulated by statutory provisions addressing parole of noncitizens, adjustment of status, and prohibitions on certain discrimination in granting visas. *Id.* at 900–04. Those sections, the Court reasoned, plainly regulated noncitizens and thus "did not seek to protect the interests of the [organization]'s members by intending them as

38

beneficiaries or as suitable challengers of [statutory] violations." *Id.* at 904. Plaintiffs' documentary-filmmaking interests here are similarly unrelated to § 1202's treatment of visa applications.

Plaintiffs did not meaningfully contest the above analysis in the district court. Instead, they cited two different provisions, 8 U.S.C. §§ 1101(a)(15)(B), 1184(c)(3), for the proposition that the INA permits foreign filmmakers to apply for and obtain visas, Dkt. No. 32, at 20–22. But those two sections say no such thing. The first *excludes* "representative[s] of foreign press, radio, film, or other foreign information media coming to engage in such [a] vocation" from the "B" visa category. 8 U.S.C. § 1101(a)(15)(B); *cf. id.* § 1101(a)(15)(I). And the second imposes a special limitation on the circumstances under which DHS may approve an employer's petition to "import" a noncitizen "seeking entry for a motion picture or television production." *Id.* § 1184(c)(3). Neither provision evinces congressional intent to protect or regulate plaintiffs' generalized interest in associating with foreign filmmakers. *See Haitian Refugee Ctr.*, 809 F.2d at 813, 815.

### C. Plaintiffs' APA claim fails on the merits.

Plaintiffs also fail to state a plausible APA claim on the merits. The social-media policy is not arbitrary and capricious, and it does not exceed the State Department's authority under 8 U.S.C. § 1202(a) and (c).

**1.**    The social-media policy reflects reasoned decision-making. It followed two notice-and-comment periods, after which the Secretary of State provided thorough responses. JA73–120. The "agency's path may reasonably be discerned," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quotation marks omitted), and there is no basis to suggest that the Secretary "failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs' contrary allegations lack footing in the records they cite. Plaintiffs assert, for example, that the Secretary did not provide a "reasonable justification" for the policy and offered only a "conclusory statement" that collecting social-media information would be "essential." Br. 43 (quotation marks omitted). But the decisional documents cited in the complaint (JA20) detailed how collecting social-media information would enable consular officers to confirm a visa applicant's identity, detect potential fraud, and check for eligibility under 8 U.S.C. § 1182. For example, the Secretary explained how social-media posts could reveal "activity, ties, or intent" suggesting criminal conduct or "potential threats" that would render the applicant inadmissible under the INA. JA77, 82, 102, 106–107; *see also, e.g.*, JA73–75, 83, 85, 97–99, 101, 109. Similarly inapt are plaintiffs' contentions (Br. 5, 47)

40

that the "State Department cited no evidence" that the policy "would be an effective means" of achieving the Department's goals. In fact, the Secretary underscored that "information on social media pages" may be used as evidence "to validate" an applicant's "relationships" (such as an alleged fiancé(e) in the U.S.) or "employment," either of which can be "required for visa eligibility" in certain circumstances. JA77, 102 (noting that social-media information could also reveal disqualifying "indicia of fraud" or "misrepresentations" in a visa application).

More generally, plaintiffs' demands for more "evidence" do not present a cognizable arbitrary-and-capricious claim. This is particularly so in the national-security and foreign-policy contexts. In this space, "information can be difficult to obtain and the impact of certain conduct difficult to assess," such that demands for "hard proof" or "specific evidence" would be a "dangerous requirement" at odds with the deference afforded to the Executive. *See Humanitarian Law Project*, 561 U.S. at 34 (quotation marks omitted). Instead, "conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what [courts] may reasonably insist on from the Government." *Id.* at 34–35. As the Secretary explained, Congress tasked the State Department with determining a visa applicant's eligibility, a role that requires evaluating "available information" about the

41

applicant. JA87, 107. There is no disputing that social-media information could be used to detect fraud, misrepresentations regarding the nature of a relationship, threats to security (such as terrorist activity or gang affiliations), or other grounds enumerated in 8 U.S.C. § 1182 rendering an applicant inadmissible. *See, e.g.*, *Strategy to Combat Transnational Organized Crime*, *supra*, at 8 (explaining that transnational criminal organizations "depend on … fraudulently obtained documents, such as … visas" to enter the United States); *supra* pp. 4–6. At a minimum, it was not arbitrary for the Secretary to have determined as much.

Plaintiffs' allegations that the Secretary failed to engage with public comments likewise contradict the records cited in the complaint. *See* JA75–91, 99–115. The only comments that plaintiffs describe in their brief (at 43–45) asserted that social-media communications are challenging to interpret or can be ineffective in identifying an individual or in making a visa determination. The Secretary addressed these concerns by explaining that consular officers make "determination[s] based on the totality of the circumstances," including "the context and circumstances of the applicant, culture, country conditions, [and] the nature of the account," while recognizing that "other postings will inform the interpretation of any social media post." JA82–83, 106–107. Indeed, in some instances, social-media posts will be unequivocal

and not difficult to interpret at all; or, in other instances, social-media iden-tifiers will provide leads to other "activity, ties, or intent that are grounds for visa denial under the INA." JA82, 107. The Secretary also stressed that ap-plicants could offer explanations and clarifications, including during their required "visa interview" with a consular officer. JA82, 87, 107, 111.

Finally, plaintiffs quibble (Br. 45) with the Secretary's discussion of a DHS report (JA296) on certain pilot programs for social-media screening. But the complaint does not plausibly allege that the Secretary's decision failed to consider "relevant factors" or betrayed "clear error of judgment." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quotation marks omitted). Rather, the Secretary noted he was "aware of" the report—which by then was two years old—and explained that "[s]ocial media screen-ing capabilities and effectiveness continue to evolve." JA77, 102. The Secre-tary accordingly reasoned that the new social-media policy was part of the State Department's efforts "to find mechanisms to improve our screening processes," including by equipping consular officers to identify applicants or "specific visa ineligibility grounds." *Id*.[6] Because the social-media policy falls

---

[6] The complaint alleged—but plaintiffs do not press on appeal—that the Secretary failed to explain the need to retain an applicant's social-media in-formation after an initial visa adjudication. *See* JA20. But the Secretary dis-cussed this too. *See* JA73–74, 91, 97–98, 105. Retaining information makes
*Continued on next page.*

well "within the bounds of reasoned decision-making," *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983), plaintiffs' claim fails as a matter of law.

**2.**    The social-media policy also falls within the Secretary's broad authority under 8 U.S.C. § 1202(a) and (c). As discussed, those provisions grant the Secretary discretion to "prescribe[]" by "regulation" that applicants disclose "such additional information necessary" to "identif[y]" the applicant and to "enforce[]" the "immigration and nationality laws," including the INA's visa-eligibility requirements. 8 U.S.C. § 1202(a), (c). And as this Court explained in *LAVAS*, courts properly decline to second-guess the Secretary's exercise of authority under § 1202 because it contains a broad "grant of discretion" in "the area of foreign affairs." 104 F.3d at 1353 (quoting *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 282 (D.C. Cir. 1989)); *cf. Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) ("The [INA] need not

_____

perfect sense because visas expire and must be renewed—and the INA permits the Secretary to collect information for "the enforcement of the immigration and nationality laws," 8 U.S.C. § 1202(a), (c), and to retain it "for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States," *id.* § 1202(f), beyond individual visa decisions. In any event, plaintiffs do not have standing to raise this unpressed claim, including because the policy does not require plaintiffs to disclose any information and because their alleged harms would not be redressed by an order requiring deletion of data the government has already obtained.

specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him.").

For good reason, plaintiffs give this aspect of their APA claim short shrift. The complaint contains no relevant allegations beyond a conclusory statement that the Secretary exceeded his authority. JA42, ¶ 77. And plaintiffs' appellate brief confirms that this claim simply rehashes their deficient arbitrary-and-capricious theory: Plaintiffs write that the Secretary did not "justify" his determination that collecting social-media information is "necessary." Br. 45–46. But that has no bearing on whether he had authority to implement the policy in the first place. Nor can plaintiffs credibly dispute the Secretary's authority because, again, they concede that consular officers "have the authority to require social media information when they believe it is necessary for the adjudication of any individual visa application." Br. 24.

## III. Plaintiffs Fail To State A First Amendment Claim

Plaintiffs also assert a freestanding First Amendment challenge to the social-media policy and "related retention and dissemination policies." JA43. They allege that the social-media policy burdens the First Amendment rights of anonymity and free association of noncitizens outside of the United States and, in turn, burdens the right of people in the U.S. to "hear from foreign members and partners outside the United States." Br. 27–28.

The district court correctly applied a deferential standard of review and concluded that the challenged actions easily pass constitutional muster. JA364–372.

## A.   The challenged policy is subject to and satisfies deferential review.

At most, plaintiffs' First Amendment claim implicates rational-basis review—or an even more deferential "facially legitimate" inquiry—because the challenged action implicates immigration, diplomacy, and national-security questions entrusted to the political branches.

**1.a.**   The Supreme Court has repeated that "the responsibility for regulating the relationship between the United States and our [noncitizen] visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). This is because immigration policy "may implicate our relations with foreign powers" and "must be defined in the light of changing political and economic circumstances." *Id.*; *see Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976) ("[T]he power over [noncitizens] is of a political character and therefore subject only to narrow judicial review."). Accordingly, the Supreme Court prescribes two deferential standards for reviewing constitutional challenges to immigration policies—particularly policies governing conditions of entry into the United States.

46

The first standard is known as "*Mandel* review." Under this framework, courts probe only whether the government's rationale for the challenged immigration-related action was "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769–70. Like this litigation, *Mandel* involved a First Amendment claim based on an asserted right to listen to a noncitizen speaker: There, U.S. citizens alleged rights to listen to "hear, speak, and debate with" Ernest Mandel, a foreign academic whose request for a visa waiver had been denied on the stated ground that he had failed to adhere to prior visa-related conditions. *Id.* at 758–62. Unlike plaintiffs here, however, the plaintiffs in *Mandel* argued that the government had discriminated based on viewpoint in political speech. *See id.* at 755–56, 760 (challenging statute rendering noncitizens ineligible for admission if they had "advocate[d] the economic, governmental, and international doctrines of world communism").

Facing those serious allegations, the Supreme Court nevertheless limited its review to whether the government's stated justification for excluding Mr. Mandel was "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769–70. In doing so, the Court recognized that "ancient principles of the international law of nation-states" establish that "the political branches of government" have "exclusive[]" control over the admission and exclusion of noncitizens. *Id.* at 765–66 (quotation marks omitted). Because Congress had

47

conferred on the Executive broad discretion over visa determinations, the Supreme Court explained that it would "neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who" sought to challenge it. *Id.* at 770. Since then, the Court has reiterated that *Mandel* review applies broadly to "the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (quoting *Diaz*, 426 U.S. at 82).

Second, in some instances, the Supreme Court has assumed without deciding that, instead of *Mandel* review, rational-basis scrutiny could apply to certain immigration policies. *See Hawaii*, 585 U.S. 667. In *Hawaii*, U.S. citizens challenged under the Establishment Clause a presidential proclamation restricting the ability of nationals of certain countries to enter the United States. *Id.* at 676–80. The Supreme Court stressed that "'[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,'" and that therefore a court's proper "inquiry into matters of entry and national security is highly constrained." *Id.* at 704 (quoting *Diaz,* 426 U.S. at 81–82). Even when "the denial of a visa allegedly burden[ed] the constitutional rights of a U.S. citizen," the Court added, the judiciary had historically "engaged in a circumscribed judicial inquiry." *Id.* at 703 (citing *Mandel*, 408

48

U.S. at 756–57). At the government's suggestion, however, the Court assumed that the rational-basis test applied. *Id.* at 704; *see also id.* at 704–05 (upholding policy because it was "plausibly related to the Government's stated objective" and could "reasonably be understood to result from a justification independent of unconstitutional grounds").

**b.**     The government action that plaintiffs challenge here is subject to either *Mandel* or rational-basis review. Indeed, plaintiffs' primary First Amendment theory—based on a desire to listen to a foreign speaker—is even weaker than the claim in *Mandel*. That case involved a statute that discriminated on viewpoint and an actual exclusion of a noncitizen that directly prevented the listeners from hearing their desired speaker. Here, by contrast, plaintiffs identify a viewpoint-neutral social-media policy that has a far more attenuated connection to the flow of information.

In any event, collecting and retaining social-media identifiers of visa applicants constitute the kinds of "conditions for entry" that the Supreme Court has long entrusted to the political branches' judgment. *Harisiades*, 342 U.S. at 596–97 (Frankfurter, J., concurring). Indeed, a "deferential standard of review" properly applies "across different contexts and constitutional claims" when, as here, the litigation involves the Executive's

49

"administration of the immigration system." *Hawaii*, 585 U.S. at 703 (quotation marks omitted).

Deference is particularly warranted here because the challenged action also has "a legitimate grounding in national security concerns," and stems from the same executive order to which the Supreme Court in *Hawaii* accorded substantial deference. *Hawaii*, 585 U.S. at 706–08; 82 Fed. Reg. 13,209, 13,209 (Mar. 9, 2017). The well-established limitations on judicial review carry "particular force in the area of national security, for which Congress has provided specific statutory directions pertaining to visa applications by noncitizens who seek entry to this country." *Kerry v. Din*, 576 U.S. 86, 104 (2015) (Kennedy, J., concurring in the judgment);[7] *see Hawaii*, 585 U.S. at 704 ("'[J]udicial inquiry into the national-security realm raises concerns for the separation of powers' by intruding on the President's constitutional responsibilities in the area of foreign affairs." (alteration omitted) (quoting *Ziglar v. Abbasi,* 582 U.S. 120, 142 (2017))). And "'when it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'" *Hawaii*, 585 U.S. at 704 (quoting *Humanitarian Law Project,* 561 U.S. at 34).

---

[7] Justice Kennedy's concurrence in *Din* is the "controlling" opinion. *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016) (so holding); *see Marks v. United States*, 430 U.S. 188 (1977).

50

For these reasons, this Court has applied rational-basis review to a policy requiring certain nonimmigrants to provide their residential information to the government because, generally, "it is not the business of courts to pass judgment on the decisions of the President in the field of foreign policy." *Narenji*, 617 F.2d at 748. That same caution is warranted here, particularly because Congress tasked the Executive with determining whether each visa applicant presents, among other things, a threat to national security. 8 U.S.C. §§ 1182(a)(3), (b), 1202(a), (c); *see supra* pp. 4–6.

**2.** The social-media policy, and the related retention of information, comfortably satisfy these deferential standards—including the modestly more-robust rational-basis review.

Rational-basis review "is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). To withstand scrutiny, a policy need only be "plausibly related to the Government's stated objective." *Hawaii*, 585 U.S. at 704–05. "Where there are 'plausible reasons' for" the action, a court's "inquiry is at an end." *Beach Commc'ns*, 508 U.S. at 313–14 (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). And surviving a motion to dismiss is "a tall task" because the complaint "must plausibly allege facts showing that no reasonably conceivable state of facts could

51

provide a rational basis for the challenged policy." *Sanchez v. Office of State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022).

Collecting and retaining information under the social-media policy reflect a legitimate interest. As in *Hawaii*, the government action here is "expressly premised on [the] legitimate purpose[]" of ensuring that foreign nationals who seek to enter the country can be "adequately vetted." 585 U.S. at 706. Plaintiffs, in fact, "do not contest the importance of the Government's asserted interests in confirming visa applicants' identities, determining their visa eligibility, or uncovering national security threats." Br. 46–47.

The challenged policies also plausibly aid the Executive Branch in carrying out its mandate to "confirm[] the applicant's identity and determin[e] whether an applicant is eligible" for a visa or otherwise poses a risk to the Nation. JA75, 99; *see also* 8 U.S.C. § 1182(a), (f) (enumerating grounds for ineligibility); *id.* § 1202(a), (c), (f) (requiring identification of applicants and permitting various uses of collected information). For example, the collected social-media information may be used to assess "potential visa fraud" regarding their relationships with U.S. citizens. JA77, 102; 8 U.S.C. § 1182(a)(6)(C) (deeming "inadmissible" any noncitizen "who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa"); *see also, e.g.*, *Strategy to Combat*

*Transnational Organized Crime*, *supra*, at 8 (explaining that transnational organizations engage in visa fraud to enter the United States).[8]

**B.    Plaintiffs' contrary arguments lack merit.**

As in district court, plaintiffs' arguments on appeal "do not seriously engage with the rational-basis standard" and instead rely on the application of heightened scrutiny. JA371. Because there is no basis for heightened review here, plaintiffs' First Amendment claim fails.

**1.**    Much of plaintiffs' argument for heightened scrutiny is beside the point.

Plaintiffs dispute the district court's conclusion (JA357–364) that they had failed to identify a cognizable First Amendment interest on the merits. Br. 26–30. But none of that alters the applicable standard of review. In *Mandel*, for example, the Supreme Court considered First Amendment allegations of viewpoint discrimination and U.S. citizens' interests in hearing from, talking to, and meeting with a foreign national. 408 U.S. at 762, 779–70. Yet the Court rejected the suggestion that the presence of First Amendment

---

[8] Plaintiffs ask this Court to take judicial notice of an email reflecting one government employee's thoughts on whether the social-media policy adds "value." Br. 6 & n.2 (quotation marks omitted). Even were it granted, that request would not save the complaint. Under rational-basis review, policy choices "are 'not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *Sanchez*, 45 F.4th at 398 (quoting *Beach Commc'ns*, 508 U.S. at 315).

allegations automatically triggers heightened scrutiny: whether "First Amendment rights are implicated" is "not dispositive," the Court emphasized, because the proper standard of review is a separate question, particularly in the immigration context. *Id.* at 765. Thus, *Mandel* declined to balance the exercise of Executive discretion "against the First Amendment interests of those who seek" to challenge it. *Id.* at 769–70; *accord Hawaii*, 585 U.S. at 703 ("[O]ur opinions have reaffirmed and applied [*Mandel*'s] deferential standard of review across different contexts and constitutional claims.").

**2.**     For the first time on appeal, plaintiffs contend that the "'highly constrained' review" under *Mandel* (or rational-basis principles) is applicable "only in the context of exclusion decisions" pursuant to the "doctrine of consular nonreviewability." Br. 31–32 (quotation marks omitted).

It would be quite odd to apply deferential review to the ultimate decision whether to admit a noncitizen to the United States, but more searching review to determinations regarding what information the Executive Branch deems necessary to that decision. And under plaintiffs' framing, the social-media policy could be recharacterized as excluding noncitizens who refuse to provide the information identified in the policy. *See* 8 U.S.C. § 1201(a)(1)(A) (requiring a "proper [visa] application" under "the conditions ... prescribed" by the Secretary). The artificial distinction that plaintiffs seek to draw thus

54

has no logical underpinning, and common sense refutes plaintiffs' view that depriving the Executive Branch of the information it believes it needs to adjudicate visa requests will not "upset substantive decisions as to *who* shall be admitted to the country." Br. 35 (quotation marks omitted).

It is therefore unsurprising that plaintiffs' argument is incompatible with Supreme Court precedent. In *Hawaii*, the Court reached its conclusions "notwithstanding consular nonreviewability," 585 U.S. at 683, and rejected the challengers' constitutional claims without purporting to limit deference to mere exclusion decisions, *id.* at 703–05; *see also id.* at 702–03 (explaining that deference applied because "[a]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations and the war power" (alteration omitted) (quoting *Harisiades*, 342 U.S. at 588–89)). And in *Fiallo*, the Court rejected the notion that "the scope of judicial review is a function of the nature of the policy choice at issue." 430 U.S. at 795–96. "To the contrary," the Court explained, deference broadly applies in this context because the State Department's policies "may implicate our relations with foreign powers" and must be implemented "in the light of changing political and economic circumstances." *Id.* (quotation marks omitted).

In practice, courts have consistently limited their constitutional inquiry to rational-basis or *Mandel* review in the immigration context generally, not just to "exclusion decisions" specifically. *Contra* Br. 31. For example, the Supreme Court has applied *Mandel* review to constitutional challenges to a "'broad congressional policy' giving immigration preferences" to certain categories of noncitizens. *Hawaii*, 585 U.S. at 703 (quoting *Fiallo*, 430 U.S. at 795). And—as particularly relevant here—the Supreme Court has endorsed rational-basis review of "broad executive action" like the "National Security Entry-Exit Registration System," a policy that required noncitizens to provide personal information to (and register with) the federal government. *Id.* at 704 (citing *Rajah v. Mukasey*, 544 F.3d 427, 433, 438–39 (2d Cir. 2008)).

**3.**     Finally, plaintiffs insist that the Court should not employ deferential review because the social-media policy is a "procedural requirement" rather than a "substantive admissibility decision[]." Br. 35–36. But even under plaintiffs' logic, the social-media policy here is "substantive" and thus entitled to deference.

Plaintiffs' principal citation, *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002), highlights the point. There, the court concluded that a policy prohibiting public access to deportation hearings was "procedural,"

56

not "substantive," because it had "no effect on the eventual outcome of" those hearings. *Id.* at 686–87.

The social-media policy, by contrast, is "substantive" because it is a condition of entry. An applicant cannot obtain a visa without complying with it. The policy has no relevance unless a noncitizen is applying for a visa to enter the country. And it has limited consequence other than the denial of the visa to come to the United States and the government's retention of the information used to reach that decision for lawful purposes pursuant to statutory authority that plaintiffs do not challenge here. *See, e.g.*, 8 U.S.C. § 1202(f). In short, the policy is integral not only to the visa process, but also to each substantive visa determination.

Plaintiffs' allegations confirm that the policy is "substantive." A central theme of the complaint is plaintiffs' fear that applicants will be denied visas based on the social-media information they are required to disclose. *See* JA32–35 (alleging a "risk that U.S. officials will misinterpret visa applicants' social media activity," "depriv[e]" applicants of opportunities, or "revoke[]" visas). By the complaint's telling, then, this suit challenges a substantive policy that affects visa-issuance decisions. Plaintiffs cannot disavow the premise of their allegations upon discovering the deferential standard of review that attaches to their claims.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

RICHARD C. VISEK
   *Principal Deputy Legal Advisor*

DANIEL TENNY

   *U.S. Department of State*

 */s/ Nicholas S. Crown*
NICHOLAS S. CROWN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7325*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-5365*
   *nicholas.s.crown@usdoj.gov*

MARCH 2024

58

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,045 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

 */s/ Nicholas S. Crown*
Nicholas S. Crown

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.


*/s/ Nicholas S. Crown*
Nicholas S. Crown

**ADDENDUM**

## TABLE OF CONTENTS

6 U.S.C. § 236 ................................................................. A1

8 U.S.C. § 1101 ............................................................... A2

8 U.S.C. § 1105 ............................................................... A3

8 U.S.C. § 1181 ............................................................... A4

8 U.S.C. § 1182 ............................................................... A4

8 U.S.C. § 1184 .............................................................. A12

8 U.S.C. § 1187 .............................................................. A13

8 U.S.C. § 1201 .............................................................. A15

8 U.S.C. § 1202 .............................................................. A16

8 U.S.C. § 1361 .............................................................. A19

8 U.S.C. § 1733 .............................................................. A19

22 C.F.R. § 40.1 ............................................................. A20

22 C.F.R. § 40.6 ............................................................. A20

22 C.F.R. § 41.102 .......................................................... A21

22 C.F.R. § 41.103 .......................................................... A22

22 C.F.R. § 41.121 .......................................................... A23

22 C.F.R. § 42.62 ........................................................... A24

22 C.F.R. § 42.63 ........................................................... A24

22 C.F.R. § 42.71 ........................................................... A25

22 C.F.R. § 42.81 ........................................................... A25

**6 U.S.C. § 236**

**§ 236. Visa issuance**

**(a) Definition**

In this subsection, the term "consular office" has the meaning given that term under section 101(a)(9) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(9)).

**(b) In general**

Notwithstanding section 104(a) of the Immigration and Nationality Act (8 U.S.C. 1104(a)) or any other provision of law, and except as provided in subsection (c) of this section, the Secretary—

(1) shall be vested exclusively with all authorities to issue regulations with respect to, administer, and enforce the provisions of such Act [8 U.S.C. 1101 et seq.], and of all other immigration and nationality laws, relating to the functions of consular officers of the United States in connection with the granting or refusal of visas, and shall have the authority to refuse visas in accordance with law and to develop programs of homeland security training for consular officers (in addition to consular training provided by the Secretary of State), which authorities shall be exercised through the Secretary of State, except that the Secretary shall not have authority to alter or reverse the decision of a consular officer to refuse a visa to an alien;

...

**(c) Authority of the Secretary of State**

(1) In general

Notwithstanding subsection (b), the Secretary of State may direct a consular officer to refuse a visa to an alien if the Secretary of State deems such refusal necessary or advisable in the foreign policy or security interests of the United States.

...

A1

**8 U.S.C. § 1101**

**§ 1101. Definitions**

(a) As used in this chapter—

...

(9) The term "consular officer" means any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this chapter, for the purpose of issuing immigrant or nonimmigrant visas or, when used in subchapter III, for the purpose of adjudicating nationality.

...

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

...

(B) an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure;

...

(O) an alien who—

(i) has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim or, with regard to motion picture and television productions a demonstrated record of extraordinary achievement, and whose achievements have been recognized in the field through extensive documentation, and seeks to enter the United States to continue work in the area of extraordinary ability; or

(ii)

(I) seeks to enter the United States temporarily and solely for the purpose of accompanying and assisting in the artistic or athletic performance by an alien who is admitted under clause (i) for a specific event or events,

A2

(II) is an integral part of such actual performance,

(III) (a) has critical skills and experience with such alien which are not of a general nature and which cannot be performed by other individuals, or (b) in the case of a motion picture or television production, has skills and experience with such alien which are not of a general nature and which are critical either based on a pre-existing longstanding working relationship or, with respect to the specific production, because significant production (including pre- and post-production work) will take place both inside and outside the United States and the continuing participation of the alien is essential to the successful completion of the production, and

(IV) has a foreign residence which the alien has no intention of abandoning. ...

...

(I) upon a basis of reciprocity, an alien who is a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation, and the spouse and children of such a representative, if accompanying or following to join him; ...

...

(16) The term "immigrant visa" means an immigrant visa required by this chapter and properly issued by a consular officer at his office outside of the United States to an eligible immigrant under the provisions of this chapter.

...

(26) The term "nonimmigrant visa" means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this chapter.

## 8 U.S.C. § 1105

### § 1105. Liaison with internal security officers; data exchange

### (a) In general

The Commissioner and the Administrator shall have authority to maintain direct and continuous liaison with the Directors of the Federal Bureau of

A3

Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States. The Commissioner and the Administrator shall maintain direct and continuous liaison with each other with a view to a coordinated, uniform, and efficient administration of this chapter, and all other immigration and nationality laws.

...

## 8 U.S.C. § 1181

### § 1181. Admission of immigrants into the United States

### (a) Documents required; admission under quotas before June 30, 1968

Except as provided in subsection (b) and subsection (c) no immigrant shall be admitted into the United States unless at the time of application for admission he (1) has a valid unexpired immigrant visa or was born subsequent to the issuance of such visa of the accompanying parent, and (2) presents a valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General. ...

## 8 U.S.C. § 1182

### § 1182. Excludable aliens

### (a) Classes of excludable aliens

Except as otherwise provided in this chapter, the following describes classes of excludable aliens who are ineligible to receive visas and who shall be excluded from admission into the United States:

### (1) Health-related grounds

(A) In general

Any alien-

(i) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance, which shall include infection with the etiologic agent for acquired immune deficiency syndrome,

A4

(ii) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)-

> (I) to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

> (II) to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

(iii) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,

is excludable.

...

## (2) Criminal and related grounds

(A) Conviction of certain crimes

> (i) In general

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of-

> (I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

> (II) a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of title 21),

is excludable.

(ii) Exception

Clause (i)(I) shall not apply to an alien who committed only one crime if-

> (I) the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed

A5

for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

(II) the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

(B) Multiple criminal convictions

Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement actually imposed were 5 years or more is excludable.

(C) Controlled substance traffickers

Any alien who the consular or immigration officer knows or has reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance, is excludable.

(D) Prostitution and commercialized vice

Any alien who-

(i) is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, entry, or adjustment of status,

(ii) directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, entry, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

(iii) is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

A6

is excludable.

(E) Certain aliens involved in serious criminal activity who have asserted immunity from prosecution

Any alien-

   (i) who has committed in the United States at any time a serious criminal offense (as defined in section 1101(h) of this title),

   (ii) for whom immunity from criminal jurisdiction was exercised with respect to that offense,

   (iii) who as a consequence of the offense and exercise of immunity has departed from the United States, and

   (iv) who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

is excludable.

...

## (3) Security and related grounds

(A) In general

Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in-

   (i) any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

   (ii) any other unlawful activity, or

   (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is excludable.

(B) Terrorist activities

   (i) In general

   Any alien who-

A7

(I) has engaged in a terrorist activity, or

(II) a consular officer or the Attorney General knows, or has reasonable ground to believe, is likely to engage after entry in any terrorist activity (as defined in clause (iii)),

is excludable....

...

(C) Foreign policy

(i) In general

An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is excludable.

...

(D) Immigrant membership in totalitarian party

(i) In general

Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is excludable.

(ii) Exception for involuntary membership

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

(iii) Exception for past membership

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that-

(I) the membership or affiliation terminated at least-

(a) 2 years before the date of such application, or

A8

(b) 5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

(II) the alien is not a threat to the security of the United States.

(iv) Exception for close family members

The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

...

**(4) Public charge**

Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is excludable.

**(5) Labor certification and qualifications for certain immigrants**

(A) Labor certification

(i) In general

Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is excludable, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that-

(I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

(II) the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed. ...

A9

## (6) Illegal entrants and immigration violators

(A) Aliens previously deported

Any alien who has been excluded from admission and deported and who again seeks admission within one year of the date of such deportation is excludable, unless prior to the alien's reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory the Attorney General has consented to the alien's reapplying for admission.

(B) Certain aliens previously removed

Any alien who-

  (i) has been arrested and deported,

  (ii) has fallen into distress and has been removed pursuant to this chapter or any prior Act,

  (iii) has been removed as an alien enemy, or

  (iv) has been removed at Government expense in lieu of deportation pursuant to section 1252(b) of this title,

and (a) who seeks admission within 5 years of the date of such alien convicted of an aggravated felony, is excludable, unless before the date of the alien's embarkation or reembarkation at a place outside the United States or attempt to be admitted from foreign contiguous territory the Attorney General has consented to the alien's applying or reapplying for admission.

(C) Misrepresentation

  (i) In general

Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or entry into the United States or other benefit provided under this chapter is excludable.

  ...

(E) Smugglers

  (i) In general

A10

Any alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is excludable.

...

## (7) Documentation requirements

(A) Immigrants

(i) In general

Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission-

(I) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

(II) whose visa has been issued without compliance with the provisions of section 1153 of this title,

is excludable.

...

(A) Nonimmigrants

(i) In general

Any nonimmigrant who-

(I) is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

(II) is not in possession of a valid nonimmigrant visa or border crossing identification card at the time of application for admission,

is excludable.

...

A11

**(8) Ineligible for citizenship**

(A) In general

Any immigrant who is permanently ineligible to citizenship is excludable.

...

**(b) Notices of denials**

If an alien's application for a visa, for admission to the United States, or for adjustment of status is denied by an immigration or consular officer because the officer determines the alien to be excludable under subsection (a) of this section, the officer shall provide the alien with a timely written notice that-

(1) states the determination, and

(2) lists the specific provision or provisions of law under which the alien is excludable or ineligible for entry or adjustment of status.

(2) The Secretary of State may waive the requirements of paragraph (1) with respect to a particular alien or any class or classes of inadmissible aliens.

(3) Paragraph (1) does not apply to any alien inadmissible under paragraph (2) or (3) of subsection (a).

...

**(f) Suspension of entry or imposition of restrictions by President**

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate. ...

**8 U.S.C. § 1184**

**§ 1184. Admission of nonimmigrants**

**(a) Regulations**

(1) The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe ....

...

A12

**(c) Petition of importing employer**

(3) The Attorney General shall approve a petition—

(A) with respect to a nonimmigrant described in section 1101(a)(15)(O)(i) of this title only after consultation in accordance with paragraph (6) or, with respect to aliens seeking entry for a motion picture or television production, after consultation with the appropriate union representing the alien's occupational peers and a management organization in the area of the alien's ability, or

(B) with respect to a nonimmigrant described in section 1101(a)(15)(O)(ii) of this title after consultation in accordance with paragraph (6) or, in the case of such an alien seeking entry for a motion picture or television production, after consultation with such a labor organization and a management organization in the area of the alien's ability.

In the case of an alien seeking entry for a motion picture or television production, (i) any opinion under the previous sentence shall only be advisory, (ii) any such opinion that recommends denial must be in writing, (iii) in making the decision the Attorney General shall consider the exigencies and scheduling of the production, and (iv) the Attorney General shall append to the decision any such opinion. The Attorney General shall provide by regulation for the waiver of the consultation requirement under subparagraph (A) in the case of aliens who have been admitted as nonimmigrants under section 1101(a)(15)(O)(i) of this title because of extraordinary ability in the arts and who seek readmission to perform similar services within 2 years after the date of a consultation under such subparagraph. Not later than 5 days after the date such a waiver is provided, the Attorney General shall forward a copy of the petition and all supporting documentation to the national office of an appropriate labor organization.

## 8 U.S.C. § 1187

### § 1187. Visa waiver program for certain visitors

...

### (c) Designation of program countries

(1) In general

A13

The Secretary of Homeland Security, in consultation with the Secretary of State, may designate any country as a program country if it meets the requirements of paragraph (2).

(2) Qualifications.

Except as provided in subsection (f), a country may not be designated as a program country unless the following requirements are met:

...

(C) Law enforcement and security interests

The Secretary of Homeland Security, in consultation with the Secretary of State—

(i) evaluates the effect that the country's designation would have on the law enforcement and security interests of the United States (including the interest in enforcement of the immigration laws of the United States and the existence and effectiveness of its agreements and procedures for extraditing to the United States individuals, including its own nationals, who commit crimes that violate United States law);

(ii) determines that such interests would not be compromised by the designation of the country; and

(iii) submits a written report to the Committee on the Judiciary, the Committee on Foreign Affairs, and the Committee on Homeland Security of the House of Representatives and the Committee on the Judiciary, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate regarding the country's qualification for designation that includes an explanation of such determination.

...

(F) Passenger information exchange

The government of the country enters into an agreement with the United States to share information regarding whether citizens and nationals of that country traveling to the United States represent a threat to the security or welfare of the United States or its citizens, and fully implements such agreement.

...

A14

**8 U.S.C. § 1201**

**§ 1201. Issuance of visas**

**(a) Immigrants; nonimmigrants**

(1) Under the conditions hereinafter prescribed and subject to the limitations prescribed in this chapter or regulations issued thereunder, a consular officer may issue

(A) to an immigrant who has made proper application therefor, an immigrant visa which shall consist of the application provided for in section 1202 of this title, visaed by such consular officer, and shall specify the foreign state, if any, to which the immigrant is charged, the immigrant's particular status under such foreign state, the preference, immediate relative, or special immigrant classification to which the alien is charged, the date on which the validity of the visa shall expire, and such additional information as may be required; and

(B) to a nonimmigrant who has made proper application therefor, a nonimmigrant visa, which shall specify the classification under section 1101(a)(15) of this title of the nonimmigrant, the period during which the nonimmigrant visa shall be valid, and such additional information as may be required.

...

**(g) Nonissuance of visas or other documents**

No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law: Provided, That a visa or other documentation may be issued to an alien who is within the purview of section 1182(a)(4) of this title, if such alien is otherwise entitled to receive a visa or other documentation, upon receipt of notice by the consular officer from the Attorney General of the giving of a bond or undertaking providing indemnity as in the case of aliens admitted under section 1183 of this title ....

A15

**(h) Nonadmission upon arrival**

Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law. The substance of this subsection shall appear upon every visa application.

## 8 U.S.C. § 1202

### § 1202. Application for visas

**(a) Immigrant visas**

Every alien applying for an immigrant visa and for alien registration shall make application therefor in such form and manner and at such place as shall be by regulations prescribed. In the application the alien shall state his full and true name, and any other name which he has used or by which he has been known; age and sex; the date and place of his birth; and such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

**(b) Other documentary evidence for immigrant visa**

Every alien applying for an immigrant visa shall present a valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Secretary of State. The immigrant shall furnish to the consular officer with his application a copy of a certification by the appropriate police authorities stating what their records show concerning the immigrant; a certified copy of any existing prison record, military record, and record of his birth; and a certified copy of all other records or documents concerning him or his case which may be required by the consular officer. The copy of each document so furnished shall be permanently attached to the application and become a part thereof. In the event that the immigrant establishes to the satisfaction of the consular officer that any document or record required by this subsection is unobtainable, the consular officer may permit the immigrant to submit in lieu of such document or record other satisfactory evidence of the fact to which such document or record would, if obtainable, pertain. All immigrant visa applications shall be reviewed and adjudicated by a consular officer.

A16

## (c) Nonimmigrant visas; nonimmigrant registration; form, manner and contents of application

Every alien applying for a nonimmigrant visa and for alien registration shall make application therefor in such form and manner as shall be by regulations prescribed. In the application the alien shall state his full and true name, the date and place of birth, his nationality, the purpose and length of his intended stay in the United States; his marital status; and such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed. The alien shall provide complete and accurate information in response to any request for information contained in the application. At the discretion of the Secretary of State, application forms for the various classes of nonimmigrant admissions described in section 1101(a)(15) of this title may vary according to the class of visa being requested.

## (d) Other documentary evidence for nonimmigrant visa

Every alien applying for a nonimmigrant visa and alien registration shall furnish to the consular officer, with his application, a certified copy of such documents pertaining to him as may be by regulations required. All nonimmigrant visa applications shall be reviewed and adjudicated by a consular officer.

## (e) Signing and verification of application

Except as may be otherwise prescribed by regulations, each application for an immigrant visa shall be signed by the applicant in the presence of the consular officer, and verified by the oath of the applicant administered by the consular officer. The application for an immigrant visa, when visaed by the consular officer, shall become the immigrant visa. The application for a nonimmigrant visa or other documentation as a nonimmigrant shall be disposed of as may be by regulations prescribed. The issuance of a nonimmigrant visa shall, except as may be otherwise by regulations prescribed, be evidenced by a stamp, or other placed in the alien's passport.

## (f) Confidential nature of records

The records of the Department of State and of diplomatic and consular offices of the United States pertaining to the issuance or refusal of visas or permits to enter the United States shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement

of the immigration, nationality, and other laws of the United States, except that—

> (1) in the discretion of the Secretary of State certified copies of such records may be made available to a court which certifies that the information contained in such records is needed by the court in the interest of the ends of justice in a case pending before the court.

> (2) the Secretary of State, in the Secretary's discretion and on the basis of reciprocity, may provide to a foreign government information in the Department of State's computerized visa lookout database and, when necessary and appropriate, other records covered by this section related to information in the database—

>> (A) with regard to individual aliens, at any time on a case-by-case basis for the purpose of preventing, investigating, or punishing acts that would constitute a crime in the United States, including, but not limited to, terrorism or trafficking in controlled substances, persons, or illicit weapons; or

>> (B) with regard to any or all aliens in the database, pursuant to such conditions as the Secretary of State shall establish in an agreement with the foreign government in which that government agrees to use such information and records for the purposes described in subparagraph (A) or to deny visas to persons who would be inadmissible to the United States.

...

## (h) In person interview with consular officer

Notwithstanding any other provision of this chapter, the Secretary of State shall require every alien applying for a nonimmigrant visa—

> (1) who is at least 14 years of age and not more than 79 years of age to submit to an in person interview with a consular officer unless the requirement for such interview is waived—

>> ...

A18

**8 U.S.C. § 1361**

**§ 1361. Burden of proof upon alien.**

Whenever any person makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he is eligible to receive such visa or such document, or is not inadmissible under any provision of this chapter, and, if an alien, that he is entitled to the nonimmigrant, immigrant, special immigrant, immediate relative, or refugee status claimed, as the case may be. If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry, no visa or other document required for entry shall be issued to such person, nor shall such person be admitted to the United States unless he establishes to the satisfaction of the Attorney General that he is not inadmissible under any provision of this chapter. In any removal proceeding under part IV of this subchapter against any person, the burden of proof shall be upon such person to show the time, place, and manner of his entry into the United States, but in presenting such proof he shall be entitled to the production of his visa or other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry in the custody of the Service. If such burden of proof is not sustained, such person shall be presumed to be in the United States in violation of law.

**8 U.S.C. § 1733**

**§ 1733. Terrorist lookout committees.**

**(a) Establishment**

The Secretary of State shall require a terrorist lookout committee to be maintained within each United States mission to a foreign country.

**(b) Purpose**

The purpose of each committee established under subsection (a) shall be—

(1) to utilize the cooperative resources of all elements of the United States mission in the country in which the consular post is located to identify known or potential terrorists and to develop information on those individuals;

(2) to ensure that such information is routinely and consistently brought to the attention of appropriate United States officials for use in administering the immigration laws of the United States; and

(3) to ensure that the names of known and suspected terrorists are entered into the appropriate lookout databases.

## 22 C.F.R. § 40.1

### § 40.1. Definitions.

...

### (*l*) *Make or file an application for a visa* means:

(1) For a nonimmigrant visa applicant, submitting for formal adjudication by a consular officer of an electronic application, Form DS–160, signed electronically by clicking the box designated "Sign Application" in the certification section of the application or, as directed by a consular officer, a completed Form DS–156, with any required supporting documents and biometric data, as well as the requisite processing fee or evidence of the prior payment of the processing fee when such documents are received and accepted for adjudication by the consular officer.

(2) For an immigrant visa applicant, personally appearing before a consular officer and verifying by oath or affirmation the statements contained on Form DS–230 or Form DS–260 and in all supporting documents, having previously submitted all forms and documents required in advance of the appearance and paid the visa application processing fee.

## 22 C.F.R. § 40.6

### § 40.6. Basis for refusal.

A visa can be refused only upon a ground specifically set out in the law or implementing regulations. The term "reason to believe", as used in INA 221(g), shall be considered to require a determination based upon facts or circumstances which would lead a reasonable person to conclude that the applicant is ineligible to receive a visa as provided in the INA and as implemented by the regulations. Consideration shall be given to any evidence submitted indicating that the ground for a prior refusal of a visa may no longer exist. The burden of proof is upon the applicant to establish eligibility to receive a visa under INA 212 or any other provision of law or regulation.

**22 C.F.R. § 41.102**

**§ 41.102. Personal appearance of applicant.**

**(a)** Except when the requirement of personal appearance has been waived pursuant to paragraph (b), (c), or (d) of this section, each applicant for a nonimmigrant visa who is at least 14 years of age and not more than 79 years of age must personally appear before and be interviewed by a consular officer, who shall determine on the basis of the applicant's representations, the visa application and other relevant documentation:

(1) The proper nonimmigrant classification, if any, of the alien; and

(2) The alien's eligibility to receive a visa.

**(b)** Waivers of personal appearance by consular officers.

Except as provided in paragraph (e) of this section or as otherwise instructed by the Deputy Assistant Secretary of State for Visa Services, a consular officer may waive the requirement of personal appearance if the consular officer concludes the alien presents no national security concerns requiring an interview and:

(1) Is within a class of [certain nonimmigrant classifications]; or

(2) Is an applicant for a diplomatic or official visa ...; or

(3) Is an applicant who is within 12 months of the expiration of the applicant's previously issued visa and:

...

(iii) Is an applicant for whom the consular officer has no indication of visa ineligibility or of noncompliance with U.S. immigration laws and regulations.

**(c)** Waivers of personal appearance in the national interest.

Except as provided in paragraph (e) of this section, the Secretary may waive the requirement of personal appearance of an individual applicant or a class of applicants if the Secretary determines that such waiver is in the national interest of the United States.

...

**(e)** Cases in which personal appearance may not be waived.

A21

Except for a nonimmigrant applicant whose personal appearance is waived under paragraphs (b)(1), (b)(2), or (c) of this section, the personal appearance requirement may not be waived for:

(1) Any nonimmigrant applicant who is not a national or resident of the country in which he or she is applying.

(2) Any nonimmigrant applicant who was previously refused a visa, is listed in CLASS, or otherwise requires a Security Advisory Opinion, unless:

(i) The visa was refused and the refusal was subsequently overcome; or

(ii) The alien was found inadmissible, but the inadmissibility was waived.

(3) Any nonimmigrant applicant who is from a country designated by the Secretary of State as a state sponsor of terrorism, regardless of age, or who is a member of a group or sector designated by the Secretary of State under section 222(h)(2)(F) of the Immigration and Nationality Act.

**22 C.F.R. § 41.103**

**§ 41.103. Filing an application.**

**(a) Filing an application—**

(1) *Filing of application required.* Every alien seeking a nonimmigrant visa must make an electronic application on Form DS–160 or, as directed by a consular officer, an application on Form DS–156. The Form DS–160 must be signed electronically by clicking the box designated "Sign Application" in the certification section of the application.

...

**(b) Application—**

(1) *Preparation of Electronic Nonimmigrant Visa Application (Form DS–160) or, alternatively, Form DS–156.* The consular officer shall ensure that the application is fully and properly completed in accordance with the applicable regulations and instructions.

(2) *Additional requirements and information as part of application.* Applicants who are required to appear for a personal interview must provide a biometric, which will serve to authenticate identity and additionally verify the accuracy and truthfulness of the statements in the application

A22

at the time of interview. The consular officer may require the submission of additional necessary information or question an alien on any relevant matter whenever the consular officer believes that the information provided in the application is inadequate to permit a determination of the alien's eligibility to receive a nonimmigrant visa. Additional statements made by the alien become a part of the visa application. All documents required by the consular officer under the authority of § 41.105(a) are considered papers submitted with the alien's application within the meaning of INA 221(g)(1).

## 22 C.F.R. § 41.121

### § 41.121. Refusal of nonimmigrant visas.

### (a) Grounds for refusal.

Nonimmigrant visa refusals must be based on legal grounds, such as one or more provisions of INA 212(a), INA 212(e), INA 214(b) or (f) or (l) (as added by Section 625 of Pub. L. 104–208), INA 221(g), INA 222(g), or other applicable law. Certain classes of nonimmigrant aliens are exempted from specific provisions of INA 212(a) under INA 102 and, upon a basis of reciprocity, under INA 212(d)(8). When a visa application has been properly completed and executed in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa, or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa.

### (b) Refusal procedure.

(1) When a consular officer knows or has reason to believe a visa applicant is ineligible and refuses the issuance of a visa, he or she must inform the alien of the ground(s) of ineligibility (unless disclosure is barred under INA 212(b)(2) or (3)) and whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal. The officer shall note the reason for the refusal on the application. Upon refusing the nonimmigrant visa, the consular officer shall retain the original of each document upon which the refusal was based, as well as each document indicating a possible ground of ineligibility, and should return all other supporting documents supplied by the applicant.

...

A23

## 22 C.F.R. § 42.62

### § 42.62. Personal appearance and interview of applicant.

**(a) Personal appearance of applicant before consular officer.**

Every alien applying for an immigrant visa, including an alien whose application is executed by another person pursuant to § 42.63(a)(2), shall be required to appear personally before a consular officer for the execution of the application or, if in Taiwan, before a designated officer of the American Institute in Taiwan, except that the personal appearance of any child under the age of 14 may be waived at the officer's discretion.

**(b) Interview by consular officer.**

(1) Every alien executing an immigrant visa application must be interviewed by a consular officer who shall determine on the basis of the applicant's representations and the visa application and other relevant documentation—

(i) The proper immigrant classification, if any, of the visa applicant, and

(ii) The applicant's eligibility to receive a visa.

(2) The officer has the authority to require that the alien answer any question deemed material to these determinations.

## 22 C.F.R. § 42.63

### § 42.63. Definitions.

**(a) Application forms** —

(1) *Application on Form DS–230 or Form DS–260 required.* Every alien applying for an immigrant visa must make application, as directed by the consular officer, on Form DS–230, Application for Immigrant Visa and Alien Registration, or on Form DS–260, Electronic Application for Immigrant Visa and Alien Registration. This requirement may not be waived. Form DS–230 consists of parts I and II which, together, are meant in any reference to this Form.

...

A24

**(b) Preparation of forms.**

The consular officer shall ensure that Form DS–230 or Form DS–260 and all other forms an alien is required to submit are fully and properly completed in accordance with the applicable regulations and instructions.

**(c) Additional information as part of application.**

The officer may require the submission of additional information or question the alien on any relevant matter whenever the officer believes that the information provided in Form DS–230 or Form DS–260 is inadequate to determine the alien's eligibility to receive an immigrant visa. Additional statements made by the alien become a part of the visa application. All documents required under the authority of § 42.62 are considered papers submitted with the alien's application within the meaning of INA 221(g)(1).

## 22 C.F.R. § 42.71

**§ 42.71. Authority to issue visas; visa fees.**

**(a) Authority to issue visas.**

Consular officers may issue immigrant visas at designated consular offices abroad pursuant to the authority contained in INA 101(a)(16), 221(a), and 224.

...

## 22 C.F.R. § 42.81

**§ 42.81. Procedure in refusing immigrant visas.**

**(a) Grounds for refusal.**

When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa.

**(b) Refusal procedure.**

A consular officer may not refuse an immigrant visa until either Form DS–230, Application for Immigrant Visa and Alien Registration, or Form DS–260, Electronic Application for Immigrant Visa and Alien Registration, has

been executed by the applicant. When an immigrant visa is refused, an appropriate record shall be made in duplicate on a form prescribed by the Department. The form shall be signed and dated by the consular officer. The consular officer shall inform the applicant of the provision of law or implementing regulation on which the refusal is based and of any statutory provision of law or implementing regulation under which administrative relief is available. Each document related to the refusal shall then be attached to Form DS–230 for retention in the refusal files. Alternatively, each document related to the refusal shall be electronically scanned and electronically attached to Form DS–260 for retention in the electronic refusal files. Any documents not related to the refusal shall be returned to the applicant. The original copy of a document that was scanned and attached to the DS–260 for the refusal file shall be returned to the applicant. If the ground of ineligibility may be overcome by the presentation of additional evidence and the applicant indicates an intention to submit such evidence, all documents may, with the consent of the alien, be retained in the consular files for a period not to exceed one year. If the refusal as not been overcome within one year, any documents not relating to the refusal shall be removed from the file and returned to the alien.

A26