NOT YET SCHEDULED FOR ORAL ARGUMENT

**No. 23-5232**

―――――――――――――――――――――

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

――――――――――

Doc Society and International Documentary Association,

*Plaintiffs–Appellants*,

v.

Antony J. Blinken, in his official capacity as Secretary of State, and
Alejandro N. Mayorkas, in his official capacity as Secretary of
Homeland Security,

*Defendants–Appellees.*

――――――――――

On appeal from the United States District Court for the
District of Columbia — No. 1:19-cv-03632 (Kelly, T.)

―――――――――――――――――――――

**REPLY BRIEF FOR PLAINTIFFS–APPELLANTS**

Carrie DeCell
Jameel Jaffer
Katherine Fallow
Anna Diakun
Hannah Vester
Knight First Amendment
   Institute at Columbia
   University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
carrie.decell@knightcolumbia.org

Joshua Polster
Evan Gilbert
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
joshua.polster@stblaw.com

*Counsel for Plaintiffs–Appellants*
*(Additional counsel on next page)*

Faiza Patel
Emile Ayoub
Brennan Center for Justice
 at NYU School of Law
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
patelf@brennan.law.nyu.edu

Rachel Levinson-Waldman
 Brennan Center for Justice
 at NYU School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
Washington, D.C. 20036
(202) 249-7190
levinsonr@brennan.law.nyu.edu

*Counsel for Plaintiffs–Appellants*

# Table of Contents

Table of Authorities ................................................................. iii

Glossary................................................................................ vii

Introduction and Summary of Argument....................................1

Pertinent Statutes..................................................................2

Argument...............................................................................3

    I.     The district court correctly concluded that Plaintiffs have standing..........3

          A.     The district court correctly concluded that Plaintiffs have organizational standing. ................................................3

               1.     Plaintiffs allege cognizable organizational injuries..............3

               2.     Plaintiffs' injuries are traceable to the Disclosure Requirement and redressable by the relief they seek. ..........7

          B.     Plaintiff IDA also has associational standing. ................................9

    II.     The Disclosure Requirement and related retention and dissemination policies are subject to review under the APA..................14

          A.     The Disclosure Requirement is not committed to agency discretion by law. ........................................................14

          B.     Plaintiffs' claims fall within the INA's zone of interests. .............17

          C.     Plaintiffs adequately allege that the Disclosure Requirement violates the APA. ......................................................20

    III.    The Disclosure Requirement and related retention and dissemination policies are subject to heightened scrutiny under the First Amendment. .....................................................21

          A.     The *Mandel–Hawaii* line of cases does not apply here. ................22

      B.     This Court should not extend the *Mandel–Hawaii* line of cases here ...........................................................................25

Conclusion ...........................................................................................27

Certificate of Compliance ..................................................................29

Certificate of Service ........................................................................30

# Table of Authorities

## Cases

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) ................................................................. 13, 19, 27

*ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015) .....................................17

*Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986) .......................................................4, 5

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586 (D.C. Cir. 2022) ................................... 9, 10, 11

*Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615 (D.C. Cir. 2020) ................................................................5

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ...............................................................21

*Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) ......... 7, 10, 13, 22, 23

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ...........................3

*Barker v. Conroy*, 921 F.3d 1118 (D.C. Cir. 2019) ...................................3

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ....................................20

*Competitive Enter. Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020) ............................8

*Cook Cnty., Ill. v. Wolf*, 461 F. Supp. 3d 779 (N.D. Ill. 2020) ...............................25

*CSL Plasma Inc. v. CBP*, 33 F.4th 584 (D.C. Cir. 2022) .................... 17, 18, 19, 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................................................................16

*Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) ................................27

*Detroit Int'l Bridge Co. v. Gov't of Can.*, 883 F.3d 895 (D.C. Cir. 2018) ................................................................16

iii

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37 (D.C. Cir. 2000) ...............................................16

*Electronic Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371 (D.C. Cir. 2017) ...............................................6

*Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) ...................................................................................................19

*Fiallo v. Bell*, 430 U.S. 787 (1977)................................................ 23, 24, 25

*Friends of Animals v. Bernhardt*, 961 F.3d 1197 (D.C. Cir. 2020).........................5

*Genuine Parts Co. v. EPA*, 890 F.3d 304 (D.C. Cir. 2018)....................................21

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020)....................................................21

*GTE Serv. Corp. v. FCC*, 205 F.3d 416 (D.C. Cir. 2000) .......................................20

*Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987).........................8, 19

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)...................................... 20, 26

*Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499 (D.C. Cir. 1988) .........................................................................................................10

*Indian River Cnty. v. Dep't of Transp.*, 945 F.3d 515 (D.C. Cir. 2019).................17

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ............................................... 2, 13, 23

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965).............................................7, 13

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...........................................................................................................5

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349 (D.C. Cir. 1997)..........................................................................15

*Lepelletier v. FDIC*, 164 F.3d 37 (D.C. Cir. 1999) ...............................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)..................................................................................................17

iv

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)......................................................................19

*Narenji v. Civiletti*, 617 F.2d 745 (D.C. Cir. 1979)................................26

*Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400 (D.C. Cir.
    1990) ..........................................................................................16

*Nat'l Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000)........................14

*Pennell v. City of San Jose*, 485 U.S. 1 (1988)......................................14

*People for the Ethical Treatment of Animals v. Dep't of Agric.*, 797 F.3d
    1087 (D.C. Cir. 2015) ...............................................................4, 5

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008)....................................25

*Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*, 489 F.3d
    1267 (D.C. Cir. 2007) ...................................................................7

*Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007) ................14

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947
    (1984)........................................................................................14

*Singleton v. Wulff*, 428 U.S. 106 (1976) ...............................................11

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ...............................3, 7

*Trump v. Hawaii*, 585 U.S. 667 (2018) .......................... 2, 23, 24, 25, 26

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517
    U.S. 544 (1996)..........................................................................14

*Ziglar v. Abbasi*, 582 U.S. 120 (2017)..................................................26

**Statutes**

8 U.S.C. § 1101 ....................................................................................18

8 U.S.C. § 1202 ....................................................................................20

**Other Authorities**

Charlie Savage, *Visa Applicants' Social Media Data Doesn't Help Screen for Terrorism, Documents Show*, N.Y. Times (Oct. 5, 2023), https://perma.cc/4MAG-HDKS .........................................................................26

H.R. Rep. No. 82-1365 (1952)...............................................................................18

U.S. Dep't of State, Bureau of Consular Affs., *Fees for Visa Services*, Travel.State.Gov, https://perma.cc/9MCS-GEZV (last visited Apr. 15, 2024) .............................................................................................................27

**Glossary**

Pursuant to D.C. Circuit Rule 28(a)(3), the following is a glossary of abbreviations and acronyms used in this brief.

| | |
|---|---|
| APA | Administrative Procedure Act |
| IDA | International Documentary Association |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix |

## Introduction and Summary of Argument

The Government's core argument relies on a flawed premise: that all aspects of immigration policy are subject to—at most—deferential judicial review. Neither this Court nor the Supreme Court has ever adopted such an unbounded theory of judicial deference to Executive action in the immigration context. Instead, the Supreme Court has only held that such deference is appropriate on review of substantive decisions to exclude certain individuals, or categories of individuals, from this country. The Government fails to justify the extension of that deference beyond that narrow context. The Government similarly fails to justify the dismissal of this case for lack of standing or failure to state statutory claims.

*First*, Plaintiffs have standing to challenge the Disclosure Requirement and related retention and dissemination policies. As the district court concluded, Plaintiffs have organizational standing because the Disclosure Requirement is causing them informational and other injuries. Plaintiff International Documentary Association ("IDA") also has associational standing because the Disclosure Requirement burdens its members' First Amendment rights.

*Second*, the Disclosure Requirement is reviewable under the Administrative Procedure Act ("APA"). The generalized security and diplomatic concerns cited by the Government do not foreclose judicial review of agency action where, as here, Congress has clearly limited agency discretion. And the zone of interests test does

1

not foreclose review because Plaintiffs' claims relate to Congress's stated interests in creating various visa classifications. Further, Plaintiffs adequately allege that the Disclosure Requirement is arbitrary and capricious and exceeds statutory authority because the Secretary of State offered no evidence that it is effective, let alone necessary, in serving the Government's interests.

*Third*, the Disclosure Requirement is subject to heightened scrutiny under the First Amendment—not deferential review. The Government's reliance on *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and *Trump v. Hawaii*, 585 U.S. 667 (2018), is misplaced because those cases addressed substantive exclusion decisions. Here, in contrast, the Secretary adopted a procedural requirement applicable to nearly all visa applicants regardless of their substantive admissibility to the country. The *Mandel–Hawaii* line of cases therefore does not apply. And the Government does not argue the Disclosure Requirement can survive heightened scrutiny, because it plainly does not.

Plaintiffs respectfully submit that this Court should reverse the district court's decision and remand the case for further proceedings.

## Pertinent Statutes

The pertinent statutes are set forth in the Addendum to this brief.

2

## Argument

## I.     The district court correctly concluded that Plaintiffs have standing.

The Government's argument that Plaintiffs lack standing to challenge the Disclosure Requirement and related retention and dissemination policies is unfounded. The district court correctly concluded that Plaintiffs have organizational standing. JA341–49. Although the district court did not reach the question, JA342, Plaintiff IDA also has associational standing.

To establish standing, a plaintiff must show that they suffered an injury in fact that (i) "is concrete, particularized, and actual or imminent"; (ii) was "likely caused by the defendant"; and (iii) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For purposes of the standing inquiry," the Court assumes that Plaintiffs "would succeed on the merits of [their] claim[s]." *Barker v. Conroy*, 921 F.3d 1118, 1124 (D.C. Cir. 2019). And at the pleading stage, Plaintiffs "are required only to 'state a *plausible* claim' that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (citation omitted). Plaintiffs have cleared this "low bar." *Id.* at 622.

### A.     The district court correctly concluded that Plaintiffs have organizational standing.

#### 1.  Plaintiffs allege cognizable organizational injuries.

As the district court found, Plaintiffs have organizational standing to challenge the Disclosure Requirement and related retention and dissemination

3

policies. In challenges to agency action, this Court asks "first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *People for the Ethical Treatment of Animals v. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1094 (D.C. Cir. 2015) (cleaned up). "The key issue is whether [the organization] has suffered a concrete and demonstrable injury to its activities," rather than "a mere setback to [its] abstract social interests." *Id.* at 1093 (cleaned up).

The district court correctly concluded that Plaintiffs adequately allege "informational" injuries sufficient for standing. JA341–49. Organizations have standing where "the challenged regulations deny [them] access to information . . . they wish to use in their routine information-dispensing, counseling, and referral activities," "inhibit[ing] their daily operations." *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986). Here, the Disclosure Requirement deters Plaintiffs' members and partners from sharing the information they once did on social media, JA031–32 (Compl. ¶¶ 54–55), which impedes Plaintiffs' efforts to gather and disseminate that information online, JA037–38 (Compl. ¶¶ 66–68); *see* JA028–29, JA037–38 (Compl. ¶¶ 46–48, 50, 67–68) (explaining how Plaintiffs relied on information their members and partners previously shared on social media). As a result, the Disclosure Requirement forces Plaintiffs "to divert time, staff resources, and funding to find and engage with

members and partners who are now reluctant to speak publicly on social media . . .; to support and promote the work of their members and partners; and to recruit new members, partners, and projects." JA042 (Compl. ¶ 75); *see* JA013–14, JA039–42 (Compl. ¶¶ 6–7, 71–72, 76). Plaintiffs thus adequately allege injuries "concrete and specific to the work in which they are engaged," which are therefore "cognizable injur[ies] sufficient to support standing." *PETA*, 797 F.3d at 1095 (cleaned up); *see Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1208 (D.C. Cir. 2020) (concluding that alleged injuries to organizational interest in educating the public sufficed for standing at pleading stage); *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *Action All.*, 789 F.2d at 937–38.

The Government asserts that such "'informational' harms are not cognizable absent a statutory right to the desired information," Gov't Br. 19; *see id.* at 21, but this is incorrect. A statutory right to such information may be sufficient, but is not necessary, to make out an informational injury. As the district court explained, this Court has repeatedly held that "the inability to use recurrent information for an organization's 'services,' 'daily operations,' or 'activities' can perceptibly impair those activities," JA343—including where no statutory right to that information existed. *See* JA344 & n.2; *Friends of Animals*, 961 F.3d at 1208; *Am. Anti-Vivisection Soc'y v. Dep't of Agric.* ("*AAVS*"), 946 F.3d 615, 618–19 (D.C. Cir. 2020); *PETA*, 797 F.3d at 1095.

5

The Government relies almost exclusively on *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity* ("*EPIC*"), 878 F.3d 371 (D.C. Cir. 2017); *see* Gov't Br. 20–21, which has no application here. *EPIC* addressed only the criteria for establishing standing based on informational injuries resulting from the alleged violation of a statutory right to information. *EPIC*, 878 F.3d at 378–79 (rejecting EPIC's ability to establish standing *solely* based on "defendants' failure to produce a privacy impact assessment" because the relevant statute did "not confer any such informational interest on EPIC"). Because *EPIC* neither limited standing based on informational injuries to plaintiffs who invoke a statutory right to information, nor set out criteria for establishing standing based on informational injuries where plaintiffs do not invoke such a right, it does not control this case.

Moreover, Plaintiffs allege more than "informational" injuries. They also assert constitutional injuries to their organizational interests—which provide independent grounds for organizational standing. Specifically, they allege burdens on their First Amendment rights to associate with, and receive information from,[1]

---

[1] The district court rejected Plaintiffs' First Amendment "listeners' rights" claim, faulting Plaintiffs for failing to identify "willing speakers" with sufficient specificity. JA358. But, as noted below, *infra* pp.9–12, Plaintiffs did sufficiently identify foreign members who would be willing to engage with U.S. members online or in person but for the Disclosure Requirement. *See* Pls.' Br. 29.

their foreign members and partners who, but for the Disclosure Requirement, would engage with them on social media or in person at Plaintiffs' U.S.-based events. *See* Pls.' Br. 28–29; *Ams. for Prosperity Found. v. Bonta* ("*AFPF*"), 141 S. Ct. 2373, 2389 (2021) (holding that the "risk of a chilling effect on association" created by mandatory disclosure requirement constitutes a First Amendment injury sufficient for standing, even when chill is suffered in first instance by third parties); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 306–07 (1965) (recognizing First Amendment interest in receiving information from abroad); *see also TransUnion*, 594 U.S. at 425 ("[T]raditional harms may also include harms specified by the Constitution itself[,]" including "abridgment of speech.").

## 2.  Plaintiffs' injuries are traceable to the Disclosure Requirement and redressable by the relief they seek.

The district court correctly concluded that "Plaintiffs' allegations show plausible traceability and redressability." JA348; *see* JA347–49. A plaintiff meets these requirements at the pleading stage where their allegations are "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n v. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).

As the district court recognized, Plaintiffs' complaint explains that their foreign members and partners previously used social media to share information with Plaintiffs and each other, and that those members and partners now refrain from

sharing that information on social media *because of* the Disclosure Requirement. JA348. These allegations are not "hypothetical." *Contra* Gov't Br. 23. As the district court noted, Plaintiffs rely "on the explicit reasoning of the relevant third parties," JA348, specifying in numerous instances the direct impact of the Disclosure Requirement on the willingness of Plaintiffs' members and partners to share on social media information on which Plaintiffs rely. *See* JA031–32, JA037–39 (Compl. ¶¶ 54–56, 67–68). Because "[t]he most logical inference from those allegations, accepted as true, is that the order Plaintiffs request would restore the information on which they rely," JA348, Plaintiffs satisfy the traceability and redressability requirements for standing. *See, e.g.*, *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 387 (D.C. Cir. 2020).

The Government's last effort to undermine Plaintiffs' standing relies exclusively on *Haitian Refugee Center v. Gracey* ("*HRC*"), the cited portion of which is non-controlling and has, to Plaintiffs' knowledge, never been relied on by this Court since. 809 F.2d 794, 796 n.1 (D.C. Cir. 1987) (stating that only Parts III.A.2 and IV "are the opinion of the court," thus excluding Part III.B, on which the Government relies, *see* Gov't Br. 24–26). As Judges Buckley and Edwards noted separately, Judge Bork's "purposeful interference" requirement departed from then-existing Supreme Court precedent. *HRC*, 809 F.2d at 801; *see id.* at 816 (Buckley, J., concurring); *id.* at 826–27 (Edwards, J., concurring in part and dissenting in part).

In any event, subsequent precedent makes clear that "purposeful interference" is not required for Plaintiffs to satisfy the traceability and redressability requirements here. *See* cases cited *supra* p.5.

      **B.**     **Plaintiff IDA also has associational standing.**

Though the district court did not reach the issue, JA342, IDA also has associational standing. An association has standing to sue on behalf of its members if "(1) at least one of its members would have standing to sue in [their] own right; (2) the interest [the association] seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.* ("*AHAS*"), 41 F.4th 586, 592 (D.C. Cir. 2022) (citation omitted). IDA satisfies this standard with respect to two categories of its members, who suffer ongoing injuries to their First Amendment–protected interests as a direct result of the Disclosure Requirement.

*First*, some of IDA's foreign members suffer present injuries due to the Disclosure Requirement because the certainty that they will have to apply for visas in the future compels them to curtail their speech now. *See* JA010, JA018, JA027 (Compl. ¶¶ 1, 23, 43). Because the Requirement is mandatory, foreign members "know that their speech and associations will be subject to review in connection with their visa applications and potentially to ongoing monitoring by the U.S.

9

government." JA031 (Compl. ¶ 54). As a result, many "now refrain from expressing themselves and engaging with others on social media as freely as they once did," *id.*; indeed, some "have deleted past posts, altered or limited their speech, or entirely dropped out of certain groups on social media," JA031 (Compl. ¶ 55). As the district court recognized, those "chilling effect[s] materialize[], in some cases, long before a noncitizen must apply for a visa, including while he lives in the United States and remains protected by the Constitution." JA364. Plaintiffs' complaint specifically describes one foreign member in the U.S. Midwest who, "[b]ecause of the [Disclosure] Requirement . . . reviewed three years of social media activity and deleted posts criticizing the [then] current U.S. administration in order to avoid any delays on future visa applications." JA031 (Compl. ¶ 55). Those chilling effects amount to a cognizable First Amendment injury, as the district court concluded in its First Amendment analysis. *See* JA364; *AFPF*, 141 S. Ct. at 2389.

The Government faults Plaintiffs for not naming that IDA member or stating their nationality, immigration status, visa eligibility, or visa application plans. Gov't Br. 27. But Plaintiffs' complaint need not identify any specific IDA member by name to establish standing. *See AHAS*, 41 F.4th at 594 ("[A]nonymity is no barrier to standing."); *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) (opinion of Mikva, J.) ("Naming those members adds no essential

10

information bearing on the injury component of standing.").[2] And the complaint makes clear that the IDA member is a noncitizen residing in the United States who plans to apply for another visa and, knowing they will be subject to the Disclosure Requirement, therefore feels obliged to curtail their speech now. *See* JA031 (Compl. ¶ 55). IDA has thus "adequately demonstrated associational standing because it has shown that at least one of its members is directly regulated by the rule and has been injured by it." *AHAS*, 41 F.4th at 592.

*Second*, IDA's U.S. members suffer present injuries as a result of the Disclosure Requirement because it deprives them of opportunities to hear from and engage with IDA's foreign members online and in person. IDA's U.S. members "rely on social media to learn about new projects from filmmakers working around the world and to engage with [foreign] members . . . about their work." JA029 (Compl. ¶ 49); *see* JA039 (Compl. ¶ 69). "In turn," foreign members "engage on social media in a near-constant, cross-platform exchange of views and information." JA029 (Compl. ¶ 50). Because of the Disclosure Requirement, however, many

---

[2] Requiring Plaintiffs to name affected members would be particularly inappropriate here. As Plaintiffs explained, their members and partners "cannot realistically challenge the [Disclosure Requirement] themselves," because doing so "would require them to draw the [G]overnment's attention to their expressive and associational activities—that is, to surrender the very anonymity or obscurity they seek to protect." JA037 (Compl. ¶ 64); *cf. Singleton v. Wulff*, 428 U.S. 106, 117–18 (1976).

foreign members "now refrain from expressing themselves and engaging with others on social media as freely as they once did." JA031 (Compl. ¶ 54); *see, e.g.*, JA032 (Compl. ¶ 55) (identifying one member who deleted certain political posts because of the Disclosure Requirement). As a result, IDA's U.S. members no longer enjoy the benefit of their online interactions with foreign members to the extent they previously did. JA039 (Compl. ¶ 69).

The Disclosure Requirement also deprives IDA's U.S. members of opportunities to hear from foreign members at IDA's U.S.-based events. JA041 (Compl. ¶ 73). Many U.S. members "attend these events to view films from around the world and to hear from and respond to the creators and subjects themselves." *Id.*; *see* JA028 (Compl. ¶ 45). Because of the Disclosure Requirement, however, some foreign members "are no longer applying for U.S. visas . . . because they do not want to disclose their social media identifiers to [the Government] and fear the consequences of doing so." JA032 (Compl. ¶ 56). For example, "[o]ne IDA member is less willing to participate in screenings and 'Question & Answer' sessions because his comments may be mischaracterized by others, shared on social media, and then read by the government." JA033–34 (Compl. ¶ 58); *see also* JA032, JA041 (Compl. ¶¶ 56, 73) (identifying two other members who have decided not to apply for visas because of the Disclosure Requirement, despite previous work experience and

12

partnerships in the United States). Therefore, U.S. members "no longer have as many opportunities to engage with [foreign members] in person." JA041 (Compl. ¶ 73).

These harms are neither "informational injuries," as the Government suggests, nor speculative. *See* Gov't Br. 28–29; *see also supra* pp.4–7. Rather, they are burdens on IDA's U.S. members' First Amendment rights to hear from and associate with IDA's foreign members, which constitute concrete, particular, and present injuries for purposes of standing. *See AFPF*, 141 S. Ct. at 2389; *Mandel*, 408 U.S. at 764–65 (recognizing U.S. citizen's First Amendment interest in having a noncitizen enter the United States "to hear him explain and seek to defend his views"); *Lamont*, 381 U.S. at 306–07 (recognizing First Amendment interest in receiving information from abroad); *Abourezk v. Reagan*, 785 F.2d 1043, 1050–51 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).[3]

IDA also meets the final two requirements for associational standing, which the Government does not dispute. The interests of both categories of members described above are plainly germane to IDA's purpose—"to support a global community of documentary filmmakers in order to foster a more informed, compassionate, and connected world" by "fund[ing] films and filmmakers and host[ing] dozens of screenings, conferences, workshops, and other events

---

[3] As noted above, *supra* p.6 n.1, these allegations suffice to state a First Amendment "listeners' rights" claim. *See* Pls.' Br. 29.

throughout the United States each year." JA026 (Compl. ¶ 41); *see Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (explaining that the germaneness requirement is "undemanding," requiring "mere pertinence between litigation subject and organizational purpose" (citation omitted)). And neither the claims asserted nor the relief requested requires IDA's members to participate in this lawsuit. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc*., 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members."); *Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988) (holding facial challenge did not require individual members' participation).[4]

## II.    The Disclosure Requirement and related retention and dissemination policies are subject to review under the APA.

### A.    The Disclosure Requirement is not committed to agency discretion by law.

Judicial review of the Disclosure Requirement under the APA is not foreclosed absent "'clear and convincing evidence of a legislative intention' to bar such review." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 601 (D.C. Cir. 2007) (citation omitted). Here, the Government does not argue that Congress intended to

---

[4] IDA also meets the requirements for third-party standing, which the Government does not dispute. *See Lepelletier v. FDIC*, 164 F.3d 37, 43 (D.C. Cir. 1999) (stating prudential requirements); *see also Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984) (relaxing application of prudential requirements in First Amendment cases).

bar review. Nor could it: the text and structure of the statute, as well as the agency action at issue, all favor judicial review. *See* Pls.' Br. 15–22. As the district court recognized—and as the Government does not dispute—"the word 'necessary' limits the Secretary's discretion." JA353.

The Government argues that APA review of the Disclosure Requirement is nonetheless unavailable because it implicates generalized "security, diplomatic, and immigration concerns." Gov't Br. 31. Yet the Government cites no case where these concerns barred judicial review of agency action despite statutory limits on agency discretion. In *Legal Assistance for Vietnamese Asylum Seekers v. Department of State* ("*LAVAS*"), 104 F.3d 1349, 1353 (D.C. Cir. 1997), on which the Government principally relies, Gov't Br. at 31–32, Congress had "place[d] no limitations" on the Secretary's authority to determine the location of consular offices. JA532; *LAVAS*, 104 F.3d at 1351, 1353 (holding the consular venue policy was "left entirely to the discretion of the Secretary"). Pursuant to that authority, the Secretary adopted a policy to process certain visa applications in Vietnam, instead of Hong Kong, based on objections from other nations. These unique "security and diplomacy" concerns, coupled with a "congressional grant of discretion as broadly worded as any we are likely to see," rendered the policy unreviewable. *LAVAS*, 104 F.3d at 1353.

The three other cases on which the Government relies are inapposite for the same reason—they each involved statutory language that did not limit agency

15

discretion. In two of those cases, Congress authorized the Executive to approve discrete actions, without any substantive standards limiting its authority. *See Detroit Int'l Bridge Co. v. Gov't of Can.*, 883 F.3d 895, 903 n.3 (D.C. Cir. 2018) (noting that, under the International Bridge Act, no international bridge could be built "unless the President has given his approval thereto"); *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 39 (D.C. Cir. 2000) (noting that, under the Shipping Act, no vessel registry could be transferred "without the approval of the Secretary"). And in the third, the plaintiffs challenged the closure of military bases that Congress had expressly directed to be closed. *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 403 (D.C. Cir. 1990).[5]

Although the Government concedes that "immigration" and "national security" concerns do not render an action "*per se* unreviewable," it relies exclusively on these generalized concerns in arguing for judicial abdication here. Gov't Br. 36. But these concerns did not bar review of the Executive's immigration enforcement policy as to childhood arrivals. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020). Nor did they bar review of the National Security Agency's collection of information to combat terrorism. *ACLU v.*

---

[5] Further, none of these cases involved notice-and-comment rulemaking. *See* Pls.' Br. 21, n.5. The Government does not respond to this argument.

*Clapper*, 785 F.3d 787, 808–09 (2d Cir. 2015). Likewise, these concerns do not rebut the "strong presumption" of APA review here. *Id.* at 809.[6]

### B.    Plaintiffs' claims fall within the INA's zone of interests.

The Government's argument that Plaintiffs' organizational claims fall outside the INA's zone of interests is without merit. The zone of interests test is "lenient," and "the benefit of any doubt goes to the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (cleaned up). Plaintiffs satisfy this test if their injury "bears a 'plausible relationship to the policies' underlying" the relevant statute. *CSL Plasma Inc. v. CBP*, 33 F.4th 584, 593 (D.C. Cir. 2022) (citation omitted); *see also Indian River Cnty. v. Dep't of Transp.*, 945 F.3d 515, 530 (D.C. Cir. 2019) (considering "context and purpose" of relevant statutory provisions).

Here, Plaintiffs' claims fall within the INA's zone of interests. Plaintiffs challenge the Disclosure Requirement because it deters some of their members and partners from applying for classes of visas that Congress intended people like Plaintiffs' members and partners to apply for, and because it chills the online speech of other foreign members and partners who do apply for those visas. Congress created classes of non-immigrant visas for individuals who work in "foreign press,

---

[6] In any event, review of the Secretary's process in promulgating the Disclosure Requirement would not intrude into these generalized foreign policy and national security concerns. *See* Pls.' Br. 21.

radio, film, or other foreign information media," 8 U.S.C. § 1101(a)(15)(I)), for artists, *id.* § 1101(a)(15)(O)(i) (including those involved in "motion picture and television productions"), and for participants in educational and cultural exchanges, *id.* § 1101(a)(15)(J)). These classifications affirmatively protect interests in cross-border informational, cultural, and research exchange. *See* H.R. Rep. No. 82-1365, at 45 (1952) (explaining that Congress established the foreign information media class to "facilitate the . . . exchange of information among nations"). But "excessively strict" visa-application requirements that deter would-be visa applicants—as alleged here, JA032 (Compl. ¶ 56)—"undermine the congressional policy of permitting [] border crossings to facilitate" informational and cultural exchange. *CSL Plasma Inc.*, 33 F.4th at 590 (holding B-1 visa classification "promotes . . . business interests" because Congress "presumably" intended those visa holders to "benefit the people and companies that do business with them").

Plaintiffs' complaint details how their work "depend[s] on the willingness and ability of non-U.S. members and partners to travel" to the United States and participate in Plaintiffs' U.S.-based programming. JA025–28 (Compl. ¶¶ 40–45). For example, "a number of [Plaintiffs'] members and partners intend or intended to apply for O-1 visas as artists of extraordinary ability or for I visas as representatives of the foreign media." JA027 (Compl. ¶ 42); JA031, JA032 (Compl. ¶¶ 55, 57). By chilling the online speech of these members and partners, *see supra* pp.9–12, and by

18

deterring others from applying for visas to participate in Plaintiffs' events, *see supra* p.12, the Disclosure Requirement impairs Plaintiffs' efforts to promote cross-border cultural exchange. Thus, Plaintiffs' interests are "such that they in practice can be expected to police the interests that the statute protects." *CSL Plasma Inc*., 33 F.4th at 590 (cleaned up); *see also Abourezk*, 785 F.2d at 1047, 1050–51 (holding organizations that invited foreign nationals to attend meetings or address audiences in the United States were within the INA's zone of interests); *cf. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 227 (2012) (holding decisions under land acquisition statute were "closely enough and often enough entwined" with land use considerations as "to make that difference immaterial" for the zone of interests analysis).

Relying on *HRC*, 809 F.2d at 812–816, and *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), the Government argues that the visa classifications cited above do not "evince[] congressional intent to protect" Plaintiffs' interests. Gov't Br. 38–39. But neither the Supreme Court nor this Court requires any "indication of congressional purpose to benefit the would-be plaintiff." *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225 (cleaned up); *see CSL Plasma Inc.*, 33 F.4th at 589.[7] And this Court recently confirmed that the zone of

---

[7] *HRC* relied on precedent expressly overturned by the Supreme Court. *Compare* 809 F.2d at 813–814 (suggesting *Control Data Corp. v. Baldrige*, 655 F.2d 283 (D.C. Cir. 1981), "prescribes" the proper zone of interests analysis), *with Clarke v.*

interests advanced by visa classifications includes the interests of those, like Plaintiffs, who "depend heavily" on the impacted visa applicants, *CSL Plasma Inc.*, 33 F.4th at 590—in addition to the interests of the applicants themselves.[8]

### C. Plaintiffs adequately allege that the Disclosure Requirement violates the APA.

Plaintiffs adequately allege that the Secretary failed to justify the Disclosure Requirement under the APA. Pls.' Br. 43–46. Contrary to the Government's contention, the Secretary's speculation about how information collected through the Requirement "may be used" to evaluate a specific visa application, Gov't Br. 41–42, does not establish that dragnet collection of this information is actually useful, let alone necessary.[9] *See, e.g.*, *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422 (D.C. Cir. 2000) (rejecting agency interpretation of "necessary" as "used or useful").

---

*Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.15 (1987) (holding *Control Data Corp.* is "inconsistent with our understanding of the 'zone of interest' test").

[8] The Government appears to concede that, if IDA has associational standing, *see supra* pp. 9–14, its members who are subject to the Disclosure Requirement plainly fall within the zone of interests protected by 8 U.S.C. § 1202(a), (c). *See* Gov't Br. 37.

[9] The Government argues that it need not provide "concrete evidence" for national security–related rules. Gov't Br. 41. But Plaintiffs do not challenge the lack of "concrete evidence," they challenge the lack of any evidence at all. Indeed, even in the case on which the Government relies, the Court concluded that Congress's judgment was supported by "persuasive evidence." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 36 (2010).

The Government argues that, in response to hundreds of comments challenging the fundamental premise of the Disclosure Requirement, *see* Pls.' Br. 43–45, it was enough for the Secretary to state that he was "aware of" the issues and that social media screening capabilities will "evolve." Gov't Br. 42–43. But this Court has repeatedly held that an agency cannot "brush[] aside critical facts," *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017); "minimize [contrary] evidence without adequate explanation," *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); or dismiss "concerns in a handful of conclusory sentences," *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). Because Plaintiffs adequately allege that the Government did just that, *see* Pls.' Br. 42–45, their complaint states a claim under the APA.

## III. The Disclosure Requirement and related retention and dissemination policies are subject to heightened scrutiny under the First Amendment.

The Government does not contest the district court's conclusion that Plaintiffs adequately allege violations of core First Amendment rights.[10] Because this case

---

[10] The Government confusingly asserts that "Plaintiffs dispute the district court's conclusion (JA357–364) that they had failed to identify a cognizable First Amendment interest on the merits." Gov't Br. 53 (citing Pls.' Br. 26–30). To clarify, the district court found that Plaintiffs had identified a cognizable First Amendment interest—their foreign members and partners living in the United States are chilled by the Disclosure Requirement. JA361–62; JA364. (This is why the district court proceeded to address the applicable standard of review under the First Amendment. JA364–69.) Plaintiffs dispute the court's separate conclusion that neither Plaintiffs nor their U.S. members and partners have a cognizable First Amendment interest in

does not fall within the narrow category of cases that receive deferential review under *Mandel* and *Hawaii*, "exacting scrutiny" applies. *See AFPF*, 141 S. Ct. at 2383 (citation omitted); Pls.' Br. 26–30.[11] The Government's argument to the contrary is largely rhetorical. It fails to engage with the substance of Plaintiffs' arguments and misapprehends the relevant precedent.

### A.    The *Mandel–Hawaii* line of cases does not apply here.

The Government fails to justify the application of deferential review under *Mandel* outside the narrow context of exclusion decisions.[12] The Government now asserts that *Hawaii* offers a distinct standard of review that applies more broadly. Gov't Br. 48; *see id.* at 49–50, 55–56. It does not. Regardless, *Hawaii* does not control this case.

The Government fails to explain why the deferential *Mandel* standard should apply outside the narrow context of exclusion decisions to cases—like this one—

---

hearing from foreign members and partners outside the United States. JA359; Pls.' Br. 28–29.

[11] As Plaintiffs argued in their opening brief, the Disclosure Requirement fails under exacting scrutiny. *See* Pls.' Br. 46–49; *AFPF*, 141 S. Ct. at 2383. The Government appears to concede as much, making no arguments to the contrary. *See* Gov't Br. 51–53.

[12] Contrary to the Government's suggestion, Gov't Br. 54, Plaintiffs also argued the limited applicability of *Mandel* and *Hawaii* below, *see* ECF No. 32, at 35 (explaining that *Mandel* and *Hawaii* concerned challenges to an "individual visa denial" and a "categorical visa denial," respectively, and "this case does not squarely implicate . . . the doctrine of consular nonreviewability").

that do not involve substantive judgments about "who shall be admitted." *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *see also* Pls.' Br. 36–47. Instead, it argues that Plaintiffs' listeners' rights claim is "weaker" than the claim in *Mandel* because *Mandel* "involved a statute that discriminated on viewpoint and an actual exclusion of a noncitizen." Gov't Br. 49. That *Mandel* addressed the exclusion of a noncitizen only underscores its inapplicability here. *See* Pls.' Br. 31–37. Unlike *Mandel*'s individual exclusion decision, the Disclosure Requirement "'broadly stifle[s]' First Amendment freedoms," *AFPF*, 141 S. Ct. at 2385 (citation omitted), burdening "the online speech and associations of millions" and "chilling visa applicants' speech and associations long before and long after they have been admitted to the country," Pls.' Br. 49; *see also* JA361–62, 364. The Government's reference to viewpoint discrimination also misses the mark. Gov't Br. 47, 49. The *Mandel* Court did not address the constitutionality of the viewpoint discriminatory statute, but rather the denial of a waiver from the statute's application. *Mandel*, 408 U.S. at 770.

The Government now asserts that *Hawaii* offers a standard of review distinct from *Mandel* that applies beyond challenges to exclusion decisions. Gov't Br. 48; *see id.* at 49–50, 55–56. It does not. Indeed, in *Hawaii* the Government argued that the case was "governed by *Mandel*"—which the Supreme Court had "recently described as providing for 'minimal scrutiny (rational-basis review),'" Pet. Br. 58, *Trump v. Hawaii*, 585 U.S. 667 (citation omitted)—because *Hawaii*, like *Mandel*,

concerned the President's exercise of his "sweeping" statutory authority "to exclude" noncitizens abroad, *id.* at 44 (citation omitted). *See also* Pet. Br. 61; Tr. of Oral Arg. 16:25–17:1; *Hawaii*, 585 U.S. at 667. The *Hawaii* Court accepted the Government's argument that *Mandel* governed the "categorical" exclusion decision at issue and accordingly conducted rational basis review. 585 U.S. at 703–04; *see id.* at 699 (describing plaintiffs' challenge to "the exclusion of their relatives").[13]

*Hawaii*, therefore, reinforces *Mandel*'s narrow applicability in challenges to exclusion decisions. The Government rejoins that in *Fiallo v. Bell*, 430 U.S. 787, the challenged statute merely gave "immigration preferences" to certain categories of noncitizens and therefore did not involve a substantive exclusion decision. Gov't Br. 56 (citation omitted). But in *Hawaii*, both the Government and the Supreme Court rightly characterized *Fiallo* as addressing a "'categorical' entry classification." *Hawaii*, 585 U.S. at 703 (citation omitted); *see* Pet. Br. 59, *Hawaii*, 585 U.S. 667 (characterizing *Fiallo* as involving "legislative determinations regarding admissibility of classes of [noncitizens]"). Indeed, the *Fiallo* plaintiffs were noncitizens who had been told they were "ineligible for an immigrant visa." *Fiallo*,

---

[13] The Government writes that the Supreme Court reached its constitutional conclusions "notwithstanding consular nonreviewability," Gov't Br. 55 (citing *Hawaii*, 585 U.S. at 683), but the Supreme Court "assume[d] without deciding that plaintiffs' *statutory* claims [were] reviewable, notwithstanding consular nonreviewability," *Hawaii*, 585 U.S. at 683 (emphasis added).

430 U.S. at 790 & n.3. Finally, the Government points to a lone out-of-circuit case, *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), as evidence of *Mandel*'s broader reach. Gov't Br. 56. But the Supreme Court never reviewed *Rajah* or "endorsed" its rationale, as the Government suggests. *Id.* Instead, the *Hawaii* Court cited *Rajah* in rejecting the dissent's position that *Mandel* applies only to individual—as opposed to "categorical"—exclusion decisions. *See Hawaii*, 585 U.S. at 703–04; *Rajah*, 544 F.3d at 438–39 (rejecting equal protection challenge to deportation orders stemming from nationality-based special registration requirement).

*Hawaii* is inapposite here for another reason, too. There, the President had acted in accordance with a statutory provision concerning exclusion criteria that "exudes deference . . . in every clause," "vest[ing] the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Hawaii*, 585 U.S. at 684 (citation omitted). Here, Congress clearly limited the Secretary's discretion, as the district court recognized. JA353; *see also, e.g.*, *Cook Cnty., Ill. v. Wolf*, 461 F. Supp. 3d 779, 788–89 (N.D. Ill. 2020) (distinguishing *Hawaii* on this basis). And Congress did so in statutory provisions that do not establish exclusion criteria. *See* Pls.' Br. A1–2.

### B. This Court should not extend the *Mandel–Hawaii* line of cases here.

This Court should reject the Government's attempt to extend deferential review under the *Mandel–Hawaii* line of cases to all government actions that

"implicate[] immigration, diplomacy, and national-security questions." Gov't Br. 46; *see id.* at 48.

*First*, the Government seeks to extend *Hawaii* beyond its context by invoking its reference to "national security concerns." Gov't Br. 50 (citing *Hawaii*, 585 U.S. at 706). But "national-security concerns" are not a "talisman used to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). Whereas in *Hawaii* the Government put forward "persuasive evidence that the entry suspension has a legitimate grounding in national security concerns," *Hawaii*, 585 U.S. at 706; *see id.* at 707, here the Government offers only conclusory assertions, *see, e.g.*, Gov't Br. 5–6 (arguing transnational criminal organizations "depend on . . . fraudulently obtained documents, such as . . . visas," (citation omitted)); *id.* at 42 ("[t]here is no disputing" this information "could be used to detect fraud" or "threats to security");[14] *cf. Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (rejecting equal protection challenge to registration requirements for certain Iranian nationals based on Attorney General affidavit stating the requirements were "a fundamental element of the President's efforts to resolve the Iranian [hostage] crisis") (*cited in* Gov't Br. 51).

---

[14] Even administration officials have acknowledged that the Disclosure Requirement has "yet to help identify terrorists among visa applicants." Charlie Savage, *Visa Applicants' Social Media Data Doesn't Help Screen for Terrorism, Documents Show*, N.Y. Times (Oct. 5, 2023), https://perma.cc/4MAG-HDKS.

*Second*, the Government seeks to extend deferential review to all mandatory aspects of the visa application process by characterizing them as substantive. Gov't Br. 57. The Government's argument rests on the tautology that "an applicant cannot obtain a visa without complying with" those mandatory requirements, including the Disclosure Requirement. *Id.* But this theory collapses the distinction between substantive and procedural requirements. Is an application fee requirement also a substantive requirement? *See* U.S. Dep't of State, Bureau of Consular Affs., *Fees for Visa Services*, Travel.State.Gov, https://perma.cc/9MCS-GEZV (last visited Apr. 15, 2024). Plainly not, but it would qualify as a substantive requirement under the Government's theory—which, if accepted, would insulate a broad swath of statutory law from meaningful judicial review.[15] *See Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) ("[T]he Constitution meaningfully limits non-substantive immigration laws and does not require special deference to the Government."); *see also Abourezk*, 785 F.2d at 1061.

## Conclusion

For the foregoing reasons, this Court should reverse the district court's decision and remand the case for further proceedings.

---

[15] The Government fares no better calling the Disclosure Requirement a "condition of entry," Gov't Br. 57; *see id.* at 49, as Plaintiffs explained in their opening brief, *see* Pls.' Br. 38–39.

27

Dated: April 19, 2024

Respectfully submitted,

 /s/ *Faiza Patel*

Faiza Patel
Emile Ayoub
Brennan Center for Justice at NYU
    School of Law[16]
120 Broadway, Suite 1750
    New York, NY 10271
patelf@brennan.law.nyu.edu
(646) 292-8310

 /s/ *Caroline DeCell*

Caroline DeCell
Jameel Jaffer
Katherine Fallow
Anna Diakun
Hannah Vester
Knight First Amendment Institute
    at Columbia University
475 Riverside Drive, Suite 302–304
New York, NY 10115
carrie.decell@knightcolumbia.org
(646) 745-8500

 /s/ *Rachel Levinson-Waldman*

Rachel Levinson-Waldman
Brennan Center for Justice at NYU
    School of Law
1140 Connecticut Avenue, NW
11th Floor, Suite 1150
    Washington, D.C. 20036
levinsonr@brennan.law.nyu.edu
(202) 249-7190

 /s/ *Joshua Polster*

Joshua Polster
Evan Gilbert
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
joshua.polster@stblaw.com
(212) 455-2000

*Counsel for Appellants*

---

[16] This brief does not purport to convey the position, if any, of the New York University School of Law.

## Certificate of Compliance

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as calculated by the word-counting function.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 19, 2024

                                */s/ Joshua Polster*
                                Joshua Polster

**Certificate of Service**

I, Joshua Polster, certify that on April 19, 2024, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 19, 2024

/s/ *Joshua Polster*

Joshua Polster

**ADDENDUM**

**Table of Contents**

**Page**

8 U.S.C. § 1101(a)(15)(I)..................................................................... A-1

8 U.S.C. § 1101(a)(15)(J) .................................................................... A-2

8 U.S.C. § 1101(a)(15)(O)(i) ............................................................... A-3

8 U.S.C. § 1202(a) .............................................................................. A-4

8 U.S.C. § 1202(c) .............................................................................. A-5

**8 U.S.C. § 1101(a)(15)(I)**

§ 1101. Definitions

(a) As used in this Act—

. . . .

    (15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

    . . . .

        (I) upon a basis of reciprocity, an alien who is a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation, and the spouse and children of such a representative, if accompanying or following to join him;

. . . .

**8 U.S.C. § 1101(a)(15)(J)**

§ 1101. Definitions

(a) As used in this Act—

. . . .

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

. . . .

(J) an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training and who, if he is coming to the United States to participate in a program under which he will receive graduate medical education or training, also meets the requirements of section 212(j) of this title, and the alien spouse and minor children of any such alien if accompanying him or following to join him;

. . . .

**8 U.S.C. § 1101(a)(15)(O)(i)**

§ 1101. Definitions

(a) As used in this Act—

. . . .

    (15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

. . . .

        (O) an alien who—

            (i) has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim or, with regard to motion picture and television productions a demonstrated record of extraordinary achievement, and whose achievements have been recognized in the field through extensive documentation, and seeks to enter the United States to continue work in the area of extraordinary ability;

. . . .

**8 U.S.C. § 1202(a)**

§ 1202. Application for visas

**(a) Immigrant visas**

Every alien applying for an immigrant visa and for alien registration shall make application therefor in such form and manner and at such place as shall be by regulations prescribed. In the application the alien shall state his full and true name, and any other name which he has used or by which he has been known; age and sex; the date and place of his birth; and such additional information necessary to the identification of the applicant and the enforcement of the immigration and nationality laws as may be by regulations prescribed.

. . . .

**8 U.S.C. § 1202(c)**

§ 1202. Application for visas

. . . .

**(c) Nonimmigrant visas; nonimmigrant registration; form, manner and contents of application**

Every alien applying for a nonimmigrant visa and for alien registration shall make application therefor in such form and manner as shall be by regulations prescribed. In the application the alien shall state his full and true name, the date and place of birth, his nationality, the purpose and length of his intended stay in the United States; his marital status; and such additional information necessary to the identification of the applicant, the determination of his eligibility for a nonimmigrant visa, and the enforcement of the immigration and nationality laws as may be by regulations prescribed. The alien shall provide complete and accurate information in response to any request for information contained in the application. At the discretion of the Secretary of State, application forms for the various classes of nonimmigrant admissions described in section 1101(a)(15) of this title may vary according to the class of visa being requested.

. . . .