# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 13, 2024          Decided June 27, 2025

No. 23-5232

DOC SOCIETY AND INTERNATIONAL DOCUMENTARY
ASSOCIATION,
APPELLANTS

v.

MARCO RUBIO, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
DEPARTMENT OF STATE AND KRISTI NOEM, IN HER OFFICIAL
CAPACITY AS SECRETARY OF HOMELAND SECURITY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03632)

———

*Carrie DeCell* argued the cause for appellants. With her
on the briefs were *Jameel Jaffer*, *Katie Fallow*, *Anna Diakun*,
*Joshua Polster*, and *Rachel Levinson-Waldman*.

*Sophia Cope* was on the brief for *amicus curiae* Electronic
Frontier Foundation in support of appellants.

2

*Simon C. Brewer*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Daniel Tenny* and *Nicholas S. Crown*, Attorneys.

Before: WALKER, CHILDS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: Under the Immigration and Nationality Act, the Secretary of State may require that applicants for immigrant and non-immigrant visas provide information needed to confirm their identity and to enforce the immigration and nationality laws. Pursuant to that authority, the Secretary has adopted a policy (the "social media policy") that requires visa applicants to disclose information relating to their activities on social media platforms.

Plaintiffs Doc Society and International Documentary Association (IDA)—two organizations that promote documentary filmmaking around the world—challenge the social media policy as violating the First Amendment and the Administrative Procedure Act. Plaintiffs assert that they have organizational standing to bring these claims because the social media policy impedes their core activities. IDA additionally asserts associational standing, on behalf of members allegedly injured by the policy.

Even assuming that Plaintiffs have identified cognizable injuries-in-fact traceable to the social media policy, they have not adequately alleged that a favorable outcome in this action would likely redress their claimed injuries. Accordingly, Plaintiffs lack standing to bring their claims. We therefore reverse the district court's determination that Plaintiffs have

3

standing, vacate the remainder of the district court's order, and remand for further proceedings.

## I.

### A.

To be admitted to the United States, non-citizens generally must hold a visa.  8 U.S.C. §§ 1181(a), 1182(a)(7).  To secure a visa, non-citizens must file a "proper application" before a U.S. consular officer.  *Id*. § 1201(a)(1)(A), (B).  A visa application may ask non-citizens to disclose their name, age, sex, date and place of birth, as well as "such additional information necessary" for "the enforcement of the immigration and nationality laws as may be by regulations prescribed." *Id*. § 1202(a) (immigrant visas); *see id*. § 1202(c) (non-immigrant visas).  After completing the relevant forms, visa applicants are typically interviewed by a consular officer.  *Id.* § 1202(e), (h); 22 C.F.R. §§ 40.1(*l*)(2), 41.102, 42.62.  A consular officer may then require that visa applicants provide additional information if the consular officer believes that the information provided in the application is inadequate to establish the applicant's eligibility. 22 C.F.R. §§ 41.103(b)(2), 42.63(c).

In 2019, the State Department adopted a social media policy for visas.  Applicants are now required to disclose on their written visa applications any usernames, handles, and other identifying information associated with accounts they have used over the last five years to access social media platforms, including Facebook, Instagram, LinkedIn, and YouTube.  The policy makes no exception for disclosure of pseudonyms or usernames created for anonymous use.

### B.

4

Plaintiffs are two documentary film organizations that work with filmmakers and other partners in the United States and around the world. Doc Society is a non-profit organization that supports documentary filmmakers. IDA is a membership-based association of documentary filmmakers. Doc Society's partners and IDA's members (collectively "Plaintiffs' partners and members") include non-U.S. citizens who intend to apply or re-apply for visas, as well as U.S. citizens who benefit from collaboration with non-citizens.

## C.

Plaintiffs bring this action to challenge the social media policy, claiming that it exceeds the Secretary's statutory authority, that it is arbitrary and capricious agency action, and that it violates First Amendment rights to speech and association. Plaintiffs seek declaratory and injunctive relief and expungement of all information collected as a result of the social media policy. The Government moved to dismiss the complaint, arguing that Plaintiffs lacked standing and failed to state a claim. The district court found that Plaintiffs sufficiently alleged organizational standing, but that they failed to state a claim under the First Amendment or the Administrative Procedure Act. The district court then dismissed the complaint with prejudice. We have jurisdiction to consider Plaintiffs' timely appeal of the district court's final order. 28 U.S.C. § 1291.

## II.

"We begin—and end—with standing." *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). "We review the district court's standing determinations *de novo.*" *Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016). "To satisfy the

5

requirements of Article III standing in a case challenging government action, a party must allege an injury in fact that is fairly traceable to the challenged government action, and 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations and citation omitted)). On this complaint, Plaintiffs do not adequately allege that a favorable decision vacating the social media policy is likely to redress their claimed injuries, and they therefore lack standing to pursue this action.

## A.

We first consider Plaintiffs' assertion of organizational standing. To establish organizational standing, Plaintiffs must have suffered a "concrete and demonstrable injury to the organization's activities." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quotations and citation omitted). The district court concluded that Plaintiffs had organizational standing, as they had: (1) "alleged a cognizable injury-in-fact because they have been deprived of information on which their regular activities rely"; (2) "[t]hat injury is traceable to [the Government's] conduct because the informational vacuum was caused by [the social media policy]; and (3) "an order vacating the [social media policy] would restore the desired information." J.A. 341–42. But even assuming that the district court is correct that Plaintiffs have identified a cognizable injury-in-fact that is traceable to the social media policy, Plaintiffs have not adequately alleged that a favorable outcome would redress their claimed injuries.

"Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate

6

the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (en banc). Plaintiffs identify two injuries-in-fact in support of organizational standing. Principally, plaintiffs claim an informational injury because the policy has deterred their partners and members from using social media to share information that Plaintiffs require to fulfill their work promoting documentary filmmaking. In the alternative, they allege that the policy burdens their rights to associate and to exchange information, because it deters their partners and members from using social media to discuss documentary filmmaking and from traveling to relevant events in the United States. To survive a motion to dismiss, Plaintiffs' "factual allegations [or] their logic" must show that a favorable outcome would redress these injuries. *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007).

Plaintiffs, however, offer no specific allegations that their partners and members are more likely to return to their prior use of social media or to reconsider their willingness to travel to the United States if the social media policy were vacated. Plaintiffs acknowledge that, on a case-by-case basis, consular officers may require that visa applicants disclose their social media information during visa applicant interviews. *See* 22 C.F.R. §§ 41.103(b)(2), 42.63(c); Pl's Br. 12–13. Visa applicants may feel equally compelled to limit their use of social media by the *possibility* of being asked to produce their social media information at a consular interview as by the *certainty* that they will be required to do so by a blanket policy. Or they may not. Because the complaint makes no specific allegations either way, we do not know how Plaintiffs' partners and members may weigh these comparative risks. And, by extension, we do not know the impact their partners and

7

members' perception of these comparative risks will have on Plaintiffs' organizational goals and activities.

To show their claimed injuries are redressable, Plaintiffs rely primarily on allegations regarding traceability. Typically, plaintiffs may rely on logical inferences from traceability to establish redressability, as traceability and redressability "overlap as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997); *see also Carpenter Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) ("[I]f a government action causes an injury, enjoining the action usually will redress the injury."). Plaintiffs state that their partners and members were deterred from engaging on social media or traveling to events in the United States by the social media policy, because they knew that "their speech and associations [would] be subject to review in connection with their visa applications," and they "fear[ed] that their political speech and associations on social media may subject them to additional scrutiny and delays in the processing of their visa applications." Compl. ¶ 54, J.A. 31. The district court concluded that "[t]he most logical inference from those allegations" of traceability was that a favorable outcome would restore the willingness of Plaintiffs' partners and members to use social media platforms and, by extension, provide Plaintiffs with the information they need for their operations. J.A. 348.

Nevertheless, redressability cannot always be logically inferred from traceability. "There might be some circumstances in which governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm." *Renal Physicians*, 489 F.3d at 1278; *cf. Murthy*, 603 U.S. at 73–74 (noting that enjoining the Government defendants may or may not affect third-party decisions that led to alleged injuries). Since a consular officer may still scrutinize a visa

8

applicant's social media activities even if the social media policy were vacated, it cannot be logically inferred that Plaintiffs' injuries would be redressed by a favorable decision in this case. Because they cannot rely on a logical inference from traceability to establish redressability, Plaintiffs necessarily have to provide more specific allegations.[1]  They have not done so on this complaint.  Accordingly, Plaintiffs lack organizational standing.

**B.**

We next consider IDA's assertion of associational standing.  Having found that both Plaintiffs had organizational standing, the district court did not consider whether IDA alone had associational standing.  Nonetheless, because we have "an independent obligation to assure that standing exists," *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009), we consider all of Plaintiffs' assertions of standing, including those "the district court did not reach," *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 289 n. 7 (D.C. Cir. 2024).  An organization can assert associational standing on behalf of its members if, as

---

[1] At oral argument, Plaintiffs identified *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), as their best support for redressability, Oral Arg. Tr. at 29:21–30:7. But Plaintiffs' reliance on *Bonta* is misplaced.  *Bonta* concerned a blanket regulation requiring charities to identify their donors, even though state investigators could obtain the same information through a targeted investigation. *Id.* at 602–03.  *Bonta* does not concern standing, and it discusses alternatives to the regulation only when asking whether the regulation was narrowly tailored for purposes of the First Amendment challenge.  *Id.* at 613–15; *see also In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008) ("It is a well-established rule that cases in which jurisdiction is assumed *sub silentio* are not binding authority for the proposition that jurisdiction exists.") (quotations and citation omitted).

9

relevant here, "at least one of its members has standing," having sufficiently alleged injury-in-fact, traceability, and redressability. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019).

IDA contends that at least one of its members has been injured by the social media policy. IDA states that the social media policy has chilled the speech of "one IDA member currently residing in the U.S. Midwest," who "reviewed three years of social media activity and deleted posts criticizing the [then-]current U.S. administration." Compl. ¶ 55, J.A. 31–32. IDA also states that a member decided against applying for a visa because of the social media policy, and that another "has decided not to accept future work in the United States." *Id*. ¶ 56, J.A. 32. More generally, IDA adds that the social media policy injures U.S.-citizen members by deterring IDA's non-citizen members from engaging with IDA online and from applying for visas to travel to IDA-sponsored events.[2] Even if IDA has adequately alleged that individual members have suffered a cognizable injury-in-fact because of the social media policy, IDA has not sufficiently alleged that such injuries will likely be redressed by a favorable decision vacating the policy.

---

[2] IDA also suggests a First Amendment injury to support associational standing based on the alleged deprivation of a non-citizen member's right to anonymous speech and free association. This injury, Plaintiffs appear to suggest, was based on a direct harm suffered by a party subject to the social media policy and was not based on the chilling effect of the social media policy. But Plaintiffs fail to provide specific allegations as to the nature of the injury or how it would be redressed, and we will not "put flesh on [the] bones" of an argument raised "only in the most skeletal way." *Gov't of Manitoba v. Bernhart*, 923 F.3d 173, 179 (D.C. Cir. 2019) (cleaned up).

10

IDA makes no specific allegations regarding redressability. IDA suggests these individual members would return to their online activities or would reconsider their willingness to travel to the United States if the social media policy were vacated, because they changed their behavior in response to the policy. As with organizational standing, however, the complaint fails to address the likelihood that these injured members may remain unwilling to engage on social media or to travel to the United States because of the possibility that a consular officer could request their social media information upon applying for a visa. Without more, IDA has failed to allege its members' injuries are redressable.

**III.**

For the foregoing reasons, on this complaint, Plaintiffs lack organizational and associational standing. Accordingly, we reverse the district court's determination that it had jurisdiction to hear Plaintiffs' claims as to the merits, vacate the remainder of the district court's order, and remand for further proceedings, including whether Plaintiffs should be granted leave to amend their complaint.

*So ordered.*